# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### GREENVILLE DIVISION

FILED

2007 AUG 27 P 1: 39

U.S. DISTRICT COURT
EASTERN DIST. TENN.

| | |
|---|---|
| SCOTT DAIRY FARM, INC. | ) |
| 2665 Fairview Parkway | ) |
| Wytheville, VA 24382 | ) |
| | ) |
| WILLIAM H. PRICE | ) Case No. 2:07-cv-208 |
| 239 Rice Road | ) Judge Greer |
| Marion, VA 24354 | ) COMPLAINT – Class Action |
| | ) |
| HIGHLAND DAIRY FARM, LLP | ) Jury Trial Demanded |
| 12394 Kilmachronan Drive | ) |
| Glade Springs, VA 24340 | ) |
| | ) |
| JEFF WHATLEY | ) |
| 2351 US Highway 31 S. | ) |
| Hanceville, AL 35077 | ) |
| | ) |
| ROBERT D. STOOTS | ) |
| 539 Sheffy School Road | ) |
| Max Meadows, VA 24360 | ) |
| | ) |
| On Behalf of Themselves and All | ) |
| Others Similarly Situated, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DEAN FOODS COMPANY | ) |
| 2515 McKinney Avenue, Suite 1200 | ) |
| Dallas, TX 75201 | ) |
| | ) |
| NATIONAL DAIRY HOLDINGS, L.P. | ) |
| 3811 Turtle Creek Boulevard, Suite 1300 | ) |
| Dallas, TX 75219 | ) |
| | ) |
| DAIRY FARMERS OF AMERICA, INC. | ) |
| 10220 North Ambassador Drive | ) |
| Kansas City, MO 64153 | ) |
| | ) |
| MID-AM CAPITAL LLC | ) |
| 10220 North Ambassador Drive | ) |
| Kansas City, MO 64153 | ) |

| | |
|---|---|
| **DAIRY MARKETING SERVICES, LLC** | ) |
| **5001 Brittonfield Parkway** | ) |
| **Syracuse, NY 13221** | ) |
| **and** | ) |
| | ) |
| **SOUTHERN MARKETING AGENCY, INC.** | ) |
| **13002 Honeysuckle Way** | ) |
| **Prospect, KY 40059** | ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT

Plaintiffs Scott Dairy Farm, Inc., William H. Price, Highland Dairy Farm, Jeff

Whatley and Robert D. Stoots (collectively referred to as "Plaintiffs"), by and through counsel,

file this action both on behalf of themselves and as a Class Action pursuant to Rule 23 of the

Federal Rules of Civil Procedure against Defendants Dean Foods Company ("Dean"), National

Dairy Holdings, L.P. ("NDH"), Dairy Farmers of America, Inc. ("DFA"), Mid-Am Capital LLC

("MID AM"), Dairy Marketing Services, LLC ("DMS") and Southern Marketing Agency, Inc.

("SMA") (collectively referred to as "Defendants"). Plaintiffs seek treble damages and

injunctive relief for Defendants' violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§

1 and 2). Plaintiffs complain and allege as follows:

## NATURE OF THE CASE

1. This is an antitrust case arising out of a combination and conspiracy among

Defendants to refuse to compete for the purchase of raw Grade A milk ("Grade A milk")

produced, marketed, and processed in the Southeast United States with the purpose and effect of

fixing, stabilizing, and maintaining prices paid to independent dairy farmers for Grade A milk,

foreclosing independent dairy farmers' access to fluid Grade A milk bottling plants, eliminating

and stifling competition from independent fluid Grade A milk bottlers, and otherwise anti-

competitively reducing the price paid by Defendants for Grade A milk purchased from Plaintiffs and other members of the class.

2. Defendants, and their unnamed co-conspirators carried out their conspiracy through a series of unlawful activities including, but not limited to:

   a. implementing long-term, full-supply agreements between Defendants and co-conspirators in order to control Southeast dairy farmers' access to fluid Grade A milk bottling plants;

   b. requiring independent dairy farmers that were previously free of DFA's control, to market their Grade A milk through marketing entities owned in whole, or part, by DFA in order to gain access to fluid Grade A milk bottling plants;

   c. threatening to cut off and cutting off independent dairy farmers' access to fluid Grade A milk bottling plants;

   d. boycotting independent dairy farmers and fluid Grade A milk bottlers;

   e. fixing, depressing and/or stabilizing prices for Grade A milk paid to Southeast dairy farmers;

   f. utilizing marketing entities to monitor prices for Grade A milk paid to independent dairy farmers;

   g. "punishing" independent dairy farmers and fluid Grade A milk bottlers that do not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive outlets for Southeast dairy farmers' Grade A milk; and

   h. purchasing fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers and fluid Grade A milk bottlers.

3. Defendants' conspiracy enables them to enjoy the economic benefits that flow from conspiring to operate an unlawful cartel that refuses to compete for the purchase of Grade A milk, forecloses access to fluid Grade A milk bottling plants and processors, and fixes prices for Grade A milk paid to Southeast dairy farmers. Dean, NDH, and DFA each can pay stabilized and artificially low prices to Southeast dairy farmers with the comfort of knowing that its horizontal competitors are paying the same price -- because DFA affiliated marketing entities such as SMA, DMS, and other co-conspirators are there to ensure compliance.

4. Plaintiffs are independent dairy farmers (defined herein as "dairy farmers who are not current members of DFA") and produce Grade A milk in the Southeast for sale in the Southeast, either alone or as members of independent cooperatives which act as Plaintiffs' agents in the sale of their milk, and who are denied free and unrestrained access to Southeast fluid Grade A milk bottling plants by Defendants' conspiracy. Plaintiffs and the other similarly situated Southeast dairy farmers are all direct victims of Defendants' conspiracy to artificially depress prices for Grade A milk paid to dairy farmers.

5. Plaintiffs bring this class action pursuant to Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure ("Rule 23"), on behalf of themselves and other Southeast dairy farmers, under Sections 1 and 2 of the Sherman Act of 1890 (the "Sherman Act"), 15 U.S.C. §§ 1 and 2, for which Defendants are jointly and severally liable. Specifically, the "Class" is defined as:

> All independent dairy farmers (whether individuals or entities)
> who produced Grade A milk within Orders 5 or 7, and sold Grade
> A milk directly or through an agent to Defendants or their co-
> conspirators in Orders 5 or 7 during any time from January 1, 2001
> to the present. The following persons are excluded from the class:
> (a) Defendants; and (b) Defendants' co-conspirators.

6.      This action seeks to enjoin Defendants' unlawful conduct and to recover treble damages, costs, expenses, as well as attorneys' fees and disbursements, along with such additional and further relief as may be deemed just and proper.

## JURISDICTION VENUE AND INTERSTATE COMMERCE

7.      This action is brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.

8.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26.

9.      This Court has personal jurisdiction over Dean, NDH, DFA, MID AM, DMS and SMA because they systematically and continuously transact substantial business in the United States and in Tennessee.

10.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 28 1391 because Defendants inhabit, transact business, reside, are found or have an agent in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

11.     Defendant Dean purchases, processes and ships Grade A milk across state lines. Defendant DFA markets, processes and ships Grade A milk across state lines. Defendant NDH purchases, processes and ships Grade A milk across state lines.

12.     All Defendants receive substantial payments across state lines from the sale of Grade A milk. Defendants' business activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate trade and commerce.

## PARTIES

13.     Plaintiff Scott Dairy Farm, Inc. ("Scott") is a general partnership organized and existing under the laws of Virginia with its principal place of business at 2665 Fairview

Parkway, Wytheville, VA 24382. Scott is an independent producer; it currently milks approximately 80 cows. During times relevant to this Complaint, Scott has sold Grade A milk to Defendants or their co-conspirators in Orders 5 and 7.

14.    Plaintiff William H. Price ("Price") is an individual who owns a dairy farm located at 239 Rice Road, Marion, VA 24354 that does business as Shady Lane Farms. Price is an independent producer that currently milks approximately 150 cows. Whatley was a member of DFA until approximately April, 2006. During times relevant to this Complaint, Whatley has sold Grade A milk to Defendants or their co-conspirators in Orders 5 and 7.

15.    Plaintiff Highland Dairy, L.L.P. ("Highland") is a limited liability partnership organized under the laws of Virginia with its principal place of business at 12394 Kilmachronan Drive, Glade Springs, VA 24340. Highland is an independent producer that currently milks approximately 250 cows. During times relevant to this Complaint, Highland has sold Grade A milk to Defendants or their co-conspirators in Orders 5 and 7.

16.    Plaintiff Jeff Whatley ("Whatley") is an individual who owns a dairy farm located at 3251 US Highway 31 S., Hanceville, Alabama that does business as Jeff Whatley & Sons Dairy. Whatley is an independent producer that currently milks approximately 150 cows. During times relevant to this Complaint, Price has sold Grade A milk to Defendants or their co-conspirators in Orders 5 and 7.

17.    Plaintiff Robert D. Stoots ("Stoots") is an individual who owns a dairy farm located at 539 Sheffy School Road, Max Meadows, VA 24360. Stoots is an independent producer that currently milks approximately 55 cows. During times relevant to this Complaint, Highland has sold Grade A milk to Defendants or their co-conspirators in Orders 5 and 7.

18. Defendant Dean is a for-profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2515 McKinney Avenue, Suite 1200, Dallas, Texas 75201. Dean owns at least 17 fluid Grade A milk bottling plants in the Southeast and is the largest fluid Grade A milk bottler in the Southeast.

19. Defendant NDH is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business at 3811 Turtle Creek Boulevard, Suite 1300, Dallas, Texas, 75219. NDH is owned 50 percent by DFA and 50 percent by Allen Meyer. NDH owns at least nine fluid Grade A milk bottling plants in the Southeast and is the second largest fluid Grade A milk bottler in the Southeast.

20. Defendant DFA is a not-for-profit corporation organized and existing under the laws of the State of Kansas with its principal place of business at 10220 North Ambassador Drive, Kansas City, Missouri 64153, and with its Southeast Council headquarters located at 10411 Cogdill Road, Knoxville, Tennessee 37932. DFA controls approximately 90 percent of the Grade A milk produced in the Southeast. DFA is a vertically integrated cooperative that controls not only Grade A milk production, but also marketing, hauling, processing, bottling and distribution of Grade A milk in the Southeast. DFA owns and operates its own hauling companies, processing plants and distribution centers that are necessary to deliver Grade A milk from the farmer producer to the grocery stores. In the Southeast, DFA fully or partially owns at least eight fluid Grade A milk bottling plants (not including NDH), and is the third largest fluid Grade A milk bottler in the Southeast.

21. Defendant MID AM is a limited liability corporation organized and existing under the laws of the State of Delaware with its principal place of business at 10220 North Ambassador Drive, Kansas City, Missouri 64153. MID AM, a subsidiary of DFA, was formed by DFA and

co-conspirators to provide capital to and make equity investments in dairy processing and bottling operations.

22.     Defendant DMS is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 5001 Brittonfield Parkway, Syracuse, New York 13221, and with its Southeast regional office located at 10411 Cogdill Road, Knoxville, Tennessee 37932.

23.     Defendant SMA is a not-for-profit corporation organized and existing under the laws of the Commonwealth of Kentucky with its principal place of business at 13002 Honeysuckle Way, Prospect, Kentucky 40059.

## UNNAMED CO-CONSPIRATORS

24.     At all relevant times, other milk marketers, milk purchasers, milk processors, or other entities, referred to herein as "co-conspirators," as well as various other persons, companies, and corporations, the identities of which are presently unknown, willingly conspired with Defendants in their unlawful restraint of trade as described herein.

25.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

26.     All averments herein against any named Defendant are also averred against these unnamed co-conspirators as though set forth at length.

## AGENTS

27. The acts charged in this Complaint as having been done by Defendants and their Co-conspirators were authorized, ordered, and/or done by their officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

## BACKGROUND AND OVERVIEW OF THE RELEVANT GEOGRAPHIC AND PRODUCT MARKETS

28. Milk from farms is processed into many different dairy products before it reaches the consumer. Fluid milk sales account for 30% of total U.S. milk consumption. Butter accounts for 6% and nonfat dry milk, 4%, of the milk consumed in the country. Almost half of the milk consumed in the U.S. is consumed in the form of cheese. Frozen products account for 7% of U.S. dairy consumption. In 2003, the U.S. produced 170 billion pounds of milk. This is equivalent to 19.7 billion gallons. Each year, the U.S. produces over 1 billion pounds of butter, more than 7 billion pounds of cheese, over 1 billion pounds of nonfat dry milk, 1.5 billion pounds of yogurt, and about 1 billion gallons of ice cream.

29. Grade A milk refers to milk produced under sufficiently sanitary conditions to permit its use as fluid milk. About 90% of the milk produced in the United States is Grade A milk. Grade B milk is produced under conditions that make it acceptable only for manufactured products such as certain cheeses, where it undergoes further processing. Grade A milk is highly perishable. It is produced on a daily basis and must be transported from farms to fluid Grade A milk bottlers nearly every day. Fluid Grade A milk bottling plants prepare Grade A milk for human consumption by packaging the milk in bottles or cartons for wholesale or retail sale. Grade A milk is regularly shipped and sold in interstate commerce.

30. Each month USDA's milk market administrators calculate minimum prices pursuant to USDA formulae for each of the four classes of Grade A milk marketed in each of the geographic regions, known as Federal Milk Market Orders ("FMMO" or "Orders"). Currently, there are 10 Orders. This Complaint is concerned with the Grade A milk bottling market in Orders 5 and 7. Order 5 is referred to as the "Southeast" Order and Order 7 is referred to as the "Appalachian" Order. Throughout this Complaint, both Orders are commonly referred to as the "Southeast."

31. The relevant geographic market is the Southeast United States. The Southeast market consists of Order 7 -- covering Alabama, Arkansas, Mississippi, Louisiana, and parts of Florida, Georgia, Kentucky, Missouri, and Tennessee, and Order 5 -- covering North Carolina, South Carolina, and portions of Georgia, Indiana, Kentucky, Tennessee, Virginia, and West Virginia.

32. Order 7 covers 318,189 square miles and contains 3,330 producers.

33. Order 5 covers 133,009 square miles and contains 3,027 producers.

34. DFA, which is also organized by geographic marketing areas, operates a marketing area designated as the "Southeast Council" which consists of the same general geographic areas as Orders 5 and 7.

35. Elvin Hollon, DFA's Director of Fluid Marketing and Economic Analysis, testifying as an expert on behalf of SMA, described DFA's Southeast Area Council as "one market" and "a common milk market, commonly supplied."

36. Access to fluid Grade A milk bottling plants is necessary and essential to the economic viability of Southeast dairy farms.

## DAIRY FARMERS AND MILK BOTTLERS

37.    Dairy cooperatives are associations of dairy farmers who agree to collectively
market their Grade A milk and other dairy products and are generally owned, operated, and
controlled by their member farmers. Cooperatives act as agents for their member farmers and
typically "market" their farmers' Grade A milk, which usually consists of locating buyers;
negotiating sales prices, coordinating the hauling, performing the testing, recording and reporting
related data to milk market regulators, and paying member farmers for their Grade A milk.

38.    Not all dairy farmers are cooperative members. Some dairy farmers seek to
remain independent of cooperatives. These dairy farmers seek to market their Grade A milk to
fluid Grade A milk bottling plants by directly contracting with plants or through non-cooperative
agents and/or marketing associations.

39.    In an unrestrained market, fluid Grade A milk bottlers compete amongst each
other for the purchase of Grade A milk from both cooperative and non-cooperative independent
dairy farmers, thereby enabling independent dairy farmers such as Plaintiffs to obtain a price for
their Grade A milk that would reflect actual market conditions and help to sustain efficient Grade
A milk production in the Southeast.

40.    In addition, in an unrestrained market, the existence of such independent
cooperatives and non-cooperative farmers provide a competitive alternative to DFA. As shown
below, however, Defendants' conspiracy forced the majority of these previously independent
farmers to join or market through DFA-controlled entities or other co-conspirators as a
prerequisite to gaining access to fluid Grade A milk bottling plants in the Southeast. The purpose
and effect of Defendants' conspiracy has been to eliminate and/or stifle competition for the
purchase of Grade A milk in the Southeast and to fix and maintain the price paid for Grade A

milk and in the Southeast so as to exclude these independent dairy farmers as potential sources of competitive access for Southeast dairy farmers.

41. Defendants' illegal activities in the Southeast have eliminated competition by and between Defendants for the purchase of Grade A milk by fluid Grade A milk bottlers, forced independent dairy farmers to join DFA or to market their Grade A milk through DFA-controlled entities or other co-conspirators as a condition of access to fluid Grade A milk bottling plants in the Southeast, and in so doing eliminated competition and fixed at artificially low levels the prices for fluid Grade A milk that would otherwise exist in a competitive market.

## DEFENDANTS' DOMINANCE AND PREDATORY CONDUCT
### Overview

42. Beginning at least as early as January 1, 2001, Defendants began to implement their conspiracy to eliminate competition in the production, marketing and processing of Grade A milk in the Southeast by a series of carefully planned and collaborative steps. Defendants agreed to assist each other in securing control of the fluid Grade A milk bottling market in the Southeast. As part of the plan, Defendants secured for DFA and its affiliates control over access to fluid Grade A milk bottling plants in the Southeast by agreeing to grant DFA a series of "full-supply" agreements. Defendants then collaboratively used these full-supply agreements to force previously independent dairy farmers to join DFA or to market their Grade A milk through DFA-controlled entities in order to gain access to fluid Grade A milk bottling plants.

### Consolidation In The Industry

43. By the close of 2000, following nearly a decade of consolidation, and increasing interrelationships between fluid Grade A milk bottlers, DFA was the largest dairy cooperative in the United States and controlled more than 50 percent of the Grade A milk produced in the Southeast United States. In addition, DFA was the fourth largest processor in the United States

by virtue of its joint ventures, including but not limited to its 33.8 percent stake in Suiza, which at the time was the largest buyer and bottler of fluid Grade A milk in the United States. At the time, Dean was the second largest buyer and bottler of fluid Grade A milk in the United States.

44. In 2001, Dean and Suiza announced their plan to merge and to thereafter operate the merged company under the name Dean. Dean and Suiza anticipated antitrust concerns by U.S. Department of Justice ("DOJ") because they were the first and second largest fluid Grade A milk bottlers in the United States. Dean, Suiza and Co-conspirators agreed to address DOJ's concerns by divesting 11 of Dean's and Suiza's fluid Grade A milk bottling plants to NDH, and, at the same time, agreeing that Dean would buy out DFA's 33.8 percent stake in Suiza.

45. In connection with Dean's agreement to acquire DFA's 33.8 percent stake in Suiza, Dean issued to DFA a $40 million promissory note ("Note") which becomes due in 2021 in the amount of $96 million. Following the mergers and divestitures, Dean, NDH and DFA increased their shares of the fluid Grade A milk bottling market in the Southeast.

46. Following the Dean-Suiza merger, Dean, NDH, and DFA have continued to acquire fluid Grade A milk bottling plants for the purpose of increasing their dominance of the Southeast market, and, have acted to close down bottling plants and/or have refused to operate bottling plants with the purpose and effect of decreasing capacity and eliminating sources of access to bottling plants. Defendant DFA has acquired fluid Grade A milk bottling plants, in part, through its subsidiary, Defendant MID AM.

47. Dean currently operates 17 fluid Grade A milk bottling plants in the Southeast and, upon information and belief, controls approximately 60 percent of the fluid Grade A milk bottling capacity in the Southeast, making Dean the largest fluid Grade A milk bottler in the Southeast. NDH owns nine fluid Grade A milk bottling plants and is the second largest fluid

Grade A milk bottler in the Southeast. DFA fully or partially owns eight fluid Grade A milk bottling plants (not including NDH) and is the third largest fluid Grade A milk bottler in the Southeast. Collectively Defendants' cartel owns at least 33 of the approximately 51 USDA-regulated fluid Grade A milk bottling plants currently operating in the Southeast. These 33 plants, upon information and belief, represent approximately 77 percent of the fluid Grade A milk bottling capacity in the Southeast. DFA has full-supply agreements with -- and control over access to -- these 33 plants. In addition, because DFA also has full-supply agreements with other fluid Grade A milk bottlers and supermarkets that own eight other fluid Grade A milk bottling plants in the Southeast, DFA has full-supply agreements for Grade A milk supplied to at least 41 of the 51 fluid Grade A milk bottling plants in the Southeast. Other fluid Grade A milk bottling plants not locked into full-supply agreements with DFA do not purchase Grade A milk from dairy farmers, are not meaningful market participants, and/or purchase Grade A milk marketed by DFA-controlled entities, including SMA or DMS. Through DFA's full-supply agreements and its control of marketing entities, upon information and belief, Defendants control approximately 90 percent of the Grade A milk produced in the Southeast,.

48.     Dean, DFA, and NDH also control most of the balancing plants in the Southeast. Typically, Grade A milk balancing plants hold Grade A milk produced during weekends and holidays when fluid Grade A milk bottling plants are closed, and convert bulk supplies of surplus Grade A milk into storable products such as cheese and powdered milk. Balancing plants are essential due to weekly and seasonal variations in Grade A milk supply and demand. It would be impossible for an independent farmer or fluid Grade A milk bottling plant to enter the Southeast market without access to balancing plants controlled by DFA and Co-conspirators.

## Defendants' Full-Supply Agreements, Foreclosure, and Price Fixing

49. As part of Defendants' conspiracy, Dean and NDH agreed to enter into exclusive or full-supply agreements for Grade A milk with DFA despite the fact that both Dean and NDH knew that DFA did not have sufficient Grade A milk production of its own to satisfy the Dean full-supply agreement, much less both such agreements.

50. DFA's full-supply agreement with Dean, which consists of a series of 20 successive one-year agreements, grants DFA the exclusive right to supply the Grade A milk requirements of Dean's fluid Grade A milk bottling plants in the Southeast. Despite a DOJ consent decree prohibiting DFA from entering into supply agreements in excess of one year, Dean and DFA ensured that their full-supply agreement would be long-term by DFA agreeing to forgive the entire balance of the Note provided Dean renews each of the 20 full-supply agreements and by Dean agreeing to pay DFA liquidated damages of up to $96 million if Dean does not renew each of the 20 full-supply agreements.

51. Defendants, together with co-conspirators, collectively conspired to suppress and restrain competition in interstate commerce of Grade A milk produced, marketed and processed in the Southeast by jointly using these full-supply agreements as a way to unlawfully force other independent cooperatives needed to fulfill these agreements to join DFA or to market their Grade A milk through DFA-controlled entities in order to have access to the fluid Grade A milk bottling plants in the Southeast. Access to such plants is essential to independent dairy farmers.

52. The result of Defendants' agreement to refuse to compete for the purchase of Grade A milk, as described herein, has been to fix, stabilize and maintain prices paid by fluid Grade A milk bottlers to Southeast dairy farmers, and to artificially lower the price received by those dairy farmers.

53.     In addition, as part of Defendants' conspiracy, Dean reversed its historical practice of purchasing Grade A milk from independent dairy farmers, refused to generally deal directly with independent dairy farmers and forced these farmers to market their Grade A milk through DFA-controlled entities or other co-conspirators.

54.     In furtherance of the conspiracy, Dean, NDH ,DFA, and MID AM agreed that all Grade A milk supplied to Dean, NDH, and DFA's fluid Grade A milk bottling plants must be marketed by DFA or through other co-conspirators which are owned in whole, or part, by Defendants.

55.     Thus, DFA-controlled marketing entities, such as DMS and SMA, and other co-conspirators market nearly all of the Grade A milk produced and processed in the Southeast and can therefore monitor the prices paid to all dairy farmers by each of the processing Defendants -- Dean, NDH and DFA. This information is used to fix and stabilize over-order premiums (*i.e.*, the amount by which prices paid to Southeast dairy farmers exceed government-set prices) at levels lower than what would have prevailed in a competitive market. Defendants' actions had the purpose and effect of depressing over-order premium prices paid to Southeast dairy farmers and cooperative members. The arrangement established by Defendants likewise reduced the incentive for Dean, NDH, and DFA to compete for Southeast dairy farmers' Grade A milk by offering higher over-order premiums, to attract better and more efficient dairy farmers, or to retain dairy farmers who might otherwise sell to one of the other Defendants. As a result, Southeast dairy farmers have received over-order premium prices materially below what they would have received but for Defendants' anti-competitive conduct. In addition, Southeast dairy farmer members have been subjected to anti-competitive and unlawful fees and dues charged by

SMA and other co-conspirators for the sole benefit of the cartel and to the detriment of Southeast dairy farmers.

56.     In furtherance of the conspiracy, Defendants have also jointly sought to exclude, discipline, and punish the few remaining independent fluid Grade A milk bottlers and independent dairy farmers that have strived to resist complying with Defendants' conspiracy or have attempted to compete with Defendants in the Southeast. These acts by Defendants damage all dairy farmers by eliminating independent fluid Grade A milk bottlers and independent dairy farmers as sources of potential competition and access to fluid Grade A milk bottling plants.

57.     Having unlawfully obtained control of, and foreclosed access to, the Southeast fluid Grade A milk bottling market by other cooperatives and non-cooperative independent dairy farmers, DFA, in collaboration with Dean, NDH, DMS, SMA, MID AM, and Co-conspirators, used that control: (a) to fix, suppress, and maintain the prices that fluid Grade A milk bottlers in the Southeast pay for Grade A milk purchased from dairy farmers in the Southeast; (b) to ensure that no Defendant competes on price for Grade A milk produced in the Southeast; and (c) to make certain that Southeast dairy farmers have no viable alternative to the restrained market and fixed and stabilized prices for Grade A milk created by Defendants' conspiracy.

58.     By agreeing and requiring that all Grade A milk flow through DFA-controlled entities and co-conspirators to gain access to fluid Grade A milk bottling plants in the Southeast, Defendants created a mechanism by which each could exchange and monitor price information and thereby monitor compliance with their conspiracy to fix, depress and stabilize the prices paid to dairy farmers. This jointly enforced price-monitoring mechanism ensures that each Defendant can operate comfortable in the knowledge that it will not have competition on price for its most important input -- Grade A milk.

59. To further ensure compliance with the conspiracy, Dean, NDH, DFA and Co-conspirators require that DFA receive, process, and account for DFA-controlled marketing agencies' member cooperatives' monies from Grade A milk sales. This allows DFA to monitor Grade A milk sales by other Southeast cooperatives and independent farmers, and allows DFA to confirm that these sales are compliant with Defendants' conspiracy to control Grade A milk production, marketing and processing in the Southeast.

60. At all times relevant to the Complaint, Defendants and co-conspirators have employed common employees who enable Defendants to monitor and enforce compliance with their conspiracy.

61. As a direct and proximate result of the combination, conspiracy, and agreement as alleged herein, Plaintiffs and class members have been injured and have sustained damages in that the prices received for Grade A milk have been artificially reduced below levels they would have received but for Defendants' unlawful agreement to refuse to compete for the purchase of Grade A milk. Dean, NDH, and DFA have purchased many billions of pounds of Grade A milk at these artificially fixed and depressed prices. As a result of this conspiracy, Defendants and Co-conspirators have reaped many hundreds of millions of dollars of profits that would have otherwise been paid to Plaintiffs and class members for their Grade A milk.

## Concealment and Tolling

62. Throughout the relevant period, Defendants have affirmatively concealed from Plaintiffs and class members the unlawful combination, conspiracy and agreement among Defendants alleged herein. Upon information and belief, Defendants planned and implemented the conspiracy during non-public meetings, monitored and enforced the conspiracy in non-public meetings, agreed not to discuss or disclose the details of their conspiracy, and falsely represented

to Plaintiffs and class members that the prices they received for Grade A milk were fair and competitive.

63. Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives.

64. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, which they exercised, the unlawful conduct alleged herein at the time it occurred.

## CLASS ACTION ALLEGATIONS

65. Plaintiffs bring this class action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis.

Plaintiffs' proposed class is defined as:

> All independent dairy farmers (whether individuals or entities) who produced Grade A milk within Orders 5 or 7, and sold Grade A milk directly or through an agent to Defendants or their co-conspirators in Orders 5 or 7 during any time from January 1, 2001 to the present. The following persons are excluded from the class: (a) Defendants; and (b) Defendants' co-conspirators.

66. At all times relevant to this Complaint, there have been hundreds of independent dairy farmers in the Southeast. Members of the proposed class reside in 14 different states. The proposed class is so numerous that joinder of all its members is impracticable.

67. Plaintiffs are adequate representatives of the class, and Plaintiffs' interests do not conflict with the interests of the members of the proposed class. Plaintiffs are highly committed and determined to pursue this litigation. Plaintiffs possess considerable knowledge of the dairy business. They are eager and able to assist counsel in this matter. Plaintiffs have retained competent counsel experienced in the prosecution of complex litigation, class actions, and antitrust litigation.

68. Plaintiffs' claims are typical of the claims of proposed class members. Plaintiffs and proposed class members are independent dairy farmers who produced Grade A milk in the Southeast, and; sold milk directly to Defendants or co-conspirators in the Southeast. Both Plaintiffs and proposed class members have been injured by the same wrongful conduct of Defendants.

69. The questions of law or fact common to the members of the proposed class predominate over any questions affecting only individual members. These common questions include, but are not limited to, the following:

> a. Whether Defendants engaged in a conspiracy to fix, stabilize, maintain, and/or artificially lower the price paid to Southeast dairy farmers for Grade A milk;
>
> b. Whether Defendants engaged in a conspiracy to foreclose independent dairy farmers from access to fluid Grade A milk bottling plants in the Southeast;
>
> c. Whether, in furtherance of the conspiracy, Defendants entered into full-supply agreements to foreclose access by independant dairy farmers;
>
> d. Whether, in furtherance of the conspiracy, Defendants engaged in a group boycott of independent dairy farmers;
>
> e. Whether DFA, and or DFA and co-conspirators collectively, exercise monopoly power in the production and marketing of Grade A milk in the Southeast United States;
>
> f. Whether DFA, and or DFA and co-conspirators collectively, have abused their monopoly power;

g. Whether Dean, and/or Dean, DFA, and NDH collectively, have a monopsony in the purchase of Grade A milk in the Southeast United States;

h. Whether Dean, and/or Dean, DFA, and NDH collectively, have abused and/or misused their monopsony;

i. Whether Defendants conspired to monopolize and/or monopsonize and/or restrain interstate trade of Grade A milk produced and marketed in the Southeast;

j. Whether Defendants' conduct has violated the Sherman Act;

k. Whether Defendants caused injury to Plaintiffs and proposed class members under the Sherman Act; and

l. Whether Plaintiffs and proposed class members are entitled to: (1) an injunction prohibiting the continuation of Defendants' violations, and ordering such other and further injunctive relief as is necessary to restore competition; (2) a declaration of their eligibility to an award of damages and other monetary relief, including treble damages; (3) interest from the date they should have received all monies rightfully owed to the actual date of payment as a result of this lawsuit; and (4), attorneys' fees and costs and any other relief the Court deems just and reasonable.

70. A class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly situated persons to prosecute their claims in a single forum simultaneously and without unnecessary duplication and effort that would result from numerous individual actions.

71.     Individual litigation of the facts of hundreds of similar cases would unduly burden the courts. Individual litigation would further present a potential for inconsistent or contradictory judgments, and would increase the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties and provides the benefit of a single adjudication under the comprehensive supervision of a single court.

## COUNT I
## SHERMAN ACT SECTION 2 VIOLATION
## Conspiracy to Monopolize and Monopsonize

72.     Plaintiffs incorporate by reference paragraphs 1 through 71 as if fully alleged herein.

73.     At all times relevant to this Complaint, Defendants have willfully, knowingly and intentionally conspired among themselves with the specific intent to monopolize the production and marketing of Grade A milk in the Southeast, to monopsonize the market for purchasing Grade A milk in the Southeast, and thereby to depress, fix and stabilize the prices paid for Grade A milk produced in the Southeast and to ensure that all dairy farmers of such milk would be unable to market their Grade A milk except at prices that were fixed and artificially depressed by Defendants' conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

74.     In furtherance of the conspiracy, Defendants have committed one or more of the following overt acts: a) implementing long-term full-supply agreements between Defendants Dean, NDH, and DFA to control access of Southeast dairy farmers to fluid Grade A milk bottling plants; b) requiring independent dairy farmers, individuals and entities that were previously free of DFA's control, to market their Grade A milk through DFA-controlled entities or other co-conspirators to gain access to fluid Grade A milk bottling plants; c) threatening to cut off and

cutting off independent dairy farmers' access to fluid Grade A milk bottling plants; d) boycotting independent dairy farmers, cooperatives, and fluid Grade A milk bottlers; e) fixing, depressing and/or stabilizing prices paid to dairy farmers; f) utilizing DFA-controlled marketing entities and other co-conspirators to monitor prices for Grade A milk paid to independent dairy farmers and independent cooperative members; g) "punishing" independent dairy farmers and fluid Grade A milk bottlers that do not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers' Grade A milk; and h) purchasing fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers and fluid Grade A milk bottlers.

75.     The relevant product market is fluid Grade A milk, which has no substitutes - *i e*, Grade B milk cannot be used for Grade A purposes. The relevant geographic market is the Southeast United States, which is comprised of FMMO 5 and 7. Among other factors, the Southeast United States is the relevant geographic market based on the structure of the industry, Grade A milk being a perishable product, the high demand for Grade A milk in the Southeast market which is in chronic short supply, and the fact that dairy farmers in the Southeast cannot turn to fluid Grade A milk bottlers outside of the Southeast as a reasonable substitute. Collectively, Defendants enjoy monopsony, power over Grade A milk production and processing in the Southeast. Upon information and belief, Defendants control approximately 77 percent of the fluid Grade A milk bottling capacity in the Southeast; over 80 percent of the Grade A milk marketed in the Southeast; and approximately 90 percent of the Grade A milk produced in the Southeast.

76. As a direct and proximate result of Defendants' continuing violation of Section 2 of the Sherman Act, Plaintiffs and class members have suffered injury and damages in an amount to be proven at trial.

77. Plaintiffs, on behalf of themselves and other members of the class, seek money damages from Defendants for these violations. Such damages represent the additional amount Plaintiffs and other members of the class would have received for sales of Grade A milk in the absence of the violations alleged. Damages may be quantified on a class wide basis. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

78. Plaintiffs, on behalf of themselves and other members of the class, also seek injunctive relief. The violations set forth above, and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT II
## SHERMAN ACT SECTION 2 VIOLATION
### Unlawful Monopolization

79. Plaintiffs incorporate by reference paragraphs 1 through 71 as if fully alleged herein.

80. The relevant product market is the market for the purchase of fluid Grade A milk, which has no substitutes – *i.e.*, Grade B milk cannot be used for Grade A purposes. The relevant geographic market is the Southeast United States, which is comprised of FMMO 5 and 7. Among other factors, the Southeast United States is the relevant geographic market based on the structure of the industry, Grade A milk being a perishable product, the high demand for Grade A milk in the Southeast market which is in chronic short supply, and the fact that dairy farmers in the Southeast cannot turn to fluid Grade A milk bottlers outside of the Southeast as a reasonable substitute. DFA enjoys monopoly power over Grade A milk production and marketing in the

Southeast; DFA controls over 80 percent of the Grade A milk marketed in the Southeast; and approximately 90 percent of the Grade A milk produced in the Southeast.

81.     DFA possesses monopoly power in the marketing of Grade A milk in the Southeast market and has abused and continues to abuse that power to maintain and enhance its market dominance in the production and marketing of Grade A milk by unreasonably restraining trade, artificially and anti-competitively reducing the price of Grade A milk purchased from Plaintiffs and members of the class, eliminating competition from rival cooperatives and non-cooperative independent dairy farmers, and foreclosing and excluding competitors from access to fluid Grade A milk bottling plants by engaging in predatory and unlawful conduct, as described above.

82.     DFA's conduct constitutes unlawful monopolization and the unlawful use of predatory and anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

83.     As a direct and proximate result of DFA's continuing violation of Section 2 of the Sherman Act, Plaintiffs and class members have suffered injury and damages in an amount to be proven at trial.

84.     Plaintiffs, on behalf of themselves and other members of the class, seek money damages from DFA for these violations. These damages represent the additional amount Plaintiffs and other members of the class would have received for sales of Grade A milk in the absence of the violations alleged. Damages may be quantified on a class wide basis. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

85.     Plaintiffs, on behalf of themselves and other members of the class, also seek injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT III
## SHERMAN ACT SECTION 2 VIOLATION
### Unlawful Monopsony

86.     Plaintiffs incorporate by reference paragraphs 1 through 71 as if fully alleged herein.

87.     The relevant product market is the market for the purchase of fluid Grade A milk, which has no substitutes - *i.e.*, Grade B milk cannot be used for Grade A purposes. The relevant geographic market is the Southeast United States, which is comprised of FMMO 5 and 7. Among other factors, the Southeast United States is the relevant geographic market based on the structure of the industry, Grade A milk being a perishable product, the high demand for Grade A milk in the Southeast market which is in chronic short supply, and the fact that dairy farmers in the Southeast cannot turn to fluid Grade A milk bottlers outside of the Southeast as a reasonable substitute. Dean enjoys monopsony power over Grade A milk production and processing in the Southeast. Dean controls over 60 percent of the fluid Grade A milk bottling capacity in the Southeast.

88.     Dean possesses monopsony power in fluid Grade A milk bottling in the Southeast market and has abused and continues to abuse that power to maintain and enhance its market dominance in the bottling of fluid Grade A milk by unreasonably restraining trade, artificially and anti-competitively reducing the price of Grade A milk purchased from Plaintiffs and members of the class, eliminating competition from rival fluid Grade A milk bottlers and

foreclosing and excluding competitors from the fluid Grade A milk bottling market by engaging in predatory and unlawful conduct as described above.

89. Dean's conduct constitutes unlawful monopsonization and the unlawful use of predatory anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

90. As a direct and proximate result of Dean's continuing violation of Section 2 of the Sherman Act, Plaintiffs and class members have suffered injury and damages in an amount to be proven at trial.

91. In the alternative, Defendants Dean, NDH, and DFA collectively as fluid Grade A milk bottlers have abused their monopsony power to maintain and enhance their market dominance in the bottling of fluid Grade A milk by unreasonably restraining trade, artificially and anti-competitively reducing the price of Grade A milk purchased by from Plaintiffs and members of the class, eliminating competition from rival fluid Grade A milk bottlers and foreclosing and excluding competitors from the fluid Grade A milk bottling market by engaging in predatory and unlawful conduct as described above. The effect of Defendants' scheme has been to harm, disrupt and eliminate competition from fluid Grade A milk bottlers and independent dairy farmers in the Southeast market.

92. Defendants' conduct constitutes unlawful monopsonization and the unlawful case of predatory anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

93.     Plaintiffs, on behalf of themselves and other members of the class, seek money damages from Dean or, in the alternative, from Defendants Dean, DFA and NDH for these violations. These damages represent the additional amount Plaintiffs and other members of the class would have received fox sales of Grade A milk in the absence of the violations alleged. Damages may be quantified on a class wide basis. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

94.     Plaintiffs, on behalf of themselves and other members of the class, also seek injunctive relief. The violations set forth above and the effects thereof are continuing and will co injunctive relief is granted.

## COUNT IV.
## SHERMAN ACT SECTION 1 VIOLATION
### Unlawful Conspiracy Among Defendants to Foreclose Competition and Fix Prices

95.     Plaintiffs incorporate by reference paragraphs 1 through 71 as if fully alleged herein.

96.     At all times relevant to this Complaint, Defendants have conspired to eliminate competition for the purchase of Grade A milk from dairy farmers in the Southeast. In furtherance of their conspiracy, Defendants have entered into exclusive dealing arrangements with the purpose and intent of restricting access to the fluid Grade A milk bottling market in the Southeast, fixing prices paid to dairy farmers for Grade A milk, and excluding dairy farmers from access to cooperatives and fluid Grade A milk bottling plants that might compete with Defendants in purchasing Grade A milk.

97.     These agreements are *per se* violations of Section 1 of the Sherman Act, and were they not, would nonetheless violate Section 1 of the Sherman Act under the Rule of Reason.

98.      The agreements that Defendants have entered, maintained, renewed, and enforced with one another have had the purpose and effect of eliminating competition among fluid Grade A milk bottlers in the Southeast. As a result of these agreements, Plaintiffs have been forced to accept suppressed prices for sales of Grade A milk, and otherwise have been damaged as described in this Complaint. But for the conspiracy alleged herein, Grade A milk prices obtained by Plaintiffs and class members in the Southeast market would have been significantly higher.

99.      In furtherance of Defendants' agreement to restrain trade, Defendants have committed, among other things, the following overt acts: a) implementing long-term full-supply agreements between Defendants Dean, NDH, and DFA to control access of Southeast dairy farmers to fluid Grade A milk bottling plants; b) requiring independent dairy farmers, individuals and entities that were previously free of DFA's control, to market their Grade A milk through DFA-controlled entities or other co-conspirators to gain access to fluid Grade A milk bottling plants; c) threatening to cut off and cutting off independent dairy farmers' access to fluid Grade A milk bottling plants; d) boycotting independent dairy farmers, cooperatives, and fluid Grade A milk bottlers; e) fixing, depressing and/or stabilizing prices paid to dairy farmers; f) utilizing DFA-controlled marketing entities and other co-conspirators to monitor prices for Grade A milk paid to independent dairy farmers and independent cooperative members; g) "punishing" independent dairy farmers and fluid Grade A milk bottlers that do not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers' Grade A milk; and h) purchasing fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers and fluid Grade A milk bottlers.

100.    The relevant product market is fluid Grade A milk, which has no substitutes – *i.e.*, Grade B milk cannot be used for Grade A purposes. The relevant geographic market is the Southeast United States, which is comprised of FMMO 5 and 7. Among other factors, the Southeast United States is the relevant geographic market based on the structure of the industry, Grade A milk being a perishable, product, the high demand for Grade A milk in the Southeast market which is in chronic short supply, and the fact that dairy farmers in the Southeast cannot turn to fluid Grade A milk bottlers outside of the Southeast as a reasonable substitute.

101.    Collectively, Defendants enjoy monopoly and monopsony power over Grade A milk produced and processed in the Southeast. Upon information and belief Defendants control approximately 77 percent of the fluid Grade A milk bottling capacity in the Southeast; over 80 percent of the Grade A milk marketed in the Southeast; and approximately 90 percent of the Grade A milk produced in the Southeast.

102.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, as well as Defendants' other unlawful conduct, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

103.    Plaintiffs, on behalf of themselves and other members of the class, seek money damages from Defendants for these violations. These damages represent the additional amount Plaintiffs and other members of the class would have received for sales of Grade A milk in the absence of the violations alleged. Damages may be quantified on a class wide basis. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

104.    Plaintiffs, on behalf of themselves and other members of the class, also seek injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by, jury pursuant to Fed.R.Civ.Pro. 38(b) of all issues triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

a. Declare this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure and declaring named Plaintiffs to be Class Representatives;

b. Adjudge and declare that Dean, DFA, MID AM, DMS, NDH, and SMA have engaged in unlawful conduct in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ I-2;

c. Preliminarily and permanently enjoin Defendants from violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2;

d. Declare null and void the full-supply agreements by and between Dean, NDH and DFA as described herein;

e. Preliminarily and permanently enjoin Dean, DFA, MID AM, DMS, NDH, and SMA and/or any entity controlled by any of them from entering into full-supply agreements as described herein;

f. Order Dean, NDH, DFA, MID AM, their subsidiaries or joint ventures to divest fluid Grade A milk bottling plants necessary to restore competition in the Southeast;

g.   Against all Defendants, jointly and severally, award Plaintiffs and the proposed

class damages in an amount to proven at trial, to be trebled with interest and the

costs of this suit, including attorneys' fees; and,

h.   Award such further relief, including structural remedies, as the Court deems just

and proper.

August 24 , 2007

Thomas C. Jessee (Bar No. 000113)
JESSEE & JESSEE
P.O. Box 997
Johnson City, TN 37605
Telephone:    (423) 928-7175
Facsimile:    (423) 928-9650

Michael D. Hausfeld
Benjamin D. Brown
James J. Pizzirusso
COHEN, MILSTEIN, HAUSFELD
  & TOLL P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Telephone:    (202) 408-4600
Facsimile:    (202) 408-4699

Steven A. Kanner
FREED KANNER LONDON &
  MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone:    (224) 632-4500
Fax:          (224) 632-4521

David J. Hodge
PITTMAN DUTTON KIRBY &
  HELLUMS, P.C.
1100 Park Place Tower
2001 Park Place North
Birmingham, AL 35203
Telephone:    (205) 322-8880
Facsimile:    (205) 328-2711

Steven K. Griffith
KNIGHT, GRIFFITH, MCKENZIE,
  KNIGHT & MCLEROY, LLP
409 First Avenue, S.W.
Griffith Building
Cullman, AL 35055
Telephone:    (256) 734-0456
Facsimile:    (256) 734-0466

Arthur N. Bailey
ARTHUR N. BAILEY &
  ASSOCIATES
111 West Second Street, Suite 4500
Jamestown, NY 14701
Telephone:    (716) 664-2967
Facsimile:    (716) 664-2983

Attorneys for Plaintiffs and the Class