**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

|  |  |
|---|---|
| SCOTT DAIRY FARM, INC., *et al.*,     ) | |
| ) | |
| Plaintiffs,     ) | **Case No. 2:07-CV-00208** |
| ) | **JUDGE GREER** |
| v.     ) | **MAGISTRATE JUDGE INMAN** |
| ) | |
| DEAN FOODS COMPANY, *et al.*,     ) | **JURY DEMAND** |
| ) | |
| Defendants.     ) | |
| ) | |

**JOINT MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS PURSUANT TO**
**RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

FACTS AND PROCEDURAL HISTORY ........................................................................ 1

STANDARD OF REVIEW .............................................................................................. 4

ARGUMENT .................................................................................................................. 4

I.  THE PLAINTIFFS FAIL TO STATE A CLAIM FOR WHICH RELIEF CAN
    BE GRANTED UNDER *TWOMBLY*. ....................................................................... 4

    A.  The *Twombly* Standard. ............................................................................. 4

    B.  Plaintiffs' Complaint Recasts a Variety of Vertical Agreements and
        Independent Business Practices as a Speculative Horizontal
        Conspiracy. ................................................................................................ 8

    C.  Plaintiffs' Allegations Do Not Render This Horizontal Conspiracy
        Plausible, as Opposed to Merely Possible or Speculative. ..................... 11

    D.  Plaintiffs Cannot Fill the Gaps in the Complaint with Conclusory
        Allegations. ............................................................................................... 12

        1.  Legal conclusions are no substitute for facts. ............................. 12

        2.  Vague allegations against unspecified "Defendants" are
            insufficient. .................................................................................. 13

II. PLAINTIFFS LACK ANTITRUST STANDING. ....................................................... 14

    A.  Plaintiffs Cannot Show Antitrust Injury Based on an Alleged Denial of
        Access to Bottling Plants or Decrease in the Prices Paid to Dairy
        Farmers. ................................................................................................... 15

    B.  Other Antitrust Standing Factors Also Require that Certain Plaintiffs'
        Claims Be Dismissed. .............................................................................. 18

III.     PLAINTIFFS FAIL TO ALLEGE A PROPER ANTITRUST MARKET. ...................... 21

     A.     Plaintiffs Must Allege Proper Antitrust Markets and Supporting Facts To Survive a Motion to Dismiss. ................................................................. 21

     B.     Plaintiffs Fail To Allege Facts Sufficient To Define the Market for Purchasing Grade A Milk and Defendants' Alleged Power in that Market. ....................................................................................................................... 22

IV.     PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS. ........................................................................................................... 24

     A.     Plaintiffs' Alleged Injuries Were Caused by Conduct Prior to August 27, 2003 and Are Therefore Time-Barred. .......................................................... 26

     B.     Plaintiffs Have Not Identified Any Overt Acts Within the Limitations Period That "Restart" the Running of the Statute. ................................................. 26

     C.     Plaintiffs' Fraudulent Concealment Allegations Are Inadequate To Avoid Dismissal of Their Claims as Untimely. ................................................... 28

CONCLUSION .................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620 (5th Cir. 2002)..................22

*Associated Gen. Contractors, Inc. v. California State Council of Carpenters*,
    459 U.S. 519 (1983)................................................................................................14, 15

*Atlantic Richfield Co. v. USA Petroleum*, 495 U.S. 328 (1990) ....................................18

*Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105 (6th Cir. 1989)..........................................18

*Baker v. Chagrin Valley Med. Corp.*, No. C82-122, 1985 WL 445
    (N.D. Ohio Mar. 22, 1985) ...............................................................................27

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325
    (7th Cir. 1986)..................................................................................................18

*Barnosky Oils, Inc. v. Union Oil Co. of Cal.*, 665 F.2d 74 (6th Cir. 1981) ............................25, 27

*Bearing Distributings, Inc. v. Rockwell Automation, Inc.*, No. 06-CV-831,
    2006 WL 2709779 (N.D. Ohio Sept. 20, 2006)................................................16

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ...................................... *passim*

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).......................15

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ...........................15

*Bubar v. Ampco Foods, Inc.*, 752 F.2d 445 (9th Cir. 1985) ..........................................20

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008 (6th Cir. 2005)..................16

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986) ..................................18, 19

*Carrier Corp. v. Outokumpu Oyj*, No. 06-CV-2186-D/P
    (W.D. Tenn. July 27, 2007) ................................................................................7

*Caudill v. Lancaster Bingo Co.*, No. 2:04-CV-695, 2005 U.S. Dist. LEXIS 24621
    (S.D. Ohio Oct. 24, 2005)................................................................................16

*Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963 (W.D. Tenn. 2004) ........................22, 24

*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005)............................................19

*Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir. 1975)..................28, 29, 30

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554 (8th Cir. 1998) ..........................22

*DXS, Inc. v. Siemens Med. Sys.*, 100 F.3d 462 (6th Cir. 1996)......................................................26

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240
        (2d Cir. 1997)........................................................................................................................11

*Ellis v. Bradley County, Tenn.*, No. 1:06-CV-260, 2007 WL 1830756
        (E.D. Tenn. June 22, 2007)......................................................................................................4

*Evans v. Pearson Enters., Inc.*, 434 F.3d 839 (6th Cir. 2006) .......................................................28

*Expert Masonry, Inc. v. Boone County, Ky.*, 440 F.3d 336 (6th Cir. 2006) .....................................9

*Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*,
        244 F.3d 521 (6th Cir. 2001) ...........................................................................................22, 24

*Garelick v. Goerlich's, Inc.*, 323 F.2d 854 (6th Cir. 1963) ...........................................................27

*Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401 (6th Cir. 1999) ...........................................27

*Gumbus v. United Food & Commercial Workers Int'l Union*, No. 95-5113,
        1995 WL 5935 (6th Cir. Jan. 6, 1995) ...............................................................................30

*Hackman v. Dickerson Realtors, Inc.*, No. 06-CV-50240, 2007 U.S. Dist. LEXIS 64669
        (N.D. Ill. Aug. 31, 2007)........................................................................................................7

*Hamilton County Board of Comm'nrs v. Nat'l Football League*, 491 F.3d 310
        (6th Cir. 2007)......................................................................................................................28

*Hesco Parts, LLC v. Ford Motor Co.*, No. 3:02-CV-736-S, 2006 U.S. Dist. LEXIS 69011
        (W.D. Ky. Sept. 22, 2006) ..................................................................................................11

*Hodges v. WSM, Inc.*, 858 F. Supp. 708 (M.D. Tenn.), *aff'd* 26 F.3d 36 (6th Cir. 1994) .............15

*HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874 (6th Cir. 1991) .................................14

*In re ACR Copper Tubing Litig.*, No. 06-2207-D/P (W.D. Tenn. July 26, 2007) ...........................8

*In re Elevator Antitrust Litig.*, No. 06-CV-3128, 2007 U.S. App. LEXIS 21086
        (2d Cir. Sept. 4, 2007)........................................................................................................6, 7

iv

*In re Insurance Brokerage Antitrust Litig.*, No. 04-CV-5184,
2007 U.S. Dist. LEXIS 64767 (D.N.J. Aug. 31, 2007).....................................................7

*Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000)..........14, 15, 16, 19

*Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922 (1st Cir. 1984)...............................17

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ....................................................25, 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)....................................12

*Meyer Goldberg, Inc. v. Goldberg*, 717 F.2d 290 (6th Cir. 1983)..................................20

*Michigan Div. - Monument Builders of N. Am. v. Michigan Cemetery Ass'n*,
458 F. Supp. 2d 474 (E.D. Mich. 2006).............................................................21

*Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705 (11th Cir. 1984)..........................20

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
419 F.3d 462 (6th Cir. 2005) ..........................................................................21

*Nat'l Soc'y of Prof'l Eng'rs v. U.S.*, 435 U.S. 679 (1978) ..........................................15

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006)...............18, 19

*Peck v. Gen. Motors Corp.*, 894 F.2d 844 (6th Cir. 1990) .......................................25, 26

*Pinney Dock & Transp. Co. v. Penn Cen. Corp.*, 838 F.2d 1445 (6th Cir. 1988) .........................28

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) .............................22

*Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843 (2d Cir. 1986)......................................20

*Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999) ............................24

*Sheridan v. Marathon Petroleum Co.*, No. 1:06-CV-1233 (S.D. Ind. Sept. 28, 2007)....................7

*Smith v. Multi-Flow Dispensers of Ohio, Inc.*, 181 F.3d 103 (6th Cir. 1999) ..............................21

*Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir. 1983) ..............................15

*Stephens v. CMG Health*, No. 96-CV-7798, 1997 U.S. Dist. LEXIS 23797
(S.D.N.Y. July 22, 1997) ..............................................................................17

*The Am. Channel, LLC v. Time Warner Cable, Inc.*, No. 06-CV-2175,
2007 U.S. Dist. LEXIS 47966 (D. Minn. June 28, 2007)....................................8

*Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield*,
No. 1:05-CV-519, 2007 U.S. Dist. LEXIS 53862 (S.D. Ohio July 25, 2007).............22, 24

*United States v. Solinger*, 457 F. Supp. 2d 743 (W.D. Ky. 2006) .................................19

*Valley Prods. Co. v. Landmark*, 877 F. Supp. 1087 (W.D. Tenn. 1994).......................19

*Valley Prods. Co. v. Landmark*, 128 F.3d 398 (6th Cir. 1997).....................................15

*Vermilion Foam Prods. Co. v. Gen. Elec. Co.*, 386 F. Supp. 255
(E.D. Mich. 1974) .....................................................................................13, 14

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 127 S. Ct. 1069 (2007) .................17

*Wood v. Carpenter*, 101 U.S. (11 Otto) 135 (1879) .........................................28, 29, 30

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971).........................25

## FEDERAL STATUTES

15 U.S.C. § 1 ................................................................................. *passim*

15 U.S.C. § 2 ................................................................................. *passim*

15 U.S.C. § 15b...............................................................................................25

28 U.S.C. § 1407 ..............................................................................................3

Fed. R. Civ. P. 8(a)(2)......................................................................................4

## JOURNALS AND TREATISES

Steven Salop, Anticompetitive Overbuying by Power Buyers,
72 Antitrust L.J. 669 (2005)................................................................18

2 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law 337 (2d ed. 2000) ..............15

# INTRODUCTION[1]

The Complaint in this case—a veritable copycat of three earlier-filed complaints—alleges that Defendants engaged in a "combination and conspiracy . . . to refuse to compete for the purchase of raw Grade A milk . . . produced, marketed, and processed in the Southeast United States," and asserts claims under Sections 1 and 2 of the Sherman Act. Compl. ¶ 1. The claims should be dismissed in their entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because: (1) the Complaint does not adequately plead an unlawful conspiracy; (2) the Plaintiffs have not suffered antitrust injury and otherwise lack standing to pursue these claims; (3) the Complaint does not adequately allege the relevant market or Defendants' alleged monopoly or monopsony power within that market; and (4) Plaintiffs' claims are barred by the applicable four-year statute of limitations.

## FACTS AND PROCEDURAL HISTORY

Plaintiffs are dairy farmers in the Southeast. They raise cows and produce milk, but do not themselves bottle that milk for sale to the public or otherwise process it into cheese and other dairy products. Plaintiffs purport to represent "independent dairy farmers," defined as "dairy farmers who are not current members" of Defendant Dairy Farmers of America ("DFA"). Compl. ¶ 4. By this definition, "independent dairy farmers" includes those who are members of any cooperative other than DFA. *Id.* Plaintiffs seek to certify a class of such dairy farmers who produced and sold Grade A milk in Federal Milk Marketing Orders 5 or 7 either directly or

---

[1] This memorandum of law is submitted on behalf of Defendants Dean Foods Company ("Dean"), National Dairy Holdings, LP ("NDH"), Dairy Farmers of America, Inc. ("DFA"), Dairy Marketing Services, LLC ("DMS"), and Mid-Am Capital LLC ("Mid-Am") in support of Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendant NDH joins this memorandum of law subject to, and without waiver of, its individual motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

through Defendants DMS or Southern Marketing Agency, Inc. ("SMA") to any Defendant milk processor during any time from January 1, 2001, to the present. Compl. ¶ 5.

Defendants are entities and/or individuals involved in either (1) the marketing and sale of milk on behalf of dairy farmers, or (2) the purchase and processing of that milk:

- Dean is a holding company that, through its operating companies, purchases raw milk from dairy farmers and dairy farmer cooperatives and then processes that raw milk into consumable dairy products. Dean's operating companies operate a number of dairy processing plants in the area the Plaintiffs have denominated the "Southeast" under brands such as Mayfield, Purity, PET and Barber.

- NDH is a limited partnership that owns subsidiaries that purchase raw milk and process that raw milk into consumable dairy products. It is 50% owned by NDH management, and 50% by Defendant DFA.

- DFA is a non-profit dairy farmer cooperative that is owned and operated by its dairy farmer members. DFA markets milk produced by its dairy farmer members and distributes the net proceeds or profits from its operations to its farmer members and in some instances, also markets milk on behalf of non-members. When marketing milk on behalf of its dairy farmers, DFA does not purchase and resell milk; rather, it acts as the agent for those members. DFA has, over the years, also made investments in certain milk processing operations in the United States.

- DMS is a common marketing agency that markets milk on behalf of its member dairy cooperatives. DMS also performs milk marketing services for milk processors pursuant to outsourcing contracts, whereby those processors have contracted with DMS to provide various milk procurement services.

- SMA is a common marketing agency that markets milk on behalf of its member dairy cooperatives, including Defendant DFA and Md/Va Cooperative, in the Southeast. It is effectively a cooperative of cooperatives, in that it markets milk on behalf of other dairy cooperatives and performs other functions designed to make its member cooperatives' marketing of milk more efficient.

- Mid-Am is a subsidiary of Defendant DFA, organized as a limited liability company. It is a financing vehicle for DFA and its affiliated joint ventures. It does not purchase, market or sell milk.

The Complaint contains four antitrust Counts: Count One charges all Defendants with participating in a conspiracy to monopolize the production and marketing of Grade A milk and to monopsonize the purchase of Grade A milk in the Southeast in violation of Section 2 of the

Sherman Act; Count Two charges DFA with the unlawful monopolization of the market for the purchase of Grade A milk in the Southeast in violation of Section 2 of the Sherman Act; Count Three charges Dean, or in the alternative Dean, NDH and DFA, with the unlawful monopsonization of the market for the purchase of Grade A milk in the Southeast in violation of Section 2 of the Sherman Act; and Count Four charges all Defendants with a conspiracy to eliminate competition for the purchase of Grade A milk from dairy farmers in the Southeast in violation of Section 1 of the Sherman Act. Compl. ¶¶ 72-104.[2]

The core of the Complaint is an alleged *conspiracy* among all Defendants "to refuse to compete for the *purchase* of raw Grade A milk . . . produced, marketed, and processed in the Southeast United States . . . ." Compl. ¶ 1 (emphasis added). Although the primary vehicle through which this alleged conspiracy was carried out is a series of individual full-supply and related agreements between DFA, SMA or DMS, on the one hand, and Dean or NDH or apparently other milk processors not sued by Plaintiffs (e.g., Kroger), on the other, the Complaint does not challenge those vertical agreements (that is, agreements between parties at two different levels of the distribution chain) as unreasonable restraints of trade. Rather, the Complaint alleges that those vertical contractual agreements are the result of a far-ranging, horizontal conspiracy between and among all Defendants and apparently other entities and

---

[2] In most meaningful respects, this case is a copycat of *Sweetwater Valley Farm, Inc., et al. v. Dean Food Co, et al.*, No. 1:07-CV-0051 (M.D. Tenn.) and *Baisley, et al., v. Dean Foods Co.*, No. 1:07-CV-0052 (M.D. Tenn.), both filed on July 5, 2007. A third related case, *Breto v. Dean Foods Co.*, 2:07-CV-00188 (E.D. Tenn.), was filed in this Court on August 9, 2007. Another copycat case, *Aker v. Dean Foods Co., et al.*, No. 2:07-CV-248, was filed in this Court on October 3, 2007. Defendants have moved to dismiss the *Baisley* and *Sweetwater* complaints on grounds similar to the ones advocated here. Defendants have also filed a motion under 28 U.S.C. § 1407 with the Judicial Panel on Multi-District Litigation to transfer all related actions to the Middle District of Tennessee for coordinated or consolidated pretrial proceedings. Both the motions to dismiss and the motion to transfer remain pending.

persons. It is, according to Plaintiffs, that underlying horizontal agreement that produces, among other things, these full-supply agreements and various bottlers' decisions regarding plant acquisition and operation.

## STANDARD OF REVIEW

A complaint must set forth, for each claim, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (hereinafter, "*Twombly*"). "To survive a motion to dismiss, the complaint's factual allegations 'must be enough to raise a right to relief above the speculative level' and must 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Ellis v. Bradley County, Tenn.*, No. 1:06-CV-260, 2007 WL 1830756 (E.D. Tenn. June 22, 2007) (quoting *Twombly*, 127 S.Ct. at 1974). "This Court need not accept legal conclusions or unwarranted factual inferences." *Id.*

## ARGUMENT

**I.    THE PLAINTIFFS FAIL TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED UNDER *TWOMBLY*.**

**A.    The *Twombly* Standard.**

The Supreme Court held in *Twombly* that (1) Rule 8 requires a plaintiff to plead sufficient facts to state a claim to relief that is *plausible* on its face, and not merely possible or speculative, and that (2) fundamental to the "plausibility" standard in a case alleging a Sherman Act conspiracy is the plaintiff's ability to plead a set of facts from which one can unambiguously infer an agreement, as opposed to merely similar but independent business conduct: "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement . . . ." *Twombly*, 127 S. Ct. at 1964-66 (quotations omitted). The fact that several businesses have behaved similarly (or even identically) is not sufficient, because, as the

4

Supreme Court observed, it is now well-recognized that such conduct may be "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.*

This critical observation about the frequent and benign occurrence of independent but parallel business conduct creates the hurdle an adequate conspiracy complaint must cross:

> In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, we have the benefit of the prior rulings and considered views of leading commentators, already quoted, that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. *Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.* . . .

*Id.* at 1965-66 (emphasis added).

The *Twombly* Court's references to additional "factual allegations" are critical: "a plaintiff's obligation to provide the 'grounds' for his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65. *Factual allegations*—not conclusory or naked assertions of conspiracy— and specifically factual allegations which distinguish individual acts from conspiratorial activity, are the key to whether an antitrust plaintiff's allegations satisfy the plausibility threshold: "A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.* at 1966. And occupying "neutral territory" is not enough:

> An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitlement to relief."

*Id.*

The sanction for stopping "short of the line" is prompt dismissal of the complaint "at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 1966 (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975)). In this regard, the Supreme Court expressly rejected any suggestion that plaintiffs should be allowed to undertake massive discovery to attempt to generate facts missing from the complaint. *Twombly*, 127 S. Ct. at 1967 ("[I]t is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support a [conspiracy] claim.").

Since the *Twombly* decision just a few months ago, lower courts have heeded the Supreme Court's admonitions and dismissed antitrust conspiracy cases where, as here, plaintiffs failed to allege sufficient facts to make an inference of conspiracy plausible. For example, in *In re Elevator Antitrust Litigation*, No. 06-CV-3128, 2007 U.S. App. LEXIS 21086 (2d Cir. Sept. 4, 2007) (per curiam), plaintiffs argued that a plausible inference of horizontal conspiracy could be drawn from (1) averments of agreements made at some unidentified place and time; (2) averments of parallel conduct; and (3) evidence suggesting that the same anticompetitive conduct occurred in Europe. *Id.* at *8.

The Second Circuit affirmed the district court's dismissal of that case at the pleading stage, concluding that these allegations were insufficient as a matter of law to give rise to a plausible inference of conspiracy. The allegations of agreement, like those here, were made "in entirely general terms without any specification of any particular activities by any particular defendant." *Id.* As for the alleged parallel conduct, which consisted of evidence of similar

contractual arrangements, pricing and equipment design, the court rejected this evidence as a basis for inferring a conspiracy, noting that such conduct is as consistent with competitive business strategies prompted by common perceptions of the market. *Id.* at *10. Last, the court concluded that plaintiffs' allegations of anticompetitive conduct in Europe, as demonstrated by European investigations and raids of defendants' businesses, provided an "insufficient factual basis for their assertions of a worldwide conspiracy affecting a global market for elevators and maintenance services." *Id*. at *12. In sum, even when faced with more detailed conspiracy allegations than those present here, the court affirmed dismissal of the action as failing to meet *Twombly*'s pleading requirements.

Other courts have done likewise. *See, e.g., Sheridan v. Marathon Petroleum Co.*, No. 1:06-CV-1233-SEB-JMS, at 17 (S.D. Ind. Sept. 28, 2007) (dismissing class action price fixing claims based only on "bare allegations" with no supporting facts to plausibly suggest an illegal agreement) (attached as Ex. 1); *In re Insurance Brokerage Antitrust Litig.*, No. 04-CV-5184, 2007 U.S. Dist. LEXIS 64767, at *91, *92-*96 (D.N.J. Aug. 31, 2007) (dismissing antitrust claims based on *Twombly* where plaintiffs' allegations demonstrated only "a series of vertical agreements between brokers and insurers," and not a horizontal agreement among the insurer defendants; dismissing claims of a "global conspiracy" among the broker defendants because allegations of parallel business conduct coupled with membership in trade groups and the sharing of information were not sufficient to infer a horizontal agreement); *Hackman v. Dickerson Realtors, Inc.*, No. 06-CV-50240, 2007 U.S. Dist. LEXIS 64669, at *36-37 (N.D. Ill. Aug. 31, 2007) (dismissing conspiracy claims based on conclusory allegations of agreement at an unspecified time, with no evidence of agreement other than parallel conduct); *Carrier Corp. v. Outokumpu Oyj*, No. 06-CV-2186-D/P (W.D. Tenn. July 27, 2007), at 11 (concluding that

antitrust class action conspiracy allegations lacked a "legitimate factual foundation" as required by *Twombly*) (attached as Ex. 2); *In re ACR Copper Tubing Litig.*, No. 06-2207-D/P, at 10 (W.D. Tenn. July 26, 2007) (same) (attached as Ex. 3); *The Am. Channel, LLC v. Time Warner Cable, Inc.*, No. 06-CV-2175, 2007 U.S. Dist. LEXIS 47966, at *4-*6 (D. Minn. June 28, 2007) (dismissing antitrust conspiracy claims based on factual allegations of parallel business conduct and conclusory assertions of conspiracy).

> **B.      Plaintiffs' Complaint Recasts a Variety of Vertical Agreements and Independent Business Practices as a Speculative Horizontal Conspiracy.**

Plaintiffs' horizontal "conspiracy" claims are at the heart of this Complaint. Three of the four alleged antitrust causes of action turn in whole or in part on allegations of this grand, horizontal conspiracy – Count One (Conspiracy to Monopolize and Monopsonize, Compl. ¶¶ 72-78), Count Three (Unlawful Monopsony, Compl. ¶¶ 86-94) and Count Four (Unlawful Conspiracy Among Defendants, Compl. ¶¶ 95-104). Plaintiffs refer to an alleged conspiracy among some number of the Defendants more than twenty times throughout the Complaint, *see, e.g.,* Compl. ¶¶ 2a, 3-5, 47-49, 51-60, 62-63, 68, 69a, 73-74, 91, 96, 98-99, without ever pleading facts that adequately and plausibly describe the formation and execution of this wide-ranging conspiracy.

According to the Complaint, the keys to this complex, multi-party conspiracy are the separate full-supply agreements between certain bottlers and DFA, whereby DFA committed to supply all of the fluid Grade A milk needed by certain of those bottlers' plants. The very first substantive paragraph setting forth Defendants' allegedly anticompetitive misdeeds focuses on these full-supply contracts. *See* Compl. ¶ 42. Most of the remaining substantive allegations of anticompetitive behavior contain further accusations about these same agreements. *Id*. ¶¶ 49-71. In the list of factual allegations that underlie the conspiracy to monopolize/monopsonize claim

(Count One) and the "unlawful conspiracy" claim (Count Four), the very first alleged wrong is "implementing long-term full-supply agreements between Defendants Dean, NDH and DFA to control access of Southeast dairy farmers to fluid Grade A milk bottling plants." *Id.* ¶¶ 74(a), 99(a). And most of the other alleged wrongs under those Counts are essentially flip sides of the same full-supply agreement coin: the so-called denial of access to fluid Grade A milk bottling plants (*id.* ¶¶ 74(b), 99(b)), the threats to cut off access (*id.* ¶¶ 74(c), 99(c)), and the so-called boycott of independents (*id.* ¶¶ 74(d), 99(d)), for example, are all accomplished by the agreements whereby the bottler agrees to obtain its milk through DFA or DMS.

Where this Complaint goes off track, however, is Plaintiffs' effort to turn these two-party, *vertical* full-supply contracts (that is, arrangements between a bottler, on the one hand and a cooperative and/or common marketing agency, on the other hand) into the products of a wide-ranging *horizontal* conspiracy that includes multiple bottlers, milk marketers and unspecified "others." These vertical full-supply agreements could, at least in theory, be challenged under the antitrust laws as agreements that unreasonably restrain trade. But that is not the attack Plaintiffs launch here—and for good reason, given the regularity with which such vertical arrangements, when challenged by unhappy competitors who have lost the business of a customer that they would have liked to serve, are found *not to* violate the antitrust laws, and indeed often to be procompetitive. *See, e.g., Expert Masonry, Inc. v. Boone County, Ky.*, 440 F.3d 336, 347-48 (6th Cir. 2006).

Plaintiffs challenge not these various agreements on their own merits, but rather claim that their existence and impact relate back to this far-reaching horizontal conspiracy. Consider, for example, Plaintiffs' allegations regarding the full-supply agreements:

> As part of the *plan*, Defendants secured for DFA and its affiliates
> control over access to fluid Grade A milk bottling plants in the

> Southeast by agreeing to grant DFA a series of "full-supply" agreements. Defendants then collaboratively used these full-supply agreements to force previously independent dairy farmers to join DFA or to market their Grade A milk through DFA-controlled entities in order to gain access to fluid Grade A milk bottling plants.

Compl. ¶ 42 (emphasis added). The phrases "*Defendants . . . agreeing to grant DFA a series of full-supply agreements*" and "*collaboratively us[ing] these full-supply agreements*" make clear that Plaintiffs are claiming that the Defendant bottlers, Dean, NDH, presumably DFA and potentially others (although it is not explained who or how), have agreed *between and among themselves* that each of the bottlers would enter into full-supply agreements with DFA.

The Plaintiffs' few substantive allegations that are not related to the full-supply agreements are also described as the product of this over-arching horizontal agreement. For example, there is an allegation that acquiring and closing plants is part of Defendants' wrongdoing here: "Following the Dean-Suiza merger, Dean, NDH, and DFA have continued to acquire fluid Grade A milk bottling plants for the purpose of increasing their dominance of the Southeast market, and have acted to close down bottling plants and/or have refused to operate bottling plants with the purpose and effect of decreasing capacity and eliminating sources of access to bottling plants." Compl. ¶ 46. By including the "purchasing fluid Grade A milk bottling plants with the purpose and intent of further stifling competition," as conduct pursuant to this broad conspiracy, *see, e.g.*, Compl. ¶¶ 74(h), 99(h), Plaintiffs challenge not the acquisition or plant-closing strategy that any of these bottlers undertook on their own, but rather are alleging that, for example, Dean agreed with NDH and DFA about which plants each would acquire and whether they would close certain plants to limit bottling capacity.

### C. Plaintiffs' Allegations Do Not Render This Horizontal Conspiracy Plausible, as Opposed to Merely Possible or Speculative.

Without those allegations of a far-ranging horizontal conspiracy—and not the two-party, vertical agreements embodied in each full-supply agreement or any unilateral plant acquisition strategy—the Complaint crumbles. And it is those allegations that must be tested against *Twombly's* plausibility standard.

The deficiency that *Twombly* highlights, however, is this: the mere fact that more than one bottler has chosen to engage in certain similar business conduct, such as entering into a full supply agreement with DFA, is *not sufficient* to render plausible the allegation that they have done so pursuant to an unlawful, horizontal agreement. Raw milk full supply agreements are legitimate and customary practices in the dairy industry, and Plaintiffs do not allege otherwise. A manufacturer has an obvious independent business interest in ensuring that its supply requirements are met, particularly in an area where, as Plaintiffs allege, demand exceeds supply. *See, e.g.,* Compl. ¶¶ 75, 80, 87, 100. The fact that it does so through what may be alleged are exclusive agreements does not change this point.

A different result could turn almost any parallel purchase from a common supplier into an unlawful conspiracy—corporations that use Microsoft software could be found to have "conspired" with Microsoft and each other to boycott "open source" software suppliers; corporations that lease cars solely from General Motors could be found to have conspired with GM and other GM lessees not to procure vehicles from Nissan or Chrysler. The list could go on *ad infinitum*. But more is required to properly plead a conspiracy than mere allegations of entry into supply contracts. *See Electronics Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997); *see also Hesco Parts, LLC v. Ford Motor Co.*, No. 3:02-CV-736-S, 2006 U.S. Dist. LEXIS 69011 at *7 (W.D. Ky. Sept. 22, 2006). As *Twombly* teaches, "an

allegation of parallel conduct and a bare assertion of conspiracy will not suffice." 127 S. Ct. at 1966.

The same conclusion applies to the alleged conspiracy to acquire plants and then to eliminate certain capacity from production. *See* Compl. ¶ 46. There are no facts alleged that would allow one to conclude that any acquisitions or closures were anything other than normal transactions or operating decisions by individual processors. There is at most parallel conduct, and as the Supreme Court has made clear, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 127 S. Ct. at 1966.[3]

> **D.    Plaintiffs Cannot Fill the Gaps in the Complaint with Conclusory Allegations.**
>
> **1.    Legal conclusions are no substitute for facts.**

Beyond the inadequately pled accusations of horizontal, conspiratorial conduct, Plaintiffs do include a few other, boilerplate recitations of alleged wrongdoing. Perhaps most prominently, or at least most frequently, Plaintiffs repeat some variation on the allegation that Defendants reached agreement with the intent to "fix, depress and stabilize prices," *see, e.g.*, Compl. ¶¶ 1, 2e, 3, 40, 41, 55, 57, 58, 74(e), 99(e)—words that merely mimic the classic statement of the rule against price fixing and that are almost ritually applied to any agreement found to have anticompetitive effects. Such boilerplate legal conclusions do not and cannot fill the gaps in the

---

[3] The Supreme Court in *Twombly* repeatedly cited its earlier opinion in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986), in which the Court had examined how an inference of conspiracy could fail the plausibility test if the allegation of conspiracy made no economic sense. That problem is clearly present here. For example, the assertion that the milk processor Defendants agreed between and among themselves that they would each sign full-supply agreements with DFA would suggest that the bottlers willingly agreed to create a near-monopoly milk supplier with which they would then have to bargain, a step which would make no economic sense.

Complaint, because they do not provide the required "factual matter . . . to suggest that an agreement was made" between and among the parties. *See Twombly*, 127 S. Ct. at 1965. Indeed, for all of the references to agreements the supposed purpose and intent of which were to "fix, depress and stabilize" prices, there is no count in the Complaint that involves an explicit claim for horizontal price fixing.[4]

### 2. Vague allegations against unspecified "Defendants" are insufficient.

The allegations of the Complaint are also fatally "conclusory" in another sense previously noted: they fail to identify each Defendant's role in and contribution to this so-called conspiracy. It did not take a recent Supreme Court decision to make it clear that, in a conspiracy case, each defendant is entitled to be able to discern from the complaint what it is accused of doing. For example, in *Vermilion Foam Products Co. v. General Electric Co.*, 386 F. Supp. 255 (E.D. Mich. 1974), the district court held that to properly plead a conspiracy, "[t]here must be alleged certain acts of each of the alleged conspirators which would connect him or it with the conspiracy . . . ." *Id.* at 259 (quoting *United States v. North Coast Transp. Co.*, 7 F.R.D. 491, 493 (W.D. Wash. 1947)). The court reasoned that since all conspirators are bound by the overt act of any one participant, "[e]ach . . . defendant, therefore, has a right to know what he or it is alleged to have done which made him or it a part of the conspiracy" and that "these facts should be alleged with sufficient definiteness." *Id.* (quotations omitted). Despite those requirements, Plaintiffs say next to nothing about Defendants DMS, SMA or Mid-Am that could substantiate their participation in a conspiracy. For example, Mid-Am (a defendant added to this Complaint but not sued by

---

[4] Even the conspiracy allegation in Count Four says only that "Defendants have entered into exclusive dealing arrangements with the purpose and intent of restricting access . . . fixing prices paid to dairy farmers for Grade A milk, and excluding dairy farmers from access to cooperatives and fluid Grade A milk bottling plants." Compl. ¶ 96. The *factual* allegation, in short, is a repackaged attack on the full-supply agreements, and not a factual allegation of horizontal price-fixing.

Plaintiffs in the other, related cases) is featured only sparingly. Plaintiffs identify it as a defendant, Compl. ¶ 21; allege that "Defendant DFA has acquired fluid Grade A milk bottling plants, in part, through its subsidiary, Defendant Mid Am," *id.* ¶ 46; and otherwise simply include Mid-Am's name in conclusory statements that it (along with several other defendants) entered into and implemented the conspiracy, *id.* ¶¶ 54, 57. These allegations are insufficient.

\* \* \*

The Complaint in this case underscores the wisdom of *Twombly.* There is no justification for sending the parties into a massive and burdensome discovery process driven by this Complaint, the pivotal allegations of which do not provide the requisite plausibility to demonstrate Plaintiffs' entitlement to relief. The Supreme Court's direction is clear: such a pleading is not a license for plaintiffs to use the club of discovery in antitrust class actions to impose costs on defendants (and on the courts), in the hopes of extracting a settlement or other concessions. Rather it should earn them only an early dismissal.

## II.   PLAINTIFFS LACK ANTITRUST STANDING.

The Supreme Court has held that an antitrust plaintiff must allege facts showing "antitrust standing," *i.e.*, that "the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) (hereinafter, "*AGC*"). As the Sixth Circuit has made clear, "[a]ntitrust standing to sue is . . . not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws." *HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991).

The Sixth Circuit uses a two-pronged analysis to determine whether a plaintiff has adequately alleged antitrust standing: (1) has the plaintiff asserted a cognizable 'antitrust injury,' and (2) is the plaintiff a proper plaintiff to assert a violation of the antitrust laws. *See Indeck*

*Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000).  The failure to

satisfy either prong of this analysis means that the plaintiff lacks antitrust standing.  Plaintiffs fail

to satisfy the first part—the antitrust injury prong—of this analysis, and their Complaint must

therefore be dismissed.  *See id.*; *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 406 (6th Cir.

1997); *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1088 (6th Cir. 1983);

*Hodges v. WSM, Inc.*, 858 F. Supp. 708, 711 (M.D. Tenn.), *aff'd* 26 F.3d 36 (6th Cir. 1994).

> **A.  Plaintiffs Cannot Show Antitrust Injury Based on an Alleged Denial of
> Access to Bottling Plants or Decrease in the Prices Paid to Dairy Farmers.**

Plaintiffs first must demonstrate that they, themselves, sustained an "antitrust injury," *i.e.*,

an injury "of the type that the antitrust statute was intended to forestall."  *AGC*, 459 U.S. at 540

(citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487-88 (1977)); *Hodges*, 858

F. Supp. at 711 ("An antitrust injury is an injury of the type the antitrust laws were designed to

prevent and which flows from that which makes the defendants' acts unlawful"); *see also* 2

Philip E. Areeda & Herbert Hovenkamp, Antitrust Law 337 (2d ed. 2000) ("the antitrust plaintiff

[must] show that its own injury coincides with the public detriment tending to result from the

alleged violation").  Plaintiffs have not and cannot satisfy this requirement.

The central purpose of the antitrust laws is to protect consumers and competition—not

*competitors*.  *Brunswick*, 429 U.S. at 488 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294,

320 (1962)); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224

(1993).  Because protection of competition as a whole focuses on harm to consumers, *see, e.g.,*

*Nat'l Soc'y of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 695 (1978), the Sixth Circuit has held

unequivocally that even a case alleging exclusion of competitors from a market requires an

allegation of some ultimate harm to consumers:  "Although antitrust actions may, of course, be

initiated by marketplace competitors, those actors in the economic forum must at least allege that

15

exclusion of the competitor from the marketplace results in the elimination *of a superior product or a lower-cost alternative*." *Indeck*, 250 F.3d at 977 (emphasis added); *see also Care Heating & Cooling, Inc. v. Am. Std., Inc.,* 427 F.3d 1008 (6th Cir. 2005); *Bearing Distribs., Inc. v. Rockwell Automation, Inc.*, No. 06-CV-831, 2006 WL 2709779 (N.D. Ohio Sept. 20, 2006); *Caudill v. Lancaster Bingo Co.*, No. 2:04-CV-695, 2005 U.S. Dist. LEXIS 24621 (S.D. Ohio Oct. 24, 2005).

Here, there is no allegation that the consumers lost a "lower-cost alternative." Rather, the Complaint alleges that because of Defendants' broad conspiracy, the Plaintiffs have been paid *less* for their milk than they believe they should have. The requirement of *Indeck Energy* that a plaintiff claiming exclusion from a market show that his or her exclusion resulted in the "elimination of a superior product or lower-cost alternative" is not obviated here because the claimed exclusion is on behalf of a putative class of competitors, and not one single competitor. "Individual injury, without accompanying market-wide injury, does not fall within the protections of the Sherman Act." *Care Heating & Cooling*, 427 F.3d at 1014. The repeated allegations of lost revenue for the farmers underscore the absence of sufficient allegations of harm to *competition and consumers*.

The Complaint does not so much as hypothesize that the Defendants' alleged conspiracy resulted in consumer harm. To the contrary, the Complaint expressly focuses on harms caused by *reduced* prices for milk (from which consumers would ordinarily be expected to benefit): "As a direct and proximate result of the combination, conspiracy, and agreement as alleged herein, Plaintiffs and class members have been injured and have sustained damages *in that the prices received for Grade A milk have been artificially reduced below levels they would have received* but for Defendants' unlawful agreement. . . ." Compl. ¶ 61 (emphasis added).

Plaintiffs' antitrust claims thus allege only harm to themselves, because they have been paid less than they believe they should have been paid, and not harm to competition and consumers.

Courts recognize that aggressive negotiating by buyers in an upstream market which lowers the price they pay to their suppliers is often and indeed usually pro-competitive. *See Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 925 (1st Cir. 1984). As then-Circuit Judge Breyer explained, it is not an antitrust violation for a firm, even assuming it has market power, to bargain for reduced input prices that its suppliers (doctors) believed were "unreasonably low." *Id.* at 928; *see also Stephens v. CMG Health*, No. 96-CV-7798, 1997 U.S. Dist. LEXIS 23797 (S.D.N.Y. July 22, 1997) (finding no antitrust injury in allegation that managed care organizations had allegedly conspired to drive down the rates paid to psychiatrists, psychologists and clinical social workers). This is true because lower prices paid to suppliers are ultimately likely to benefit consumers, and hence do not represent an end result that the antitrust laws were meant to prevent.

In this regard the Supreme Court's recent decision in *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 127 S. Ct. 1069 (2007), is also instructive. *Weyerhaeuser* involved an alleged scheme to engage in "predatory bidding"—*i.e.,* initially to bid up an input price to eliminate or weaken competitors, and then later to use the power gained as the dominant buyer to drive *down* the prices paid to suppliers. In determining the rules of law that should govern such claims, the Court reviewed the rationale for its policies and rules as to predatory pricing, which rationale it determined should likewise guide the law as to predatory buying: "Thus, we specifically declined to allow plaintiffs to recover for above-cost price cutting, concluding that 'discouraging a price cut and . . . *depriving consumers of the benefits of lower prices . . . does not constitute sound antitrust policy.*'" *Id.* at 1074-75 (quoting *Brooke Group*, 509 U.S. at 224

(emphasis added)).  In the article repeatedly cited by Justice Thomas in his *Weyerhaeuser* opinion—Steven Salop, Anticompetitive Overbuying by Power Buyers, 72 *Antitrust L.J.* 669, 672 (2005)—Professor Salop explains why there can and should be no Section 2 violation for reduced input prices absent consumer harm.  Antitrust rules must not curb the price competition and attendant price reductions that directly benefit consumers.  *See also Atlantic Richfield Co. v. USA Petroleum*, 495 U.S. 328, 340 (1990) ("low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition").

In this case, it is part of the normal competitive process for bottlers as purchasers—Dean and NDH—to attempt to get the best (*i.e.*, lowest) price possible.  Their reduced input prices have the potential to result in lower prices for those who buy milk and milk products.  Plaintiffs' hoped-for gains, on the other hand—*higher prices for raw milk*—are diametrically opposed to consumers' interest in lower prices.  When, like here, plaintiffs and consumers have "divergent rather than congruent interests," the courts recognize that there are "potential problems in finding 'antitrust injury,'" and that "court[s] must be especially careful not to grant relief that may undercut the proper functions of antitrust."  *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986).

### B.     Other Antitrust Standing Factors Also Require that Certain Plaintiffs' Claims Be Dismissed.

Even if, arguendo, Plaintiffs had adequately alleged facts to support antitrust injury, they would still lack standing.  "A showing of antitrust injury is necessary, but is not always sufficient, to establish standing . . . ."  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986); *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1109 (6th Cir. 1989) (citing *Cargill*); *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006).  "Other

factors relevant to standing—sometimes referred to as the 'efficient enforcer' factors—may 'indicate that a party who states an antitrust injury is nevertheless not a proper antitrust plaintiff.'" *Paycom*, 467 F.3d at 290 (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005)); *see also Cargill*, 479 U.S. at 111 n.6; *United States v. Solinger*, 457 F. Supp. 2d 743, 761 (W.D. Ky. 2006); *Valley Prods. Co. v. Landmark*, 877 F. Supp. 1087, 1091-92 (W.D. Tenn.), *aff'd* 128 F.3d 398 (6th Cir. 1997). The Sixth Circuit has identified the following relevant factors:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Indeck*, 250 F.3d at 976 (quoting *Southaven*, 715 F.2d at 1088). "All five factors must be balanced, however, with no one factor being determinative." *Id*. at 976 (quoting *Southaven*, 715 F.2d at 846). Nonetheless, courts need not consider all of the factors in all cases. Rather, any one of these factors can provide a sufficient basis to deny standing in an appropriate case. *See, e.g., Daniel*, 428 F.3d at 443-44 (lack of standing based on consideration of only one factor, *i.e.*, the presence of other, more appropriate antitrust enforcers "whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement").

Plaintiffs define their proposed class of "independent" producers to include farmers who are not members of DFA, but instead could be members of other cooperatives. Compl. ¶ 4. Such plaintiffs are not the most efficient vindicators of whatever antitrust interests exist here, and they do not have standing as a result. It is clear on the face of the Complaint that the conduct of such other cooperatives was crucial to what transpired here. Plaintiffs allege that the full-supply

agreement between DFA and Dean caused *cooperatives*—not their individual farmer members—to "join DFA or market their Grade A milk through DFA-controlled entities in order to have access to the fluid Grade A milk bottling plants in the Southeast."  Compl. ¶ 51  Such an allegation necessarily involves a determination of what other cooperatives, as self-governing entities, decided to do and why, and what they, as entities, had been informed about SMA and its policies.  The fact that individual farmers are currently dissatisfied with the decisions made by their cooperatives does not make them appropriate antitrust plaintiffs to pursue a claim about what their cooperatives were supposedly "forced" to do.  The link between the alleged conduct of Defendants and the claimed harm to Plaintiffs is simply too attenuated and speculative, given the critical role played by their own cooperative in this sequence of events.  In terms of the key factors laid out in *Southaven*, Plaintiffs fail at least factors one, three, four and five.

Nor can this problem be "solved" by the suggestion that Plaintiffs are bringing this action as *members* of the cooperatives—that is, essentially as shareholders of the cooperative. Cooperative members have equity in their cooperative, are entitled to vote, and receive dividends similar to stockholders.  Courts have consistently held that stockholders lack standing to bring an antitrust suit for injury to their corporations.  *See, e.g., Meyer Goldberg, Inc. v. Goldberg*, 717 F.2d 290, 294 (6th Cir. 1983); *Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir. 1986); *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 450 (9th Cir. 1985); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 710 (11th Cir. 1984) (per curiam).

The bases for courts' holding that stockholders do not have standing to sue for alleged antitrust injuries are (1) that the injury is indirect and the corporation itself is the better plaintiff to bring the action, (2) that the relative damage to the equity holder is best resolved and remedied within the corporate structure, and (3) any diminution in the value of the equity holder would be

remedied by a corporate recovery. Furthermore, it is the corporation's claim and the

corporation's decision as to whether to bring suit, how to conduct it, and whether to settle it, as

determined in the best interests of the corporation. Additionally, there would be problems of

determining the effect of various equity rights and the amount of the recovery that would flow

through to the equity holders, and the difficulty of ensuring that damages to an equity holder

would not become duplicative when other equity holders or the entity brought suit. In short, the

reasons for denying shareholder standing apply to the farmer members of other cooperatives.

## III.    PLAINTIFFS FAIL TO ALLEGE A PROPER ANTITRUST MARKET.

### A.    Plaintiffs Must Allege Proper Antitrust Markets and Supporting Facts To Survive a Motion to Dismiss.

Where, as here, the alleged relevant product or geographic market is inappropriate,

dismissal of the Complaint is warranted. *See e.g., Nat'l Hockey League Players Ass'n v.

Plymouth Whalers Hockey Club*, 419 F.3d 462 (6th Cir. 2005) (complaint that failed to allege no

cross-elasticity of demand between the proposed narrow markets and a broader market for the

services of 16 to 20 year-old North American hockey players defective as to narrow markets);

*Smith v. Multi-Flow Dispensers of Ohio, Inc.*, 181 F.3d 103 (6th Cir. 1999) (table) (upholding

dismissal where alleged relevant market clearly did not encompass all interchangeable substitute

products); *Michigan Div. – Monument Builders of N. Am. v. Michigan Cemetery Ass'n*, 458 F.

Supp. 2d 474, 483 (E.D. Mich. 2006) (dismissing complaint where market alleged clearly did not

encompass all interchangeable substitutes).

Plaintiffs may not simply state the parameters of their proposed relevant market; rather,

they must provide a factual predicate to support their legal conclusions. Despite the frequent

acknowledgement that market definition can be a fact-intensive inquiry, courts grant motions to

dismiss when, as here, the market definition deficiencies are clear from the face of the

Complaint. *See e.g., Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) (rejecting alleged product market as facially too narrow, and dismissing complaint because it "did not provide a sufficient factual predicate to support its allegations" that the defendant enjoys market power in the broader market); *Total Benefits Planning Agency Inc. v. Anthem Blue Cross & Blue Shield,* No. 1:05-CV-519, 2007 U.S. Dist. LEXIS 53862, at *7 (S.D. Ohio July 25, 2007) ("While Plaintiffs' Amended Complaint speaks of the health insurance market in the geographical area of Indiana, Ohio, and Kentucky, the Amended Complaint fails to mention other insurance companies or agents within this market. There is nothing in the Amended Complaint which would indicate the power which Defendants have in the health insurance market. Without this information, the Court finds that Defendants are entitled to dismissal."); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004) (rejecting plaintiff's alleged market definition as overly narrow and granting defendants' motion to dismiss because "a more specific definition and accounting of the brands and suppliers to be included in the [broader] relevant market" would be necessary in order to assess defendants' market power).[11]

### B. Plaintiffs Fail To Allege Facts Sufficient To Define the Market for Purchasing Grade A Milk and Defendants' Alleged Power in that Market.

Plaintiffs here have failed to allege sufficient facts regarding any Defendant's purported monopoly or monopsony power in the product market the Plaintiffs allege is relevant. Plaintiffs

---

[11] Courts in other circuits have come to similar conclusions. *See, e.g., Apani Southwest, Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) (same); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998).

generally describe their alleged relevant product market as either "fluid Grade A milk," *see, e.g.*, Compl. ¶¶ 75, 100, or "the market for the purchase of fluid Grade A milk," *id.* ¶¶ 80, 87. Yet Plaintiffs offer no factual allegations to show that any Defendant possesses monopsony or monopoly power in such a market. In all of their underlying factual allegations, Plaintiffs ignore all of the other firms besides the processor Defendants who purchase Grade A milk produced in the "Southeast," including processors that make sour cream, ice cream, custard, cheese, nonfat dry milk, and butter.

The face of the Complaint makes it clear that Grade A milk is purchased by at least four types of dairy plants—not just fluid milk bottlers, but also manufacturers of "soft" dairy products like ice cream; manufacturers of "hard" dairy products like cheese; and manufacturers of butter and nonfat dry milk. Compl. ¶ 28. Although Plaintiffs claim, for example, that Dean controls "60 percent of the fluid Grade A milk bottling capacity in the Southeast," *id.* at ¶¶ 47, 87, they fail to say *anything* about Dean's share of their proposed relevant market—*i.e.*, "the market for the purchase of fluid Grade A milk." The allegation that Dean controls "60 percent" of fluid milk bottling *capacity* is uninformative when it comes to the question Plaintiffs' Complaint must address: whether Dean possesses monopsony power in the market alleged—that is, the market *for the purchase of Grade A milk*. Without alleging relevant facts relating to market share and market power within the asserted product market, Plaintiffs' claims must be dismissed.[5]

Similar problems afflict the geographic market allegations here. Plaintiffs identify two USDA Federal Milk Marketing Orders—Orders 5 and 7 (referred to by Plaintiffs as "the

---

[5] The problem with respect to Count Two is similar, but perhaps even more severe: there Plaintiffs accuse DFA of monopolizing a market they describe as the market for the purchase of Grade A milk (Compl. ¶ 80), yet the Complaint makes clear that that DFA is, even counting its indirect ownership interests, smaller than at least two other milk bottlers, and some unknown number of other milk purchasers.

Southeast")—as their proposed relevant geographic market. Compl. ¶¶ 75, 80, 87, 100. With their next breath, however, Plaintiffs assert that those geographic regions are in "chronic short supply" of milk, *id.*, a condition that ensures competitors from outside the geographic market are making up the difference. This causes Plaintiffs' legal conclusion that "the Southeast" is the relevant geographic market to fail as a matter of law, because it demonstrates that the area within which consumers look to purchase the product at issue—which is how geographic markets are defined, *see Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999)—is by their own allegations broader than the Southeast.

Plaintiffs' unexplained exclusion of other purchasers of Grade A milk from the analysis of monopoly or monopsony power in the "market for the purchase of fluid Grade A milk," and decision to ignore the role of other sellers of milk to consumers in the Southeast, leaves the Complaint lacking the "sufficient factual predicate" to support plaintiffs' Section 2 claims, either in the Southeast or in a broader geographic market. *Found. for Interior Design Educ. Research*, 244 F.3d at 531; *see also Total Benefits Planning Agency*, 2007 U.S. Dist. LEXIS, at *7 (defendants entitled to dismissal where Complaint failed to indicate defendant's market power in alleged market); *Cupp*, 310 F. Supp. 2d at 971 (motion to dismiss granted because Complaint lacked information necessary for court to assess defendant's market power in broader market). Because the Complaint fails to set forth a properly defined relevant market or to provide the requisite allegations of Defendants' monopoly and/or monopsony power in that market, the Complaint is insufficient and warrants dismissal as a matter of law.

## IV.    PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

Even assuming Plaintiffs were able to overcome all of the issues discussed above, their antitrust claims still should be dismissed because they are barred by the statute of limitations. As the Complaint shows, the acts that allegedly gave rise to Plaintiffs' claims occurred years outside

the limitations period, and Plaintiffs were aware of their claims at that time. Evidently recognizing the untimeliness of their Complaint, Plaintiffs allege that the statute of limitations was tolled by virtue of fraudulent concealment by Defendants. Compl. ¶¶ 62-64. Under well-established law in this Circuit, however, allegations of fraudulent concealment must be pled with particularity in accordance with Rule 9(b) of the Federal Rules of Civil Procedure, something Plaintiffs have not done and, given their allegations, cannot do.

The statute of limitations for private federal antitrust actions is four years from the date of the accrual of the action. *See* 15 U.S.C. § 15b. A cause of action accrues, and the limitations period begins to run, each time "a defendant commits an act that injures [the] plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). "[T]he focus is on the timing of the causes of injury, *i.e.*, the defendant's overt acts, as opposed to the effects of the overt acts." *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990) (per curiam). Even in the context of a continuing conspiracy, "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Thus, "plaintiffs may sue only for damages that result from acts committed by the defendants within the four years preceding commencement of suit." *Barnosky Oils, Inc. v. Union Oil Co. of Cal.*, 665 F.2d 74, 81 (6th Cir. 1981) (quotations omitted).

In this case, Plaintiffs seek to recover damages allegedly associated with numerous acts that fall outside the four-year limitations period. Yet, the law is clear that, unless the statute of limitations was tolled (which, as explained below, it was not), Plaintiffs cannot seek to recover damages for such acts—in this case, acts prior to August 27, 2003. The law is equally clear that Plaintiffs can only maintain a claim for acts committed *after* August 27, 2003, if those acts

constitute new "overt acts" in furtherance of the alleged conspiracy. Those two constraints are fatal to Plaintiffs' claims.

## A. Plaintiffs' Alleged Injuries Were Caused by Conduct Prior to August 27, 2003 and Are Therefore Time-Barred.

Plaintiffs claim that the conspiratorial conduct that caused their harm was the "implement[ation of] long-term full-supply agreements" between and among Dean, NDH and DFA (Compl. ¶ 2a) and an alleged agreement among Defendants to acquire milk processing plants and deny others the right to use them except through DFA-controlled enterprises, *id.* ¶ 51. But as Plaintiffs themselves concede, the full supply contacts were initiated "as early as January 1, 2001" (*id.* ¶ 42), and DFA's acquisition of bottling plants began the same year (*id.* ¶ 44), all clearly prior to the limitations period. Indeed, the Complaint is littered with allegedly unlawful conduct that occurred prior to August 2003. The alleged class period, for example, dates back to January 1, 2001. *Id.* ¶¶ 5, 42. Unless there is a basis for tolling the statute of limitations, Plaintiffs' claims based upon conduct that occurred prior to August 27, 2003 are time-barred.

## B. Plaintiffs Have Not Identified Any Overt Acts Within the Limitations Period That "Restart" the Running of the Statute.

As discussed above, "even when a plaintiff alleges a continuing [antitrust] violation, an overt act by the defendant is required to restart the statute of limitations." *Peck*, 894 F.2d at 849 (quotations omitted). "An overt act that restarts the statute of limitations is characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must "inflict new and accumulating injury on the plaintiff." *DXS, Inc. v. Siemens Med. Sys.*, 100 F.3d 462, 467 (6th Cir. 1996) (internal quotations omitted). "Acts that simply reflect or implement a prior refusal to deal, or acts that are merely unabated inertial consequences (of a single act), do not restart the statute of limitations." *Id*. at 467-68 (internal quotations and citations omitted). The problem Plaintiffs face is that the only truly "overt acts"

they have identified—implementation of the long-term full-supply agreements and the alleged agreement to exclude others from processing plants—all occurred prior to August 2003.

Plaintiffs allege that these agreements were implemented "in order to control Southeastern dairy farmers' access to fluid Grade A milk bottling plants." Compl. ¶ 2a. But such allegations go to effects; they do not create new overt acts within the limitations period. Any continued implementation of an older agreement was simply a reaffirmation of the already existing agreement and thus caused no new and accumulating injury to Plaintiffs. Therefore, it cannot suffice to start the four-year period running anew. *See, e.g.*, *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999) (to restart running of statute of limitations, overt act "must be a new and independent act that is not merely a reaffirmation of a previous act" and "must inflict new and accumulating injury on the plaintiff") (citations and internal quotations omitted); *Barnosky*, 665 F.2d at 82 ("'unabated inertial consequences' of [a] 1971 contract" could not form basis for continuing violation); *Garelick v. Goerlich's, Inc.*, 323 F.2d 854, 856 (6th Cir. 1963) (per curiam) (acts that "simply . . . reflected that defendant-appellee continued in refusing to sell its products to plaintiffs-appellants" were not sufficient to restart running of statute of limitations); *see also Baker v. Chagrin Valley Med. Corp.*, No. C82-122, 1985 WL 445, at *8-*9 (N.D. Ohio Mar. 22, 1985) (discussing cases).[6]

---

[6] The *Baisley* and *Sweetwater* complaints from which this Complaint was copied contain certain factual allegations concerning the manner in which the conspiracy was supposedly implemented, and every identified act either flows from the full-supply agreements or takes place outside the limitations period. *See, e.g.*, Complaint, *Sweetwater Valley Farms v. Dean Foods, et al.*, No. 1:07-CV-0051 (M.D. Tenn.) (attached hereto as Ex. 4), at ¶ 69. Plaintiffs evidently hoped to avoid that problem here by failing to allege how or when the conspiracy was allegedly implemented.

## C. Plaintiffs' Fraudulent Concealment Allegations Are Inadequate To Avoid Dismissal of Their Claims as Untimely.

Plaintiffs recognize their statute of limitations problem, because in their Complaint they attempt to avoid the limitations period by alleging "fraudulent concealment." *Compl.* ¶¶ 62-64. "To toll a limitations period on this basis, a plaintiff must show '(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.'" *Hamilton County Bd. of Comm'nrs v. National Football League*, 491 F.3d 310, 315 (6th Cir. 2007) (quoting *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975)). Rule 9(b) of the Federal Rules of Civil Procedure requires that each of these elements be pleaded with particularity. *Evans v. Pearson Enters., Inc.*, 434 F.3d 839, 851 (6th Cir. 2006). Indeed, the Sixth Circuit has recognized:

> [B]ecause "statutes of limitation are vital to the welfare of society and are favored in the law," the plaintiff who invokes the doctrine of fraudulent concealment will be "held to stringent rules of pleading and evidence, 'and especially must there be distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether, by ordinary diligence, the discovery might not have been before made.'"

*Pinney Dock & Transport Co. v. Penn Cen. Corp.*, 838 F.2d 1445, 1465 (6th Cir. 1988) (quoting *Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 139-40 (1879)). Plaintiffs' Complaint falls far short of this standard.

As to the first element, "[m]ere silence, or one's unwillingness to divulge one's allegedly wrongful activities, is not sufficient"; an antitrust plaintiff must allege and ultimately prove "affirmative acts of concealment." *Pinney Dock*, 838 F.2d at 1472; *accord Wood*, 101 U.S. at 143 ("Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry."). Even liberally construing the Complaint,

the only assertion that arguably goes beyond "mere silence" is Plaintiffs' allegation that Defendants "falsely represented to Plaintiffs and class members that the prices they received for Grade A milk were fair and competitive." Compl. ¶ 62. But Plaintiffs do not state "the circumstances constituting" this alleged false representation "with particularity," as Rule 9(b) requires. For example, there are no allegations about who said what to whom, when, or where.

Plaintiffs also fail to satisfy the second element of their fraudulent concealment claim. They allege that they "did not discover . . . the unlawful conduct alleged [in the Complaint] at the time it occurred." Compl. ¶ 64. But they do not—and presumably cannot—allege that they failed to discover the acts giving rise to their claim *within the four-year limitations period.* The relevant inquiry under *Dayco* is failure to discover the operative facts "within the limitations period," 523 F.2d at 394—not failure to discover those facts "at the time [they] occurred."

Plaintiffs' allegations regarding the third element of their fraudulent concealment claim are likewise lacking. As the Supreme Court has stated, "a plaintiff who is not reasonably diligent may not assert fraudulent concealment." *Klehr*, 521 U.S. at 194 (internal quotations omitted). "If the plaintiff has delayed beyond the limitations period, he must fully plead the facts and circumstances surrounding his belated discovery 'and the delay which has occurred must be shown to be consistent with the requisite diligence.'" *Dayco*, 523 F.2d at 394 (quoting *Wood*, 101 U.S. at 143). Thus, there must be "distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether, by ordinary diligence, the discovery might not have been before made." *Wood*, 101 U.S. at 140 (internal quotations omitted). "A general allegation of ignorance at one time and of knowledge at another are of no effect. If the plaintiff made any particular discovery,

it should be stated when it was made, what it was, how it was made, and why it was not made sooner." *Id.* at 140-41.

Here, however, the Complaint contains only boilerplate allegations that Plaintiffs "could not have discovered through the exercise of reasonable diligence, which they exercised, the unlawful conduct alleged herein at the time it occurred." Compl. ¶ 64. Such bare allegations of due diligence are not sufficient to withstand a motion to dismiss. *See, e.g.*, *Gumbus v. United Food & Commercial Workers Int'l Union*, No. 95-5113, 1995 WL 5935, at *3 (6th Cir. Jan. 6, 1995) ("[T]o overcome a 12(b)(6) motion, the plaintiffs must . . . plead facts showing that they exercised due diligence. Plaintiffs' bare allegation to this effect is not enough."); *Dayco*, 523 F.2d at 394 ("Dayco's mere allegation of due diligence without asserting what steps were taken is insufficient").

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss the Complaint in its entirety as to all Defendants.

Dated: October 15, 2007                     Respectfully submitted,

                                            WILLIAMS & CONNOLLY LLP


                                            /s/ John E. Schmidtlein
                                            Steven R. Kuney
                                            John E. Schmidtlein  (BPR # 441261)

                                            725 12th St., N.W.
                                            Washington, D.C.  20005
                                            Tel:  (202) 434-5000
                                            skuney@wc.com
                                            jschmidtlein@wc.com

H. Buckley Cole
GREENEBAUM, DOLL & McDONALD PLLC
AmSouth Center
315 Deaderick Street, Suite 1425
Nashville, TN 37238
Tel: (615) 760-7130
hbc@gdm.com

*Counsel for Defendants Dairy Farmers of America,*
   *Dairy Marketing Services, LLC, and Mid-Am*
   *Capital LLC*

BAKER & MILLER PLLC
W. Todd Miller
2401 Pennsylvania Avenue, N.W.
Suite 300
Washington, D.C. 20037
Tel: (202) 663-7820

*Of Counsel*

*Authorized to file on behalf of other Defendants,*
   *through their counsel of record, as follows:*

Jerry L. Beane
Kay Lynn Brumbaugh
ANDREWS KURTH LLP
Suite 3700, 1717 Main Street
Dallas, TX 75201
Tel: (214) 659-4400
jerrybeane@andrewskurth.com

Taylor B. Mayes
Robert L. Trentham
MILLER & MARTIN, LLP
150 Fourth Avenue, North
1200 One Nashville Place
Nashville, TN 38219
Tel: (615) 244-9270
tmayes@millermartin.com

*Counsel for Defendant National Dairy*
   *Holdings, L.P.*

Paul S. Davidson
Lea Carol Owen (BPR # 19531)
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street
Post Office Box 198966
Nashville, TN 37219
Tel: (615) 244-6380
paul.davidson@wallerlaw.com

Paul Denis
Paul H. Friedman
DECHERT LLP
1775 I Street, N.W.
Washington, DC 20006
Tel: (202) 261-3398
paul.denis@dechert.com
paul.friedman@dechert.com

*Counsel for Defendant Dean Foods Company*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 15th day of October, 2007, notice of the filing of JOINT MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE will be sent by operation of the Court's electronic filing system to counsel as indicated on the electronic filing receipt and listed below:

Thomas C. Jessee
JESSEE & JESSEE
P.O. Box 997
Johnson City, TN 37605
jjlaw@jesseeandjessee.com

Michael D. Hausfeld
Benjamin D. Brown
James J. Pizzirusso
COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington D.C. 20005
mhausfeld@cmht.com
jpizzirusso@cmht.com

*Counsel for Plaintiffs*

W. Gordon Dobie
Kari M. Rollins
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
w.dobie@winston.com
karollins@winston.com

David Alexander Fardon
HARWELL HOWARD FYNE GABBERT &
  MANNER, P.C.
315 Deaderick Street, Suite 1800
Nashville, TN 37238-1800
daf@h3gm.com

*Counsel for Defendant Southern Marketing
  Agency, Inc.*

/s/ John E. Schmidtlein