# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## GREENEVILLE DIVISION

| | | |
|---|---|---|
| **SWEETWATER VALLEY FARM, INC.** | ) | **MDL No. 1899** |
| **17988 West Lee Highway** | ) | |
| **Philadelphia, TN  37846** | ) | **Master File No. 2:08-MD-1000** |
| | ) | |
| **BARBARA ARWOOD** | ) | |
| **VICTOR ARWOOD** | ) | |
| **d/b/a VBA DAIRY** | ) | |
| **238 County Road 401** | ) | **CONSOLIDATED AMENDED** |
| **Madisonville, TN  37354** | ) | **COMPLAINT** |
| | ) | |
| **JEFFREY P. BENDER** | ) | |
| **117 Twin Hollies Lane** | ) | **Class Action** |
| **Norlina, NC 27563** | ) | **Jury Trial Demanded** |
| | ) | |
| **RANDEL E. DAVIS** | ) | **Judge J. Ronnie Greer** |
| **d/b/a Davis Brothers Dairy** | ) | **Magistrate Judge Dennis H. Inman** |
| **2303 Davis Dairy Road** | ) | |
| **Philadelphia, TN  37846** | ) | |
| | ) | |
| **FARRAR & FARRAR DAIRY, INC.** | ) | |
| **175 Farrar Dairy Road** | ) | |
| **Lillington, NC  27546** | ) | |
| | ) | |
| **FRED JAQUES** | ) | |
| **3024 Ebenezer Road** | ) | |
| **Bowman, SC  29018** | ) | |
| | ) | |
| **JOHN M. MOORE** | ) | |
| **1342 Dry Valley Road NE** | ) | |
| **Cleveland, TN  37312** | ) | |
| | ) | |
| **D.L. ROBEY FARMS** | ) | |
| **2160 Schochoh Road** | ) | |
| **Adairville, KY  42202** | ) | |
| | ) | |
| **ROBERT D. STOOTS** | ) | |
| **539 Sheffy School Road** | ) | |
| **Max Meadows, VA  24360** | ) | |
| | ) | |

**VIRGIL C. WILLIE**                    )
**7084 Ivanhoe Road**                   )
**Ivanhoe, VA  24350**                  )
                                        )
**JAMES D.BAISLEY**                     )
**EVA C. BAISLEY**                      )
**d/b/a Baisley Farms**                 )
**4247 Highway 70 North**               )
**Crossville, TN  38571**               )
                                        )
**STEPHEN J. CORNETT**                  )
**565 Hiwassee Road**                   )
**Madisonville, TN  37354**             )
                                        )
**WILLIAM C. FRAZIER**                  )
**BRANSON C. MCCAIN**                   )
**d/b/a McCain Dairy**                  )
**1904 Lake Lucas Road**                )
**Sophia, NC  27350**                   )
                                        )
**and**                                 )
                                        )
**JERRY L. HOLMES**                     )
**663 Holmes Road**                     )
**Keactchie, LA  71046**                )
                                        )
        **Plaintiffs**                  )
                                        )
**v.**                                  )
                                        )
**DEAN FOODS COMPANY**                  )
**2515 McKinney Avenue, Suite 1200**    )
**Dallas, TX  75201**                   )
                                        )
**NATIONAL DAIRY HOLDINGS, L.P.**       )
**3811 Turtle Creek Boulevard, Suite 1300** )
**Dallas, TX 75219**                    )
                                        )
**DAIRY FARMERS OF AMERICA, INC.**      )
**10220 North Ambassador Drive**        )
**Kansas City, MO  64153**              )
                                        )
**DAIRY MARKETING SERVICES, LLC**       )
**5001 Brittonfield Parkway**           )
**Syracuse, NY  13221**                 )
                                        )

2

Case 2:07-cv-00208 Document 174 Filed 06/20/08 Page 2 of 60 PageID #: 2194
Case 2:08-md-01000 Document 67 Filed 06/20/2008 Page 2 of 60

SOUTHERN MARKETING AGENCY, )
INC. )
**Waterfront Plaza** )
**325 West Main Street** )
**Prospect, KY  40202059** )
)
**MID-AM CAPITAL LLC** )
**10220 North Ambassador Drive** )
**Kansas City, MO 64153** )
)
**JAMES BAIRD** )
**217 Baird Lane** )
**Windthorst, TX 36389** )
)
**GARY HANMAN** )
**17505 Humphreys Road** )
**Platte City, MO 64079** )
)
**and** )
)
**GERALD BOS** )
**7604 NW Eastside Drive** )
**Kansas City, MO 64152** )
)
             **Defendants.** )
                                                )

## CONSOLIDATED AMENDED COMPLAINT

Plaintiffs Sweetwater Valley Farm, Inc. ("Sweetwater Farm"), Barbara and Victor
Arwood d/b/a VBA Dairy ("Arwoods"), Jeffrey P. Bender ("Bender"), Randel E. Davis d/b/a
Davis Brothers Dairy ("Davis"), Farrar & Farrar Dairy, Inc. ("Farrar Dairy"), Fred Jaques
("Jaques"), John M. Moore ("Moore"), D.L. Robey Farms ("Robey Farms"), Robert D. Stoots
("Stoots"), Thomas R. Watson d/b/a Dawn Dairy ("Watson") and Virgil C. Willie ("Willie")
(collectively "independent dairy farmers and independent cooperative members"), and James D.
Baisley and Eva C. Baisley ("Baisleys"), Stephen J. Cornett ("Cornett"), Jerry L. Holmes
("Holmes") and McCain Dairy ("McCain Dairy") (collectively "DFA member dairy farmers"),
as Plaintiffs and Class Representatives, by and through counsel, file this action both on behalf of
themselves and as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure

3

Case 2:07-cv-00208 Document 174 Filed 06/20/08 Page 3 of 60 PageID #: 2195
Case 2:08-md-01000 Document 67 Filed 06/20/2008 Page 3 of 60

against Defendants Dean Foods Company ("Dean"), National Dairy Holdings, L.P. ("NDH"), Dairy Farmers of America, Inc. ("DFA"), Dairy Marketing Services, LLC ("DMS"), Southern Marketing Agency, Inc. ("SMA"), Mid-Am Capital LLC ("Mid-Am"), James Baird ("Baird"), Gary Hanman ("Hanman") and Gerald Bos ("Bos") (collectively referred to as "Defendants"). Plaintiffs seek treble damages and injunctive relief for Defendants' violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). Plaintiffs complain and allege as follows:

## <u>NATURE OF THE CASE</u>

1.        This is an antitrust case arising out of Defendants' combination and conspiracy to refuse to compete for raw Grade A milk marketed or sold to or purchased by bottling plants ("fluid Grade A milk") in the Southeast United States with the purpose and effect of fixing, stabilizing, and maintaining prices paid to dairy farmers for fluid Grade A milk, foreclosing independent dairy farmers' and independent cooperative members' access to fluid Grade A milk bottling plants, eliminating and stifling competition from independent dairy cooperatives and independent fluid Grade A milk bottlers, and other unlawful activities designed to artificially and anti-competitively reduce the price paid by Defendants for fluid Grade A milk purchased from Plaintiffs and other members of the class.

2.        Defendants' actions further demonstrate their individual intent to unlawfully acquire and maintain monopoly and monopsony power in the market for the marketing or sales of fluid Grade A milk to, or purchase of fluid Grade A milk by, bottling plants in the Southeast. Defendants engaged in myriad anticompetitive, exclusionary and predatory acts in their quest to achieve and exploit market power.

3.        Defendants, together with their co-conspirators, including among others DairyCom Inc. ("Dairy.com"), The Kroger Co. ("Kroger"), Prairie Farms Dairy, Inc. ("Prairie Farms"), Robert W. Allen ("Allen"), Jay Bryant ("Bryant"), Herman Brubaker ("Brubaker"), Gregg L. Engles ("Engles"), Michael J. McCloskey ("McCloskey"), Allen A. Meyer ("Meyer") and Pete Schenkel ("Schenkel") (collectively "Co-conspirators"), carry out their conspiracy through a series of unlawful activities including, but not limited to:

a.  entering full-supply agreements with DFA that it could not satisfy with its own production, and implementing long-term full-supply agreements between Defendants Dean, NDH, DFA and their Co-conspirators to control Southeast dairy farmers' access to fluid Grade A milk bottling plants;

b.  depressing, fixing and stabilizing prices for fluid Grade A milk paid to dairy farmers;

c.  requiring Southeast dairy farmers to market their fluid Grade A milk through DFA-controlled entities such as DMS or SMA to gain access to fluid Grade A milk bottling plants;

d.  threatening to cut off and cutting off Southeast dairy farmers' access to fluid Grade A milk bottling plants;

e.  boycotting dairy farmers, cooperatives, and fluid Grade A milk bottlers;

f.  "flooding" the Southeast with Grade A milk to further depress prices for fluid Grade A milk paid to Southeast dairy farmers;

g.  utilizing DFA-controlled entities such as DMS or SMA to monitor prices for fluid Grade A milk paid to independent dairy farmers and independent cooperative members;

h.  "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers' fluid Grade A milk; and

i.  purchasing fluid Grade A milk bottling plants, closing down fluid Grade A milk bottling plants and/or refusing to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers in the Southeast.

4.     Defendants' conspiracy enables them to enjoy the economic benefits that flow from conspiring to operate an unlawful cartel that refuses to compete for the purchase of fluid Grade A milk for bottling, forecloses access to fluid Grade A milk bottling plants and processors, and fixes prices for fluid Grade A milk paid to Southeast dairy farmers. Dean, NDH, and DFA each can pay stabilized and artificially low over-order premium prices to Southeast dairy farmers with the comfort of knowing that its horizontal competitors are paying the same price – because SMA and DMS are there to police compliance. Defendants' actions have left independent dairy

5

Case 2:07-cv-00208-... Document 174 Filed 06/20/08 Page 5 of 60 PageID #: 2197
Case 2:08-md-01000 ... Document 67 Filed 06/20/2008 Page 5 of 60

farmers and independent cooperative members with only two options: a) forego their independence by agreeing to utilize DFA, or entities it controls such as DMS or SMA, to market their fluid Grade A milk at the cartel's fixed price; or b) go out of business.

5.      In addition to engaging in this antitrust conspiracy and unlawfully acquiring and maintaining monopoly power in the relevant markets, DFA management also diverted millions of dollars of revenues, monies and assets that lawfully belonged to DFA member dairy farmers through a pattern of inappropriate transactions involving SMA and other entities that bottle and market Grade A milk. These actions resulted in extraordinary and unnecessary fees being passed through to DFA member dairy farmers. DFA member dairy farmers in the Southeast were especially hurt by these inflated fees because of the ongoing suppression of prices through Defendants' antitrust violations.

6.      In 1998, DFA management began to invest massive amounts of its producer members' monies and equity and incurred massive amounts of debt to acquire stakes in many fluid Grade A milk bottling plants. The success of such investments depend upon DFA management's ability to supply these plants with fluid Grade A milk obtained at the lowest possible price, which is directly contrary to the core responsibility that DFA management owes to DFA member dairy farmers to market their fluid Grade A milk at the highest possible price.

7.      In connection with DFA management's decision to increase its investments in fluid Grade A milk bottling plants, beginning in January 1998 and continuing to the present, DFA management entered into business ventures with processors and DFA management insiders and favored business partners, giving them "sweetheart" deals, the details of which DFA management concealed – and continues to conceal – from DFA member dairy farmers.

8.      The substantial increase in DFA's investment in plants aligned DFA management's interest with processors' interest in securing control of the fluid Grade A milk markets in the Southeast because doing so would ensure that it and its fluid Grade A milk bottling allies would have an adequate supply of fluid Grade A milk at the lowest possible price.

6

Case 2:07-cv-00208 Document 174 Filed 06/20/08 Page 6 of 60 PageID #: 2198
Case 2:08-md-01000 Document 67 Filed 06/20/2009 Page 9 of 60

9.     Independent dairy farmer and independent cooperative member Plaintiffs are current and former producers of fluid Grade A milk marketed to bottling plants in the Southeast, either alone as independent dairy farmers or as members of independent cooperatives which act as Plaintiffs' agents in the marketing and sale of their milk. These Plaintiffs and the other similarly situated Southeast independent dairy farmers and independent cooperative members are denied free and unrestrained access to Southeast fluid Grade A milk bottling plants by Defendants' unlawful acts, and are all direct victims of Defendants' unlawful acts and conspiracy to eliminate competition and artificially depress prices for fluid Grade A milk paid to dairy farmers.

10.     DFA dairy farmer member Plaintiffs are current and former DFA member dairy farmers who produce fluid Grade A milk marketed to bottling plants in the Southeast. These Plaintiffs and the other similarly situated Southeast DFA member dairy farmers are victims of Defendants' unlawful acts and conspiracy to eliminate competition and artificially depress prices for fluid Grade A milk paid to dairy farmers. These Plaintiffs also have been harmed by DFA's breach of its membership agreement with DFA member dairy farmers in the Southeast through excessive and unnecessary fees resulting in "mailbox" prices for Grade A milk which are lower than those received by other dairy farmers in the market.

11.     Plaintiffs bring a class action pursuant to Rule 23(a) and (b)(2) and (3) of the Federal Rules of Civil Procedure ("Rule 23"), on behalf of themselves and other Southeast dairy farmers, under Sections 1 and 2 of the Sherman Act of 1890 (the "Sherman Act"), 15 U.S.C. §§ 1 & 2, for which Defendants are jointly and severally liable. Specifically, the "Class" is defined as:

> All dairy farmers, whether individuals or entities, who produced Grade A milk within Orders 5 or 7 and sold Grade A milk directly or through an agent to Defendants or Co-conspirators in Orders 5 and/or 7 during any time from January 1, 2001 to the present. The following persons are excluded from the Class: a) Defendants and b) Defendants' co-conspirators.

Plaintiffs seek certification of two "Subclasses" because, although <u>all</u> dairy farmers in the Southeast have been injured by Defendants' antitrust violations, DFA member dairy farmers have an additional claim for breach of contract. The subclasses are defined as:

a. **Independent Dairy Farmer and Independent Cooperative Member Subclass** – All independent dairy farmers and independent cooperative members (whether individuals or entities) who produced Grade A milk within Orders 5 or 7 and sold Grade A milk directly or through an agent to Defendants or Co-conspirators in Orders 5 or 7 during any time from January 1, 2001 to the present. The terms "independent dairy farmer" and "independent cooperative member" refer to Southeast dairy farmers who were not members of DFA at the time of their Grade A milk sales.

b. **DFA Member Dairy Farmer Subclass** - All DFA members (whether individuals or entities) who produced Grade A milk within Orders 5 or 7 and sold Grade A milk directly or through an agent to Defendants or Co-conspirators in Orders 5 or 7 during any time from January 1, 2001 to the present. The term "DFA member dairy farmer" refers to Southeast dairy farmers who were members of DFA at the time of their Grade A milk sales.

12.     This action seeks to enjoin Defendants' unlawful conduct and to recover treble damages, costs and expenses, as well as attorneys' fees and disbursements, along with such additional and further relief as may be deemed just and proper.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

13.     This action is brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.

14.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26.

15.     This Court has personal jurisdiction over Dean, NDH, DFA, DMS, SMA and Mid-Am, because they systematically and continuously transact substantial business in the United States and in Tennessee.

16.     This Court has personal jurisdiction over Baird, Bos and Hanman because of their numerous contacts with Tennessee including but not limited to the following:

8

a.  Baird attended numerous meetings in Tennessee, including with current and prospective members of Lone Star Milk Producers, Inc. ("Lone Star"), with prospective investors in a fluid Grade A milk bottling plant, with DFA management at DFA's Southeast Council headquarters in Knoxville, with DMS management at DMS' regional office in Knoxville, with SMA's management at DFA's offices in Knoxville, and with current and former independent dairy farmers and cooperative members in Knoxville. Baird made numerous related telephone calls and, upon information and belief, sent letters, facsimiles and electronic communications to Tennessee residents.

b.  Bos attended numerous meetings in Tennessee, including with DFA management and members in Memphis, with DFA management at DFA's Southeast Council headquarters in Knoxville, with DMS management at DMS' regional office in Knoxville, and with SMA's management at DFA's offices in Knoxville. Bos made numerous related telephone calls and, upon information and belief, sent letters, facsimiles and electronic communications to Tennessee residents.

c.  Hanman attended numerous meetings in Tennessee, including with DFA management and members throughout Tennessee including at DFA's Southeast Council headquarters in Knoxville, with DMS management at DMS' regional office in Knoxville, with SMA management at DFA's offices in Knoxville, and with current and former Southeast dairy farmers in Tennessee. Hanman made numerous related telephone calls and, upon information and belief, sent letters, facsimiles and electronic communications to Tennessee residents.

17.    Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants inhabit, transact business, reside, are found or have an agent in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

18.    Defendants Dean and NDH purchase, process and ship fluid Grade A milk across state lines. Defendant DFA markets, processes and ships Grade A milk across state lines. Defendants DMS and SMA market fluid Grade A milk across state lines, Defendant Mid-Am provides financing to DFA's fluid Grade A milk bottling plants across state lines, and Defendants Baird, Bos and Hanman have actively managed and participated in Defendants' interstate marketing of fluid Grade A milk. All defendants receive substantial payments across state lines from the sale of fluid Grade A milk. Defendants' business activities that are the

subject of this Complaint are within the flow of, and substantially have affected, interstate trade and commerce.

## PARTIES

### Plaintiffs

19.     Plaintiffs Arwoods, individuals, own a dairy farm located at 238 County Road 401, Madisonville, Tennessee 37354 that does business as VBA Dairy.  VBA Dairy currently milks approximately 100 cows.  During all times relevant to this Complaint, VBA Dairy, through DMS, has sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

20.     Plaintiff Bender, an individual, owns a dairy farm located at 117 Twin Hollies Lane, Norlina, North Carolina 27563.  Bender was a member of Maryland & Virginia Producers Cooperative Association, Inc. ("Maryland & Virginia Coop") from 1999 until April 2007, and Bender was a member of Maryland & Virginia Coop's board of directors from 2000 until 2006. Bender milked between 100 and 250 cows.  In April 2007 Bender sold his cows because his over-order premiums were too low to permit his dairy farm to operate.  During all times relevant to this Complaint until April 2007, Bender, through SMA, sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

21.     Plaintiff Davis, an individual, owns a dairy farm located at 2303 Davis Dairy Road, Philadelphia, Tennessee 37846 that does business as Davis Brothers Farm.  Davis Brothers Farm was a member of Maryland & Virginia Coop from 1999 until August 2005, and Davis was a member of Maryland & Virginia Coop's board of directors from 1999 until 2005.  Davis Brothers Farm currently milks approximately 650 cows.  During all times relevant to this Complaint, Davis Brothers Farm has directly, and through SMA and DMS, sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

22.     Plaintiff Farrar Dairy is a for-profit corporation organized and existing under the laws of the State of North Carolina with its principal place of business at 1175 Farrar Dairy Road, Lillington, North Carolina 27546.  During all times relevant to the Complaint until 2006,

Case 2:07-cv-00208   Document 174   Filed 06/20/08   Page 10 of 60   PageID #: 2202

Farrar Dairy, through SMA, sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

23.     Plaintiff Jaques, an individual, owns a dairy located at 3024 Ebenezer Road, Bowman, South Carolina 29018.  During all times relevant to the Complaint, Jaques, through SMA, sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

24.     Plaintiff Moore, an individual, owns a dairy located at 1342 Dry Valley Road NE, Cleveland, Tennessee 37312.  Moore currently milks approximately 100 cows.  During all times relevant to this Complaint, Moore has directly, and through DMS, sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

25.     Plaintiff Robey Farms is a general partnership organized and existing under the laws of the Commonwealth of Kentucky with its principal place of business at 2160 Schochoh Road, Adairville, Kentucky 42202.  The shares of Robey Farms are owned by Lee Robey, Denise Robey, Jane Robey, D. L. Robey, Adam Robey, Eli Robey and Chris Robey.  Robey Farms currently milks approximately 1200 cows.  During all times relevant to this Complaint, Robey Farms has directly, and through DMS, sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

26.     Plaintiff Stoots, an individual, owns a dairy farm located at 539 Sheffy School Road, Max Meadows, Virginia 24360.  Stoots currently milks approximately 55 cows.  During all times relevant to the Complaint, Stoots, through SMA, has sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

27.     Plaintiff Sweetwater Farm is a for-profit corporation organized and existing under the laws of the State of Tennessee with its principal place of business at 17988 West Lee Highway, Philadelphia, Tennessee 37846.  John and Celia Harrison are the sole shareholders of Sweetwater Farm.  Sweetwater Farm currently milks approximately 700 cows.  During all times relevant to this Complaint, Sweetwater Farm has directly, and through DMS, sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

11

Case 2:07-cv-00208 Document 174 Filed 06/20/08 Page 11 of 60 PageID #: 2203
Case 2:08-md-01000 Document 67 Filed 06/20/2008 Page 11 of 60

28.     Plaintiff Watson, an individual, owns a dairy farm located at 1319 Dawn Dairy Road, Bedford, Virginia 24523 that does business as Dawn Dairy.  Dawn Dairy currently milks approximately 100 cows.  During all times relevant to the Complaint, Dawn Dairy, through SMA, has sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

29.     Plaintiff Willie, an individual, owns a dairy farm located at 7084 Ivanhoe Road, Ivanhoe, Virginia 24530 that does business as Bar-W Farms.   Willie currently milks approximately 60 cows.  During times relevant to this Complaint, Willie has sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

30.     Plaintiffs Baisleys, individuals, own a dairy farm located at 4247 Highway 70 North, Crossville, Tennessee 38571 that does business as Baisley Farms.   Baisley Farms currently milks about 300 cows.  Baisley Farms has been a DFA member dairy farmer from 1998 to the present, during which time it produced and sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

31.     Plaintiff Cornett, an individual, operates a dairy farm located at 1053 Provo Road, Madisonville, Tennessee 37354.  Cornett was a DFA member dairy farmer from January 2002 until May 2004, during which time milked about 200 cows and he sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

32.     Plaintiff McCain Dairy is a general partnership organized and existing under the laws of the State of North Carolina with its principal place of business at 1904 Lake Lucas Road, Sophia, North Carolina, 27350.  The shares of McCain Dairy are owned by William C. Frazier and Branson C. McCain.  McCain Dairy currently milks about 300 cows.  McCain Dairy has been a DFA member dairy farmer from 1998 to the present, during which time it produced and sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

33.     Plaintiff Holmes, an individual, owns a dairy farm located at 663 Holmes Road, Keactchie, Louisiana 71046.  Holmes currently milks about 100 cows.  Holmes has been a DFA member dairy farmer from 1998 to the present, during which time he produced and sold fluid Grade A milk to Defendants or Co-conspirators in Orders 5 and/or 7.

Case 2:07-cv-00208 Document 174  Filed 06/20/08  Page 12 of 60  PageID #: 2204
Case 2:08-md-01000  Document 67  Filed 06/20/08  Page 12 of 60  PageID #: 2204

**Defendants**

34. Defendant Dean is a for-profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2515 McKinney Avenue, Suite 1200, Dallas, Texas 75201. Dean owns at least 17 fluid Grade A milk bottling plants in the Southeast and is the largest fluid Grade A milk bottler in the Southeast.

35. Defendant NDH is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business at 3811 Turtle Creek Boulevard, Suite 1300, Dallas, Texas, 75219. NDH is owned 50 percent by DFA and 50 percent by Allen Meyer. NDH owns at least nine fluid Grade A milk bottling plants in the Southeast and is the second largest fluid Grade A milk bottler in the Southeast.

36. Defendant DFA is a not-for-profit corporation organized and existing under the laws of the State of Kansas with its principal place of business at 10220 North Ambassador Drive, Kansas City, Missouri 64153, and with its Southeast Council headquarters located at 10411 Cogdill Road, Knoxville, Tennessee 37932. DFA controls approximately 90 percent of the fluid Grade A milk produced in the Southeast. DFA is a vertically integrated cooperative that controls not only fluid Grade A milk production, but also marketing, hauling, processing, bottling and distribution of fluid Grade A milk in the Southeast. DFA owns and operates its own hauling companies, processing plants and distribution centers that are necessary to deliver Grade A milk from the farmer producer to the grocery stores. In the Southeast, DFA fully or partially owns at least eight fluid Grade A milk bottling plants (not including NDH), and is the third largest fluid Grade A milk bottler in the Southeast. As explained more fully herein, as a result of DFA's increased involvement in fluid Grade A milk bottling, DFA's management has acted in a manner that is contrary to the interests of its dairy farmer membership.

37. Defendant DMS is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 5001 Brittonfield Parkway, Syracuse, New York 13221, and with its Southeast regional office located at 10411 Cogdill Road, Knoxville, Tennessee 37932. As explained more fully below, independent dairy farmers

are required to use DMS to market their fluid Grade A milk as a condition for gaining access to fluid Grade A milk bottling plants. Because independent dairy farmers are required to utilize DMS to market their fluid Grade A milk, DMS is able to monitor and police the prices fluid Grade A milk bottlers pay to independent dairy farmers.

38.     Defendant SMA is a not-for-profit corporation organized and existing under the laws of the Commonwealth of Kentucky with its principal place of business at 1812 Waterfront Plaza, 325 West Main Street, Louisville, Kentucky 40202. As explained more fully below, cooperatives that previously acted independently of each other, such as the Maryland & Virginia Coop, were required to join SMA to gain access to fluid Grade A milk bottling plants in the Southeast. Because dairy farmer members of Maryland & Virginia Coop are required to utilize SMA to market their fluid Grade A milk, SMA is able to monitor and police the prices fluid Grade A milk bottlers pay to these independent cooperative members.

39.     Defendant Mid-Am is a limited liability corporation organized and existing under the laws of the State of Delaware with its principal place of business at 10220 North Ambassador Drive, Kansas City, Missouri 64153. Mid-Am, a subsidiary of DFA, was formed by DFA and co-conspirators to provide capital to and make equity investments in dairy processing and fluid Grade A milk bottling operations.

40.     Defendant Baird, an individual, is the manager of SMA, an officer, director, and general manager of Lone Star, a dairy cooperative based in Texas, and the principal owner, officer and manager of Lone Star Milk Transport, Inc., BullsEye Transport, LLC, BullsEye Logistics, LLC (collectively "BullsEye"), Texas-based companies that transport Grade A milk for DFA and SMA, and J.G. Baird Management Co. Baird is also the principal owner and manager of VFC, LLC, an entity designed to manage, and/or coordinate the operations of Defendants SMA, DMS and other entities, and which administers, monitors and enforces compliance with Defendants' unlawful conspiracy. Baird has participated in, authorized, directed and/or knowingly approved or ratified the illegal conduct alleged herein.

14

Case 2:07-cv-00208 Document 174 Filed 06/20/08 Page 14 of 60 PageID #: 2206
Case 2:08-md-01000 Document 67 Filed 06/20/2008 Page 14 of 60

41.     Defendant Hanman, an individual, was DFA's Chief Executive Officer from its formation in 1998 until he retired on December 31, 2005.   Hanman also served on the management committee of Dairy Management LLC, the sole general partner of Defendant NDH. Hanman has participated in, authorized, directed and/or knowingly approved or ratified the illegal conduct alleged herein.  Upon information and belief, Hanman continues to participate in the activities of DFA.

42.     Defendant Bos, an individual, was DFA's Chief Financial Officer from its formation until his retirement on December 31, 2005.  Bos also served on the management committee of Dairy Management LLC.  Bos has participated in, authorized, directed and/or knowingly approved or ratified the illegal conduct alleged herein.

### Co-conspirators

43.     At all relevant times, other milk marketers, milk purchasers, milk processors or other entities, including Dairy.com, Kroger, Prairie Farms, Allen, Brubaker, Bryant, Engles, McCloskey, Meyer and Schenkel, as well as various other persons, companies, and corporations, the identities of which are presently unknown (collectively "Co-conspirators"), have participated as Co-conspirators with the Defendants in the violations alleged herein and have performed acts and made statements in the United States in furtherance thereof.

44.     All averments herein against any Defendant are also averred against these unnamed Co-conspirators as though set forth at length.

45.     The acts alleged herein that were done by each of the Co-conspirators were fully authorized by each of those Co-conspirators, or ordered, or done by duly authorized officers, managers, agents, employees, or representatives of each Co-conspirator while actively engaged in the management direction or control of its affairs.  The acts charged in this Complaint as having been done by Defendants and their Co-conspirators were authorized, ordered, and/or done by their officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

## OVERVIEW OF THE RELEVANT MARKETS

46.     Grade A milk is highly perishable.  It is produced on a daily basis and must be transported from farms to fluid Grade A milk bottlers nearly every day.  Dairy farmers milk their cows at least twice a day.  Grade A milk is typically stored in refrigerated bulk tanks until it is picked up by a milk hauler who transports it in insulated trucks to fluid Grade A milk bottling plants.  Fluid Grade A milk bottling plants prepare Grade A milk for human consumption by processing and packaging raw fluid Grade A milk in bottles or cartons for wholesale or retail sale.  Fluid Grade A milk is regularly shipped and sold in interstate commerce.

47.     Federal milk sanitation standards distinguish between milk eligible for use in fluid products, known as Grade A milk, and milk eligible only for manufactured dairy products, known as Grade B milk.  The highest standards are established for Grade A milk because of safety risks associated with fluid milk products. There is no substitute for Grade A milk.

48.     Pursuant to the 1937 Agriculture Act, the Secretary of the U.S. Department of Agriculture ("USDA") classifies Grade A milk into four classes for minimum pricing purposes based upon the actual end-use of the milk:

      a.   Class I milk is used in beverage milk products for human consumption.

      b.   Class II milk is commonly used to manufacture "soft" dairy products, such as sour cream, cottage cheese, ice cream, and custards.

      c.   Class III milk, also known as "cheese milk," is commonly used to manufacture "hard" dairy products such as cheddar cheese.

      d.   Class IV milk is commonly used to produce butter and nonfat dry milk.

49.     Each month USDA's milk market administrators calculate minimum prices pursuant to USDA formulae for each of the four classes of Grade A milk marketed in each of the geographic regions, known as Federal Milk Market Orders ("FMMO" or "Order").  Currently, there are 10 Orders.  This Complaint is concerned with fluid Grade A milk (*i.e.,* raw Grade A marketed or sold to or purchased by fluid Grade A milk bottlers) in Orders 5 and 7, which, as described more fully below, are commonly referred to as the "Southeast."

16

Case 2:07-cv-00208 Document 174  Filed 06/20/08  Page 16 of 60  PageID #: 2208
Case 2:08-md-01000  Document 87  Filed 06/20/2008  Page 16 of 60

50.    USDA regulations mandate that fluid Grade A milk bottlers pay at least the weighted uniform average or minimum "blend" price for fluid Grade A milk that is "pooled" on an order.  Dairy farmers "pool" Grade A milk on an order by delivering specified minimum quantities of fluid Grade A milk to USDA-regulated fluid Grade A milk bottling plants associated with that order.  Dairy farmers' delivery of the minimum quantity of fluid Grade A milk to fluid Grade A milk bottling plants is referred to as "touching base."  USDA regulations require that dairy farmers touch base each month they are pooled on an order.

51.    The minimum blend price for an order is based upon the end uses of all Grade A milk pooled on that order.  Thus, for example, if 60 percent of all Grade A milk pooled on an order was used as Class I milk (fluid Grade A milk), and the remaining 40 percent was used as Class III milk (cheese milk), the minimum blend price for all Grade A milk pooled on the order would consist of the Class I price for 60 percent and the Class III price for 40 percent.  To use hypothetical prices for this example, if the Class I price is $2.00 per pound and the Class III price is $1.50 per pound, the minimum blend price would be $1.80 per pound.  (Using the hypothetical utilization of 60 percent for Class 1 yields $2.00 x .6 = $1.20.  40 percent utilization for Class III yields $1.50 x .4 = $.60.  When these two prices are added together, $1.20 + $.60 = $1.80.)

52.    Due to seasonal and other variations in Grade A milk production and demand and uneven distribution of dairy farmers throughout the United States, Class I utilization, the highest valued use of Grade A milk in the USDA pricing scheme, varies between orders.  On some orders, such as Orders 5 and 7 where demand for bottled fluid Grade A milk often exceeds Grade A milk production, Class I utilization has traditionally exceeded 70 percent.  In other areas, such as the Southwest where demand for bottled fluid Grade A milk does not exceed Grade A milk production, the percentage of Class I utilization may often be as low as 40 percent.  Consequently, orders with high Class I utilization generally have higher FMMO minimum blend prices than orders with lower Class I utilization.

53.    Shifting substantial quantities of Grade A milk from one order to another is referred to as "diluting" or "flooding" a pool because the "outside" Grade A milk increases the

total volume of Grade A milk pooled to the point that it decreases the Order's Class I utilization, and hence reduces the minimum blend prices. Because DFA has the capacity to flood pools and to move money arbitrarily among its members, it can use that power, as well as other means, to stifle competition in the Southeast market.

54.     USDA minimum prices for Class I Grade A milk represent the minimum or floor prices that fluid Grade A milk bottlers must pay for Grade A milk marketed pursuant to USDA regulation. Cooperatives and independent dairy farmers are free to negotiate for prices in excess of FMMO minimum prices to reflect more accurately market conditions. The amounts by which prices for Grade A milk exceed FMMO minimum blend prices are known generically as "over-order premiums." Fluid Grade A milk bottling plants in the Southeast traditionally paid over-order premiums for Grade A milk prior to the successful implementation of Defendants' conspiracy, monopolization and monopsonization.

55.     The actual price a dairy farmer receives for Grade A milk is referred to as the "mailbox price." The mailbox price received by independent dairy farmers is comprised of the FMMO minimum blend price plus any over-order premium and bonuses for volume or quality, minus marketing costs. The mailbox price received by dairy cooperative members is calculated in the same way except additional charges may be deducted by the cooperative. Prior to Defendants' antitrust violations, dairy farmers in the Southeast received mailbox prices for Grade A milk that included over-order premiums that reflected more accurately competitive market conditions.

56.     The relevant geographic market is the Southeast United States. The Southeast market consists of Order 7 – covering Alabama, Arkansas, Mississippi, Louisiana, and parts of Florida, Georgia, Kentucky, Missouri, and Tennessee, and Order 5 – covering North Carolina, South Carolina, and portions of Georgia, Indiana, Kentucky, Tennessee, Virginia, and West Virginia. DFA, which is organized by geographic marketing areas, operates a marketing area designated as the Southeast Council which consists of the same geographic areas as the Southeast. DFA and SMA also treat Orders 5 and 7 as a single and distinct geographic market.

Elvin Hollon, DFA's Director of Fluid Marketing and Economic Analysis, testifying as an expert on behalf of SMA, described the geographic region of DFA's Southeast Council as "one market" and "a common market, commonly supplied."

57. The relevant product market consists of the market for the sales or marketing of fluid Grade A milk to fluid Grade A milk bottling plants (*i.e.,* sell-side), and the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants (*i.e.,* buy-side). The market for the sales or marketing of fluid Grade A milk to, or purchase of fluid Grade A milk by, bottling plants is treated as a distinct market by the industry and by federal regulations.

58. The market for the sales or marketing of fluid Grade A milk to fluid Grade A milk bottling plants is a distinct product market. Fluid Grade A milk (Class I) is not interchangeable with non-fluid milk end uses because Grade A milk is less valuable when it is used in the manufacture of non-fluid commodities, such as sour cream (Class II), cheese (Class III) and butter (Class IV), and because Southeast dairy farmers traditionally receive over-order premiums only for marketing or selling fluid Grade A milk to bottling plants.

59. The market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants is a distinct product market. Under the applicable FMMOs, dairy farmers qualify to participate in the Southeast FMMOs only by selling fluid Grade A milk (Class I) to bottling plants. Processors of non-fluid commodities, such as sour cream (Class II), cheese (Class III) and butter (Class IV) are not viable substitutes for Southeast dairy farmers because they cannot "touch base" by delivering Grade A milk to such commodity processors, and milk delivered directly to these processors is less valuable than fluid Grade A milk purchased by fluid Grade A milk bottlers because commodity manufacturers traditionally do not pay over-order premiums.

60. Access to fluid Grade A milk bottling plants in the Southeast and receipt of both FMMO minimum prices and over-order premiums is necessary and essential to the economic viability of Southeast dairy farmers. Due to the market structure – *i.e.*, the investment dairy farmers have made in their farms, the cost of transportation, the market prices established for Class I milk versus other classes of milk, and the need for access to fluid Grade A milk bottling

plants in order to qualify for such prices – Southeast dairy farmers have no viable economic alternative to access to Southeast fluid Grade A milk bottling plants.

## DAIRY FARMERS AND MILK BOTTLERS

61.     Dairy cooperatives are associations of dairy farmers who agree to market collectively their Grade A milk and other dairy products and are supposed to be owned, operated, and controlled by their member farmers.  Cooperatives typically "market" their farmers' fluid Grade A milk, which usually consists of locating buyers, negotiating sales prices, coordinating the hauling, performing the testing, recording and reporting related data to milk market regulators, and processing payments to member farmers for their fluid Grade A milk.

62.     Not all dairy farmers are cooperative members.  Some dairy farmers seek to remain independent of cooperatives and are referred to as "independent dairy farmers." Independent dairy farmers seek to market their fluid Grade A milk to bottling plants by directly contracting with plants or through agents and/or marketing associations.  In an unrestrained market, fluid Grade A milk bottlers would compete amongst each other for the purchase of fluid Grade A milk from these independent dairy farmers, thereby enabling independent dairy farmers such as Plaintiffs to obtain a price for their fluid Grade A milk that would reflect actual market conditions and help to sustain efficient Grade A milk production in the Southeast.

63.     DFA is by far the largest dairy cooperative in the country.  In addition to marketing its members' milk, DFA owns fluid Grade A milk bottling plants, invests in joint ventures providing it with control of additional fluid Grade A milk bottling plants, partially owns and controls other marketing entities, and provides services – such as hauling and assembling – that it charges members for on a volume basis.

64.     As a fluid Grade A milk bottler, DFA has an interest in suppressing and maintaining the prices paid for fluid Grade A milk in the Southeast.  Suppressing the purchase price for fluid Grade A milk increases DFA's bottling revenues, drives out competitors in the Southeast, and increases revenues from services such as processing and hauling.

65.     In addition to independent dairy farmers who are not members of a cooperative, there also existed several independent cooperatives, such as the Maryland & Virginia Coop, whose member dairy farmers sought to market their fluid Grade A milk to fluid Grade A milk bottlers in the Southeast independent of DFA.  In an unrestrained market, fluid Grade A milk bottlers in the Southeast would compete amongst each other to purchase Grade A milk from independent cooperatives as well as independent dairy farmers, thereby enabling Southeast dairy farmers such as Plaintiffs to obtain a price for their fluid Grade A milk that would reflect actual market conditions and help to sustain efficient fluid Grade A milk production in the Southeast. In addition, in an unrestrained market, the existence of such independent cooperatives and independent dairy farmers provided a competitive alternative to DFA.  As shown below, however, Defendants' conspiracy and anticompetitive conduct forced these previously independent farmers to join DMS and forced previously independent cooperatives such as the Maryland & Virginia Coop to join SMA as a prerequisite to gaining access to fluid Grade A milk bottling plants in the Southeast.  The purpose and effect of Defendants' anticompetitive conduct and conspiracy has been to eliminate competition and/or stifle competition for the purchase of fluid Grade A milk marketed or sold to fluid Grade A milk bottlers in the Southeast, fix and maintain the price paid for fluid Grade A milk in the Southeast, coerce membership in DFA, force independent dairy farmers and independent cooperatives to market their fluid Grade A milk through DFA-controlled entities and exclude these independent dairy farmers and cooperatives as potential sources of competitive access for Southeast dairy farmers.

66.     Fluid Grade A milk supply is essential to the operation of fluid Grade A milk bottling plants owned by Dean, NDH and DFA, inasmuch as, upon information and belief, approximately 85 percent of Dean's revenues, 90 percent of NDH's revenues, and 25 percent of DFA's revenues are derived from sales of processed Grade A milk products.

67.     Defendants' illegal activities in the Southeast have eliminated competition by and between Defendants for the purchase of fluid Grade A milk by fluid Grade A milk bottlers, forced independent dairy farmers and previously independent cooperatives such as the Maryland

Case 2:07-cv-00208 Document 174 Filed 06/20/08 Page 21 of 60 PageID #: 2213

& Virginia Coop to join DFA or to market their fluid Grade A milk through DFA-controlled DMS and SMA as a condition of access to fluid Grade A milk bottling plants in the Southeast, and, in so doing eliminated and fixed at artificially low levels the over-order premium that would otherwise exist in a competitive market.

## DEFENDANTS' DOMINANCE AND PREDATORY CONDUCT

### Overview

68.     Beginning at least as early as January 1, 2001, Defendants began to implement their conspiracy to eliminate competition in the market for the marketing or sales of fluid Grade A milk to, or purchase of fluid Grade A milk by, bottling plants the Southeast by undertaking a series of carefully planned and collaborative steps.  Defendants agreed to assist each other in securing for Dean, NDH, and DFA control of the fluid Grade A milk bottling market in the Southeast.  As part of the plan, Defendants secured for DFA and its affiliates control over access to fluid Grade A milk bottling plants in the Southeast by agreeing to grant DFA a series of full-supply agreements for the provision of fluid Grade A milk to Southeast bottling plants. Defendants then collaboratively used these full-supply agreements as clubs to force previously independent cooperatives such as the Maryland & Virginia Coop to join DFA or to market their fluid Grade A milk through DFA-controlled SMA and to force previously independent dairy farmers to market their fluid Grade A milk through DFA-controlled DMS in order to gain access to fluid Grade A milk bottling plants.

69.     For example, in January 2003, Dean informed its independent dairy farmers in the Southeast that it would no longer permit direct access to its fluid Grade A milk bottling plants, but would require all independent dairy farmers to market their fluid Grade A milk through DFA-controlled DMS in order to gain access.  At the time, independent dairy farmers were informed only that Dean was "outsourcing" certain marketing functions.  No mention was made that, in fact, Dean was conspiring with DFA, DMS, and SMA to fix and suppress over-order premiums paid by Dean, not only to DFA member dairy farmers' fluid Grade A milk marketed to fluid Grade A milk bottling plants, but also to independent dairy farmers for their fluid Grade

A milk sold to fluid Grade A milk bottling plants. The effect of these activities has been to eliminate competition and to fix and stabilize prices paid to Southeast dairy farmers for their fluid Grade A milk.

70. By way of further example, in late 2001 and in 2002, Dean and DFA informed Maryland & Virginia Coop that Dean's fluid Grade A milk bottling plants would no longer accept fluid Grade A milk from Maryland & Virginia Coop members because Dean had executed full-supply agreements with DFA. Maryland & Virginia Coop was further informed that the only way to obtain access to Dean's and NDH's fluid Grade A milk bottling plants in the Southeast was to join SMA. No mention was made to dairy farmer members of the Maryland & Virginia Coop that: a) by joining SMA, Maryland & Virginia Coop would lose the ability to negotiate price with Defendants on behalf of its members; b) SMA and DFA would flood the Southeast market with Grade A milk from the Southwest thereby further reducing the prices received by dairy farmer members of Maryland & Virginia Coop; c) contrary to industry practice, SMA would pay the cost of transporting the Grade A milk from the Southwest at exorbitant rates, dictate the hauler(s) to be used, and deduct the cost from the mailbox price received by dairy farmer members of Maryland & Virginia Coop; and d) SMA would not permit financial accountability to its members. The effect of these activities has been to eliminate competition and to fix and stabilize prices paid to Southeast dairy farmers for fluid Grade A milk marketed or sold to or purchased by fluid Grade A milk bottlers.

## Consolidation In The Industry

71. By the close of 2000, following nearly a decade of consolidation, and increasing interrelationships between fluid Grade A milk bottlers, DFA was the largest dairy cooperative in the United States and controlled more than 50 percent of the Grade A milk produced in the Southeast United States. In addition, DFA was the fourth largest processor in the United States, by virtue of its joint ventures, including but not limited to its 33.8 percent stake in Suiza, which at the time was the largest buyer and bottler of fluid Grade A milk in the United States. At the time, Dean was the second largest buyer and bottler of fluid Grade A milk in the United States.

Upon information and belief, many of the fluid Grade A milk bottling plants acquired by Suiza, Dean and DFA during their unprecedented, rapid consolidation of the 1990s were purchased at extremely high price-to-revenue or price-to-profit multiples.

72. In 2001, Dean and Suiza announced their plan to merge and to thereafter operate the merged company under the name Dean. Dean and Suiza anticipated antitrust concerns by the U.S. Department of Justice ("DOJ") because they were the first and second largest fluid Grade A milk bottlers in the United States. Dean and Suiza, together with other Defendants and Co-conspirators, agreed to address DOJ's concerns by divesting 11 of Dean's and Suiza's fluid Grade A milk bottling plants to NDH, a new partnership formed by DFA and three individuals and financed by Mid-Am to purchase the plants. In addition, Dean, Suiza, and DFA agreed that Dean would buy out DFA's 33.8 percent stake in Suiza.

73. Upon information and belief, DFA and its subsidiaries, including Mid-Am, have provided more than $400 million in financing to NDH, enabling it to acquire the 11 fluid Grade A milk bottling plants divested by Dean and Suiza and other bottling plants. At all times relevant to this Complaint, DFA has owned at least 50 percent of NDH's equity and voting shares, and DFA has recently increased its ownership stake in NDH to 87.5%.

74. In connection with Dean's agreement to acquire DFA's 33.8 percent stake in Suiza, and in addition to the divesture of 11 processing plants to NDH, Dean issued to DFA a $40 million promissory note ("Note") which becomes due in 2021 in the amount of $96 million. Dean also agreed that it would offer DFA the right to supply fluid Grade A milk to Dean's fluid Grade A milk bottling plants when existing contracts expired or pay DFA liquidated damages of up to $47 million. Following the mergers and divestitures, Dean, NDH and DFA increased their shares of the fluid Grade A milk bottling market in the Southeast.

75. Following the Dean-Suiza merger, Dean, NDH, and DFA have continued to acquire fluid Grade A milk bottling plants for the purpose of increasing their dominance of the Southeast market, and have acted to close down fluid Grade A milk bottling plants and/or have

refused to operate fluid Grade A milk bottling plants with the purpose and effect of decreasing capacity and eliminating sources of access to fluid Grade A milk bottling plants.

76. Dean currently operates 17 fluid Grade A milk bottling plants in the Southeast and, upon information and belief, controls 60 percent of the fluid Grade A milk bottling capacity in the Southeast, making Dean the largest fluid Grade A milk bottler in the Southeast. NDH owns nine fluid Grade A milk bottling plants and is the second largest fluid Grade A milk bottler in the Southeast. DFA fully or partially owns eight fluid Grade A milk bottling plants (not including NDH) and is the third largest fluid Grade A milk bottler in the Southeast. Collectively Defendants' cartel owns at least 33 of the approximately 51 USDA-regulated fluid Grade A milk bottling plants operating in the Southeast. These 33 plants, upon information and belief, represent 77 percent of the fluid Grade A milk bottling capacity in the Southeast. DFA has full-supply agreements with – and control over access to – these 33 plants. In addition, because DFA also has full-supply agreements with other fluid Grade A milk bottlers, including Prairie Farms and Kroger, that own ten additional other fluid Grade A milk bottling plants in the Southeast, DFA has full-supply agreements for fluid Grade A milk supplied to at least 43 of the 51 fluid Grade A milk bottling plants in the Southeast. Other fluid Grade A milk bottling plants not locked into full-supply agreements with DFA do not purchase fluid Grade A milk from dairy farmers, are not meaningful market participants, or purchase fluid Grade A milk marketed by DFA-controlled entities, including SMA or DMS. Through DFA's full-supply agreements and its control of SMA or DMS, upon information and belief, Defendants control 90 percent of the Grade A milk produced in the Southeast, and more than 80 percent of the fluid Grade A milk marketed or sold to or purchased by fluid Grade A milk bottlers in the Southeast.

77. Dean, DFA, and NDH also own or control most of the balancing plants in the Southeast. Typically, Grade A milk balancing plants hold Grade A milk produced during weekends and holidays when fluid Grade A milk bottling plants are closed, and convert bulk supplies of surplus Grade A milk into storable, non-fluid commodities such as cheese (Class III) or powdered milk (Class IV). Balancing plants are essential due to weekly and seasonal

variations in Grade A milk supply and demand. It would be impossible for an independent farmer, cooperative, or fluid Grade A milk bottling plant to enter the Southeast market without access to balancing plants controlled by DFA and Co-conspirators.

78. As DFA's investments in fluid Grade A milk bottling operations expanded, its leadership's interests increasingly were aligned with those of fluid Grade A milk bottlers such as NDH and Dean. The decision by DFA's leadership to make significant investments in fluid Grade A milk bottling operations has created a conflict of interest between the leadership's duty to obtain for DFA's member dairy farmers the highest possible prices for their fluid Grade A milk and DFA's need as a bottler to pay the lowest possible prices for fluid Grade A milk.

### Defendants' Full-Supply Agreements, Foreclosure, and Price Fixing

79. As part of Defendants' conspiracy, Dean and NDH agreed to enter into exclusive or full-supply agreements for Grade A milk with DFA despite the fact that both Dean and NDH knew that DFA did not have sufficient fluid Grade A milk production of its own to satisfy the Dean full-supply agreement, much less both such agreements.

80. DFA's full-supply agreement with Dean, which consists of a series of 20 successive one-year agreements, grants DFA the exclusive right to supply Dean's requirements of fluid Grade A milk to Dean's fluid Grade A milk bottling plants in the Southeast. Despite a DOJ consent decree prohibiting DFA from entering into supply agreements with terms in excess of one year, Dean and DFA ensured that their full-supply agreement would be long-term by DFA agreeing to forgive the entire balance of the Note, provided Dean renews each of the 20 full-supply agreements and by Dean agreeing to pay DFA liquidated damages of up to $47 million if Dean does not renew each of the 20 full-supply agreements.

81. In furtherance of the conspiracy, Dean, NDH, DFA and Mid-Am agreed that all fluid Grade A milk supplied to Dean, NDH, and DFA's fluid Grade A milk bottling plants must be marketed by DFA or through either SMA or DMS, both of which were formed by, and are controlled by, DFA or other Co-conspirators which are owned in whole, or part, by Defendants.

82.     Defendants, together with Co-conspirators, including Bryant, collectively conspired to suppress and restrain competition in interstate commerce of fluid Grade A milk marketed or sold to or purchased by fluid Grade A milk bottling plants in the Southeast by jointly using these full-supply agreements as a club to unlawfully force other independent cooperatives needed to fulfill these agreements to join DFA or to market their fluid Grade A milk through DFA-controlled entities such as SMA and to unlawfully force independent dairy farmers to market their fluid Grade A milk through DFA-controlled entities such as DMS in order to have access to the fluid Grade A milk bottling plants in the Southeast. Access to such plants is essential to independent cooperative members and independent dairy farmers since it is their only means to qualify to participate in the FMMO program by "touching base," receive FMMO minimum blend prices, and to be eligible to receive over-order premiums for sales of fluid Grade A milk.

83.     As part of the Defendants' conspiracy, Dean and DFA informed Maryland & Virginia Coop that, notwithstanding many years of Dean's fluid Grade A milk bottling plants continuously acquiring fluid Grade A milk from Maryland & Virginia Coop, Dean would no longer accept fluid Grade A milk from Maryland & Virginia Coop members because of the full-supply agreement with DFA, unless Maryland & Virginia Coop agreed to join SMA. As the direct result of unlawful foreclosure and coercion by Defendants and Co-conspirators, including Baird, Bryant and McCloskey, the board of Maryland & Virginia Coop had no choice but to join SMA in order to gain access to fluid Grade A milk bottling plants in the Southeast. At all times relevant to this Complaint, DFA has used its full-supply agreements to control SMA.

84.     Upon information and belief, substantially similar threats with similar results were made to Arkansas Dairy Cooperative Association, Inc. and Dairyman's Marketing Cooperative, Inc., small cooperatives that operate in the Southeast. The boards of these previously independent cooperatives felt they had no choice but to join SMA to gain access to fluid Grade A milk bottling plants in the Southeast. Because DFA controls access to fluid Grade A milk bottlers in the Southeast and is the controlling member of SMA, DFA member dairy

farmers likewise have no choice but to pay inappropriate fees and charges for the "services" performed by SMA.

85. Defendants and their Co-conspirators also forced independent cooperatives to join DFA or market their members' fluid Grade A milk through SMA which was formed by and is controlled by DFA. Independent cooperatives were presented with an Hobbesian choice: Either join SMA and pay fees in order to continue marketing fluid Grade A milk to their own customers at prices determined by DFA and Co-conspirators or cease operations altogether.

86. Dean and DMS and their Co-conspirators informed formerly independent cooperatives that they could no longer market their fluid Grade A milk directly to Dean and would have to join SMA to retain access to fluid Grade A milk bottling plaints. As the DOJ has stated, producers and cooperatives in the Southeast have not joined DFA or SMA because they believe they can do better in DFA or SMA rather than out. Instead, '[i]t is usually after the loss, or threatened loss, of their markets and ability to market their milk, and the choice is to be able to market their milk or not."

87. In furtherance of the conspiracy, DFA has utilized its control of SMA to flood the Southeast market with unnecessary amounts of Grade A milk from the Southwest, and has compounded this injury by utilizing SMA to pay the transportation costs associated with hauling this milk over such a long distance. The result of Defendants' agreement to refuse to compete for the purchase of fluid Grade A milk, as described herein, has been to fix, stabilize and maintain the over-order premium paid by fluid Grade A milk bottlers to Southeast dairy farmers, and to lower the mail box price received by those dairy farmers to an amount often below the FMMO minimum price.

88. In addition, as part of Defendants' conspiracy, Dean reversed its historical practice of purchasing fluid Grade A milk from independent dairy farmers, refused to deal directly with independent dairy farmers, and forced them to market their fluid Grade A milk through DFA-controlled entities such as DMS. Prior to 2002, Defendants agreed that Dean, in furtherance of the conspiracy, would assign its marketing agreements with its remaining

28

Case 2:07-cv-00208 Document 174 Filed 06/20/08 Page 28 of 60
Case 2:08-md-01000 Document 67 Filed 06/20/2008 Page 28 of 60 PageID #: 2220

independent dairy farmers to DMS, a company that was formed by DFA and another cooperative. DMS is so thoroughly dominated by DFA that commentators have stated: "DMS is DFA."

89. In 2003, pursuant to Defendants' conspiracy, Dean assigned its marketing agreements with its remaining independent dairy farmers to DMS. No Defendant informed these independent dairy farmers that their fluid Grade A milk would thereafter be marketed, processed, and controlled by DFA, that DFA would process the payments for their fluid Grade A milk, or that prices paid to DMS producers were fixed, suppressed, and stabilized by Defendants and Co-conspirators.

90. Upon information and belief, despite this agreement and the full-supply agreement, DFA and Dean permit some independent dairy farmers to deliver fluid Grade A milk directly to Dean's fluid Grade A milk bottling plants, but only at prices set pursuant to Defendants' conspiracy. Although a few independent dairy farmers have gained access to Dean directly, these independent dairy farmers are not permitted to negotiate price, but must instead accept the price fixed by Defendants' cartel. The result of Defendants' agreement to refuse to compete for the purchase of fluid Grade A milk, as described herein, has been to fix, stabilize and maintain the over-order premium paid by fluid Grade A milk bottlers to Southeast dairy farmers, and to lower the mail box price received by those dairy farmers to an amount often below the FMMO minimum price.

91. DFA, SMA and DMS thus market nearly all the fluid Grade A milk marketed or sold to or purchased by fluid Grade A milk bottlers in the Southeast and can therefore monitor the prices paid to all dairy farmers by each of the milk bottling Defendants and Co-conspirators – Dean, NDH, DFA, Kroger and Prairie Farms. This information is used to fix and stabilize over-order premiums (*i.e.,* the amount by which prices paid to Southeast dairy farmers exceed FMMO minimum blend prices) at levels lower than what would have prevailed in a competitive market. Defendants' actions had the purpose and effect of depressing over-order premium prices paid to Southeast dairy farmers and cooperative members. The arrangement established by Defendants

likewise reduced the incentive for Dean, NDH, DFA and their Co-conspirators to compete for Southeast dairy farmers' Grade A milk by offering higher over-order premiums, to attract better and more efficient dairy farmers, or to retain dairy farmers who might otherwise sell to one of the other Defendants. As a result, Southeast dairy farmers have received over-order premium prices materially below what they would have received but for Defendants' anti-competitive conduct. In addition, Southeast dairy farmer members have been subjected to anti-competitive and unlawful fees and dues charged by SMA and other co-conspirators for the sole benefit of the cartel and to the detriment of Southeast dairy farmers.

92.  In furtherance of the conspiracy, Defendants have also jointly sought to exclude, discipline, and punish the few remaining independent fluid Grade A milk bottlers and independent cooperatives that have strived to resist complying with Defendants' conspiracy or have attempted to compete with Defendants in the Southeast. These acts by Defendants damage all dairy farmers by eliminating independent fluid Grade A milk bottlers and cooperatives as sources of potential competition and access to fluid Grade A milk bottling plants. The following are examples of such activity:

a.  In August 2006, Dean, citing its full-supply agreement with DFA, refused to discuss a fluid Grade A milk supply agreement with U.S. Milk, a newly-formed Southeast organization consisting of a variety of independent dairy farmers and independent cooperative members.

b.  Since 2002 and continuing to the present, DFA and Dean have jointly punished a small Southeast cooperative for its refusal to join SMA by demanding, *inter alia*, that DFA process Dean's monthly payments to the small cooperative thereby enabling DFA to monitor prices paid to the small cooperative and to deduct numerous wrongful fees and penalties from those payments.

c.  In early 2005, after NDH purchased Dairy Fresh Corp., a fluid Grade A milk bottler in the Southeast, DFA gave independent dairy farmers serving Dairy Fresh Corp. plants an ultimatum of either joining DFA or finding new markets for their Grade A milk.

d.  In 2001 and 2003, independent dairy farmers in the Southeast, including Sweetwater, attempted to negotiate an agreement to supply fluid Grade A milk to a small fluid Grade A milk bottling plant located in the Southeast.

When DFA learned of these negotiations, it threatened that it would never again balance the small bottling plant's fluid Grade A milk if it agreed to be supplied by independent dairy farmers. As a result of this threat, the small bottling plant discontinued its negotiations with independent dairy farmers.

e. In July 2002, after learning that SMI was paying dairy farmers in the Southeast near the Florida-Georgia border over-order premiums in excess of what DFA was paying its member dairy farmers in the Southeast pursuant to Defendants' conspiracy, DFA demanded that SMI decrease its payments by $.20 to $.40 per hundredweight. DFA threatened that, if SMI refused to do so, DFA would, among other things, flood Order 6 with Grade A milk and terminate DFA's agreement to assist SMI in balancing its Grade A milk supply. DFA threatened SMI with a "train wreck" if it did not comply with DFA's demands. As a result of these and other threats, SMI was forced to pay DFA tributes totaling nearly $10 million.

93.     Having unlawfully obtained control of, and foreclosed access to, Southeast fluid Grade A milk bottlers by other cooperatives and independent dairy farmers, DFA, under the direction and control of Bos and Hanman, and in collaboration with Dean, NDH, DMS, SMA, Mid-Am, Baird, and Co-conspirators, have used that control to: a) fix, suppress, and maintain the over-order premiums fluid Grade A milk bottlers in the Southeast ostensibly pay for fluid Grade A milk marketed or sold by or purchased from dairy farmers in the Southeast; b) ensure that no Defendant competes on price for fluid Grade A milk produced in the Southeast; and c) make certain that Southeast dairy farmers have no viable alternative to the restrained market and fixed and stabilized prices for fluid Grade A milk created by Defendants' conspiracy.

94.     By agreeing and requiring that all fluid Grade A milk flow through DFA or DFA-controlled entities such as SMA or DMS to gain access to fluid Grade A milk bottling plants in the Southeast, Defendants created a mechanism by which each could exchange price information and thereby monitor compliance with their conspiracy to fix, depress and stabilize the price paid to dairy farmers. This jointly enforced price monitoring mechanism ensures that each Defendant can operate comfortable in the knowledge that it will not have competition on price for its most important input – fluid Grade A milk.

31

Case 2:07-cv-00208 Document 174 Filed 06/20/08 Page 31 of 60
Case 2:08-md-01000 Document 87 Filed 06/20/2008 Page 31 of 60 PageID #: 2223

95.     To further ensure compliance with the conspiracy, Dean, NDH, DFA and Co-conspirators require that DFA receive, process, and account for DFA-controlled marketing agencies' member cooperatives' monies from fluid Grade A milk sales.  This allows DFA to monitor fluid Grade A milk sales by other Southeast cooperatives and independent dairy farmers, and allows DFA to confirm that these sales are compliant with Defendants' conspiracy to control the marketing or sale to or purchase of fluid Grade A milk by fluid Grade A milk bottlers in the Southeast.

96.     At all times relevant to the Complaint, Defendants have employed common employees who enable Defendants to monitor and enforce compliance with their conspiracy. Upon information and belief, DFA and DMS share common employees, DMS and Dean share common employees, DFA and NDH share common employees, and DFA and SMA share common employees.

97.     Defendants have agreed to utilize a trucking company owned by Baird to haul Grade A milk produced by SMA's member cooperatives.  Defendants are thus aware of the amounts, origins and destinations of nearly all Grade A milk shipped in the Southeast, and are thus able to monitor and confirm compliance with their conspiracy.

98.     As a direct and proximate result of the antitrust violations alleged herein, Plaintiffs and class members have been injured and have sustained damages in that the prices received for fluid Grade A milk have been artificially reduced below levels they would have received but for Defendants' unlawful agreement to refuse to compete for the marketing, sales or purchase of fluid Grade A milk by fluid Grade A milk bottlers.  Dean, NDH, and DFA have purchased many billions of pounds of fluid Grade A milk at these artificially fixed and depressed prices.  As a result of this conspiracy Defendants and Co-conspirators have reaped many hundreds of millions of dollars of profits that would have otherwise been paid to Plaintiffs and class members for their Grade A milk.

99.     Outside the Southeast market, technological advances in fluid Grade A milk bottling have produced significant cost savings for fluid Grade A milk marketers, fluid Grade A

milk bottlers and consumers. But, Defendants' illegal domination of the marketing, sales or purchase of Grade A milk by fluid Grade A milk bottlers in the Southeast has foreclosed and prevented the emergence in the Southeast of more efficient competitors and technological advances in fluid Grade A milk bottling, ensured that Defendants' inefficient marketing methods and outdated processing technology – which are part of the policing activity of the conspiracy – are not challenged by competitors. As a result, Defendants' conspiracy has harmed: a) competition for producing, marketing, and bottling fluid Grade A milk; b) competition for purchasing fluid Grade A milk from dairy farmers in the Southeast United States; and c) consumers of fluid Grade A milk in the Southeast.

### DFA'S RELATIONSHIP WITH ITS MEMBER DAIRY FARMERS AND TRANSFORMATION INTO A PROCESSOR

100. As a dairy marketing cooperative, DFA is organized under the Kansas Cooperative Marketing Act. DFA has approximately 3,000 member dairy farmers in the Southeast. A Membership and Marketing Agreement ("Member Agreement") governs the relationship between DFA and its member dairy farmers for the marketing of Grade A milk. The Member Agreement incorporates and is controlled by the Bylaws of DFA. Relevant articles of the DFA Bylaws include:

> "PURPOSES OF THE ASSOCIATION: . . . to engage in any lawful act or activity for which an Association may be organized under the Kansas Cooperative Marketing Act." § III.c.

> "MEMBERSHIP: . . . This Association shall be operated on a cooperative, non-profit basis for the mutual benefit of its members as producers . . . ." § V.b.

Relevant Member Agreement provisions include:

> "DFA agrees to market all Milk received from Member in a form and manner as DFA deems best for the advantage and benefit of all members." ¶ 2.a.

> "Member grants DFA full power and authority in its name to collect all moneys due the Member from the sale of Member's Milk. DFA will first

pay, or make provisions for the payment of all ordinary and necessary expenses incurred in the marketing of Member's Milk . . . ." ¶ 3.a.

101. Because cooperatives owe their producer members the duty to obtain the highest possible prices for their Grade A milk, cooperatives traditionally have not invested in business ventures with processors when the profitability of these ventures depends on obtaining low cost Grade A milk. At the formation of DFA in 1998, it was announced that DFA would provide, *inter alia,* "cost effective marketing and movement of milk" and "greater long-term value and returns" because of "access to branded and value-added markets" and "expanded product manufacturing capabilities." Rather than improving the "returns" of its member diary farmers in the Southeast, DFA management instead aligned itself with the interests of DFA's fluid Grade A milk bottler allies by making significant, unsound, and unreasonable investments in such processing ventures.

102. DFA's management, under the direction and control of Bos and Hanman, embarked on an aggressive expansion into processing. DFA management obtained ownership interests in Southern Belle Dairy Co., LLC ("Southern Belle"), HP Hood, LLC, Keller's Creamery, LLC, Rosenberger's Dairies, Inc., Turner Holdings, LLC, Wilcox Farms, Inc. and Melody Farms, L.L.C., all of which are fluid Grade A milk bottlers, and DairiConcepts L.P., Dairy.com and Dietrich Milk Products LLC, all of which serve wholesale and retail cheese and dairy markets. In addition, DFA, which already owned Borden, Inc., one of the largest cheese makers in the United States, in partnership with other processors built large cheese facilities such as Southwest Cheese Company L.L.C. and Melrose Dairy Proteins LLC.

103. In January 2000, DFA further expanded its fluid Grade A milk bottling investments by forming Suiza Dairy Group L.P. ("SDG"), a joint venture with Suiza, then the largest fluid Grade A milk bottler in the United States Under the direction and control of Bos and Hanman, DFA contributed its share of Southern Foods Group L.P., a joint venture owned by DFA, Schenkel and Meyer which was the third largest fluid Grade A milk bottler in the United States, and Suiza contributed its fluid Grade A milk bottling operations to SDG. In connection

with the formation of SDG, DFA obtained a 33.8 percent ownership stake in Suiza's fluid Grade A milk bottling operations. (After DFA and Suiza purchased Schenkel's stake in SDG for $100 million, Schenkel was elected to Dean's Board of Directors in January 2000 and became Dean's Vice Chairman in January 2006; Meyer owns 50 percent of NDH and served as its Chief Executive Officer.)

104. Upon information and belief, DFA management has invested massive amounts of DFA member dairy farmers' monies and equity and borrowed more than $1 billion to finance DFA's and Defendants' acquisitions of Grade A milk processing operations identified in the preceding paragraphs, and other properties.

105. In addition to furthering the antitrust conspiracy, DFA's expansion into Grade A milk processing enabled its management to engage in a scheme to divert millions of dollars, the details of which DFA management has refused to disclose to DFA member dairy farmers. Bos and Hanman were assisted in this scheme by Co-conspirators, including Allen, Brubaker, Engles, Meyer, Schenkel and others. (Allen was an executive with Borden, Inc. ("Borden") which DFA acquired in 1998, is an "advisor" to DFA's Board of Directors, and with NDH jointly owned Southern Belle, a fluid Grade A milk bottler in the Southeast; Engles is Dean's Chief Executive Officer and Chairman of the Board, and he previously served as Suiza's Chief Executive Officer and Chairman of the Board until Dean and Suiza merged in 2001.)

106. Through a series of "sweetheart" deals, DFA, under the direction and control of Bos and Hanman, purchased processors or other ventures from Allen, Baird, Meyer and others for grossly inflated prices, or sold its processors or other business ventures to Allen, Baird, Meyer and others for unreasonably deflated prices. Upon information and belief, these deals include, among others, the following transactions:

      a. When Mid-American Dairymen, Inc. ("Mid-Am"), DFA's predecessor directed and controlled by Bos and Hanman, attempted to acquire Borden in 1997, Allen formed Milk Products LLC – which a Mid-Am subsidiary financed with a guaranteed $30 million loan – to purchase Borden's assets in Texas, Louisiana, and New Mexico to remedy the DOJ's antitrust concerns. Upon information and belief, in 2001 Allen sold Milk Products

LLC to NDH for a price substantially above fair market value, and he reaped a multi-million dollar profit from his risk-free venture with DFA and NDH. In these transactions, upon information and belief, the Mid-Am subsidiary unnecessarily loaned Allen $30 million and sold the divested assets to Allen at substantially less than fair market value.

b. In 2001 DFA and Allen, through his partnership, jointly acquired Southern Belle, a fluid Grade A milk processor, for $18.7 million. DFA contributed $18 million and Allen contributed $1 million to their joint venture, yet DFA granted Allen 100 percent control of management, 100 percent of the voting shares, 50 percent of the profits, and DFA guaranteed Allen's $1 million investment in their venture. DFA's agreement to grant Allen 50 percent of Southern Belle's profits, when he contributed only 1/18 of the purchase price – which DFA guaranteed in any event – was not a fair market value transaction. DFA recently bought Allen's ownership stake in Southern Belle, and DFA then agreed to sell Southern Belle to another joint venture partner for a nearly $9 million loss.

c. In 2001, DFA, Meyer, and two other individuals formed NDH. Meyer and the two individuals each contributed $5 million for the same ownership stakes in NDH. Three years later DFA purchased the other two individuals' ownership stakes in NDH for a total of $41 million, or more than four times their initial investment, which, upon information and belief, was not a fair market value transaction.

107. In 2001, Defendants also agreed that DFA management and Co-conspirators would form and operate SMA, an entity that would market all Grade A milk sold in the Southeast by its cooperative members. When SMA began operating in April 2002, Defendants and Co-conspirators, including Bryant, Engels, McCloskey and Schenkel, began using SMA to divert millions of dollars of revenues and other monies from DFA member dairy farmers. (Bryant is the General Manager of the Maryland & Virginia Coop, and a member of SMA's operations committee; McCloskey is an owner of Fair Oaks Dairy Products, L.L.C., a fluid Grade A milk bottler, and several mega-dairies in New Mexico and other states, and he is the Chief Executive Officer of Select Milk Producers, Inc. ("Select Milk") and Continental Dairy Products, Inc., dairy cooperatives based in New Mexico and Indiana respectively.)

108. Since it began operating, SMA's marketing and overhead expenses have been unreasonably high as the direct result of Defendants and Co-conspirators' diversion of revenues by, among other things, the following:

a. In 2001 Defendants and Co-conspirators, including Bryant and McCloskey, agreed that BullsEye, owned by Baird, would transport Grade A milk for SMA. Upon information and belief, Baird's shipping charges are nearly twice as high as other Grade A milk haulers' rates because, upon information and belief, Baird transports unnecessarily large quantities of Grade A milk for SMA from the Southwest to the Southeast, and also transports Grade A milk for SMA unnecessarily long distances within the Southeast. BullsEye's inefficient shipping routes are designed to maximize SMA's transportation costs and revenue to Baird and Co-conspirators.

b. In 2001 Defendants and Co-conspirators, including Bryant and McCloskey, agreed to use SMA to pay for the Grade A milk transportation expenses of Co-conspirators. Baird and Co-conspirators, such as McCloskey, invested millions of dollars building mega-dairies in the Southwest. This rapid expansion of mega-dairies created a surplus of Grade A milk in the Southwest. Baird and Co-conspirators were losing substantial amounts of money due to the Grade A milk surplus in the Southwest, and they were desperate for an outlet for their Grade A milk. If Baird and Co-conspirators had to pay the full cost of transporting Grade A milk from the Southwest to the Southeast, they would normally have incurred substantial losses because of the high cost to transport milk from the Southwest to the Southeast. In 2002 DFA, Lone Star, a cooperative managed by Baird, and Select Milk, a cooperative controlled by McCloskey, formed Greater Southwest Agency, Inc. ("GSA") to market their Grade A milk. The management of DFA, SMA, Lone Star and Select Milk designed GSA as a vehicle by which SMA pays GSA's full cost of transporting milk from the Southwest to the Southeast. Upon information and belief, SMA thus includes in its overhead expenses GSA's transportation expenses, which are deducted from the paychecks of all Southeast dairy farmers whose milk is marketed by SMA. With the incentive of free transportation, Baird and Co-conspirators have pooled excessive amounts of Grade A milk in the Southeast, which reduced Class I utilization from 70 percent to 50 percent, diluted FMMO minimum blend prices, and resulted in lower mailbox prices received by Southeast dairy farmers.

c. In 2001 Defendants and Co-conspirators agreed that SMA would purchase an unlimited quantity of Grade A milk produced by certain of McCloskey's mega-dairies. SMA also agreed to guarantee minimum over-order premiums paid to McCloskey and, upon information and belief, to pay his milk hauling costs. Pursuant to these terms, SMA has purchased massive quantities of Grade A milk produced by certain of McCloskey's mega-dairies. These purchases by SMA have had the effect of further diluting Class I utilization in the Southeast, and, in combination with the favorable terms of sale SMA gave McCloskey, have further reduced mailbox prices received by Southeast dairy farmers.

Case 2:07-cv-00208 Document 174 Filed 06/20/08 Page 37 of 60 PageID #: 2229

109.     Defendants and Co-conspirators, including Baird, Brubaker, Bryant, Bos and Hanman, designed and operate SMA to conceal their improper business dealings. SMA monthly collects hundreds of millions of dollars from Grade A milk sales and places this money in a pool. SMA management deducts SMA's purported expenses from the pool, including marketing expenses such as transportation costs. DFA management and Co-conspirators also claim money from the pool, supposedly to reimburse SMA-related expenses. Upon information and belief, SMA exercises no oversight of these claims from the pool.

110.     Despite repeated requests by producers whose Grade A milk is marketed by SMA for an accounting of SMA's expenses or an explanation of SMA's transactions – which total hundreds of millions of dollars of producers' monies – management of SMA, DFA, and Co-conspirators have withheld information that would reveal SMA's expense and transaction accounting.

111.     These transactions were an improper use of DFA member monies and assets, and caused Plaintiffs and class members to pay excessive and unnecessary fees for the marketing of their Grade A milk which, together with the illegally suppressed prices resulting from Defendants' antitrust conspiracy, has harmed Southeast DFA member dairy farmers through abnormally and unreasonably low mailbox prices.

112.     DFA management and Co-conspirators have taken full advantage of the absence of the comprehensive financial reporting and disclosure rules regulating what DFA and its affiliates must disclose to member producers to conceal the details of these and other inappropriate transactions.

### Concealment and Tolling

113.     Throughout the relevant period, Defendants have affirmatively concealed from Plaintiffs and class members the unlawful combination, conspiracy and agreement among Defendants alleged herein. Defendants and their co-conspirators conducted their conspiracy in secret. Upon information and belief, Defendants planned and implemented the conspiracy during non-public meetings, monitored and enforced the conspiracy in non-public meetings,

agreed not to discuss or disclose the details of their conspiracy, and falsely represented to Plaintiffs and class members that the prices they received for Grade A milk were fair and competitive.

114. As a result of Defendants' concealment, any applicable statute of limitations affecting the rights of Plaintiffs and class members has been tolled. Plaintiffs exercised due diligence to learn of their legal rights, and, despite the exercise of due diligence, did not discover and could not have discovered the unlawful conduct alleged herein at the time it occurred.

## CLASS ACTION ALLEGATIONS

115. Plaintiffs bring this class action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis. Plaintiffs' proposed class is defined under Rule 23(b)(2) and (3) as representatives of the following class and subclasses:

> All dairy farmers, whether individuals or entities, who produced Grade A milk within Orders 5 or 7 and sold Grade A milk directly or through an agent to Defendants or Co-conspirators in Orders 5 and/or 7 during any time from January 1, 2001 to the present. The following persons are excluded from the class: a) Defendants and b) Defendants' co-conspirators.

> a. **Independent Dairy Farmer and Independent Cooperative Member Subclass** – All independent dairy farmers and independent cooperative members (whether individuals or entities) who produced Grade A milk within Orders 5 or 7 and sold Grade A milk directly or through an agent to Defendants or Co-conspirators in Orders 5 or 7 during any time from January 1, 2001 to the present. The terms "independent dairy farmer" and "independent cooperative member" refer to Southeast dairy farmers who were not members of DFA at the time of their Grade A milk sales.

> b. **DFA Member Dairy Farmer Subclass** - All DFA members (whether individuals or entities) who produced Grade A milk within Orders 5 or 7 and sold Grade A milk directly or through an agent to Defendants or Co-conspirators in Orders 5 or 7 during any time from January 1, 2001 to the present. The term "DFA member dairy farmer" refers to Southeast dairy farmers who were members of DFA at the time of their Grade A milk sales.

116. At all times relevant to this Complaint, there have been more than 4,500 members of the proposed class in the Southeast, including more than 1,500 members of the proposed

independent dairy farmer and independent cooperative member subclass and more than 3,000 members of the proposed DFA member dairy farmer subclass. Members of the proposed class and subclasses reside in 14 different states. The members of the proposed class and subclasses are so numerous that the individual joinder of all members is impracticable.

117. The questions of law or fact common to the members of the proposed class predominate over any questions affecting only individual proposed members. These common questions include, but are not limited to, the following:

  a. Whether Defendants engaged in a conspiracy to fix, stabilize, maintain, and/or artificially lower the price paid to Southeast dairy farmers for fluid Grade A milk;

  b. Whether Defendants foreclosed Southeast dairy farmer access to fluid Grade A milk bottling plants in the Southeast;

  c. Whether, in furtherance of the conspiracy, Defendants entered into full-supply agreements to foreclose access to bottling plants;

  d. Whether, in furtherance of the conspiracy, Defendants engaged in group boycott;

  e. Whether DFA, and or DFA, DMS and SMA and Co-conspirators collectively, exercise monopoly power in the marketing and sale of fluid Grade A milk to bottling plants in the Southeast United States;

  f. Whether DFA, and or DFA, DMS, and SMA and Co-conspirators collectively, have abused their monopoly power;

  g. Whether Dean, and/or Dean, DFA, and NDH collectively, have a monopsony in the purchase of fluid Grade A milk by bottling plants in the Southeast United States;

  h. Whether Dean, and/or Dean, DFA, and NDH collectively, have abused and/or misused their monopsony power;

  i. Whether Defendants conspired to monopolize and/or monopsonize and/or restrain interstate trade of fluid Grade A milk marketed or sold to or purchased by bottling plants in the Southeast;

  j. Whether Defendants' conduct has violated the Sherman Act;

40

k.  Whether Baird, Bos and Hanman participated in, authorized, directed and/or knowingly approved or ratified Defendants' violation of the Sherman Act;

l.  Whether Defendants caused injury to Plaintiffs and proposed class members under the Sherman Act;

m.  Whether Plaintiffs and proposed class members are entitled to: i) an injunction prohibiting the continuation of Defendants' violations, and ordering such other and further injunctive relief as is necessary to restore competition; ii) a declaration of their eligibility to an award of damages and other monetary relief, including treble damages; iii) interest from the date they should have received all monies rightfully owed to the actual date of payment as a result of this lawsuit; and iv) attorneys' fees and costs and any other relief the Court deems just and reasonable;

n.  Whether DFA breached the Member Agreement with Southeast DFA members; and

o.  The amount by which DFA assessed fees, dues, and/or other charges upon class members that were unreasonable and unnecessary, and overpaid for processing plants and otherwise entered into transactions to the detriment of class members.

118.    This class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will permit a large number of similarly situated persons to prosecute their claims in a single forum simultaneously and without unnecessary duplication and effort that would result from numerous individual actions.

119.    Individual litigation of the facts of hundreds of cases would unduly burden the courts.  Individual litigation would further present a potential for inconsistent or contradictory judgments, and would increase the delay and expense to all parties and the court system.  By contrast, a class action presents far fewer management difficulties and provides the benefit of single adjudication under the comprehensive supervision of a single court.  Notice of pendency of the action and any resolution thereof can be provided to proposed class members by publication and/or other means.

120.    Plaintiffs' claims are typical of the claims of proposed class members.  Plaintiffs and proposed class members are dairy farmers who produce Grade A milk in the Southeast and, directly or through an agent, sold fluid Grade A milk to Defendants or Co-conspirators in the

Southeast. All Plaintiffs and proposed class members have been injured by the same wrongful, anticompetitive conduct of Defendants. In addition, DFA member dairy farmer Plaintiffs' breach of contract claims are typical of the breach of contract claims of proposed class members. DFA member dairy farmer Plaintiffs and proposed class members are dairy farmers in the Southeast who have been injured by the same wrongful breaches of contract by the DFA.

121.     Plaintiffs are adequate representatives of the class, and Plaintiffs' interests do not conflict with the interests of the members of the proposed class. Plaintiffs are highly committed and determined to pursue this litigation. Plaintiffs possess considerable knowledge of the dairy business. They are eager and able to assist counsel in this matter. Plaintiffs have retained competent counsel experienced in the prosecution of complex litigation, class actions, and antitrust litigation.

**COUNT ONE**
**SHERMAN ACT SECTION 2 VIOLATION**
<u>**Conspiracy to Monopolize and Monopsonize**</u>

122.     Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully alleged herein.

123.     At all times relevant to this Complaint, Defendants have willfully, knowingly and intentionally conspired among themselves with the specific intent to monopolize the market for the marketing or sales of fluid Grade A milk to bottling plants in the Southeast, to monopsonize the market for the purchase of fluid Grade A milk by bottling in the Southeast, and thereby to depress, fix and stabilize the over-order premiums paid for fluid Grade A milk produced in the Southeast and to ensure that all dairy farmers of such milk would be unable to market their fluid Grade A milk except at prices that were fixed and artificially depressed by Defendants' conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

124.     In furtherance of the conspiracy, Defendants have committed one or more of the following overt acts: a) entering full-supply agreements with DFA that it could not satisfy with

42

its own production and implementing these long-term full-supply agreements between Defendants Dean, NDH, DFA and their Co-conspirators to control Southeast dairy farmers' access to fluid Grade A milk bottling plants; b) depressing, fixing and stabilizing prices for fluid Grade A milk paid to dairy farmers; c) requiring Southeast dairy farmers to market their fluid Grade A milk through DFA-controlled entities such as DMS or SMA to gain access to fluid Grade A milk bottling plants; d) threatening to cut off and cutting off Southeast dairy farmers' access to fluid Grade A milk bottling plants; e) boycotting dairy farmers, cooperatives, and fluid Grade A milk bottlers; f) "flooding" the Southeast Grade A milk market to further depress prices paid to Southeast dairy farmers; g) utilizing DFA-controlled entities such as DMS or SMA to monitor prices for fluid Grade A milk paid to independent dairy farmers and independent cooperative members; h) "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers' fluid Grade A milk; and i) purchasing fluid Grade A milk bottling plants, closing down fluid Grade A milk bottling plants and/or have refusing to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers in the Southeast.

125.    The relevant geographic market is the Southeast United States, which is comprised of FMMO 5 and 7.  Among other factors, the Southeast United States is the relevant geographic market based on the structure of the industry, fluid Grade A milk being a perishable product, the high demand for fluid Grade A milk in the Southeast market which is in chronic short supply, and the fact that dairy farmers in the Southeast cannot turn to fluid Grade A milk bottlers outside of the Southeast as a reasonable substitute.  Collectively, Defendants enjoy monopsony power over the purchase of fluid Grade A milk for bottling plants in the Southeast. Upon information and belief, Defendants control 77 percent of the fluid Grade A milk bottling capacity in the Southeast; over 80 percent of the Grade A milk marketed in the Southeast; and 90 percent of the fluid Grade A milk produced in the Southeast.

126.     The relevant product market consists of the market for the sales or marketing of fluid Grade A milk to fluid Grade A milk bottling plants (*i.e.,* sell-side), and the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants (*i.e.,* buy-side).  The market for the sales or marketing of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants is treated as a distinct market, and it is not interchangeable with non-fluid milk end uses because Grade A milk is less valuable when it is used in the manufacture of non-fluid commodities and dairy farmers qualify to participate in the Southeast FMMOs only by selling fluid Grade A milk to fluid Grade A milk bottling plants.

127.     Defendants willfully conspired among themselves with the intent to acquire, maintain and exploit monopoly power in the market for the marketing and sales of fluid Grade A milk to fluid Grade A milk bottling plants in the Southeast, and Defendants willfully conspired among themselves with the intent to acquire, maintain and exploit monopsony power in the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants in the Southeast.

128.     As a direct and proximate result of Defendants' continuing violation of Section 2 of the Sherman Act, Plaintiffs and class members have suffered injury and damages in an amount to be proven at trial.

129.     Plaintiffs, on behalf of themselves and other members of the class, seek money damages from Defendants jointly and severally for these violations.  Such damages represent the additional amount Plaintiffs and other members of the class would have received for sales of Grade A milk in the absence of the violations alleged. Damages may be quantified on a class-wide basis.  These actual damages should be trebled under Section 4 of the Clayton Act.  15 U.S.C. § 15.

130.     Plaintiffs, on behalf of themselves and other members of the class, also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

44

Case 2:07-cv-00208 Document 174 Filed 06/20/08 Page 44 of 60 PageID 2236
Case 2:08-md-01000 Document 87 Filed 06/20/2008 Page 44 of 60

**COUNT TWO**
**SHERMAN ACT SECTION 2 VIOLATION**
**Attempt to Monopolize and Monopsonize**

131.    Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully alleged herein.

132.    The relevant geographic market is the Southeast United States, which is comprised of FMMO 5 and 7.  Among other factors, the Southeast United States is the relevant geographic market based on the structure of the industry, fluid Grade A milk being a perishable product, the high demand for fluid Grade A milk in the Southeast market which is in chronic short supply, and the fact that dairy farmers in the Southeast cannot turn to fluid Grade A milk bottlers outside of the Southeast as a reasonable substitute.  Collectively, Defendants enjoy monopsony power over the purchase of fluid Grade A milk for bottling plants in the Southeast.  Upon information and belief, Defendants control 77 percent of the fluid Grade A milk bottling capacity in the Southeast; over 80 percent of the Grade A milk marketed in the Southeast; and 90 percent of the fluid Grade A milk produced in the Southeast.

133.    The relevant product market consists of the market for the sales or marketing of fluid Grade A milk to fluid Grade A milk bottling plants (*i.e.,* sell-side), and the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants (*i.e.,* buy-side).  The market for the sales or marketing of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants is treated as a distinct market, and it is not interchangeable with non-fluid milk end uses because Grade A milk is less valuable when it is used in the manufacture of non-fluid commodities and dairy farmers qualify to participate in the Southeast FMMOs only by selling fluid Grade A milk to fluid Grade A milk bottling plants.

134.    DFA, both by itself and in combination with DFA-controlled marketing agencies DMS and SMA, has attempted to and continues to attempt to possess market power in the marketing and sales of fluid Grade A milk to fluid Grade A milk bottling plants in the Southeast market and maintains a dominant position in the market for the purchase of fluid Grade A milk

45

Case 2:07-cv-00208 Document 174 Filed 06/20/08 Page 45 of 60
Case 2:08-md-01000 Document 87 Filed 06/20/08 Page 45 of 60 PageID #: 2237

by fluid Grade A milk bottling plants in the Southeast. DFA has acted with the specific intent to monopolize and has used and is using its market dominance in an attempt to eliminate competition from independent dairy farmers and cooperatives by, among other things, a) entering full-supply agreements with DFA that it could not satisfy with its own production and implementing these long-term full-supply agreements between Defendants Dean, NDH, DFA and their Co-conspirators to control Southeast dairy farmers' access to fluid Grade A milk bottling plants; b) depressing, fixing and stabilizing prices for fluid Grade A milk paid to dairy farmers; c) requiring Southeast dairy farmers to market their fluid Grade A milk through DFA-controlled entities such as DMS or SMA to gain access to fluid Grade A milk bottling plants; d) threatening to cut off and cutting off Southeast dairy farmers' access to fluid Grade A milk bottling plants; e) boycotting dairy farmers, cooperatives, and fluid Grade A milk bottlers; f) "flooding" the Southeast Grade A milk market to further depress prices paid to Southeast dairy farmers; g) utilizing DFA-controlled entities such as DMS or SMA to monitor prices for fluid Grade A milk paid to independent dairy farmers and independent cooperative members; h) "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers' fluid Grade A milk; and i) purchasing fluid Grade A milk bottling plants, closing down fluid Grade A milk bottling plants and/or have refusing to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers in the Southeast.

135.    DFA's scheme to monopolize has had success in restricting, excluding and foreclosing competition, and there is a dangerous probability of success of DFA monopolizing these markets.

136.    DFA's scheme and its predatory acts in furtherance of this scheme constitutes attempted monopolization in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

137. Defendants have attempted to and continue to attempt to obtain market power in the purchase of fluid Grade A milk by fluid Grade A bottling plants in the Southeast market and they have acted with the specific intent to obtain a monopsony and use their market dominance in the bottling of fluid Grade A milk by, among other things, a) entering full-supply agreements with DFA that it could not satisfy with its own production and implementing these long-term full-supply agreements between Defendants Dean, NDH, DFA and their Co-conspirators to control Southeast dairy farmers' access to fluid Grade A milk bottling plants; b) depressing, fixing and stabilizing prices for fluid Grade A milk paid to dairy farmers; c) requiring Southeast dairy farmers to market their fluid Grade A milk through DFA-controlled entities such as DMS or SMA to gain access to fluid Grade A milk bottling plants; d) threatening to cut off and cutting off Southeast dairy farmers' access to fluid Grade A milk bottling plants; e) boycotting dairy farmers, cooperatives, and fluid Grade A milk bottlers; f) "flooding" the Southeast Grade A milk market to further depress prices paid to Southeast dairy farmers; g) utilizing DFA-controlled entities such as DMS or SMA to monitor prices for fluid Grade A milk paid to independent dairy farmers and independent cooperative members; h) "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers' fluid Grade A milk; and i) purchasing fluid Grade A milk bottling plants, closing down fluid Grade A milk bottling plants and/or have refusing to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers in the Southeast.

138. Defendants' scheme to monopsonize has had success in restricting, excluding and foreclosing competition, and there is a dangerous probability of success of Defendants monopsonizing these markets.

139. Defendants' scheme and their predatory acts in furtherance of this scheme to control the market for the sales or marketing of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants the Southeast United States constitutes attempted

monopolization and monopsonization in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

140.    As a direct and proximate result of Defendants' continuing violation of Section 2 of the Sherman Act, Plaintiffs and class members have suffered injury and damages in an amount to be proven at trial.

141.    Plaintiffs, on behalf of themselves and other members of the class, seek money damages from Defendants for these violations.  These damages represent the additional amount Plaintiffs and other members of the class would have received for sales of fluid Grade A milk in the absence of the violations alleged.  Damages may be quantified on a class-wide basis.  These actual damages should be trebled under Section 4 of the Clayton Act.  15 U.S.C. § 15.

142.    Plaintiffs, on behalf of themselves and other members of the class, also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT THREE**
**SHERMAN ACT SECTION 2 VIOLATION**
**<u>Unlawful Monopolization</u>**

143.    Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully alleged herein.

144.    The relevant geographic market is the Southeast United States, which is comprised of FMMO 5 and 7.  Among other factors, the Southeast United States is the relevant geographic market based on the structure of the industry, fluid Grade A milk being a perishable product, the high demand for fluid Grade A milk in the Southeast market which is in chronic short supply, and the fact that dairy farmers in the Southeast cannot turn to fluid Grade A milk bottlers outside of the Southeast as a reasonable substitute.  Collectively, Defendants enjoy monopsony power over the purchase of fluid Grade A milk for bottling plants in the Southeast. Upon information and belief, Defendants control 77 percent of the fluid Grade A milk bottling

48

Case 2:07-cv-00208 Document 174   Filed 06/20/08   Page 48 of 60
Case 2:08-md-01000   Document 67   Filed 06/20/2008   Page 48 of 60   PageID #: 2240

capacity in the Southeast; over 80 percent of the Grade A milk marketed in the Southeast; and 90 percent of the fluid Grade A milk produced in the Southeast.

145. The relevant product market consists of the market for the sales or marketing of fluid Grade A milk to fluid Grade A milk bottling plants (*i.e.,* sell-side), and the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants (*i.e.,* buy-side). The market for the sales or marketing of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants is treated as a distinct market, and it is not interchangeable with non-fluid milk end uses because Grade A milk is less valuable when it is used in the manufacture of non-fluid commodities and dairy farmers qualify to participate in the Southeast FMMOs only by selling fluid Grade A milk to fluid Grade A milk bottling plants.

146. DFA possesses monopoly power in the market for marketing and sales of fluid Grade A milk to fluid Grade A milk bottling plants in the Southeast market and has abused and continues to abuse that power to maintain and enhance its market dominance in the market for the marketing and sales of fluid Grade A milk to fluid Grade A milk bottling plants by unreasonably restraining trade, artificially and anti-competitively reducing the price of fluid Grade A milk purchased from Plaintiffs and members of the class, eliminating competition from rival cooperatives and independent dairy farmers, and foreclosing and excluding competitors from access to fluid Grade A milk bottling plants by engaging in predatory and unlawful conduct. This conduct includes, but is not limited to, the following acts: a) entering full-supply agreements with DFA that it could not satisfy with its own production and implementing these long-term full-supply agreements between Defendants Dean, NDH, DFA and their Co-conspirators to control Southeast dairy farmers' access to fluid Grade A milk bottling plants; b) depressing, fixing and stabilizing prices for fluid Grade A milk paid to dairy farmers; c) requiring Southeast dairy farmers to market their fluid Grade A milk through DFA-controlled entities such as DMS or SMA to gain access to fluid Grade A milk bottling plants; d) threatening to cut off and cutting off Southeast dairy farmers' access to fluid Grade A milk bottling plants; e) boycotting dairy farmers, cooperatives, and fluid Grade A milk bottlers; f) "flooding" the

Southeast Grade A milk market to further depress prices paid to Southeast dairy farmers; g) utilizing DFA-controlled entities such as DMS or SMA to monitor prices for fluid Grade A milk paid to independent dairy farmers and independent cooperative members; h) "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers' fluid Grade A milk; and i) purchasing fluid Grade A milk bottling plants, closing down fluid Grade A milk bottling plants and/or have refusing to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers in the Southeast.

147.    As a direct and proximate result of DFA's continuing violation of Section 2 of the Sherman Act, Plaintiffs and class members have suffered injury and damages in an amount to be proven at trial.

148.    Plaintiffs, on behalf of themselves and other members of the class, seek money damages from DFA for these violations.   These damages represent the additional amount Plaintiffs and other members of the class would have received for sales of Grade A milk in the absence of the violations alleged.   Damages may be quantified on a class-wide basis.   These actual damages should be trebled under Section 4 of the Clayton Act.  15 U.S.C. § 15.

149.    Plaintiffs, on behalf of themselves and other members of the class, also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT FOUR**
**SHERMAN ACT SECTION 2 VIOLATION**
**Unlawful Monopsony**

150.    Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully alleged herein.

151.    The relevant geographic market is the Southeast United States, which is comprised of FMMO 5 and 7.  Among other factors, the Southeast United States is the relevant

geographic market based on the structure of the industry, fluid Grade A milk being a perishable product, the high demand for fluid Grade A milk in the Southeast market which is in chronic short supply, and the fact that dairy farmers in the Southeast cannot turn to fluid Grade A milk bottlers outside of the Southeast as a reasonable substitute. Collectively, Defendants enjoy monopsony power over the purchase of fluid Grade A milk for bottling plants in the Southeast. Upon information and belief, Defendants control 77 percent of the fluid Grade A milk bottling capacity in the Southeast; over 80 percent of the Grade A milk marketed in the Southeast; and 90 percent of the fluid Grade A milk produced in the Southeast.

152. The relevant product market consists of the market for the sales or marketing of fluid Grade A milk to fluid Grade A milk bottling plants (*i.e.,* sell-side), and the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants (*i.e.,* buy-side). The market for the marketing or sales of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants is treated as a distinct market, and it is not interchangeable with non-fluid milk end uses because Grade A milk is less valuable when it is used in the manufacture of non-fluid commodities and dairy farmers qualify to participate in the Southeast FMMOs only by selling fluid Grade A milk to fluid Grade A milk bottling plants.

153. Dean possesses monopsony power in the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants in the Southeast market and has abused and continues to abuse that power to maintain and enhance its market dominance in the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants by unreasonably restraining trade, artificially and anti-competitively reducing the price of Grade A milk purchased from Plaintiffs and members of the class, eliminating competition from rival fluid Grade A milk bottlers and foreclosing and excluding competitors from the fluid Grade A milk bottling market by engaging in predatory and unlawful conduct. This conduct includes, but is not limited to, the following acts: a) entering full-supply agreements with DFA that it could not satisfy with its own production and implementing these long-term full-supply agreements between Defendants Dean, NDH, DFA and their Co-conspirators to control Southeast dairy farmers' access to fluid Grade A

51

Case 2:07-cv-00208 Document 174 Filed 06/20/08 Page 51 of 60 PageID #: 2243
Case 2:08-md-01000 Document 67 Filed 06/20/2008 Page 59 of 60

milk bottling plants; b) depressing, fixing and stabilizing prices for fluid Grade A milk paid to dairy farmers; c) requiring Southeast dairy farmers to market their fluid Grade A milk through DFA-controlled entities such as DMS or SMA to gain access to fluid Grade A milk bottling plants; d) threatening to cut off and cutting off Southeast dairy farmers' access to fluid Grade A milk bottling plants; e) boycotting dairy farmers, cooperatives, and fluid Grade A milk bottlers; f) "flooding" the Southeast Grade A milk market to further depress prices paid to Southeast dairy farmers; g) utilizing DFA-controlled entities such as DMS or SMA to monitor prices for fluid Grade A milk paid to independent dairy farmers and independent cooperative members; h) "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers' fluid Grade A milk; and i) purchasing fluid Grade A milk bottling plants, closing down fluid Grade A milk bottling plants and/or have refusing to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers in the Southeast.

154. Dean's conduct constitutes unlawful monopsonization, the unlawful use of predatory anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

155. As a direct and proximate result of Dean's continuing violation of Section 2 of the Sherman Act, Plaintiffs and class members have suffered injury and damages in an amount to be proven at trial.

156. In the alternative, Defendants Dean, NDH, and DFA collectively as fluid Grade A milk bottlers have abused their monopsony power to maintain and enhance their market dominance in the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants by unreasonably restraining trade, artificially and anti-competitively reducing the price of Grade A milk purchased from Plaintiffs and members of the class, eliminating competition from rival fluid Grade A milk bottlers and foreclosing and excluding competitors from the fluid Grade

A milk bottling market by engaging in predatory and unlawful conduct as described above.  The effect of Defendants' scheme has been to harm, disrupt and eliminate competition from fluid Grade A milk bottlers and independent dairy farmers in the Southeast market.

157.    Defendants' conduct constitutes unlawful monopsonization and the unlawful use of predatory anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

158.    Plaintiffs, on behalf of themselves and other members of the class, seek money damages from Dean or, in the alternative, from Defendants Dean, DFA and NDH for these violations.  These damages represent the additional amount Plaintiffs and other members of the class would have received for sales of Grade A milk in the absence of the violations alleged.  Damages may be quantified on a class-wide basis.  These actual damages should be trebled under Section 4 of the Clayton Act.  15 U.S.C. § 15.

159.    Plaintiffs, on behalf of themselves and other members of the class, also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

### COUNT FIVE
### SHERMAN ACT SECTION 1 VIOLATION
### Unlawful Conspiracy Among Defendants to Foreclose Competition and Fix Prices

160.    Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully alleged herein.

161.    At all times relevant to this Complaint, Defendants have combined and conspired to eliminate competition for the purchase of fluid Grade A milk from dairy farmers in the Southeast.  In furtherance of their conspiracy, Defendants have entered into exclusive dealing arrangements with the purpose and intent of restricting access to the fluid Grade A milk bottling market in the Southeast, fixing, suppressing and stabilizing prices paid to dairy farmers for fluid Grade A milk, and excluding dairy farmers from access to cooperatives and fluid Grade A milk

53

Case 2:07-cv-00208  Document 174  Filed 06/20/08  Page 53 of 60  PageID #: 2245
Case 2:08-md-01000  Document 87  Filed 06/20/2008  Page 53 of 60

bottling plants that might compete with Defendants in purchasing fluid Grade A milk for bottling.

162.    These agreements are *per se* violations of Section 1 of the Sherman Act, and were they not, would nonetheless violate Section 1 of the Sherman Act under the Rule of Reason.

163.    The agreements that Defendants have entered, maintained, renewed, and enforced with one another have had the purpose and effect of eliminating competition for the purchase of fluid Grade A milk by and among fluid Grade A milk bottlers in the Southeast.  As a result of these agreements, Plaintiffs have been forced to accept suppressed prices for sales of fluid Grade A milk to bottlers, and otherwise have been damaged as described in this Complaint.  But for the conspiracy alleged herein, fluid Grade A milk prices obtained by Plaintiffs and class members in the Southeast market would have been significantly higher.

164.    In furtherance of Defendants' agreement to restrain trade, Defendants have committed.  This conduct includes, but is not limited to, the following acts:  a) entering full-supply agreements with DFA that it could not satisfy with its own production and implementing these long-term full-supply agreements between Defendants Dean, NDH, DFA and their Co-conspirators to control Southeast dairy farmers' access to fluid Grade A milk bottling plants; b) depressing, fixing and stabilizing prices for fluid Grade A milk paid to dairy farmers; c) requiring Southeast dairy farmers to market their fluid Grade A milk through DFA-controlled entities such as DMS or SMA to gain access to fluid Grade A milk bottling plants; d) threatening to cut off and cutting off Southeast dairy farmers' access to fluid Grade A milk bottling plants; e) boycotting dairy farmers, cooperatives, and fluid Grade A milk bottlers; f) "flooding" the Southeast Grade A milk market to further depress prices paid to Southeast dairy farmers; g) utilizing DFA-controlled entities such as DMS or SMA to monitor prices for fluid Grade A milk paid to independent dairy farmers and independent cooperative members; h) "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive outlets for dairy farmers' fluid Grade A milk; and i) purchasing fluid Grade A milk bottling plants, closing down

fluid Grade A milk bottling plants and/or have refusing to operate fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers in the Southeast.

165.     The relevant geographic market is the Southeast United States, which is comprised of FMMO 5 and 7.  Among other factors, the Southeast United States is the relevant geographic market based on the structure of the industry, fluid Grade A milk being a perishable product, the high demand for fluid Grade A milk in the Southeast market which is in chronic short supply, and the fact that dairy farmers in the Southeast cannot turn to fluid Grade A milk bottlers outside of the Southeast as a reasonable substitute.  Collectively, Defendants enjoy monopsony power over the purchase of fluid Grade A milk for bottling plants in the Southeast. Upon information and belief, Defendants control 77 percent of the fluid Grade A milk bottling capacity in the Southeast; over 80 percent of the Grade A milk marketed in the Southeast; and 90 percent of the fluid Grade A milk produced in the Southeast.

166.     The relevant product market consists of the market for the sales or marketing of fluid Grade A milk to fluid Grade A milk bottling plants (*i.e.,* sell-side), and the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants (*i.e.,* buy-side).  The market for the marketing or sales of fluid Grade A milk to, or the purchase of fluid Grade A milk by, bottling plants is treated as a distinct market, and it is not interchangeable with non-fluid milk end uses because Grade A milk is less valuable when it is used in the manufacture of non-fluid commodities and dairy farmers qualify to participate in the Southeast FMMOs only by selling fluid Grade A milk to fluid Grade A milk bottling plants.

167.     Collectively, Defendants enjoy monopoly and monopsony power over the market for the sales or marketing of fluid Grade A milk to, or the purchase of fluid Grade A milk by, fluid Grade A milk bottling plants in the Southeast.  Upon information and belief, Defendants control 77 percent of the fluid Grade A milk bottling capacity in the Southeast; over 80 percent of the Grade A milk marketed in the Southeast; and 90 percent of the fluid Grade A milk produced in the Southeast.

168.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, as well as Defendants' other unlawful conduct, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

169.    Plaintiffs, on behalf of themselves and other members of the class, seek money damages from Defendants jointly and severally for these violations.  These damages represent the additional amount Plaintiffs and other members of the class would have received for sales of Grade A milk in the absence of the violations alleged. Damages may be quantified on a class-wide basis.  These actual damages should be trebled under Section 4 of the Clayton Act.  15 U.S.C. § 15.

170.    Plaintiffs, on behalf of themselves and other members of the class, also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT SIX
## AGAINST DFA
### Breach of Contract

171.    Plaintiffs incorporate by reference paragraphs 1 through 112 as if fully alleged herein.

172.    DFA markets its member dairy farmers' Grade A milk pursuant to a standard form Member Agreement.

173.    The Member Agreement requires DFA "to market all Milk received from Member in a form and manner . . . for the advantage and benefit of all members."  ¶ 2.a.

174.    The Member Agreement requires that DFA use the power and authority granted by each member to collect moneys due the Member from the sale of Member's Milk to, *inter alia,* "pay, or make provisions for the payment of all ordinary and necessary expenses incurred in the marketing of Member's Milk".  ¶ 3.a.

175.    The Member Agreement also incorporates the DFA Bylaws, including the following articles:

"PURPOSES OF THE ASSOCIATION: . . . to engage in any lawful act or activity for which an Association may be organized under the Kansas Cooperative Marketing Act." § III.c.

"MEMBERSHIP: . . . This Association shall be operated on a cooperative, non-profit basis for the mutual benefit of its members as producers . . . ." § V.b.

176.    DFA materially breached its obligations to Plaintiffs and class members under the Member Agreement and DFA Bylaws by:

    a.  entering into transactions and engaging in conduct that disadvantaged the Southeast DFA member dairy farmers and were not beneficial to Southeast DFA member dairy farmers' interests;

    b.  engaging in unlawful acts or activities; and

    c.  causing Southeast DFA member dairy farmers to pay expenses for the marketing of their Grade A milk that were not ordinary and necessary.

177.    Plaintiffs and DFA member dairy farmer class members have performed their obligations under the Member Agreement.

178.    Plaintiffs and DFA member dairy farmer class members are entitled to recover all damages proximately caused by DFA's breach, including compensatory, incidental, and consequential damages, and pre- and post- judgment interest.  Damages may be quantified on a class-wide basis.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. Pro. 38(b) of all issues triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

    a.  Declare this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, and declare:

        i.  Plaintiffs Sweetwater Farm, Inc., Barbara and Victor Arwood d/b/a VBA Dairy, Jeffrey P. Bender, Randel E. Davis d/b/a Davis Brothers Dairy, Fred Jaques, Farrar & Farrar Dairy, Inc., John M. Moore, D.L. Robey Farms, Robert D. Stoots, Thomas R. Watson

d/b/a Dawn Dairy, and Virgil C. Willie to be Class Representatives for the Class and the independent dairy farmer and independent cooperative member Subclass; and

    ii.    Plaintiffs James D. Baisley and Eva C. Baisley, Stephen J. Cornett, Jerry L. Holmes and McCain Dairy to be Class Representatives for the Class and the DFA member dairy farmer Subclass.

b.    On behalf of the independent dairy farmer, independent cooperative member and DFA member dairy farmer Subclasses:

    i.    Adjudge and declare that Dean, DFA, DMS, NDH, SMA, Mid-Am, Baird, Bos and Hanman have engaged in unlawful conduct in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2;

    ii.    Preliminarily and permanently enjoin Defendants from violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2;

    iii.    Declare null and void the full-supply agreements by and between Dean, NDH and DFA as described herein;

    iv.    Preliminarily and permanently enjoin Dean, DFA, DMS, NDH, SMA, Mid-Am, Baird, Bos and Hanman, and/or any entity controlled by any of them from entering into full-supply agreements as described herein;

    v.    Order Dean, NDH, DFA, Mid-Am, their subsidiaries or joint ventures to divest fluid Grade A milk bottling plants necessary to restore competition in the Southeast;

    vi.    Against all Defendants, jointly and severally, award Plaintiffs and the proposed class damages in an amount to proven at trial, to be trebled with interest and the costs of this suit, including attorneys' fees; and

    vii.    Award such further relief, including structural remedies, as the Court deems just and proper.

c.    On behalf of the DFA member dairy farmer Subclass:

    i.    Against DFA, award Plaintiffs and the proposed class compensatory, incidental, and consequential damages for breach of contract in an amount to be proven at trial with interest and the costs of this suit; and

    ii.    Award such further relief, including structural remedies, as the Court deems just and proper.

June 20, 2008

Respectfully submitted,

_____/s/ Robert G. Abrams_____
Robert G. Abrams
Gregory J. Commins, Jr.
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone: (202) 783-0800
Facsimile: (202) 383-6610

***Interim Lead Counsel for Consolidated
Plaintiffs***

***Additional Counsel for Independent Dairy Farmer
and Independent Cooperative Member Plaintiffs***

Thomas C. Jessee
Jessee & Jessee
P.O. Box 997
Johnson City, TN 37605

*Plaintiffs' Liaison Counsel*

Michael D. Hausfeld
Richard A. Koffman
James J. Pizzirusso
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500 West Tower
Washington, D.C. 20005

Gary E. Mason
Donna F. Solen
Khushi K. Desai
The Mason Law Firm, L.L.P.
1225 19th Street, N.W.
Suite 500
Washington, D.C. 20036

William A. Isaacson
Tanya S. Chutkan
Jennifer Milici
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, NW
Washington, D.C. 20015

Roberta D. Liebenberg
Ria C. Momblanco
Fine, Kaplan & Black, R.P.C.
1835 Market St.
28th Floor
Philadelphia, PA 19103

59

## CERTIFICATE OF SERVICE

I certify that on the 20th day of June, 2008, a true and correct copy of Consolidated Amended Complaint was served by operation of the electronic filing system of the U.S. District Court for the Eastern District of Tennessee upon all counsel who have consented to receive notice of filings in the matters styled *In re Southeast Milk Antitrust Litigation*, MDL No. 1899.

I further certify that on the 20th day of June, 2008, a true and correct copy Consolidated Amended Complaint was served by United States Postal Service upon:

John C. Whitfield
Whitfield & Cox, P.S.C.
29 East Center Street
Madisonville, KY 42431
*Counsel for Farrar Plaintiffs*

Dated:  June 20, 2008

_____/s/ Danyll Foix_____
Counsel for Plaintiffs

.