# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## GREENEVILLE DIVISION

|  |  |
|---|---|
| IN RE SOUTHEASTERN MILK ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) ) |

CASE NO. 2:08-MD-01000

JUDGE GREER
MAGISTRATE JUDGE INMAN

THIS DOCUMENT RELATES TO:

*Sweetwater Valley Farm, Inc., et al. v. Dean Foods Co., et al.*, No. 2:07-cv-208.


## JOINT MEMORANDUM OF ALL DEFENDANTS
## REGARDING COUNTS I THROUGH V


**[FILED UNDER SEAL PURSUANT TO 9/22/09 STANDING ORDER]**


July 27, 2010

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

    A.    There Is an Overall Raw Milk Deficit in Federal Orders 5 and 7, which
           Requires that the Milk Supply Be "Balanced." ........................................................4

    B.    There Are a Variety of Options for Dairy Farmers in Orders 5 and 7 in
           Marketing Their Milk. ...........................................................................................5

    C.    Full-Supply Agreements, Outsourcing, Supplemental Milk Purchases and
           Coop Investments in Bottling Plants Are Common Arrangements Not
           Limited to These Parties or This Part of the Country. ............................................7

    D.    The Prices that Plants Pay and that Dairy Farmers Receive in Orders 5 and
           7 for Raw Milk Are Different, and Both Are Among the Highest in the
           Nation.....................................................................................................................7

ARGUMENT ........................................................................................................................ 9

I.      PLAINTIFFS CANNOT ESTABLISH THAT ORDERS 5 AND 7 CONSTITUTE A
       RELEVANT GEOGRAPHIC MARKET. ............................................................... 9

    A.    A Properly Defined Geographic Market Is an Essential Element of Each of
           Plaintiffs' Antitrust Claims. ...................................................................................9

    B.    A Properly Defined Relevant Geographic Market Turns on the
           Commercial Realities Facing Buyers and Sellers..................................................10

    C.    The Federal Milk Marketing Orders, Established for Administrative
           Purposes, Do Not Define Relevant Antitrust Markets...........................................13

    D.    None of the Parties Treats Orders 5 and 7 as a Relevant Market. .........................14

    E.    Plaintiffs' Proffered Expert Opinions on Geographic Market Definition
           Provide No Basis for a Market Limited to Orders 5 and 7. ...................................15

II.     PLAINTIFFS HAVE FAILED TO ESTABLISH ANTITRUST INJURY AND
       ANTITRUST STANDING. ..................................................................................... 17

    A.    Plaintiffs Cannot Show that the Challenged Conduct Caused Suppression
           in Their Pay Prices. ..............................................................................................19

          1.    Establishing the Causal Link Here Is Confounded by the
                Competitive Factors Putting Downward Pressure on Pay Prices and
                Plaintiffs' Failure To Even Measure Dairy Farmer Pay Prices. ................19

| | 2. | Dr. Rausser's Stage 2 Damages Model Is Not a Reliable Basis for Concluding that There Has Been Premium Suppression Caused by the Conduct at Issue. | 20 |
| | 3. | Even Accepting Dr. Rausser's Statistical Model, Plaintiffs Cannot Link The Premium Suppression He Claims To Estimate To the Challenged Conduct by Defendants. | 21 |
| B. | | Plaintiffs Did Not Suffer Antitrust Injury Due to Alleged Exclusive Dealing Arrangements. | 24 |
| C. | | Plaintiffs Otherwise Lack Standing To Pursue Their Antitrust Claims. | 26 |

III. THERE IS NO TRIABLE ISSUE OF FACT AS TO THE ALLEGED CONSPIRACY TO SUPPRESS DAIRY FARMER PAY PRICES. ......... 28

| A. | | The Law of Antitrust Conspiracies and the Summary Adjudication Thereof. | 31 |
| B. | | There Is No Direct Evidence of a Conspiracy To Suppress Pay Prices. | 34 |
| C. | | Plaintiffs' Circumstantial Evidence of Conspiracy Is Not Sufficient To Create a Genuine Issue for Trial. | 38 |
| | 1. | Plaintiffs Cannot Explain Why Defendants Had an Economic Interest in Participating in the Alleged Conspiracy. | 38 |
| | | a. The conspiracy Plaintiffs have alleged makes no economic sense for the processors—indeed, it is affirmatively *against* their economic interests. | 38 |
| | | 1) Plaintiffs have not shown, and cannot show, that processors paid lower prices for raw milk. | 39 |
| | | 2) Paying prices to Southeast farmers that are below a competitive level would increase the costs for processors in Orders 5 and 7. | 40 |
| | | 3) Processors would have absolutely no reason to participate in a conspiracy to "flood" Orders 5 and 7 with unneeded outside milk. | 41 |
| | | 4) Rebates and credits do not provide an adequate reason for processors to participate in the alleged conspiracy. | 41 |
| | | b. It makes no economic sense for coops and common marketing agencies to participate in a conspiracy to reduce pay prices. | 43 |

- ii -

c. Plaintiffs have no explanation or evidence for why the unnamed "co-conspirators" participated, yet without these additional participants, Plaintiffs' claims make even less sense. .................................................................................45

2. The conduct that Plaintiffs claim was conspiratorial is not sufficiently parallel to support a reasonable inference of conspiracy. ....................................................................................47

3. None of the conduct cited by Plaintiffs is inconsistent with the Defendants' unilateral self-interest. ...........................................48

 a. Entering into full-supply agreements was not inconsistent with the unilateral self interest of processors and coops................49

  1) Full-supply agreements are common in the industry and have been for years......................................................49

  2) Full-supply agreements benefit processors, particularly in deficit regions. ............................................50

  3) Dean's recent change in procurement strategy does not make its prior use of FSAs inconsistent with its unilateral self-interest.........................................................51

  4) Full-supply agreements benefit dairy farmers who belong to cooperatives in many ways. ...............................52

  5) Coops benefit from full-supply agreements even in deficit areas. ......................................................................53

 b. The Dean-DMS outsourcing agreement was not inconsistent with the parties' unilateral self-interest. ...................55

 c. The granting of competitive credits and rebates was not inconsistent with the coops' unilateral self-interest.......................58

 d. The collaborative purchase of supplemental milk by the SMA coops was not inconsistent with their unilateral self-interest.............................................................................................59

 e. DFA's investments in bottling plants, including NDH, were not inconsistent with its unilateral self-interest. ............................61

4. The undisputed evidence shows that Defendants consistently acted in ways *contrary* to the alleged conspiracy................................................64

IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' UNILATERAL CONDUCT CLAIMS....................................................................................66

A.     Plaintiffs Cannot Establish that DFA Possessed, or Had a Dangerous Probability of Acquiring, Monopoly Power in the Relevant Market........................67

B.     Plaintiffs Cannot Establish that Dean Possessed, or Had a Dangerous Probability of Acquiring, Monopsony Power in the Relevant Market. ................69

C.     Plaintiffs' Shared Monopoly Theory Fails as a Matter of Law. ...........................71

V.     PLAINTIFFS' CLAIM OF DAMAGES DUE TO "FLOODING" IS BARRED BY THE FILED-RATE DOCTRINE. ......................................................................72

CONCLUSION........................................................................................................ 75

## TABLE OF AUTHORITIES

### FEDERAL CASES

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396 (7th Cir. 1989) ....................12

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031
    (N.D. Cal. 2001)..................................................................................................66

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212 (4th Cir. 2004)................31, 33

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric
    Surgery, Inc.*, 185 F.3d 606 (6th Cir. 1999)..............................................................70

*Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342 (5th Cir. 1980)......................31

*B&H Med., LLC v. ABP Admin., Inc.*, 526 F.3d 257 (6th Cir. 2008) ............................................10

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*, 203 F.3d 1028
    (8th Cir. 2000) (en banc)...............................................................................15, 36

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)................55, 57

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ......................................17, 18

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008 (6th Cir. 2005)...................10

*Carlin v. Dairy America, Inc.*, 690 F. Supp. 2d 1128 (E.D. Cal. 2010) ...........................72, 73, 74

*Caruana v. Gen. Motors Corp.*, 204 F. App'x 511 (6th Cir. 2006)...............................................26

*E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1
    (1st Cir. 2004) ........................................................................................24, 49

*Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037 (2d Cir. 1980) ...................................36

*Gordon v. Lewistown Hosp.*, 423 F.3d 184 (3d Cir. 2005)...........................................................12

*Hodges v. WSM, Inc.*, 26 F.3d 36 (6th Cir. 1994)......................................................................23

*HyPoint Tech., Inc. v. Hewlett-Packard, Co.*, 949 F.2d 874 (6th Cir. 1991) ...............................25

*Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531 (6th Cir. 2008).........................................31

*In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497 (D. Kan. 1995) ..........................20

*In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999)..........................................31, 36, 49

*In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934 (E.D. Tenn. 2008).........................................18

*In re Se. Milk Antitrust Litig.*, No. 2:08-MD-1000, 2008 WL 2368212
 (E.D. Tenn. June 6, 2008) ...........................................................................................................73

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009)......................31, 33, 49

*Indeck Energy Servs., Inc. v. Consumers Energy Co.* 250 F.3d 972
 (6th Cir. 2000).........................................................................................................24, 25, 26, 49

*InvaCare Corp. v. Respironics, Inc.*, No. 1:04 CV 1580, 2008 WL 906112
 (N.D. Ohio Mar. 31, 2008) .........................................................................................................49

*Kartell v. Blue Shield of Mass, Inc.*, 749 F.2d 922 (1st Cir. 1984)................................................58

*Kentucky Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908 (6th Cir. 2009)............................ *passim*

*Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F. Supp. 608 (M.D. Ga. 1981)..................................14

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002)................................68

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .................. *passim*

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726
 (6th Cir. 2008)......................................................................................................................9, 12

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)..............................................31, 35

*Monsanto Co. v. Trantham*, 156 F. Supp. 2d 855 (W.D. Tenn. 2001) ....................................12, 68

*NHL Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712 (6th Cir. 2003)...............10

*NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007) (en banc).....................................17, 24, 49

*Nilavar v. Mercy Health Sys.-W. Ohio*, 244 F. App'x 690 (6th Cir. 2007) .......................11, 15, 16

*Peck v. Gen. Motors Corp.*, 894 F.2d 844 (6th Cir. 1990) ...........................................................26

*Re/Max Int'l v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999) ............................................ *passim*

*Smith Wholesale Co. v. Phillip Morris USA, Inc.*, No. 2:03-CV-221,
 2005 WL 1981452 (E.D. Tenn. Aug. 17, 2005) ........................................................68, 70, 72

*Spahr v. Leegin Creative Leather Prods., Inc.*, 2008 WL 3914461
(E.D. Tenn. Aug. 20, 2008) .............................................................................10

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ...........................................66

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917 (6th Cir. 2005).......................70

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)....................................10, 11, 24, 49

*Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86 (6th Cir. 1989)..........................17

*Todd v. Exxon*, 275 F.3d 191 (2d Cir. 2001)...............................................................13

*United States v. Country Lake Foods, Inc.*, 754 F. Supp. 669 (D. Minn. 1990)...........................12

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) .........................67

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ......................................67

*Va. Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549
(W.D. Va. 2000)..........................................................................................68, 69

*Valley Prods. Co., Inc. v. Landmark*, 128 F.3d 398 (6th Cir. 1997)..............................18

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)............................................................................................66

*Walker Process Equip. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965)................9

*Wallace v. Bank of Bartlett*, 55 F.3d 1166 (6th Cir. 1995) ...........................................36

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007)....................67

*White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495 (6th Cir. 1983)..........................10

*White Mule Co. v. ATC Leasing Co.*, 540 F. Supp. 2d 869 (N.D. Ohio 2008)..............................67

*Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100 (1969).................................66

## STATE CASES

*In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693 (Del. Ch. 2005) ........................27

## OTHER AUTHORITIES

7 U.S.C. § 601................................................................................................74

7 U.S.C. § 608c (2006) ...............................................................................13

7 U.S.C. § 608c(5)(G)..................................................................................13

Herbert Hovenkamp, *Antitrust Law* ¶ 1810 (2d ed. 2005)......................24, 49

Philip E. Areeda *et al.*, *Antitrust Law* ¶ 350g (3d ed. 2007)........................24

Fed. R. of Civ. P. 23.1..................................................................................27

Fed. R. of Evidence 702...............................................................................20

15 U.S.C. § 1......................................................................................*passim*

15 U.S.C. § 2......................................................................................*passim*

## INTRODUCTION

After three years of discovery, in which millions of pages of documents were produced and over one hundred depositions were taken, Plaintiffs now must come forward with evidence to support their antitrust claims, which include allegations that the Defendants have conspired in violation of Sections 1 and 2 of the Sherman Act; that Dean Foods Company ("Dean") has unlawfully obtained, or attempted to obtain, monopsony power in a portion of the Southeastern United States in violation of Section 2; and that Dairy Farmers of America, Inc. ("DFA") has unlawfully obtained, or attempted to obtain, monopoly power in the same region, also in violation of Section 2. Compl. ¶¶ 122-70 (Dkt. # 111). As explained in detail below, Plaintiffs do not possess evidence sufficient to create a triable issue of fact on any of these claims.

First, all of Plaintiffs' antitrust claims require proof of a properly-defined geographic market, for that is the context in which one can assess whether competition has been harmed by the conduct at issue. Under the applicable law, however, Plaintiffs cannot support the market they have proposed—Orders 5 and 7, which represent two of the three Federal Milk Marketing Orders in the Southeast (Order 6 (Florida) being the third). The boundaries of these Orders do not limit where milk is bought or sold. In fact, nearly half of the raw milk pooled on Orders 5 and 7 comes from farmers located *outside* of those Orders, and over 10% of the raw milk produced *in* Orders 5 and 7 is routinely shipped elsewhere. A geographic market that ignores these market realities, and that excludes the farmers who supply such a large portion of the milk to buyers within its contours, is unprecedented and unsustainable.

Second, Plaintiffs cannot show antitrust injury—that is, that they have in fact been harmed by conduct forbidden by the antitrust laws—and they otherwise lack antitrust standing to sue on behalf of DFA, MD/VA or other cooperatives. Already among the most highly paid dairy farmers in the U.S., their claim of "unlawful price suppression" turns out to be a complaint that

their prices might be even higher if only they could be shielded from competition by dairy farmers from elsewhere, especially those out west, whose large, efficient farms are expanding at the same time that production in the Southeast continues its long-term decline. That is not a grievance for which the antitrust laws provide a remedy.

Third, there is no triable issue of fact regarding the alleged conspiracy to suppress pay prices to local dairy farmers. Plaintiffs must rely on circumstantial proof of this alleged conspiracy, and following the Supreme Court's seminal decision in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), a claim of antitrust conspiracy cannot survive summary judgment if the defendants "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations." *Id.* at 596. That is the case here. Despite a mountain of discovery, Plaintiffs cannot explain why the processor Defendants (Dean and National Dairy Holdings, LP ("NDH")) would participate in this conspiracy, since the natural result of Plaintiffs' claimed price suppression would be to reduce local supplies of raw milk, and increase the processors' reliance on more distant supplies. Nor can Plaintiffs explain why the producer Defendants (DFA, the coop, and the common-marketing agencies Dairy Marketing Services ("DMS") and Southern Marketing Agency ("SMA")) would join an alleged conspiracy to purposely harm the very dairy farmers they serve. As for the specific conduct that Plaintiffs claim furthered this conspiracy—including most notably the full-supply agreements between DFA and various processors, the outsourcing agreement between Dean and DMS, and the procurement of supplemental milk by coops to fulfill their full-supply obligations—the undisputed evidence is that such agreements have long been used and are commonplace in the milk industry and thus are readily explained by the parties' independent competitive interests. Plaintiffs' conspiracy claim does not satisfy the *Matsushita* standard.

Fourth, Plaintiffs have not even attempted to generate evidence sufficient to avoid summary judgment on their monopolization claim against DFA or their monopsonization claim against Dean. With respect to the former, Plaintiffs do not offer the opinion that DFA possesses monopoly power in Plaintiffs' proposed market. And with respect to Dean, the market share they attribute to it—███████████████████—is, as a matter of law, insufficient to support Plaintiffs' monopsonization and attempted monopsonization claims.

Finally, Defendants are entitled to summary judgment on Plaintiffs' claim of damages due to the alleged "flooding" of the Southeast with raw milk from the Southwest. These damages allegedly arise out of Defendants' conduct affecting the uniform milk price set by the federal market administrator under the authority of the U.S. Department of Agriculture. As another federal court has just recently ruled, such a claim is barred by the filed-rate doctrine.

For all of these reasons, discussed in more detail below, Defendants are entitled to summary judgment on Plaintiffs' antitrust claims.

## BACKGROUND

The Plaintiffs in this case are dairy farmers who purport to represent a class of all farmers in Orders 5 and 7 who sold their raw milk either to or through one of the Defendants or one of their alleged co-conspirators. *See* Concise Statement of Undisputed Material Facts in Supp. of Defs.' Joint Mot. for Summ. J. ("SMF") ¶ 1(a). They claim, among other things, that the Defendants were parties to a decade-plus-long conspiracy between various individuals, dairy cooperatives, common marketing agencies, and processors to suppress the pay prices that farmers in Orders 5 and 7 received for their milk. According to Plaintiffs, the alleged conspirators were able to accomplish this price suppression by forcing dairy farmers in Orders 5 and 7 to market their milk through one of three defendant dairy cooperatives or common marketing agencies—DFA, DMS, or SMA—and to accept a lower price for their milk than they

-3-

otherwise would have received. The specific allegations behind each of Plaintiffs' claims, and the reasons those claims fail as a matter of law based on the undisputed facts, are discussed below in the Argument section. To provide context for that discussion, we briefly set forth first certain undisputed facts about the milk industry and milk production in Orders 5 and 7, the options farmers have for marketing their milk, the use of full-supply agreements in this industry, and the manner in which the prices paid by plants and received by farmers are determined.

### A. There Is an Overall Raw Milk Deficit in Federal Orders 5 and 7, which Requires that the Milk Supply Be "Balanced."

It is undisputed that Orders 5 and 7, like Order 6 in Florida, on the whole constitute "deficit" regions for raw milk production, meaning that the total amount of raw milk produced in those Orders is insufficient to satisfy the total demands of the processing plants located there. *See* SMF ¶ 3.[1] Orders 5 and 7 have had a region-wide deficit for some time, since well before the conspiracy alleged by the Plaintiffs in this case. SMF ¶ 5. The deficit has been increasing so that now approximately 50% of the raw milk pooled on Orders 5 and 7 comes from farm outside of those orders. SMF ¶ 7.[2]

While raw milk production in Orders 5 and 7 has been declining, raw milk production has been increasing dramatically elsewhere, most significantly in Order 126 (the Southwest), where production has almost doubled since 1993. SMF ¶ 8. In many of those growth areas, the dairy

---

[1]  As explained below, within this "deficit" region, there are significant geographic pockets where there is a local surplus of milk—i.e., more milk produced than nearby bottling plants process. SMF ¶ 6.

[2]  For an explanation of how milk comes to be pooled on an order, *see* Expert Report of Kenneth G. Elzinga, Ph.D. ("Elzinga Rpt."), Regulatory Appendix (Ex. 1). All exhibits cited in this Memorandum are attached as exhibits to the Concise Statement of Undisputed Material Facts in Support of Defendants' Joint Motion for Summary Judgment.

farms tend to be substantially larger and to have lower unit production costs than most dairy farms in Orders 5 and 7. SMF ¶¶ 46-50.

The growing regional raw milk deficit in the Southeast has complicated the task of "balancing" raw milk supply and demand in the region—"being able to deliver, as needed, additional raw milk on days when the customers' Class I demand is higher and to "divert" to manufacturing plants raw milk supplies to be utilized in Class II through IV products on days when the customers' Class I demand is lower, and to satisfy the very real demands of the manufacturing plants for raw milk to process into cheese, ice cream, butter, and other Class II through IV products." SMF ¶ 11; Expert Report of Albert Ortego, Ph.D. ("Ortego Rpt.") at 28-29 (Ex. 4). As explained below, much of the conduct at issue in this case involves different solutions to balancing. Full-supply agreements, for example, reflect one approach—through a full-supply agreement with a coop, a processor shifts to the coop, for a price, the obligation of obtaining sufficient milk during "tight" supply periods and disposing of excess milk, if any, during "flush" periods. SMF ¶ 12. The acquisition of "supplemental milk"—milk produced from outside of the area in which the processing plant is located—is often necessary for the coop to fulfill its end of the full-supply bargain. SMF ¶ 13.

**B.    There Are a Variety of Options for Dairy Farmers in Orders 5 and 7 in Marketing Their Milk.**

There are two ways in which a dairy farmer can market his or her milk—either by joining a cooperative, or by marketing milk independently. In the Southeast, there are multiple coops from which a farmer can choose, five of which—DFA, Maryland & Virginia Milk Producers Cooperative Association, Inc. ("MD/VA"), Arkansas Dairy Cooperative Association, Inc. ("ADCA"), Dairymen's Marketing Cooperative Inc. ("DMCI"), and Lone Star Milk Producers Association ("Lone Star")—are members of SMA, and several of which—*e.g.*, Southeast Milk,

-5-

Case 2:07-cv-00208   Document 622   Filed 08/03/10   Page 14 of 87   PageID #: 13646

Inc. ("SMI"), Cobblestone Milk Cooperative, Inc. ("Cobblestone"), Cooperative Milk Producers Association, Inc., and Southeast Graded Milk Producers Association—are not. SMF ¶¶ 15-17.

Independent farmers have options as well. The Dairy Fresh plants have purchased significant volumes of milk from independent farmers throughout the period at issue. SMF ¶ 18. So has the Kleinpeter Dairy in Louisiana. SMF ¶ 19. Dean has procured milk from independents in different ways. From 2003 through 2009, Dean contracted with DMS (the "outsourcing agreement") to handle the raw milk procurement from independent farmers, including testing, lab work, hauling, field work, and farmer payroll. SMF ¶ 20. Except in 2003 and 2004, however, Dean also acquired milk directly from independent dairy farmers ███████ ████████████████████████████████████

The named Plaintiffs illustrate the alternatives available to farmers in the Southeast. Plaintiffs McCain and Frazier, are DFA members. *See* SMF ¶ 1(b). Former Plaintiffs Roger Jefferson (Mountain View) and Ben Shelton (Rocky Creek Dairy) formed their own coop, Cobblestone, in December 2006. SMF ¶¶ 1(q), 1(r).[3]

Other Plaintiffs are independent dairy farmers. Plaintiff Moore has never belonged to a cooperative; he shipped to Dean's Mayfield plant as an independent, was a DMS shipper for a time after 2003, and then became a Dean Direct, with no intermediary, in 2008. SMF ¶ 1(d). Similarly, Sweetwater began as an independent selling directly to Mayfield, then became a member of MD/VA in the 1990s, went back to shipping directly to Mayfield in 1999, became a DMS shipper in 2003, and then became a Dean Direct in mid-2007. SMF ¶ 1(e). Moreover, just months after its relationship with DMS began, Sweetwater was asked if it would be interested in marketing its milk through SMI. SMF ¶ 1(f). Mr. Harrison of Sweetwater illustrates another

---

[3] Cobblestone is not open to all dairy farmers, ███████████████████████████████ ████████████████████████████████████████████████████

option for farmers—he operates his own cheese plant and could, if he so desired, use his milk there, although he has found better options elsewhere. SMF ¶ 121(e).

**C.    Full-Supply Agreements, Outsourcing, Supplemental Milk Purchases and Coop Investments in Bottling Plants Are Common Arrangements Not Limited to These Parties or This Part of the Country.**

Full-supply agreements are commonplace in the dairy industry. SMF ¶¶ 22-23. And, as a result, so is the procurement of supplemental milk by coops to fulfill their full-supply obligations. SMF ¶¶ 13, 24-26, 116. The same can be said for the practice commonly known as "outsourcing"—the use of a common marketing agent for the procurement of milk from independent dairy farmers—and for coops investing in processing plants. SMF ¶¶ 109, 121. These arrangements and activities have a history and broad acceptance that extends beyond the parties, the time period and the region at issue here. *See* SMF ¶¶ 22-26, 109, 116, 121.

**D.    The Prices that Plants Pay and that Dairy Farmers Receive in Orders 5 and 7 for Raw Milk Are Different, and Both Are Among the Highest in the Nation.**

Raw milk pricing is complicated. In general, there are two prices of interest—the prices that plants pay for the raw milk they buy, and the prices that dairy farmers receive for the raw milk they sell. Because of USDA regulation, however, those prices are not the same.

"The price that regulated processing plants pay (PPP) for raw milk is made up of (1) the federally regulated minimum class prices; (2) a market-driven price on top of the federal minimum, often called the over order premium or 'OOP'; and (3) other credits or charges on top of the price." SMF ¶ 27. The first component is "a government established price floor for regulated milk sales," with the specific minimum price "depend[ent] on the use to which the plant puts the milk (e.g., bottled milk versus cottage cheese)." SMF ¶ 27(a). Class I (fluid milk) plants generally pay the highest minimum prices. SMF ¶¶ 27(b)-(c).

The second component—the OOP—is "[t]he amount bottlers pay above the federally regulated Class I price," and it "reflects current market conditions as well as services that might be provided to the plant by suppliers." SMF ¶ 27(e). The third component reflects additional credits (*e.g.*, rebates to specific customers) and fees (*e.g.*, federally established and mandated payments into a transportation credit balancing fund) that are sometimes given to, or paid by, processing plants. SMF ¶ 27(f).

"The revenue that farmers actually receive for their raw milk is often called the 'mailbox price.' This is not the same as the price for raw milk paid by processors." SMF ¶ 28. For independent farmers, the mailbox price is relatively easy to calculate—it reflects the blend price set by the Market Administrator,[4] plus any applicable premium, less regulated marketing costs (e.g., a deduction related to national advertising), and occasionally other costs related to the receipt of milk by the plant (e.g., lab testing). SMF ¶ 28(a). "For farmers who belong to cooperatives, the determination of the mailbox price involves a different type of calculation unique to each coop. The revenues associated with the sale of farmer's milk, and some of the farmer's costs, are pooled with those of other coop members. This means that a particular farmer in a cooperative pooling arrangement will receive a payment that reflects his share of this pool and this share will depend on the coop's methods for allocating the pool." SMF ¶ 28(b).

---

[4] The *blend* price, announced each month by the market administrator, is essentially a weighted average price based on the production by all plants within the order of each class of milk and the price of that class. A processing plant must pay the minimum blend price to the dairy farmer or the cooperative supplying his plant, but the plant's *total* payment obligation is still based on the *class* pricing system and is determined the products it produced that month. If the processing plant's obligation under the classified pricing system is higher (lower) than the blend payments it must make to producers (which is typically the case for class I plants), then the plant pays (receives) the difference into (out of) the federal pool. *See* SMF ¶ 27(d).

The Plaintiffs' case is about the alleged suppression of the mailbox prices received by farmers. *See generally* Compl. ¶¶ 1, 3(b), 91; Expert Report of Gordon Rausser, Ph.D. ("Rausser Rpt.") (Ex. 5). But those prices are indisputably among the highest of those earned by any dairy farmers in the U.S. during the period at issue here. SMF ¶ 29. As for the prices that processors such as Dean and NDH pay for raw milk, Plaintiffs have not analyzed them. Defendants did, and their unrebutted analysis reveals that one of the critical things that should have occurred if Plaintiffs' conspiracy theory were correct—that the conspiring processors paid lower prices for raw milk—did not happen.

We start below, however, with another, equally fundamental flaw in the Plaintiffs' case— their erroneous claim that Federal Milk Marketing Orders 5 and 7 together constitute a relevant geographic market for antitrust purposes.

## ARGUMENT

### I.  PLAINTIFFS CANNOT ESTABLISH THAT ORDERS 5 AND 7 CONSTITUTE A RELEVANT GEOGRAPHIC MARKET.

#### A.  A Properly Defined Geographic Market Is an Essential Element of Each of Plaintiffs' Antitrust Claims.

All of Plaintiffs' antitrust claims require proof of the relevant market. *See, e.g., Kentucky Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908, 916-17, 919 (6th Cir. 2009) (affirming summary judgment in favor of defendants on Section 1 conspiracy claim and Section 2 claims for monopolization, attempted monopolization, and conspiracy to monopolize where plaintiff "lack[ed] the ability to define the relevant markets necessary to succeed on its claims"). A Section 2 claim generally requires proof of the relevant market, because without it "there is no way to measure [a defendant's] ability to lessen or destroy competition."[5] *Walker Process*

---

[5]  Plaintiffs previously argued that a conspiracy to monopolize claim does not require proof of a relevant market. *See* Pls.' Opp'n to Defs.' Joint Mot. To Dismiss (Dkt No. 115), at 37. This is

*Equip. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965).  For the same reason, most

Section 1 claims also require proof that the challenged restraint has "produce[d] significant

anticompetitive effects within the relevant product and geographic markets."[6] *NHL Players'*

*Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003); *Spahr v. Leegin*

*Creative Leather Prods., Inc.*, 2008 WL 3914461, at *8 (E.D. Tenn. Aug. 20, 2008) ("The

threshold question in any rule of reason antitrust case is definition of the relevant market.").

Plaintiffs' failure of proof as to the relevant geographic market entitles Defendants to

judgment as a matter of law.  *See, e.g., Kentucky Speedway*, 588 F.3d at 919; *B&H Med., LLC v.*

*ABP Admin., Inc.*, 526 F.3d 257, 261 (6th Cir. 2008); *Spahr*, 2008 WL 3914461, at *8.

### B.  A Properly Defined Relevant Geographic Market Turns on the Commercial Realities Facing Buyers and Sellers.

The relevant geographic market is "the area of effective competition."  *Tampa Elec. Co.*

*v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  That means "the market area in which the

seller operates, and to which the purchaser can practicably turn for supplies."  *Id.*; *accord White*

*& White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 503 (6th Cir. 1983) (the relevant market

---

not the law in the Sixth Circuit.  *See, e.g., Ky. Speedway*, 588 F.3d at 919; *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 737 (6th Cir. 2008).

[6]  Except in limited circumstances not present here, agreements challenged under Section 1 are evaluated under the "rule of reason," which requires the plaintiff to prove that the alleged agreement unreasonably restrained trade in the relevant market.  *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012-14 (6th Cir. 2005); *Spahr*, 2008 WL 3914461, at *5. Plaintiffs have previously suggested that DFA's ownership interest in some processing plants, and Dean and NDH's procurement of raw milk directly from some farmers, somehow transforms DFA's *vertical* raw milk supply contracts into *horizontal* agreements that are *per se* violations of Section 1 and as such do not require proof of the relevant market.  *See* Pls.' Opp'n to Defs.' Joint Mot. To Dismiss (Dkt. No. 115) at 16-20.  As this Court has previously held, however, "dual distribution," i.e., a company having operations at more than one level in the chain of distribution, does not make its vertical agreements horizontal for purposes of Section 1.  To the contrary, "[b]ecause they are considered vertical, [agreements between] companies involved in a dual distribution situation are analyzed under a rule of reason standard, 'in the same manner as other vertical restraints.'"  *Spahr*, 2008 WL 3914461, at *7 (citation omitted).

is "the area in which 'producers effectively compete'") (quotation omitted). Thus, as the Sixth Circuit has recognized, "when the evidence indicates that a large proportion of consumers within the proposed area in fact turn to alternative sources of supply outside the proposed area, the market boundaries posited by the plaintiff must be rejected." *Re/Max Int'l v. Realty One, Inc.*, 173 F.3d 995, 1017 (6th Cir. 1999). This is true whether the legal theory at issue is monopoly, monopsony, or conspiracy.

In *Tampa Electric* the Supreme Court considered a supplier's challenge to its own exclusive contract for the supply of coal.[7] 365 U.S. at 321-23 & n.3. Tampa Electric (the buyer under the contract) was expected to account for between 33% and 76% of the total consumption of coal in peninsular Florida. *Id.* at 323-24. The seller proposed a geographic market consisting of "peninsular Florida, or all of Florida, or the Bituminous Coal Act area comprising peninsular Florida and the Georgia 'finger,' or, at most, all of Florida and Georgia." *Id.* at 331. The Court squarely rejected the notion that, to determine whether the exclusive contract significantly foreclosed competition in the relevant market, the focus should be on the buyer's percentage of *localized purchases* in and around Florida and Georgia. Rather, the Court held that the relevant market comprised the area that included the "700 coal producers who *could* serve" peninsular Florida. *Id.* at 330-31 (emphasis added). These producers "mined in parts of Pennsylvania, Virginia, West Virginia, Kentucky, Tennessee, Alabama, Ohio and Illinois," and their production was necessarily part of the "relevant area of effective competition." *Id.* at 329, 332.

---

[7] *Tampa Electric* involved claims brought under § 1 and § 2 of the Sherman Act and § 3 of the Clayton Act. *Tampa Elec.*, 365 U.S. at 321 & n.2. After analyzing the § 3 claim, the Court concluded: "We need not discuss the respondents' further contention that the contract also violates § 1 and § 2 of the Sherman Act, for, if it does not fall within the broader proscription of § 3 of the Clayton Act, it follows that it is not forbidden by those of the former." *Id.* at 335.

Since *Tampa Electric,* courts have consistently rejected overly narrow geographic markets that ignore the "commercial realities" facing buyers and sellers or that unduly limit the "relevant area of effective competition." *See, e.g., Nilavar v. Mercy Health Sys.-W. Ohio*, 244 F. App'x 690, 698 (6th Cir. 2007) (affirming summary judgment where proposed geographic market failed to account for significant customer substitution to supplier located outside the proposed market); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005) (rejecting two-county market when more than 20% of patients came from other counties); *United States v. Country Lake Foods, Inc.*, 754 F. Supp. 669, 677 (D. Minn. 1990) (proposed geographic market for fluid milk sales defeated by evidence of outside shipments).[8]

The undisputed record here shows that at least 40% of the milk pooled on Orders 5 and 7 was produced elsewhere—including Order 1 (Northeast), Order 6 (Florida), Order 32 (Central), Order 33 (Mideast), and Order 126 (Southwest), or in unregulated areas. *See* SMF ¶ 30. In each year between 2000 and 2008, at least 40% (and in more recent years, more than 50%) of the milk pooled on Order 5 was produced *outside* Orders 5 and 7; and at least 30% (and in more recent years, more than 50%) of the milk pooled on Order 7 was produced *outside* Orders 5 and 7. *See* SMF ¶ 32. Between 2004 and 2008, milk pooled exceeded milk produced by a *billion* pounds. *See id.* Milk produced here also flowed out—from 2003 and 2008, between 8% and 13% of the milk produced in Orders 5 and 7 was pooled on Order 6. *See* SMF ¶ 31(a).

Given these undisputed facts, the geographic market must include the producers of raw milk who are within "the relevant area of effective competition"—that is, who impact

---

[8] *See also, e.g., Mich. Div.-Monument Builders*, 524 F.3d at 733-37 (rejecting plaintiffs' proposed geographic market as too narrow); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1403 (7th Cir. 1989) (rejecting geographic market that ignored outside sources of supply); *Monsanto Co. v. Trantham*, 156 F. Supp. 2d 855, 862-63 (W.D. Tenn. 2001) (granting plaintiff's motion for summary judgment on antitrust counterclaims).

significantly the supply of, demand for, and price of raw milk in Orders 5 and 7. Particularly in light of the major inflow of milk to these Orders from dairy farmers elsewhere, the answer cannot be, as Plaintiffs would have it, only dairy farmers located within the boundaries of Orders 5 and 7. Rather, as in *Tampa Electric*, the relevant market must include dairy farmers located *outside* Orders 5 and 7 who have, or could have, shipped raw milk into these two Orders. Plaintiffs' proposed market definition fails because the "area of effective competition" for raw milk sales in Orders 5 and 7 is, as a matter of law, larger than the geographic boundaries of just those two Orders.[9]

### C. The Federal Milk Marketing Orders, Established for Administrative Purposes, Do Not Define Relevant Antitrust Markets.

Plaintiffs contend that the existence of federal milk marketing orders support their proposed geographic market. Compl. ¶ 56. But federal milk marketing orders are creatures of statute, not the law of supply and demand. *See* 7 U.S.C. § 608c (2006). The number of orders regulated by the USDA has decreased from more than 80 in the early 1960s to 41 in 1990, 11 in 2000, and finally 10 today. SMF ¶ 34. Large portions of the United States are part of no federal order at all. It is surely not the case that these unregulated areas are not part of any "relevant market," or that the number of "relevant markets" shrank by 30 in the decade between 1990 and 2000. Moreover, the federal regulatory system encourages the movement of milk *between orders*; it does not treat them as islands unto themselves. 7 U.S.C. § 608c(5)(G); SMF ¶¶ 37-38.

---

[9]  Plaintiffs claim to find support for their market definition in *Todd v. Exxon*, 275 F.3d 191 (2d Cir. 2001), an antitrust case involving employees for several oil companies. *See, e.g.,* Rebuttal Report of Gordon Rausser, Ph.D. ("Rausser Rebut. Rpt.") at 16 n.26 (Ex. 6). In that case, Judge (now Justice) Sotomayor focused the market definition question on the issue of where the plaintiff-employees could turn if they were trying to avoid an exercise of monopsony power by the employers—in other words, the key should be "competing buyers," rather than "competing sellers." But the opinion in no way supports the Plaintiffs' view that the availability of competing buyers should be analyzed only with respect to those *current sellers who are resident in Orders 5 and 7*—and not with respect to the sellers who provide at least 40% of the milk pooled in those Orders, but who live elsewhere.

-13-

Courts have rightly *rejected* attempts to define a relevant market by reference to federal order boundaries. For example, in *Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F. Supp. 608 (M.D. Ga. 1981), *aff'd*, 715 F.2d 520 (11th Cir. 1983), the court held that the relevant market was not Order 7 as it existed at that time (basically the state of Georgia), but rather included all or part of 13 states as far away as Illinois. That court observed:

> Geographic areas described in federal market orders do not commend themselves particularly as candidates for recognition as relevant geographic markets for Sherman Act § 2 cases. The marketing areas of federal orders are established for administrative purposes. . . . *Regulations serve purposes and have their appropriate effect, but they do not alter economic realities.*

512 F. Supp. at 640 (emphasis added). Looking at those "economic realities," the court noted that "actual movements of milk," among other factors, "suggest[ed] a geographic market larger than the areas proposed by plaintiff." *Id.* at 639-40. The court also observed that the plaintiff was trying to exclude Alabama from the relevant market even though Kinnett's plant was "immediately across the river" from the state of Alabama, and so surely could obtain supplies there, and elsewhere. *Id.* at 640. Under these circumstances, limiting the market to the state of Georgia "would be to create an unrealistic and synthetic relevant geographic market." *Id.*

The federal milk regulatory system contemplates and encourages shipments across order boundaries; it provides no support for Plaintiffs' proposed geographic market.

### D. None of the Parties Treats Orders 5 and 7 as a Relevant Market.

Plaintiffs also argue that Defendants' internal organizational structures support their proposed market definition. Compl. ¶ 56. If Defendants' internal organizational structures are relevant to the question of market definition, they further demonstrate that Plaintiffs' proposed market is wrong.

Plaintiffs' Complaint alleges that DFA's Southeast Area Council "consists of the same geographic areas" as Orders 5 and 7, *see id.*, but the evidence is otherwise. DFA's Southeast Council is *not* coextensive with the boundaries of Orders 5 and 7. *See* SMF ¶ 39. To the contrary, the Southeast Council includes all of Order 6 (Florida) portions of Orders 126 (Southwest), 32 (Central), 33 (Mideast), and 1 (Northeast), and areas that are not part of any federal order, and excludes part of Order 5. *See id.* These distinctions matter: in recent years, more than 20% of the members of DFA's Southeast Council have had farms located outside Orders 5 and 7, and they have produced nearly 30% of the Council's milk. SMF ¶ 40.

Nor are SMA's operations coextensive with Orders 5 and 7. In 2007, for example, more than 35% of SMA member milk production occurred outside Orders 5 and 7. *See* SMF ¶ 41. And approximately 22% of all SMA-managed milk sales (including milk produced by nonmembers) has been pooled somewhere other than on Orders 5 and 7. *See id.*[10]

### E. Plaintiffs' Proffered Expert Opinions on Geographic Market Definition Provide No Basis for a Market Limited to Orders 5 and 7.

Finally, the Plaintiffs try to bolster their case on market definition through the opinion of their primary economist, Dr. Gordon Rausser. Dr. Rausser purports to apply two economic methods of analysis to support the Plaintiffs' proffered market definition of Orders 5 and 7—the so-called "SSNIP" (small but significant and non-transitory increase in price) test, *see, e.g., Ky. Speedway*, 588 F.3d at 918; *see generally* DOJ & FTC Horizontal Merger Guidelines, and an analysis of shipments data. *See, e.g., Nilavar*, 244 F. App'x at 697-98 (recognizing Elzinga-Hogarty method of shipments analysis). As will be demonstrated in Defendants' upcoming

---

[10] Plaintiffs' Complaint alleges that an employee of DFA, testifying at a USDA hearing "on behalf of SMA," "described the geographic region of DFA's Southeast Council as 'one market' and 'a common market, commonly supplied.'" Compl. ¶ 56. The view that, for purposes of USDA regulations, it would be more effective to have two orders combined does not answer any pertinent question about a relevant antitrust market.

-15-

Motion to Exclude Testimony of Dr. Rausser (which will be filed per the Court's schedule), to arrive at a market definition that is so clearly at odds with the applicable case law, Dr. Rausser has misused and misapplied those economic tests in a variety of ways that render his opinion unreliable and inadmissible:[11]

- Dr. Rausser labels his analysis a SSNIP test, but it is not, but rather a variant that finds no support in field of economics or in the case law—moreover, the outcome of what he calls his SSNIP analysis is driven by the fact that farmers in Orders 5 and 7 have the highest pay prices of any dairy farmers in the U.S. (except for Order 6), notwithstanding Plaintiffs' claims of pay price suppression;

- Dr. Rausser's analysis of shipments data fails to adhere to the recognized economic test for analyzing such data, and he embraces a market definition whose outflows and inflows fail any recognized threshold for shipments analysis; and

- To make matters worse, Dr. Rausser ignores the implications of his own analysis, because initially it led him to a market that is *different* than what Plaintiffs have alleged: "Based on my analysis of the available data, *the geographic boundaries of the relevant market include Orders 5, 6 and 7.*" Rausser Rpt. at 66 (Ex. 5) (emphasis added).

The courts are clear that the use of economic methods can be an *aid* to the process of market definition, but these tests do not change the law applicable to market definition, and they have a useful role only if the methods are applied appropriately. *See, e.g., Ky. Speedway*, 588 F.3d at 918 (SSNIP test may be useful aid, but rejecting expert's effort to make up his "own version" of that test); *Nilavar*, 244 F. App'x at 697-98 (endorsing use of shipments data to define markets per the Elzinga-Hogarty test, but rejecting application of that test expert had proposed).

Dr. Rausser's methodological failings warrant the same treatment (exclusion) as the experts received in *Kentucky Speedway* and *Nilavar*. Indeed, it is not clear on balance how far

---

[11]  As will be set forth in that Motion, Dr. Rausser's economic opinions have been rejected in other cases. *See, e.g., Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*, 203 F.3d 1028, 1038 (8th Cir. 2000) (en banc) (deeming his model to be "fundamentally unreliable because of its heavy (if not exclusive) reliance on evidence that is not probative of conspiracy, coupled with his failure to consider significant external forces" that contradicted his view).

Dr. Rausser advances Plaintiffs' ball, since the market definition section of his opening report ends by concluding that "[t]he expanded geographic scope of the relevant market **beyond the geographic boundaries of Orders 5 and 7** means that defendants and co-conspirators had to have control over shipments of fluid milk into and out of Orders 5 and 7." Rausser Rep. at 66 (Ex. 5) (emphasis added). At the end of the day, however, an opinion so at odds with the applicable law and the marketplace facts cannot create a genuine issue of fact, even if it were deemed to somehow cross the admissibility threshold.

*  *  *  *  *

The undisputed record here is that almost half of the milk pooled on Orders 5 and 7 is supplied by producers outside those Orders. Given this, the relevant geographic market cannot be artificially limited to Orders 5 and 7. *See, e.g., Re/Max*, 173 F.3d at 1017 ("[W]hen the evidence indicates that a large proportion of consumers within the proposed area in fact turn to alternative sources of supply outside the proposed area, the market boundaries posited by the plaintiff must be rejected."). Plaintiffs' failure to prove a relevant market entitles the Defendants to judgment on all of Plaintiffs' antitrust claims.

## II.  PLAINTIFFS HAVE FAILED TO ESTABLISH ANTITRUST INJURY AND ANTITRUST STANDING.

It has often been repeated that the antitrust laws were intended to protect *competition*, not *competitors*. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). Not every person injured in his business or property may recover under the antitrust laws. *See Re/Max*, 173 F.3d at 1000 ("Unlike the assumption that informs most areas of tort and contract law, in the marketplace certain 'harms' are not only accepted, they are encouraged. . . . Ordinarily, when an efficient enterprise displaces an inefficient one, we conclude that consumers' economic interests are better served, despite that the inefficient enterprise is injured

-17-

or even destroyed."). To establish a right to recover, an antitrust plaintiff must first prove the fact of damage—that is, that the anticompetitive conduct about which it complains was in fact a material cause of the injury for which it seeks compensation. *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450-51 (6th Cir. 2007) (en banc); *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 88 (6th Cir. 1989).

An antitrust plaintiff must also establish that it has suffered *antitrust injury*, that is, injury of "the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *Brunswick Corp.*, 429 U.S. at 489.[12] In *Brunswick*, the plaintiff claimed that it had been injured by the defendant's acquisition of competing bowling centers. While the plaintiff could prove damage linked to Brunswick's acquisition of the bowling centers, i.e., fact of damage, its injury was due to Brunswick having saved failing businesses, which then competed more vigorously with the plaintiff. The Supreme Court held that allowing plaintiff to recover would be "inimical" to the purposes of the antitrust laws. *Id.* at 488.

This Court previously observed that "[i]t may well be that plaintiffs' case will fail on the issue of standing upon scrutiny after further discovery in this case." *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 945 (E.D. Tenn. 2008). As detailed below, the record now confirms that Plaintiffs cannot establish antitrust injury or antitrust standing.

---

[12] "The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not an antitrust violation." *Valley Prods. Co., Inc. v. Landmark*, 128 F.3d 398, 403 (6th Cir. 1997).

**A.** **Plaintiffs Cannot Show that the Challenged Conduct Caused Suppression in Their Pay Prices.**

**1. Establishing the Causal Link Here Is Confounded by the Competitive Factors Putting Downward Pressure on Pay Prices and Plaintiffs' Failure To Even Measure Dairy Farmer Pay Prices.**

To establish antitrust injury, the Plaintiffs must demonstrate that conduct found to be anticompetitive *caused* a suppression in their pay prices. It is undisputed that the prices Plaintiffs received were among the highest in the country, but Plaintiffs contend that they would have been higher still but for Defendants' anticompetitive acts. Before they can establish the requisite causation, however, Plaintiffs have to account for the tremendous growth in the supply of available milk outside the boundaries of Orders 5 and 7, and the fact that the federal milk regulatory system sets higher prices for milk in these Orders precisely to encourage farmers elsewhere to ship milk here. This growing inflow of outside milk obviously provides an alternative, non-conspiratorial explanation for why pay prices might be lower in these Orders than Plaintiffs would otherwise been expected.

Plaintiffs' challenge is further complicated because they never present data on actual pay prices of dairy farmers in Orders 5 and 7. Rather, Dr. Rausser



But his modeling and estimates of these various "created measures" cannot change the facts about the mailbox prices of dairy farmers in Orders 5 and 7—i.e., that they were already among the highest in the country, they went *up* during the alleged class period and,

perhaps most significantly, the spread between pay prices in Orders 5 and 7 and pay prices

elsewhere in the country *increased* during this period. SMF ¶¶ 42. These undisputed facts, and

Dr. Rausser's failure to present any contrary data measuring pay prices, obviate the need to even

examine the issue of causation, as there is no pay price suppression to be explained.

### 2. Dr. Rausser's Stage 2 Damages Model Is Not a Reliable Basis for Concluding that There Has Been Premium Suppression Caused by the Conduct at Issue.

If one assumes that pay prices were suppressed, the issue becomes why. Plaintiffs' sole

support for their claim that pay prices were suppressed by defendants' conduct is Dr. Rausser's

multi-stage statistical analysis. And, the "lynchpin" of that work is his assumption that █████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

There are such serious methodological problems with Dr. Rausser's econometrics and his

interpretation of his R-OOP results that these statistics do not pass the reliability threshold

required for admissibility under Rule 702 of the Federal Rules of Evidence. These methodology

flaws will be set forth in full detail in Defendants' Motion to Exclude Dr. Rausser's testimony on

this subject. For these purposes, it suffices to note that Dr. Rausser never compares ████████

████████████████████████████████████████████████ for any

period *prior to the alleged wrongful conduct*, which comparison is essential to evaluate whether

anything *changed* during the so-called conspiracy. *See, e.g., In re Aluminum Phosphide Antitrust

Litig.*, 893 F. Supp. 1497, 1503 (D. Kan. 1995) (excluding expert who failed to properly apply

"before and after" method; "it is fundamentally necessary to explain the pattern of forces outside

the violation period using factors that might have changed ( i.e., supply, demand, and differences

in competition) to predict the prices during the conspiratorial period"). Instead, Dr. Rausser

relies on an unfounded assumption about what that relationship *should have been*: ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

   When Defendants' experts challenged this unsupported assumption as the foundation of

Dr. Rausser's analysis, *see* Elzinga Rpt. at 104-06 & Ex. 42 (Ex. 1), Dr. Rausser attempted to

defend his work, and in so doing, *proved that his assumption* ████████████████████

████████████████████████ *is wrong two-thirds of the time.*  Rausser Rebut. Rpt. at

107-11 (Ex. 6).  Thus, Dr. Rausser's estimation of premium suppression is based on an

assumption that his own rebuttal report shows to be false.  There is no basis to believe that the

"difference" Dr. Rausser claims to be measuring ██████████████████████████████

████████████████████████, is a reliable measure of anything, let alone of the

degree to which pay prices for dairy farmers in Orders 5 and 7 were "lower than they should

have been because of the conspiracy."  Because Plaintiffs' proof of antitrust injury depends on

Dr. Rausser's statistical house of cards, Plaintiffs fail on this essential element of their case.

   **3. Even Accepting Dr. Rausser's Statistical Model, Plaintiffs Cannot Link the Premium Suppression He Claims To Estimate To the Challenged Conduct by Defendants.**

   Even if one ignored Dr. Rausser's failure to use a reliable statistical methodology, his

statistical results—by which he finds *most* of what he calls price suppression occurred *before* any

of the key alleged acts in furtherance of the conspiracy—still does not provide the required

causal connection between the purported harm and the allegedly unlawful acts.

The Dean-Suiza merger, which took place in December 2001, is a pivotal event in this case. Plaintiffs have portrayed the pre-merger landscape as essentially unaffected by the alleged antitrust violations. *See, e.g.,* Pls.' Am. & Supplemental Resp. to All Defs.' Joint First Set of Interrogs. at 14 (Ex. 184) ("[P]rior to the Dean-Suiza merger . . . independent producers were able to find other buyers for their Grade A milk, namely premerger Dean, in a market not yet dominated by Defendants."); Expert Report of Frank Scott, Ph.D. ("Scott Rpt.") at 26 (Ex. 7)

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████ Rebuttal Report of Frank Scott, Ph.D. ("Scott Rebut. Rpt.") at 3 (Ex. 8) (stating that ████████████ ████████████████████████████████████ . Dr. Rausser acknowledged that, prior to the merger, there was more Class I bottling capacity in Orders 5 and 7 outside the control of Suiza or DFA than there was milk produced by farmers in Orders 5 and 7, *see* Rausser Dep. at 433, 436, 447-53 (Ex. 53), and he has not offered the opinion that Legacy Dean, which pre-merger was a significant bottler in the Southeast, participated in the alleged conspiracy. *Id.* at 215-16.

Notwithstanding these facts, Dr. Rausser's statistical analysis finds ████████████ ██████████████████████████, *before* any of the alleged anticompetitive acts in furtherance of this supposed conspiracy had come to fruition. *See* Rausser Rpt. at 216 & Table 46 (Ex. 5); Rausser Dep. at 246-55 (Ex. 53).[14] Common sense tells us that, given these results,

---

[14]  According to Dr. Rausser's statistics, ███████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████ *See* Rausser Rpt. at 216 & Table 46 (Ex. 5).

Dr. Rausser's statistical model cannot be measuring the effects of the alleged anticompetitive conduct, since most of what he has estimated occurred *before* the Dean-Suiza merger, *before* the expansion of full-supply agreements following that merger, *before* the outsourcing from Dean to DMS of the procurement of independent milk, and *before* the creation of SMA. Dr. Rausser has, if anything, shown that something *other than* the conduct challenged by the Plaintiffs has resulted in their pay prices being "suppressed."

Plaintiffs are left with their belief, but no proof, that their prices were lower than they should have been, for reasons they have not explained. The alternative explanation for Plaintiffs' unhappiness with their pay prices is competition. Dairy farmers in Orders 5 and 7 do not exist on an island, protected from competition by those outside:

> [I]ndustry trends towards fewer farms in Orders 5 and 7, and larger farms in the West and Southwest, have been underway for decades—before the formation of DFA, before Legacy Dean and Legacy Suiza merged, before NDH was established, before SMA was formed, before the class period began, indeed *before anything that plaintiffs are complaining about in this case.* . . .

> One does not need to come up with a conspiracy theory to explain why there has been faster growth in milk production by large farms in the West and Southwest than by farms in Orders 5 and 7. Basic economics will do. Cost-efficient dairy farms are much larger than they used to be. Because of the favorable western growing conditions and farm size, the average farmer in the West and Southwest enjoys cost economies relative to the average farmer in Orders 5 and 7. Lower costs enable these farmers to sell milk profitably within their orders *and* haul the surplus to surrounding orders. This puts more supply in Orders 5 and 7. It really is that simple.

Elzinga Rpt. at 41-42 (Ex. 1) (emphasis added); *see also id.* at 35-46; SMF ¶¶ 46-50. Increased competition from distant farmers may have harmed local farmers in the sense of preventing their

-23-

pay prices from rising to the level they would have liked to see, but that is the type of "harm" the antitrust laws were meant to encourage, not prevent.[15]

### B. Plaintiffs Did Not Suffer Antitrust Injury Due to Alleged Exclusive Dealing Arrangements.

Plaintiffs' allegation that separate milk supply agreements between DFA and various processors deprived them of "free and unrestrained access" to plants, Compl. ¶ 9, does not give rise to antitrust injury. *See generally* IIA Philip E. Areeda et al., *Antitrust Law* ¶ 350g (3d ed. 2007) ("When a downstream firm merely substitutes one supplier for another there is certainly injury-in-fact to the terminated supplier but there is rarely antitrust injury."). Requirements contracts and other exclusive dealing arrangements can have important pro-competitive benefits—including assurance of supply, enabling of long-term planning, and obviation of expense and risk associated with fluctuating demand—and are not inherently unlawful. *See Tampa Elec.*, 365 U.S. at 333-34; *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 8 (1st Cir. 2004) ("[I]t is widely recognized that in many circumstances [exclusive dealing] may be highly efficient . . . and pose no competitive threat at all."); XI Herbert Hovenkamp, *Antitrust Law* ¶ 1810 (2d ed. 2005) ("The benefits of exclusive dealing are many [and] greatly exceeds their potential for harm . . . .").

The Sixth Circuit has held that, to have standing, an excluded competitor challenging an alleged exclusive dealing arrangement must show that the exclusion "results in the elimination of

---

[15] Plaintiffs also cannot show antitrust injury from the alleged reduction in federally-set blend prices due to what Plaintiffs call "flooding." *See* Rausser Rpt. at 194 (Ex. 5). First, the USDA establishes limits on the amount of milk that can be pooled on any given order. *See* SMF ¶ 51. Thus, Plaintiffs' claimed injury—lower uniform blend prices resulting from allegedly "excessive imports"—flows from adherence to the diversion limits established by the USDA. Plaintiffs do not accuse Defendants of violating the diversion limits, and antitrust injury cannot flow from an otherwise lawful act. *See Hodges v. WSM, Inc.*, 26 F.3d 36 (6th Cir. 1994). *See also* Part V, *infra* (discussion of the filed rate doctrine).

-24-

a superior product or a lower-cost alternative." *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 977 (6th Cir. 2000); *see also NicSand*, 507 F.3d at 451 (collecting cases).

Here, the allegedly excluded competitors cannot satisfy these requirements. ████████

████████████████████████████████████████████████████████

████████████████████ Thus, there is no evidence that independent dairy farmers and independent cooperative members were prevented from competing to sell milk at a lower price. ████████

████████████████████████████████████████████████  •

Second, there is no evidence that independent dairy farmers or independent coops offer better services to processors. Plaintiffs' expert concedes that ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ Plaintiffs have no evidence that independent dairy farmers could supply these same services, let alone do so more efficiently.

Like the independent energy producers in *Indeck*, independent dairy farmers and independent cooperative members "have no statutory right to compete in the economic marketplace on their own terms and in such a manner as to accumulate expected profits." *Indeck*, 250 F.3d at 978-79. And as in *Indeck*, these Plaintiffs' assertions that they "were unable

to receive prices . . . that they felt were 'reasonable' are insufficient to justify a finding" of standing or antitrust injury. *Id.* at 979.

## C. Plaintiffs Otherwise Lack Standing To Pursue Their Antitrust Claims.

Even apart from the antitrust injury issues, the majority of the putative class of Plaintiffs otherwise lacks antitrust standing. *See HyPoint Tech., Inc. v. Hewlett-Packard, Co.*, 949 F.2d 874, 877 (6th Cir. 1991) ("[Antitrust standing] is not a mere technicality [] [i]t is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws."). For the most part, the putative class is comprised of dairy farmers who are themselves *members* of DFA and of the other cooperatives that make up SMA (i.e., MD/VA, LSMP, ADCA, and DMCI). Through this lawsuit, some of these farmer-members are attempting to challenge policies—e.g., whether to enter into full-supply agreements, to procure supplemental milk, to invest in processing plants, or to join a common marketing agency like SMA—that their cooperatives have chosen to adopt and pursue. Whether or not these Plaintiffs agree with the paths their cooperatives have taken, the law does not permit them to use an antitrust suit as a means for challenging their cooperatives' decision-making.

The Sixth Circuit has articulated five factors to consider in determining whether Plaintiff has established antitrust standing:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Indeck*, 250 F.3d at 976. Applying these factors, the Sixth Circuit has repeatedly found that derivative injuries sustained by stockholders, officers, directors, and creditors of the company *do*

*not* confer antitrust standing. *See, e.g., Caruana v. Gen. Motors Corp.*, 204 F. App'x 511 (6th Cir. 2006) (a former *sole* shareholder and operator of car dealership was harmed but, because the dealership was a corporation, the dealership suffered the antitrust injury); *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 847 (6th Cir. 1990) (per curiam) (plaintiff's injuries merely derivative of the antitrust injury to the corporation). The Plaintiffs here who are members of DFA and the other SMA cooperatives are no different from the shareholders who lack antitrust standing.

Each of SMA's member coops is a non-profit corporation with a dairy farmer board of directors. SMF ¶ 58. And each is quite capable of asserting its own claims—just as they have in the past. Thus, the decision by a cooperative to assert an antitrust claim, to decide how best to compete in the marketplace, or to take any other action, rests with the sound business judgment of the dairy farmer board. *See e.g., In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746 (Del. Ch. 2005) ("business judgment rule serves to protect and promote the role of the board as the ultimate manager of the corporation" and "operates to preclude a court from imposing itself unreasonably on the business affairs of [the] corporation"), *aff'd*, 906 A.2d 27 (Del. 2006).

Application here of the Sixth Circuit's five factors noted above confirms Plaintiffs' lack of standing. The difficulties in showing causation are multiplied when the immediate cause is a decision by the dairy farmer's coop. For example, if some Plaintiffs believe they were harmed by MD/VA's decision to join SMA, which Plaintiffs allege it was "forced" to do, then (1) the causal link is too attenuated—since it of necessity includes MD/VA's decision making—and, in any event, (5) MD/VA itself would be the direct victim of this claim and best positioned to assert it on behalf of its members. Compl. ¶ 38. Even if the coop is not the alleged victim, but rather the alleged wrongdoer, the same conclusion about standing follows. There is no doubt that most of the putative class members here are or were DFA members. To the extent that DFA members

believe, for example, that their coop's decision to enter full-supply agreements with processors was somehow misguided and injured the coop and its members, then they can avail themselves of the corporate governance structures available to them (or some other cause of action). But just as individual stockholders may not generally assert claims for injury to their corporation absent compliance with Fed. R. of Civ. P. 23.1, neither may these Plaintiffs.

The other factors cited by the Sixth Circuit further counsel against standing for the dairy farmers who are coop members. None of the members of DFA or the other SMA coops is a consumer or competitor in the relevant market; they are members of coops, and their coops are the market participants that were allegedly the victims or the wrongdoers here. Moreover, the potential for duplicative or difficult damage apportionment argues strongly against standing. If there were a judgment against DFA or SMA, the purported Plaintiffs would substantially overlap with the purported Defendants. DFA and the member coops of SMA are non-profit entities that pay out their revenues to their members. SMF ¶ 59. Plaintiffs and their expert have included no analysis of the circular nature of and difficulty of apportioning damages given the unique nature of this claim. For all of these reasons, the farmer members of DFA and the other coops that belong to SMA lack antitrust standing.

## III. THERE IS NO TRIABLE ISSUE OF FACT AS TO THE ALLEGED CONSPIRACY TO SUPPRESS DAIRY FARMER PAY PRICES.

As explained above, all of Plaintiffs' antitrust claims should be dismissed for the failure to prove a relevant market and for Plaintiffs' lack of antitrust injury and antitrust standing. Their conspiracy claims should dismissed for a third reason as well. Plaintiffs have alleged that there exists a vast conspiracy involving both milk processors, such as Dean and The Kroger Company ("Kroger"), and a dairy cooperative (DFA) and two common marketing agencies, DMS and SMA, the purpose of which is to suppress prices paid to dairy farmers in Federal Orders 5 and 7.

This conspiracy was hatched, according to Plaintiffs, by DFA and Suiza (a predecessor to the current Dean Foods) in 1998. *See* Rausser Rpt. at 19, 85-87 (Ex. 5); Rausser Rebut. Rpt. at 61 n.166 (Ex. 6). And since that time, the conspiracy has allegedly expanded massively in scope by virtue of Suiza's merger with legacy Dean (which led to the creation of the current Dean) and by including firms such as Kroger (one of the country's largest processors and grocery retailers), NDH (created as a processor in 2001), Prairie Farms (a vertically-integrated dairy cooperative that owns several processing plants), and others. *See* Compl. ¶ 43.

The supposed lynchpins of this conspiracy are the separate full-supply agreements that DFA entered with each of the conspiring processors. These agreements, according to Plaintiffs, "locked up" access to processing plants in Orders 5 and 7 and forced the dairy farmers in those Orders to sell their milk through DFA or an entity that DFA controlled. *See, e.g.*, Compl. ¶ 68. By making farmers deal through DFA or a DFA-controlled entity, Plaintiffs argue that the conspirators were able to impose lower prices on the dairy farmers than they otherwise would have received.

Plaintiffs' Complaint offers two theories for why this price-suppressing cartel was in the conspirators' interest. For the processors, Plaintiffs theorize that it allowed them to pay less for their key input, raw milk. And for DFA and the entities it supposedly controls (e.g., SMA and DMS), Plaintiffs claim that they gained market power (which they curiously used to drive the prices they charged to processors ***down,*** and ***not up***). But despite a massive discovery effort, Plaintiffs cannot substantiate either proposition.

Although agreeing that ████████████████████████████████████

████████████████████████ Rausser Rebut. Rpt. at 32 (Ex. 6), Plaintiffs' experts ***did not analyze the prices that processors in Orders 5 and 7 paid for raw milk.*** Defendants' experts

did. And that analysis showed that prices plants paid for raw milk in Orders 5 and 7 *increased* during the alleged conspiracy period and were *higher* than almost everywhere else in the nation (except Order 6). SMF ¶ 43; Elzinga Rpt. at 89-98 (Ex. 1); Kalt Rpt. at 23-29, 45-50 (Ex. 3).[16] And what of the market power that DFA and SMA supposedly gained in exchange for selling out their farmer members? Plaintiffs' expert confirmed in deposition that ███████████████ ████████████████████████████ Rausser Dep. at 100-01 (Ex. 53).

At bottom, Plaintiffs' case rests on the illogical proposition that the processor and coop Defendants conspired to reduce the availability of what Plaintiffs claim is a lower-cost, local supply of milk (and, in the case of the coops, to harm their own members in the process), in favor of what Plaintiffs allege is a more distant and expensive supply of milk. But, as is detailed below, Plaintiffs cannot explain why either processors or coops would have any rational interest in joining this plot: "[A]s presumably rational businesses, [Defendants] had every incentive *not* to engage in the conduct with which they are charged . . . ." *Matsushita,* 475 U.S. at 595.

Moreover, no conspiracy hypothesis is necessary to account for the various activities that are alleged to be in furtherance of this unlawful agreement—the full-supply agreements, the outsourcing of the procurement of independent milk, the occasional granting of rebates and credits to processors, the collaborative purchase of supplemental milk by the coops in SMA, and the investments by DFA in various bottling interests. These are efforts by processors and coops to best compete in an often difficult marketplace, and in so doing to serve their respective constituencies, including the dairy farmers in Orders 5 and 7.

---

[16] This was not an oversight. Plaintiffs' lead expert, Dr. Rausser, submitted an initial report that of some 235 pages, that included dozens of statistical charts and exhibits. Defendants' experts noted and criticized his failure to evaluate the prices plants pay in their reports. See Elzinga Rpt. at 97-98 (Ex. 1); Kalt Rpt. at 23-24 (Ex. 3) ("leaves this inherently factual question unaddressed"). Yet Dr. Rausser declined to provide such analysis in his 128 page rebuttal report, which contained no less than 54 new exhibits . *See* Rausser Rebut. Rpt. at 27-30, 71-80 (Ex. 6).

As we detail below, consistent with the Supreme Court's holding in *Matsushita*, when the claimed conspiracy makes no sense, and there are other plausible explanations for the conduct at issue, the conduct does not give rise to an inference of conspiracy, and the Defendants are entitled to summary judgment.

### A.     The Law of Antitrust Conspiracies and the Summary Adjudication Thereof

Plaintiffs complain of an overarching conspiracy in Orders 5 and 7 in violation of both Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits conspiracies in restraint of trade, and Section 2 of the Act, *id.* § 2, which prohibits conspiracies to monopolize or monopsonize a market. To prove such a conspiracy, "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quotations omitted); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009). And to show a conspiracy to monopolize or monopsonize under Section 2, the plaintiff must go a step further and show that "the object and purpose of the conspiracy was or is to achieve monopoly power." *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1356 n.24 (5th Cir. 1980).

As the Supreme Court noted in *Monsanto*, Plaintiffs can attempt to meet their evidentiary burden with either direct evidence of a conspiracy or with circumstantial proof. The former is extremely rare—in the words of the Third Circuit, "[d]irect evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999); *see also Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) ("We agree with the Third Circuit that direct evidence in [the antitrust law] context is explicit and requires no inferences to establish the proposition or conclusion being asserted." (quotations

omitted)).[17] A confession by a participant in the conspiracy or a guilty plea to a criminal price-fixing charge are the primary examples of direct evidence.

Given the high threshold for direct evidence, antitrust plaintiffs overwhelmingly rely on circumstantial evidence to prove the existence of a conspiracy. And although ordinarily all inferences at summary judgment are drawn in favor of the non-moving party, "antitrust law limits the range of permissible inferences from ambiguous evidence." *Matsushita*, 475 U.S. at 588. Thus:

> [C]onduct as consistent with permissible competition as with illegal conspiracy does *not*, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence that *tends to exclude the possibility that the alleged conspirators acted independently*. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents.

*Id.* (emphasis added, internal quotations and citations omitted). And "if the factual context renders [the plaintiffs'] claim implausible—if the claim is one that simply makes no economic sense—[the plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* at 587.

Most critically, the Supreme Court explained in *Matsushita* how the motives of the alleged conspirators and the existence of alternative explanations for their conduct bear on the issue of what inferences can be drawn:

> [T]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule 56(e). Lack of motive bears on

---

[17] The Sixth Circuit has announced the same understanding of "direct evidence" in an employment case. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543-44 (6th Cir. 2008) ("Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action.").

the range of permissible conclusions that might be drawn from ambiguous evidence: ***if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.***

*Id.* at 596-97 (emphasis added).

In the years since *Matsushita* was decided, the Sixth Circuit has identified the following "plus factors" to help guide courts in evaluating circumstantial evidence of concerted action:

> (1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether defendants have been uniform in their actions; (3) whether defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether defendants have a common motive to conspire.

*Travel Agent Comm'n*, 583 F.3d at 907 (quoting *Re/Max,* 173 F.3d at 1009)). "Ordinarily, an affirmative answer to the first of these factors will consistently tend to exclude the likelihood of independent conduct." *Id.*

\*     \*     \*     \*     \*

We turn now to the evidence that Plaintiffs have cited in support of their claims of antitrust conspiracy. We first address the supposed direct evidence of conspiracy, of which there is in fact none. We then address the circumstantial evidence that Plaintiffs claim supports an inference of conspiracy. It does not. In a nutshell, the anti-farmer conspiracy posited by the Plaintiffs makes no economic sense—it does not make sense for the processors, who, if Plaintiffs were correct, have been reducing supplies from nearby local farmers only to make themselves beholden to farmers in more distant regions; nor does it make sense for the cooperatives, who have nothing to gain and everything to lose by turning on their own members and suppressing the prices those members receive for milk. Moreover, there are straightforward, legitimate business explanations for the conduct that Plaintiffs claim is in furtherance of this conspiracy.

-33-

**B.     There Is No Direct Evidence of a Conspiracy To Suppress Pay Prices.**

"Direct evidence is extremely rare in antitrust cases . . . ." *Am. Chiropractic*, 367 F.3d at

226.  Nonetheless, the Plaintiffs here point to four types of what they label direct evidence:  (1)

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████ *None*

of this is direct evidence of the alleged conspiracy to reduce the prices received by dairy

farmers—*all* of it requires a number of inferences before anyone could conclude that the

evidence shows such an unlawful agreement (which, in any event, it does not).

*First*, Plaintiffs point to letters sent by Gregg Engles to Gary Hanman in 1997 and 1998.

*See, e.g.,* ████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████ These letters reflect simply the

formation of a mutually beneficial business relationship between DFA, a cooperative interested

in selling raw milk and occasionally in selling plants, on the one hand, and Suiza, a processor interested in acquiring raw milk and additional plants, on the other. The letters do not show that Suiza and DFA "had a conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto*, 465 U.S. at 764, as they do not, among other things, say anything about the dairy farmers who operate within what has since become Federal Milk Marketing Orders 5 and 7 or about reducing pay prices for those farmers. SMF ¶ 62.

*Second*, Plaintiffs point to a page of typewritten notes that appear to relate to a conversation between Ronnie Rider, then an employee of DMS, and Ernie Yates, then an employee of Dean as direct evidence of an agreement to suppress pay prices. ████████████ ████████████████████████ t is not. ████████████████

████████████████████████████████████

████████████████████████ Mr. Rider was the manager who dealt with the independent farmers who shipped milk to Dean's plants through DMS, and Ernie Yates was responsible for raw milk procurement at Dean. SMF ¶¶ 65-66. ████████████

████████████████████████████████████

████████████████████████████████████

██ It is not antitrust "price fixing" for a seller and a buyer to discuss the seller's input prices, especially when the purpose is to ensure that the buyer will continue to receive an adequate supply of the product given marketplace competition. ████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████ This conversation ██████████████████████ is not direct evidence of a *conspiracy to suppress* those prices.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████ But courts have consistently held that the exchange of pricing information, which in certain circumstances can provide *circumstantial* evidence of conspiracy, is *not direct* evidence—after all, "[g]athering competitors' price information can be consistent with independent competitor behavior." *Baby Food*, 166 F.3d at 126 (affirming grant of summary judgment to the defendants, notwithstanding evidence of competitors exchanging information regarding prices); *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*, 203 F.3d 1028 (8th Cir. 2000) (en banc) (evaluating evidence of price communications as circumstantial proof and affirming summary judgment for defendants); *see also Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1169 (6th Cir. 1995) ("The exchange of price information among competitors is not a per se violation of the antitrust laws." (quotations omitted)). ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

     *Fourth*, and finally, Plaintiffs point to the process by which DCMA—the non-defendant common marketing agency, of which roughly a dozen coops are members (including non-conspirators such as SMI and Cobblestone)—determines the over-order premium ("OOP") that its cooperative members commit to charge their customers.[18] SMF ¶¶ 71-72. Specifically,

---

[18] The collective setting of order-order premiums by dairy cooperatives is perfectly lawful and, in and of itself, not challenged by Plaintiffs. *See Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1038-39 (2d Cir. 1980) (Capper-Volstead Act immunity).

Plaintiffs point to the fact that, in advance of the DCMA meetings at which the announced OOPs are voted upon and approved by the DCMA dairy farmer Board of Directors, ██████████

██████████████████████████████████████████████████

██████████████████████████████ This is not surprising in that suppliers do

not set prices in a vacuum and customers can purchase milk from other producers.  SMF ¶ 75. ██

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

    ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████ Plaintiffs' efforts to infer that these conversations ██████████████████████

███████ are somehow direct evidence of an agreement to *reduce prices paid to* dairy farmers involves an elaborate (and erroneous) chain of inferences. The number and complexity of these inferences disqualifies this as direct evidence of a pay price-suppression conspiracy.

### C. Plaintiffs' Circumstantial Evidence of Conspiracy Is Not Sufficient To Create a Genuine Issue for Trial.

As the Supreme Court made clear in *Matsushita*, "*if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.*" 475 U.S. at 596-97 (emphasis added). That is precisely the situation here—the defendants had no "rational motive" to join in the conspiracy Plaintiffs have alleged, *and* their conduct is "consistent with other equally plausible explanations," leaving the Plaintiffs with a collection of accusations that "does not give rise to an inference of conspiracy."

#### 1. Plaintiffs Cannot Explain Why Defendants Had an Economic Interest in Participating in the Alleged Conspiracy.

The Plaintiffs have not shown that either the processor defendants or the dairy cooperative defendants had a rational motivation to participate in the alleged conspiracy to suppress dairy farmer pay prices. The Plaintiffs' patchwork of answers—vaguely specified and unmeasured "side payments" to processors, and the supposed "hijacking" of the primary coop defendant by rogue managers—does not come close to salvaging their case.

##### a. The conspiracy Plaintiffs have alleged makes no economic sense for the processors—indeed, it is affirmatively *against* their economic interests.

Plaintiffs do not provide an economically rational incentive for the processors—Dean and NDH, among others—to conspire with the coop defendants to reduce the pay prices received by dairy farmers in Orders 5 and 7. As detailed below, the conspiracy as alleged not only failed to benefit the processors, but also it would have been fundamentally *not in their economic interest.*

-38-

### 1) Plaintiffs have not shown, and cannot show, that processors paid lower prices for raw milk.

Plaintiffs' first misstep is their failure to show that the alleged processor-conspirators paid lower prices for raw milk as a result of this supposed pay-price-suppressing conspiracy. As Professor Elzinga observes, "[g]iven the nature of plaintiffs' price suppression claims, it is peculiar that neither Dr. Rausser nor Professor Scott offers an empirical analysis of the prices that processors paid for milk." Elzinga Rpt. at 97 (Ex. 1). Although the dairy farmer Plaintiffs and their expert, Dr. Rausser, *assert* that the prices plants paid for raw milk were lower, and that this mattered, Dr. Rausser makes no attempt to *show* that processors paid lower prices. *See id.* at 97-98. Significantly, Dr. Rausser "leaves this inherently factual question unaddressed and unanswered. . . . even though data are readily available." Kalt Rpt. at 23-24 (Ex. 3).



The problem is not simply these inconsistencies or the data that Dr. Rausser failed to analyze—it is that the analysis of the prices processors paid, which Defendants' experts *did* conduct, undercuts any claim that the processors benefitted from this so-called conspiracy. Elzinga Rpt. at 89-95 & Exs. 34-35, 37-39 (Ex. 1) (concluding that, if anything, prices increased: "If [Professor Rausser] had done these analyses, he would have found that the results do not support plaintiffs' claims."); Kalt Rpt. at 28-29 (Ex. 3) ("Plaintiffs have not offered any analysis

to support the proposition that Dean paid lower prices for the milk it bought, even though doing so was putatively the 'clear motive' for Dean participating in an alleged monopsonistic conspiracy. The data reject claims that Dean has been able to satisfy its 'clear motive'.") The claimed motive for the processors' alleged participation in this conspiracy is simply not there.

> **2)** **Paying prices to Southeast farmers that are below a competitive level would increase the costs for processors in Orders 5 and 7.**

Aiding Plaintiffs' alleged conspiracy would in fact have *harmed the processors'* interest by reducing the supply from what the Plaintiffs' claim to be lower-cost, local producers, and forcing processors to rely more heavily on more distant and, according to the Plaintiffs, more costly milk, produced outside Orders 5 and 7. As Professor Elzinga explained:

> Any bottler—either a monopsonist or one in a competitive market—seeks low cost milk. Paying extra for "excess" outside raw milk (when cheaper local milk is otherwise available or the outside milk is simply not needed) would not benefit the defendant bottlers individually or collectively.
>
> . . . It is in the economic interest of Dean and NDH to have an efficient, low-cost, raw milk supply. It is not in their economic interest to forego alleged "cheaper" supplies of milk (purportedly from dairy farmers in Orders 5 and 7) in favor of allegedly more expensive supplies of milk (from Southwest dairy farmers), or to pay the cost of bringing in unneeded milk from outside the region, as plaintiffs contend.

Elzinga Rpt. at 123 (Ex. 1). Finally, the harm to the processors here is further compounded because Dr. Rausser posits ████████████████████████████████████

████████████████████████████████

> Professor Rausser's hypothetical monopsonist seems to lack incentives to act in its own self-interest. By his logic, █████
> ████████████████████████████████
> ████████████████████████████████
> ███████████████████████

*Id.* at 67. This is not a conspiracy that a rational processor would join.

> 3) **Processors would have absolutely no reason to participate in a conspiracy to "flood" Orders 5 and 7 with unneeded outside milk.**

Plaintiffs lack of a cogent explanation of the processors' motives to participate in this conspiracy is particularly clear with respect to the alleged "flooding" of the Southeast with excess, outside milk. *See* Kalt Rpt. at 32, 60 (Ex. 3). As Dr. Rausser noted in his initial report,

██████████████████████████████████████████████████████

████████████████████ the very opposite of flooding. Moreover, ████████████████

██████, lower utilization rates and reduced blend prices—the supposed effects of flooding—

*do not save processors any money.* ██████████████████████ SMF ¶ 80. Those

buying milk for Class I purposes are still paying the Class I price plus any over order premium,

even if the addition of more Class II-IV milk to the pool lowers the average blend price that any

farmer receives. SMF ¶ 80. Processors would have no incentive to participate in a conspiracy to

suppress blend prices by flooding the Southeast with extra, unneeded milk, and every reason to

avoid bringing extra costs into the system.

> 4) **Rebates and credits do not provide an adequate reason for processors to participate in the alleged conspiracy.**

Lacking any other motive for processor participation in the alleged conspiracy, Dr.

Rausser argues that their motive was ██████████████████████████████████

████████████████████████████ Rausser Dep. at 225 (Ex. 53); Elzinga Rpt. at 131 (Ex.

1). Dr. Rausser's reliance on ██████████████████ is a concession that ████████████

██████ the processors would have no incentive to participate in the alleged conspiracy:

> Saying that bottlers would need ██████████ is another way of saying that without them bottlers would not be incentivized to take part in the alleged activity. But Professor Rausser . . . does not offer any measure of these hypothetical side payments or explain

> how or whether they are large enough to incentivize participation
> in the alleged conspiracy. . . .

Elzinga Rpt. at 131-32 (Ex. 1). But even accepting for this purpose the most Plaintiff-friendly

view of the facts, the so-called ███████████ that they have identified cannot support the weight

of explaining why Dean and the other processors would participate in a conspiracy that was

detrimental to their own interests, albeit while allegedly depriving dairy farmers of ███████

███████ *Id.* at 77-79, Ex. 29.

     Dr. Rausser tries ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████ But this argument sidesteps the key point, which is

whether Plaintiffs can show that ███████████ are a sufficient plank to motivate the processors

to participate in this conspiracy. The total ███████ to Dean and the other processors, using

even the numbers from Dr. Rausser's worst case scenario, is surely insufficient for that purpose:

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

█████████████████████████ [9] And even this percentage is achieved only by applying a

number of nationwide numbers and, with no basis, attributing them just to Orders 5 and 7.

     Finally, there is one more fatal flaw in ███████ as a sufficient incentive for processors

to participate in this alleged conspiracy to reduce the prices paid to dairy farmers. Dr. Rausser

---

[19] All Professor Scott seems willing to offer ████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████ But this still
would not explain Dean's incentive to participate in the conspiracy in the first place.

has claimed ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

**b.** **It makes no economic sense for coops and common marketing agencies to participate in a conspiracy to reduce pay prices.**

Plaintiffs fare no better at articulating rational motivations on the dairy cooperatives to join in the conspiracy they allege. Dr. Rausser admitted that he had a difficult time explaining



████████████████████████ In short, Dr. Rausser acknowledged ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

-43-

There are significant problems with Dr. Rausser's theory of ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

Finally, Plaintiffs would have the Court accept the novel theory that ████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████. This argument

does not constitute a "rational" explanation for the organization's participation in the alleged

conspiracy to hurt dairy farmers.

Plaintiffs' other expert, Professor Scott, makes Plaintiffs' problem even worse. He insists

that ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████. There is

no explanation provided—nor can one find one in the record of this case—for Professor Scott's novel motivational theory, but it is clearly *not the same* as Dr. Rausser's.

Earlier in the case, Plaintiffs offered yet another theory—namely, that coops that invest in bottling plants adopt the perspective and motivation of processors, and thus seek to pay lower prices to farmers because that means lower costs and higher profits. Compl. ¶ 64. Dr. Rausser makes no mention of that theory in trying to explain DFA's participation in a conspiracy to suppress pay prices.[20]

Plaintiffs' differing theories underscore that they have no coherent theory at all. Professor Elzinga aptly summarizes the problem:

> Professor Rausser and the plaintiffs are stuck. As if it's not bad enough that they have provided no coherent explanation of why bottlers would participate in the conspiracy they allege, they are left with the other critical alleged co-conspirator, DFA, as an organization that likewise would have had no incentive to participate in any version of the conspiracy they have pled. Simply put, DFA would not want to play.

Elzinga Rpt. at 136 (Ex. 1). Nor would SMA and its member cooperatives. As Professor Elzinga notes, it is "striking" that Professor Rausser's explanation of Plaintiffs' conspiracy theory "necessarily requires both that the cooperatives act against the interests of their members, and the processors act against their self-interest unless the side payments are truly large . . ." *Id.* at 132.

> c. **Plaintiffs have no explanation or evidence for why the unnamed "co-conspirators" participated, yet without these additional participants, Plaintiffs' claims make even less sense.**

---

[20] Given his failure to demonstrate that plants *did* pay lower prices for raw milk, and the obvious mismatch between DFA's bottling revenues and its milk sales revenues, it is easy to understand why this "acting like a processor" argument has disappeared.

Plaintiffs and Dr. Rausser spend almost all of their ink on defendants Dean, DFA, SMA and NDH, but their conspiracy alleges, and in fact its ability to succeed depends upon, the alleged participation of numerous other parties. As to these other parties, the failure of proof is absolute. There is nothing that provides a factual foundation for an opinion that the full-supply agreements that ██████████████ entered into were somehow contrary to these entities unilateral self-interest. Nor do Plaintiffs offer even a suggestion of proof to explain why entities not named as co-conspirators—including ████████████████████████ ██████████████—would have engaged in similar conduct as that complained of here (e.g., full-supply agreements and membership in common-marketing agencies) if such conduct makes sense only in the context of conspiracy. Indeed, the full supply agreements about which Plaintiffs complain are the norm in the dairy industry, and thus mere proof of such conduct cannot be used to support the inference of conspiracy. *See infra*, Part III.C.3.a.1; SMF ¶¶ 22-23.

In some cases, the problem is even worse than an absence of proof. Mike McCloskey of Continental Milk Producers is identified by Plaintiffs as a non-party co-conspirator. █████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████

## 2. The conduct that Plaintiffs claim was conspiratorial is not sufficiently parallel to support a reasonable inference of conspiracy.

The cases involving the use of circumstantial evidence to prove a conspiracy typically involve the alleged conspirators engaging in parallel conduct, and the court then analyzing whether there are sufficient additional facts ("plus factors") to support the inference that the observed parallelism is the result of an unlawful agreement. *See, e.g., Re/Max,* 173 F.3d at 1009. Here Plaintiffs have not made and could not make the requisite threshold showing that pay prices to dairy farmers are sufficiently "parallel" to justify an inference of conspiracy.

There is no dispute that Plaintiffs have not made a showing that these allegedly fixed pay prices are the same for all dairy farmers. In many ways, Plaintiffs have emphasized that this is *not* true. For example, Dr. Rausser acknowledged ███████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████ Moreover, the record is replete with anecdotes about the reactions to the pay price differences between DMS shippers and other dairy farmers, in particular members of DFA. SMF ¶ 85.

The significance of these observed price differences is confirmed by the extensive, undisputed evidence that pay price competition leads dairy farmers to both threaten to and to actually leave their coop, either to go independent or to another coop, and that this happens at times even among the coops that otherwise collaborate through SMA. SMF ¶¶ 86-87.

Since they are all marketing a similar commodity and there is a degree of uniformity imposed by the regulatory scheme, it is no surprise that there are similarities in the movements of the pay prices that all dairy farmers receive. *See, e.g.*, Elzinga Rpt. at 178-79 (Ex. 1). But in suggesting that these observed prices are the result of a conspiracy, and in arguing that their circumstantial proof can exclude the possibility that independent action explains the observed pattern of prices, Plaintiffs should have demonstrated a degree of similarity in pricing movements beyond that which would be expected in the marketplace. This they clearly have not done.

### 3. None of the conduct cited by Plaintiffs is inconsistent with the Defendants' unilateral self-interest.

In cases in which plaintiffs seek to use circumstantial proof of the existence of a conspiracy, the most critical factor is frequently whether the parties behaved in a manner that is inconsistent with what they would have rationally done in their *unilateral (as opposed to conspiratorial) self-interest*. As the Sixth Circuit explained in *Re/Max*, "[o]rdinarily, an affirmative answer" to the question of whether a defendant's actions "would be contrary to their economic self-interest" "will consistently tend to exclude the likelihood of independent conduct." 173 F.3d at 1009. In *Re/Max*, the Court's conclusion that the conduct was *not* in defendants' unilateral self-interest was based on the evidence that neither of the defendant realty firms would have rationally adopted the challenged policy on splitting commissions absent the alleged conspiracy. *Id.* at 1009-10. This evidence tended to exclude the possibility of independent action because adopting the policy at issue would not have been economically rational if done independently, but would have been if done in concert. The exact opposite is the

case here: Defendants' conduct is consistent with their unilateral self-interest, but would not have been rationally motivated, for all the reasons explained above, by the alleged conspiracy.[21]

      **a.**      **Entering into full-supply agreements was not inconsistent with the unilateral self interest of processors and coops.**

Plaintiffs fail to show that the conduct about which they have most vociferously complained—the full-supply agreements between DFA and Dean (and before that, Suiza)—are inconsistent with the parties' unilateral self-interest and would not have been entered into absent the alleged price-suppressing conspiracy. Given the law's treatment of such agreements, their failure comes as no great surprise. *See, e.g., Tampa Elec.*, 365 U.S. at 333-34 (listing benefits of exclusive agreements); *NicSand*, 507 F.3d at 453-58 (upholding challenged exclusivity agreements on the pleadings); *Indeck*, 250 F.3d at 977-78 (same); *E. Food*, 357 F.3d at 8 ("[I]t is widely recognized that in many circumstances [exclusive dealing] may be highly efficient . . . and pose no competitive threat at all."); XI Hovenkamp, *Antitrust Law* ¶ 1810 (2d ed. 2005) ("The benefits of exclusive dealing are many . . . [and] greatly exceeds their potential for harm, and they should be presumptively lawful in all but a few carefully defined circumstances.").

      **1)**      **Full-supply agreements are common in the industry and have been for years.**

Gregg Engles, current CEO of Dean, back in 2001 described full supply agreements as "the standard course of dealing" in the dairy industry. SMF ¶ 22. ███████████████

████████████████████████████████████████████████████████

---

[21] The cases are clear, moreover, that the plaintiffs do not create a material dispute of fact on this issue simply because they claim, or they proffer an expert who is prepared to opine, that the defendants' conduct was inconsistent with their unilateral self-interest. *See, e.g., Baby Food*, 166 F.3d 112 (rejecting expert opinion that defendants had acted contrary to their independent self-interest); *InvaCare Corp. v. Respironics, Inc.*, No. 1:04 CV 1580, 2008 WL 906112 (N.D. Ohio Mar. 31, 2008) (rejecting plaintiff's claim that giving away free masks was against self-interest and therefore evidence of conspiracy); *see also In re Travel Agent Comm'n*, 583 F.3d 896 (on motion to dismiss, court rejected claim that airlines acting independently would not have reduced commission rates).

 In short, it is undisputed
that full-supply agreements are a staple of the industry, used before and during the alleged
conspiracy by non-conspirators both in and outside of the Southeast. *See* SMF ¶ 22.

**2)** **Full-supply agreements benefit processors, particularly in deficit regions.**

The USDA has noted not only the existence of full-supply agreements, but also their

benefits to processors:

> Procuring and coordinating a fluctuating supply to meet varying
> demands is costly to individual handlers. A full-supply
> arrangement with a cooperative can reduce the cost. Cooperatives
> supply the exact needs of the handler for fluid use and/or ice cream
> and cottage cheese production and manage the remaining milk for
> other uses. Full-supply arrangements do not eliminate fluctuations,
> but they do provide a relatively simple, routine way of balancing
> supply and demand with minimum effort or expense to the
> processor.

Alden C. Manchester & Don P. Blayney, Milk Pricing in the United States, Econ. Research

Serv., U.S. Dept. of Agriculture, Agriculture Info. Bulletin No. 761 ("USDA Milk Pricing"), at

14 (Feb. 2001) (*available at* http://www.ers.usda.gov/publications/aib761/aib761.pdf (last

accessed Jul. 27, 2010)) (SMF ¶ 89). Those benefits eliminate any need to seek a conspiratorial

explanation for the processors' signing such contracts:

> Contrary to claims that FSAs are a tool of conspiracy, Dean and
> NDH and other so-called co-conspirator processors would have
> ample independent business reasons to enter into such transactions.
> It is easy to understand why a bottler might prefer to off-load the

-50-

costs and risks associated with balancing its milk supply with its fluctuating demand for milk. 

Elzinga Rpt. at 145-46 (Ex. 1).

### 3) Dean's recent change in procurement strategy does not make its prior use of FSAs inconsistent with its unilateral self-interest.

This does not undercut that Dean acted in its unilateral self-interest in entering into various full-supply agreements with DFA in 1998, 2001 and later:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And,
of course, the fact that Dean felt the need to experiment with ways to *lower* its raw milk

procurement costs is hardly consistent with the Plaintiffs' contention that Dean had been

conspiring with its raw milk suppliers for years to maintain unlawfully low prices.

### 4) Full-supply agreements benefit dairy farmers who belong to cooperatives in many ways.

There is also no doubt that full-supply agreements can also be in the interest of

cooperatives by, for example, providing the assurance of a market, the opportunity to achieve

efficiencies in supply and thereby reduce costs, and the chance to meet any offers the customer

may receive of a more attractive price.  SMF ¶ 92.

USDA has recognized the benefits of full-supply agreements for coops:

> Cooperatives can achieve significant economies of scale by
> coordinating supplies with demands using full-supply
> arrangements and can reduce the uncertainties for handlers, fluid
> milk processors, and dairy product manufacturers. The reserve
> supplies that must be carried to meet the fluctuating demands of an
> entire market are smaller and less variable for a cooperative
> servicing the entire market than the sum of individual fluid handler
> reserves.  A single agent moving milk between producers and users
> and among the users is more efficient also.  Savings from a
> centralized supply and surplus management operation can be
> shared among the cooperatives providing the services and the
> fluid milk processors.

USDA Milk Pricing, at 14 (SMF ¶ 94).

Full-supply agreements also provided the best opportunity to negotiate premiums that

covered the cost of balancing the market.  SMF ¶ 93.  *See also* Elzinga Rpt. at 171-72 (Ex. 1)

("DFA had reasons to believe it could be more efficient in managing supply if it had FSAs.

Having supply agreements, including FSAs, with processing plants allowed DFA to ensure a market for its members' milk and afforded DFA the opportunity to achieve efficiencies in marketing and balancing milk supply across its marketing area."). Even Plaintiffs' expert acknowledged that, ████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████ A full-supply agreement that enables a coop to keep a customer that it might otherwise lose is surely a contract that a coop would pursue in its unilateral, non-conspiratorial self-interest.

Full-supply agreements are not the exclusive province of DFA, or the members of SMA. *See* Elzinga Rpt. at 151 & n. 292, 166 (Ex. 1) ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

### 5) Coops benefit from full-supply agreements even in deficit areas.

Plaintiffs and Dr. Rausser try to make much of their claim that DFA acted against its self-interest by entering into full-supply agreements in a "deficit" region. Both the factual premise and the inference are wrong. The undisputed facts demonstrate that the full-supply agreements at issue here were, for the most part, not agreements limited to plants in so-called deficit regions, but rather virtually all applied to some plants in other parts of the country. *E.g.*, Exs. 106, 111.

But even if a decision had been made to enter into full-supply agreements limited to "deficit" areas, there are ample, non-conspiratorial reasons why such an agreement would be in a

cooperatives' self-interest, contrary to Dr. Rausser's claim. Remarkably enough, before he made

that assertion, Dr. Rausser failed to evaluate or analyze the full-supply agreements in the record



Calling a region "a deficit" does not eliminate the benefits of a full-

supply agreement, including the benefits of having an assured and predictable market for a

coop's milk. It is not simply a matter of "finding a home for the milk," but rather "at what cost

and at what return"—"how do we minimize the hauling of getting milk to wherever it's

beginning to go, and overall price levels in the marketplace." [22]

---

[22] As noted previously, while Orders 5 and 7 are often referred to generally as "deficit" regions, there are substantial geographic pockets within Orders 5 and 7 where there is a local surplus of milk—that is, more milk is produced than the nearby bottling plants can process. SMF ¶6. Obviously, the full-supply agreements work to the substantial benefit of producers—especially



Only by blithely ignoring all these facts was Dr. Rausser able to opine that entering into such contracts was so contrary to a coop's self-interest as to be explained only by a pay-price-suppressing conspiracy. This is surely a classic example of an opinion so divorced from marketplace facts as to be worthy of no consideration. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."). There are clearly legitimate reasons for a dairy cooperative to sign full-supply agreements.

> **b.** **The Dean-DMS outsourcing agreement was not inconsistent with the parties' unilateral self-interest.**

Plaintiffs and Dr. Rausser contend that only a conspiracy can explain Dean's decision to outsource its independent milk procurement to DMS in 2003. Such sentiments ignore commercial reality and the undisputed record. The fact is, in *2001*, a year and a half before the

---

smaller producers, which comprise the bulk of DFA's membership in the Southeast—located in those areas of local surplus.

23 ████████████████████████████████████████████████
████████████████████ Such a retrospective look at the experience in certain time periods is not sufficient to warrant the inference that entering into such contracts was so antithetical to a coop's self-interest as to suggest that signing such an agreement is evidence of conspiratorial conduct.

-55-

outsourcing agreement was entered into, █████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

The reasons for making this change were not a conspiracy, but basic economics. ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████[24]

     As Professor Elzinga notes, "outsourcing provided economic benefits to Dean (and to DFA) and made sense as a business decision." Elzinga Rpt. at 173 (Ex. 1). As he explained, "[t]he outsourcing agreement was expected to benefit both Dean and DMS by generating efficiencies in the assembly and delivery of raw milk":





---

[24] Moreover, this was not a Southeast-specific strategy. ████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████

"This is additional evidence that outsourcing is not a novel arrangement 'cooked up' as part of a conspiracy by the defendants." Elzinga Rpt. at 199 (Ex. 1).

Even Dr. Rausser admitted that ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Indeed, Dr. Rausser's critique of these agreements as *inconsistent* with Dean's unilateral self-interest depends upon his claim that ████████████████████████████████

██████████████████████████

Without explanation, in short, Dr. Rausser somehow presumes that, contrary to his earlier statements about the prices processors paid being reduced, Dean paid *more* for milk post-outsourcing, even given its internal cost savings, and that this net increase was greater than whatever rebates it received from DMS. If Dr. Rausser's suppositions were correct, and the rebates Dean received were *insufficient* to cover a net increase in net milk acquisition costs, that would have important implications for his theory: namely, that the rebates were (a) too small to provide a motivation for Dean's participation in the conspiracy, and (b) small enough to leave DFA with a net benefit from the outsourcing arrangement. But not to Dr. Rausser: even with the receipt of these additional revenues and additional efficiencies in the use of its milk delivery network, the DMS arrangement was, in his view, so patently detrimental for DFA members as to be explainable only by Plaintiffs' conspiracy hypothesis. This is simply another opinion so divorced from market facts as to be worthy of no consideration. *Brooke Group*, 509 U.S. at 242.

### c. The granting of competitive credits and rebates was not inconsistent with the coops' unilateral self-interest.

Dr. Rausser claims that the payment of credits and rebates was somehow inconsistent with the coops and common marketing agencies' unilateral self-interest. That is transparently wrong on multiple counts.

*First,* as the record of the case makes clear, credits and rebates are, in many situations, a means of avoiding an across-the-board price cut that would cost farmers far more money. SMF ¶ 111. ████████████████████████████████████

████████████████████████████████████████

███████████████████████ The reason is simple—doing so is necessary to keep the business by keeping the customer "competitive" in its market, while at the same time avoiding a cut in premiums across the entirety of the DCMA area. There is no basis for calling such payments inconsistent with the coops' unilateral self-interest.

Nor are these credits—or the purposes behind them—in any way a secret within or without the industry. ████████████████████████████████



█████████ Dr. Rausser simply ignores these parts of the record in declaring such payments as evidence of conduct inconsistent with non-conspiratorial self-interest.

*Second,* it can be in a seller's unilateral self-interest to grant a discount to its largest customer, especially where that customer possesses monopsony power. And it is certainly in the buyer's interest to demand such discounts. *See, e.g., Kartell v. Blue Shield of Mass, Inc.,* 749

-58-

F.2d 922, 929-30 (1st Cir. 1984). Dr. Rausser has himself asserted that Dean had the unilateral monopsony power to demand such discounts. Rausser Rpt. at 173 (Ex. 5). The essence of such unilateral power would be that Dean's suppliers have to succumb to its demands, or else the consequences will be more severe. In short, rather than "excluding the possibility of independent action," Plaintiffs have themselves offered a non-conspiratorial explanation that is as plausible as their conspiracy hypothesis ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

### d. The collaborative purchase of supplemental milk by the SMA coops was not inconsistent with their unilateral self-interest.

Plaintiffs also cannot show that SMA and its cooperative members' procurement of supplemental milk constitutes proof of a conspiracy among Defendants to suppress the pay prices of dairy farmers in Orders 5 and 7.[25] As explained above, by undertaking to provide a full supply of raw milk to their processor customers, the cooperative members of SMA committed themselves to procuring the supplemental milk required to meet the processors' demand for raw milk. *See supra*, Part III.C.3.a.4-5. It thus follows that since the full-supply agreements are in the interest of the cooperatives, *see id.*, it also is in cooperatives' interest to acquire the raw milk necessary to fulfill their obligations under those contracts. Far from suppressing prices paid to local farmers, these arrangements help *protect* the premiums that local farmers are able to charge for their milk ███████████████████████████████████████████████████

██████████████████████████████

---

25 ███████████████████████████████████████████████████████

As noted earlier, there is no dispute that Orders 5 and 7 are overall a deficit region. *See* SMF ¶ 3. This regional deficit, which predates the alleged conspiracy, means that raw milk from outside of Orders 5 and 7 *must* be shipped into those Orders. *See* SMF ¶ 116. No one—not even Plaintiffs—contends otherwise. The only question then is whether it is in the cooperatives' interest for themselves to acquire that additional (supplemental) milk, or to leave it to the processors to do so. History and logic have shown that it is in the cooperatives' and their members' interest to handle it themselves. Professor Elzinga has explained the logic:



History supports this logic, because there are instances in which processors *have* procured their own supplemental milk, with immediate adverse consequences on the prices paid to local farmers.

To the extent SMA and its member cooperatives can work to provide the necessary supplemental milk and help preserve prices in Orders 5 and 7, that is in their self interest

-60-



It surely cannot be evidence of a conspiracy for SMA and its members to engage in conduct which Plaintiffs concede they would have engaged in absent any conspiracy.

### e. DFA's investments in bottling plants, including NDH, were not inconsistent with its unilateral self-interest.

Plaintiffs also claim that DFA's investments in bottling plants were part of a conspiracy to suppress farmer pay prices. In Plaintiffs' minds, by investing in bottling plants and receiving supply rights in the process—something that DFA and its predecessors (e.g., Mid-America Dairymen) indisputably did years before this supposed conspiracy—DFA furthered its supposed goal of "locking up" access to bottling plants, and thereby forcing local farmers to deal with the conspirators and accept lower prices for their milk. Plaintiffs argue that these investments were against DFA's self-interest and thus only explainable by conspiracy. To the contrary, DFA's investments are easily explained by its twin goals of providing a return on its members' investment and, even more importantly, securing markets for its members' milk.

DFA's former CEO Gary Hanman explained the origin of these investments as follows:

> Mid-America Dairymen and later DFA was put together by dairy farmers themselves. And *the single most important issue that dairy farmers faced then and had faced in the past was the assurance of a market for their milk*, that they knew [that] . . . marketing arrangements, had been predetermined prior to producing the milk. . . . So traditionally dairy farmers organized dairy marketing cooperatives to make those prearranged marketing arrangements, contracts if you please. In the development of those

> prearranged marketing plans, our leadership, and at first Mid-Am
> and later DFA, said ***the best assurance that we know that we have
> that market is to own a piece of it.***

Hanman Dep. at 35–37 (Ex. 156) (emphasis added); SMF ¶ 118. But DFA also recognized that

dairy farmers, as the persons selling the primary input to the processing plant, "inherently had a

conflict of interest" in owning a processing facility—do they sell raw milk at a high price and

increase their milk checks while adversely impacting the profitability of the plant, or do they sell

raw milk at a low price and diminish their milk checks while increasing the profitability of the

plant? *Id.* at 37. ███████████████



██████████ With that approach, DFA was able to help ensure that DFA's members

would both earn a profit on their investment, and have a market for their milk. *Id.*; SMF ¶ 120.

The legitimacy of DFA's interest in investing in processing plants is confirmed by the

fact that other cooperatives and farmers ████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

---

[26] The Cobblestone cooperative, which was established by former named Plaintiffs in this case,
has ████████████████████

Despite this evidence, Plaintiffs claim that DFA's investments were against its interest because (a) the stated reason for the investments—to assure a market for DFA's members' milk—does not apply in the "deficit market" of Orders 5 and 7, and (b) farmers have a conflict in owning plants. *See* Rausser Rpt. at 144-45 (Ex. 5); Scott Rpt. at 51-56 (Ex. 7). The undisputed evidence cited in the previous paragraph shows that *many* cooperatives and farmers, *even in so-called deficit regions*, have seen the merits in investing in processing plants, notwithstanding this perceived conflict of interest. And to the extent there is a conflict, Plaintiffs ignore the fact that DFA took steps to address it by having professionals manage its plants instead of dairy farmers.

Finally, Plaintiffs claim that DFA's investments were against its self-interest because, in Plaintiffs' view, certain of the investments did not turn out well. In this regard, Plaintiffs focus almost entirely on DFA's investment in NDH. But even if that were true, NDH is just one of many investments DFA made in processing plants over the years—investments which overwhelmingly resulted in significant gains for DFA and its members, ███████████████ ████████████████████████████████████████████ Plaintiffs cannot prove that these investments were against DFA's interest by pointing to one allegedly unsuccessful investment out of dozens. And, in any case, while Plaintiffs like to *say* that DFA lost significant sums of money on NDH, only one expert—DFA's expert, Carl Herbein—actually analyzed whether that is true, and it is not. *Id.* at 9. DFA actually *made* ██████████████ when it sold NDH in May 2009 for ████████ *Id.*; SMF ¶ 123.

In short, Plaintiffs do not have evidence that tends to exclude the possibility that DFA was acting independently when—prior to this alleged conspiracy ever occurring, and consistent

with what other cooperatives have done in the Southeast—it invested in processing plants to help secure a market for its members' milk and earn a return on its members' money.

### 4. The undisputed evidence shows that Defendants consistently acted in ways *contrary* to the alleged conspiracy.

Plaintiffs also fail to exclude the possibility of unilateral action here because of the undisputed evidence that Defendants acted in ways contrary to the alleged conspiracy.

*First*, contrary to the notion that Defendants were part of a conspiracy to suppress the pay prices of farmers and reduce the quantity of raw milk produced in Orders 5 and 7, Defendants were in fact undertaking to *increase* local raw milk production in the Southeast: SMA was instrumental in starting the production incentive program ("PIP") designed to increase local milk production; the SMA member cooperatives offered financial incentives to local farms to reward them for increasing production; and that representatives of SMA actively sought to recruit dairy farmers to the Southeast. *See* SMF ¶¶ 124-127.

*Second*, SMA and its member cooperatives have petitioned for regulatory reforms designed to put *more* money into the pockets of dairy farmers in Orders 5 and 7. For example, SMA, along with DCMA, successfully petitioned the USDA to raise Class I differentials (resulting in more money paid for milk used for Class I purposes) and increase transportation credits in Orders 5 and 7 (requiring processors to defray additional transportation costs). SMF ¶ 128; *see also* Elzinga Rep., Regulatory App. (Ex. 1).

*Third*, in December 2003  If Defendants were engaged in a conspiracy to force farmers to sell their milk through DFA or a DFA-

controlled entity, with the goal of suppressing farmer pay prices, then one would have expected that NDH, ▮▮▮▮▮▮▮▮▮▮▮▮ would have ceased purchasing milk from independent farmers and that, ▮▮▮▮▮▮▮▮▮▮▮▮▮ farmer pay prices would have fallen. In fact, exactly the opposite occurred. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and in the period following ▮▮▮▮▮▮▮▮▮▮▮▮ pay prices for farmers in Orders 5 and 7 have trended *upward* relative to farmers in other Orders. SMF ¶¶ 42, 129(c).

*Fifth*, like NDH, Dean purchases significant quantities of raw milk directly from independent dairy farmers in Orders 5 and 7. SMF ¶ 130. While Plaintiffs suggest that farmers were "foreclosed" from selling directly to Dean beginning in 2003 when Dean outsourced certain procurement functions to DMS, it is undisputed that, in 2005, Dean resumed purchasing milk directly from farmers, without using DMS, and that the volume of raw milk Dean purchased directly from farmers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮. *Id.* These purchases by Dean are totally inconsistent with Plaintiffs' claim that Defendants implemented their conspiracy by forcing farmers to market their milk through DFA or a DFA-controlled entity like DMS.[27]

*Finally*, as discussed above, there is the undisputed evidence of competition for farmers among SMA's member cooperatives. *See supra*, Part III.C.2. The fact that constituent members

---

[27] Plaintiffs have argued that the Dean Directs were nevertheless subject to the alleged conspiracy because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Nor have Plaintiffs offered any evidence that Dean and DMS *agreed* on the prices Dean paid to Dean Direct farmers.

of SMA continued during the alleged conspiracy period to compete for members—principally,

by attempting to offer more attractive pay prices, *id.*—is directly at odds with the notion that

those cooperatives had conspired to fix the very price over which they were competing.

*   *   *   *   *

In summary, Plaintiffs lack any direct evidence of the conspiracy they have alleged. And

Plaintiffs have neither been able to identify any "rational economic motive" for Defendants to

have engaged in a conspiracy to suppress the pay prices for farmers resident in Orders 5 and 7,

nor to present evidence that "tends to exclude the possibility" that the alleged conspirators were

acting independently. *Matsushita*, 475 U.S. at 588, 596. As demonstrated above, the record

makes clear that Defendants' conduct "is consistent with other, equally plausible explanations,"

*id.* at 596, and Defendants are therefore entitled to summary judgment.

## IV.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' UNILATERAL CONDUCT CLAIMS.

Summary judgment is also warranted on Plaintiffs' § 2 claims.[28]  These claims of

monopolization and attempted monopolization apply to conduct by a single firm. *Spectrum

Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993) ("§ 2 addresses the actions of single firms

that monopolize or attempt to monopolize").  Monopolization requires proof that the defendant

possessed monopoly power in the relevant market. *Verizon Commc'ns, Inc. v. Law Offices of

Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  Attempted monopolization requires proof that

the defendant had a "dangerous probability" of acquiring monopoly power in the relevant

market. *Spectrum Sports*, 506 U.S. at 456.  Monopoly power is "the power to control prices or

---

[28] Plaintiffs offer no proof of damages from their Section 2 claims. ███████████
███  For that reason alone summary judgment should be granted. *See, e.g., Zenith Radio
Corp. v. Hazeltine Research*, 395 U.S. 100, 123 (1969); *Am. Booksellers Ass'n, Inc. v. Barnes &
Noble, Inc.*, 135 F. Supp. 2d 1031, 1041-42 (N.D. Cal. 2001) (granting summary judgment to
defendant because plaintiff failed to provide any evidence of actual damage).

-66-

exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391

(1956).[29] Plaintiffs' § 2, unilateral conduct claims (Counts II-IV) fail because they cannot

establish that either DFA or Dean possesses or is likely to acquire monopoly or monopsony

power.

### A. Plaintiffs Cannot Establish that DFA Possessed, or Had a Dangerous Probability of Acquiring, Monopoly Power in the Relevant Market.

A plaintiff can attempt to demonstrate the possession of, or dangerous probability of

acquiring, monopoly power in one of two ways. "The first is by presenting direct evidence

showing the exercise of actual control over prices or the actual exclusion of competitors."

*Re/Max*, 173 F.3d at 1016 (quotation omitted). "The second is by presenting circumstantial

evidence of monopoly power by showing a high market share within a defined market." *Id.*

Plaintiffs here have neither direct nor circumstantial evidence that DFA possesses unilateral

monopoly power, or had a dangerous probability of acquiring monopoly power, in their proposed

market of Orders 5 and 7.

*First*, Plaintiffs have not identified any direct evidence of DFA monopoly power. Nor

could they. There is no evidence of DFA excluding any competitor from Plaintiffs' proposed

market—the market for raw milk (regardless of the class of use) in Orders 5 and 7. *See* Rausser

Rpt. at 50-67 (Ex. 5). At most, Plaintiffs could show that DFA successfully competed against

other raw milk suppliers for the business of certain processors. But, as explained above, nothing

in DFA's contracts precludes others from competing away business by offering superior prices

---

[29] When exercised by a buyer, rather than a seller, monopoly power is sometimes called
"monopsony power." *United States v. Syufy Enters.*, 903 F.2d 659, 663 n.4 (9th Cir. 1990);
*White Mule Co. v. ATC Leasing Co.*, 540 F. Supp. 2d 869, 878 n.4 (N.D. Ohio 2008)
Monopsonization and attempted monopsonization claims are subject to the same standards as
their monopolization counterparts. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
549 U.S. 312, 315 (2007); *White Mule*, 540 F. Supp. 2d at 886.

or services.[30] *Supra*, Part III.C.3.a.2. Nor is there any evidence of DFA possessing unilateral power over prices in Plaintiffs' proposed market. Quite the contrary, Plaintiffs' position is that a *cartel* suppressed the prices plants paid for milk, and not that DFA as monopolist could and did raise those prices.

*Second*, there is no circumstantial evidence of DFA possessing, or having a dangerous probability of acquiring, unilateral monopoly power. To prove monopoly power with circumstantial evidence, the starting point is the defendant's market share within a properly defined market. *Re/Max*, 173 F.3d at 1016. But "[m]arket share, standing alone, is insufficient to establish market power as a matter of law and is only the starting point for determining whether monopoly power exists." *Smith Wholesale Co. v. Phillip Morris USA, Inc.*, No. 2:03-CV-221, 2005 WL 1981452, at *8 (E.D. Tenn. Aug. 17, 2005) (Greer, J.), *aff'd*, 219 F. App'x 398 (6th Cir. 2007). "[O]ther factors [may] qualify market share inferences, such as entry conditions and the ability to control price or to exclude competition." *Va. Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 600 (W.D. Va. 2000). For these reasons, generally "expert proof is required to prove antitrust claims merely because the knowledge of the markets required to prove such a claim is generally beyond that of a lay person."[31] *Monsanto*

---

[30] And even if ███████████████████████████████████████████████████ ████████████████████████████████ DFA's contracts gave it some measure of contract power; that is not tantamount to *monopoly* power. *See Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1219 (11th Cir. 2002) ("[T]he mere existence and exercise of contract power does not show that a defendant had market power or violated the law."). "In other words, courts must attempt to ascertain a defendant's economic position in the relevant market, rather than its power pursuant to a particular contract, when considering whether a defendant has market power." *Id.*

[31] The Sixth Circuit has reserved judgment on the question whether expert testimony analyzing the market is necessary in all § 2 cases. Nevertheless, in the cases cited above, it has recognized the need for a "sound economic basis for assessing the market" and has rejected litigants'

*Co. v. Trantham*, 156 F. Supp. 2d 855, 862 n.3 (W.D. Tenn. 2001); *see also Va. Vermiculite*, 108 F. Supp. 2d at 601 ("economic inferences necessary to establish actual monopoly power cannot be drawn . . . without the aid of antitrust economics testimony").

Here, Plaintiffs' lead expert, Dr. Rausser, conducted no analysis of DFA's market share or market power, and included no opinions on the subject in his reports. And he confirmed that ███████████████████████████████████████████████[32] Plaintiffs lack sufficient evidence—direct or circumstantial— to support their monopolization or attempted monopolization claim against DFA.

### B. Plaintiffs Cannot Establish that Dean Possessed, or Had a Dangerous Probability of Acquiring, Monopsony Power in the Relevant Market.

There also is no direct or circumstantial evidence that Dean possessed monopsony power in the market to buy raw milk, nor ever had a dangerous probability of acquiring such power. The record shows that prices for raw milk rose throughout the period in question. While Plaintiffs attempted to prove monopsony power circumstantially through market share, the market share they attribute to Dean is insufficient to support monopsonization or even attempted monopsonization.

Plaintiffs' experts have purported to calculate Dean's share of bottling capacity in Orders 5 and 7 at various points in time.[33] While they have reached different conclusions, notably *all* of

---

attempts to rely upon "lay testimony and . . . internal [] marketing documents" for that purpose. *Ky. Speedway*, 588 F.3d at 919.

[32] Professor Scott also offers no opinions on DFA's market power, despite noting ████████████

[33] Although Plaintiffs' experts examine bottling "capacity," this is not the relevant market Plaintiffs allege was monopsonized. Estimates of Dean's share of bottling capacity, therefore, are insufficient to provide circumstantial evidence of Dean's share within the market alleged, i.e., purchases of raw Grade A milk by processing plants.

their market share estimates are under ██. SMF ¶ 135. Plaintiffs' proposed class expert, Dr.

John C. Beyer, estimated Dean's share of bottling capacity in Orders 5 and 7 as approximately



Plaintiffs' proposed merits experts reached

similar conclusions: they estimated Dean's share of bottling capacity to be approximately ████

████ respectively, as of 2007.[34] ████████████████████

████████ These ranges are below the market share levels required to support a claim even

for attempted monopolization, let alone monopolization. *See, e.g., Spirit Airlines, Inc. v. Nw.*

*Airlines, Inc.*, 431 F.3d 917, 935 (6th Cir. 2005) ("Judge Learned Hand enunciated what has

become the classic explanation of when market share becomes large enough to constitute a

monopoly: 'over ninety . . . percent[] is enough to constitute a monopoly; it is doubtful whether

sixty or sixty-four percent would be enough . . .'"); *Smith Wholesale*, 2005 WL 1981452, at *8

(56% market share, without more, insufficient to establish attempted monopolization).

Even a high market share (which has not been shown here) would just be the "starting

point" for determining whether monopsony power exists or is dangerously probable. *Am.*

*Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185

F.3d 606, 623 (6th Cir. 1999). A firm lacks market power when competitors can easily enter the

market or possess excess capacity. *See Smith Wholesale*, 2005 WL 1981452, at *9-10.

Expansion of capacity by Dean's competitors belies Plaintiffs' suggestion that high entry barriers

---

[34] Professors Rausser and Scott also estimate market shares for earlier points in time (1998 and
2001, respectively), but their estimates aggregate shares for Suiza and legacy Dean even though
the Dean-Suiza merger had not yet occurred. In any event, they likewise totaled less than ████
████████████████████████████████████

exist. And according to Plaintiffs' own experts, both existing and new rivals of Dean have expanded or purchased new facilities in Orders 5 and 7.[35] *See supra*, Part III.C.4; SMF ¶ 136.

Nor is there any evidence that Dean "controlled" the prices it paid for raw milk, or excluded other processors from purchasing raw milk. The prices Dean pays for raw milk are predominantly determined by federal regulation (which establishes the minimum class price a processor must pay, as well as other obligations such as payments to the transportation credit balancing fund) and marketing agencies (such as DCMA, which sets the over-order premium). *See supra* at p. 7. Further, there is no evidence that Dean reduced input prices by artificially reducing its demand. *See* Beyer Reply Rpt., Ex. 2 with Defendants' annotations (Ex. 9); *see generally* Rausser Rpt. (Ex. 5); Scott Rpt. (Ex. 7). No evidence here shows that Dean (or its rivals) purchased less raw milk than they would have but-for some anticompetitive acts. In fact, Plaintiffs' experts calculate that consumption of raw milk has steadily increased. Beyer Reply Rpt., Ex. 2 with Defendants' annotations (Ex. 9); Scott Rpt., Exs. 9-10 (Ex. 7). Plaintiffs' experts also calculated that ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████

## C. Plaintiffs' Shared Monopoly Theory Fails as a Matter of Law.

Plaintiffs try to salvage their unilateral conduct claims by attempting to aggregate the market shares of Dean, NDH, and DFA. *See, e.g.*, Compl. ¶¶ 137, 156; Rausser Rpt. at 104-05 (Ex. 5). Courts, however, have consistently rejected attempts to aggregate the market shares of

---

[35] Though one witness guessed a new plant could cost between ██████████████ undisputed evidence of plants actually constructed show this figure is far lower, around $10-$12 million. SMF ¶ 137. ███████████████████████████████████████████████
███████████████████████████████████

separate entities for purposes of monopolization or attempted monopolization claims. *See, e.g.,*

*Smith Wholesale*, 219 F. App'x at 409 ("[C]onsidering a combination of market shares of more

than one company is an inappropriate measure of [the defendant's] market power. Market power

under § 2 of the Sherman Act is the ability of a *single seller* to raise prices and restrict output.")

(emphasis added, citations and internal quotations omitted).

## V.    PLAINTIFFS' CLAIM OF DAMAGES DUE TO "FLOODING" IS BARRED BY THE FILED-RATE DOCTRINE.

As discussed above, one aspect of Plaintiffs' case is their allegation that Defendants

"distort[ed] Southeast milk prices by 'flooding' the Southeast with excessive quantities of milk

from other areas." Pls.' Mot. for Class Cert. (Dkt # 287) at 15; *see also* Compl. ¶¶ 3, 87.

According to Plaintiffs, "flooding reduces the federal minimum blend prices for milk," thereby

"ensur[ing] that Southeast prices are artificially reduced." Pls.' Mot. for Class Cert. at 15. In Dr.

Rausser's words,

To calculate the damages he claims were caused by flooding—his so-called Stage 1

damages—Dr. Rausser estimates

It is clear that

this Stage 1 damages claim is barred by the filed-rate doctrine. *Carlin v. Dairy America, Inc.*,

690 F. Supp. 2d 1128, 1133-41 (E.D. Cal. 2010) (filed-rate doctrine "bars 'challenges under state

law and federal antitrust laws to rates set by federal agencies.'") (quotation omitted).

This Court previously addressed the filed-rate doctrine in response to a motion to dismiss filed by certain Defendants, and held that the doctrine did not require dismissal of Plaintiffs' claims at that stage of the case. *See In re Se. Milk Antitrust Litig.*, No. 2:08-MD-1000, 2008 WL 2368212 (E.D. Tenn. June 6, 2008). Tellingly, based upon the Plaintiffs' opposition to the Motion, the Court found that Plaintiffs did not appear to be challenging the federally established minimum blend prices, but rather only the over-order premiums paid to dairy farmers, which are not set by the federal government. *Id.* at *7.

Much has changed in the two years since the Court's initial evaluation of the filed rate doctrine. The facts established in discovery have made clear that (i) Plaintiffs' "flooding" allegations present a direct challenge to the federal minimum blend price; and (ii) the federal minimum blend price is in fact a price set by the USDA through its federal market administrator,[36] a government employee tasked with regulating minimum prices in the dairy industry. SMF ¶ 139. Thus, it is now clear that the Plaintiffs are challenging both over-order premiums *and the federal minimum blend price*, and that Plaintiffs' Stage 1 damages claim is based entirely on an alleged suppression of that federal minimum blend price.

The law has changed, too. At the time of this Court's prior ruling, no court had specifically addressed the question of whether federal minimum blend prices are subject to the filed rate doctrine. Since then, another district court has done exactly that and held that they are. *See Carlin*, 690 F. Supp. 2d at 1133-41. The *Carlin* case involved claims by a putative class of dairy farmers that the defendants—a dairy cooperative and a common marketing agency—had

---

[36] Indeed, contrary to Plaintiffs' claims that Defendants can flood the Southeast with "excessive" supplies of "outside" milk and depress the blend price, the federal market administrator establishes a limit that caps the amount of milk that can be delivered to manufacturing plants and pooled on an Order. SMF ¶ 140. These diversion limitations are absolute and cannot be violated—if it appears that a cooperative or producer is attempting to load the pool, the market administrator will kick the milk off the pool.

reported incorrect information to the National Agricultural Statistics Service ("NASS"), which

information is used to calculate the federal minimum prices for raw milk, with the result being

that the federal minimum prices significantly lower than they should have been. *Id.* at 1129-31.

The Court held that filed rate doctrine applies and barred the claim:

> The power of the Secretary to regulate market conditions for the
> sale of raw milk is rooted in the Commerce Clause as expressed in
> the Declaration of Conditions for the Agricultural Adjustment Act
> at 7 U.S.C. § 601. . . . Application of the filed rate doctrine to rates
> set by the Secretary for minimum prices for raw milk is consistent
> with both the purposes of the Agricultural Adjustment Act and the
> animating purposes of the filed rate doctrine. . . . [T]he non-
> justiciability strand of the filed rate doctrine supports Congress's
> right to allocate jurisdiction, and therefore justiciability, of
> commodity pricing for goods flowing in interstate commerce away
> from courts and to an agency of the federal government. . . .
>
> . . . The monetary damages Plaintiffs claim are to be determined, as
> the court understands it, by calculating the difference between raw
> milk minimum prices as set forth in the FMMOs [Federal Milk
> Marketing Orders] and what those prices would have been had
> Defendants not submitted [incorrect information to the NASS]. In
> other words, Plaintiffs' damages can only be ascertained by
> reference to rates set by the Secretary pursuant to the FMMOs
> during the time period in question. ***This is precisely what the filed
> rate doctrine forbids***.

*Id.* at 1135, 1136 (emphasis added).[37]

Plaintiffs' Stage 1 "flooding" damages "can only be ascertained by reference to rates set

by the Secretary pursuant to the FMMOs," *id.* at 1136—and involve a calculation of what the

Plaintiffs believe the federal minimum blend prices should have been. That claim for damages,

like the claim in *Carlin*, is barred by the filed-rate doctrine, and Defendants are therefore entitled

to summary judgment on Plaintiffs' Stage 1 damage claim.

---

[37] The *Carlin* court noted that this Court's prior decision not to apply the filed-rate doctrine had
been based on the fact that "the rates being challenged were not the minimum blend rate
determined by the Secretary, but were over-order premiums above the minimum rates that were
allegedly manipulated by the defendants' anti-competitive behavior." 690 F. Supp. 2d at 1134.

## CONCLUSION

For all of these reasons, Defendants are entitled to summary judgment on Plaintiffs' antitrust claims.

Dated:  July 27, 2010                           Respectfully submitted,


                                     _____*/s/ Steven R. Kuney*_____
                                     Steven R. Kuney
                                     Kevin Hardy
                                     WILLIAMS & CONNOLLY LLP
                                     725 Twelfth Street, N.W.
                                     Washington, DC  20005
                                     Tel:  (202) 434-5000
                                     skuney@wc.com
                                     khardy@wc.com

                                     W. Todd Miller
                                     BAKER & MILLER PLLC
                                     2401 Pennsylvania Avenue, N.W.
                                     Suite 300
                                     Washington, DC  20037
                                     Tel:  (202) 663-7820
                                     tmiller@bakerandmiller.com

                                     G.P. Gaby
                                     MILLIGAN & COLEMAN
                                     230 West Depot Street
                                     P.O. Box 1060
                                     Greeneville, TN  37744-1060
                                     Tel:  (423) 639-6811
                                     sweems@milligancoleman.com

                                     *Counsel for Defendants*
                                     *Dairy Farmers of America, Mid-Am Capital*
                                     *LLC, and Dairy Marketing Services, LLC*

*On behalf of all Defendants, with permission:*

Paul T. Denis
Paul H. Friedman
Dechert LLP
1775 I Street, N.W.
Washington, DC 20006
Tel: (202) 261-3300
paul.denis@dechert.com
paul.friedman@dechert.com
paul.frangie@dechert.com

Carolyn H. Feeney
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Tel: (215) 994-4000
carolyn.feeney@dechert.com
david.stanoch@dechert.com

William C. Bovender
Mark S. Dessauer
Hunter, Smith & Davis, LLP
1212 North Eastman Road
Kingsport, TN 37664
Tel: (423) 378-8840
bovender@hsdlaw.com
dessauer@hsdlaw.com

*Attorneys for Defendant*
*Dean Foods Company*


Jerry L. Beane
Kay Lynn Brumbaugh
ANDREWS KURTH LLP
1717 Main Street
Suite 3700
Dallas, TX 75201
Tel: 214-659-4000
jerrybeane@andrewskurth.com
kaylynnbrumbaugh@andrewskurth.com

Steven E. Kramer
Thomas M. Hale
KRAMER, RAYSON, LEAKE, RODGERS
& MORGAN, LLP
800 S. Gay Street, Suite 2500
P. O. Box 629
Knoxville, TN 37901-0629
Tel: 865-525-5134
skramer@kramer-rayson.com
tomhale@kramer-rayson.com

*Counsel for Defendant National Dairy Holdings, LP*


W. Gordon Dobie
Kari M. Rollins
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-9703
Tel: 312-558-5600
wdobie@winston.com
karollins@winston.com

Craig V. Gabbert, Jr.
J. David McDowell
HARWELL HOWARD FYNE GABBERT
& MANNER, P.C.
315 Deaderick Street, Suite 1800
Nashville, TN 37238-1800
Tel: 615-256-0500
cvg@h3gm.com
jdm@h3gm.com

*Counsel for Defendant Southern Marketing*
*Agency, Inc.*

Andrew T. Wampler
Robert L. Arrington
WILSON WORLEY MOORE GAMBLE &
STOUT, PC
2021 Meadowview Lane, 2nd Floor
Eastman Credit Union Building
P. O. Box 88
Kingsport, TN 37662
Tel: 423-723-0400
awampler@wwmgs.com
rarrington@wwmgs.com

Kelly B. Tidwell
PATTON, TIDWELL & SCHROEDER,
LLP
4605 Texas Boulevard
Texarkana, TX 75503
Tel: 903-792-7080
kbt@texarkanalaw.com

*Counsel for Defendant James Baird*

Edward T. Brading
Bradley E. Griffith
HERNDON, COLEMAN, BRADING &
McKEE
104 E. Main Street
Johnson City, TN 37604
Tel: 423-434-4700
ebrading@lawyerfirm.com
bgriffith@lawyerfirm.com

Charles W. German
Brandon J.B. Boulware
ROUSE HENDRICKS GERMAN MAY
P.C.
1010 Walnut, Suite 400
Kansas City, MO 64106
Tel: 816-471-7700
Charleyg@rhgm.com
brandonb@rhgm.com

*Counsel for Defendant Gerald Bos*

Richard W. Pectol
PECTOL & MILES
202 East Unaka Avenue
Johnson City, TN 37601
Tel: 423-928-6106
rwpectol@earthlink.net

Daniel D. Crabtree
David E. Everson
STINSON MORRISON HECKER LLP
1201 Walnut, Suite 2900
Kansas City, MO 64106
Tel: 913-344-6750 (Crabtree)
Tel: 816-842-8600 (Everson)
dcrabtree@stinson.com
deverson@stinson.com

*Counsel for Defendant Gary Hanman*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of July 2010, the foregoing JOINT MEMORANDUM OF ALL DEFENDANTS REGARDING COUNTS I THROUGH V was served by electronic mail upon the following counsel of record:

Robert G. Abrams
Terry L. Sullivan
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004
Tel: (202) 783-0800
abramsr@howrey.com
sullivant@howrey.com

*Attorneys for Dairy Farmer Plaintiffs*

Richard L. Wyatt, Jr.
Todd M. Stenerson
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, DC 20006
Tel: (202) 955-1500
rwyatt@hunton.com
tstenerson@hunton.com

*Attorneys for Retailer Plaintiffs*

And all other counsel of record via electronic mail.


/s/ Carl R. Metz
Carl R. Metz