# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### GREENEVILLE DIVISION

|  |  |  |
|---|---|---|
| IN RE SOUTHEASTERN MILK ANTITRUST LITIGATION | ) ) ) | **CASE NO. 2:08-MD-01000** |
|  | ) ) | **JUDGE GREER** |
| THIS DOCUMENT RELATES TO: | ) ) | **MAGISTRATE JUDGE INMAN** |
| *Sweetwater Valley Farm, Inc., et al. v. Dean Foods Co., et al.*, No. 2:07-cv-208 | ) ) ) ) | |

## JOINT REPLY OF ALL DEFENDANTS IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT ON COUNTS I THROUGH V

### (MOTION AND OPENING BRIEF FILED AT DKT. # 839-840;
### RESPONSE BRIEF FILED AT DKT. # 919)

### [FILED UNDER SEAL PURSUANT TO 9/22/09 STANDING ORDER]

September 17, 2010

# TABLE OF CONTENTS

I.   PLAINTIFFS MUST, BUT CANNOT, PROVE THAT ORDERS 5 AND 7 ARE A RELEVANT GEOGRAPHIC MARKET. .......................................................................... 1

    A.   All of Plaintiffs' Antitrust Claims Require Proof of a Geographic Market ............ 1

        1.   Plaintiffs' Section 1 conspiracy claim must be evaluated under the Rule of Reason, which requires proof of a geographic market ............. 1

        2.   Plaintiffs' Section 2 conspiracy claim also requires proof of a relevant geographic market ....................................................................... 4

    B.   Plaintiffs' Approach to Market Definition Is Based on an Incorrect Legal Test for Defining a Relevant Geographic Market ...................................................... 5

    C.   Plaintiffs Lack Sufficient Evidence to Raise a Material Dispute of Fact as to the Relevant Geographic Market. ......................................................................... 11

II.  PLAINTIFFS HAVE NOT SHOWN INJURY *CAUSED BY* DEFENDANTS' ALLEGEDLY ANTICOMPETITIVE CONDUCT. ........................................................ 13

    A.   Dr. Rausser's Statistical Analysis Does Not Show Injury Caused By Defendants' Allegedly Anticompetitive Behavior .................................................. 13

    B.   Plaintiffs' Assertions About Monopsony Theory and the Prices Plants Paid for Milk Do Not Raise a Triable Issue of Fact about Antitrust Injury ........... 14

III. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS OF CONSPIRACY. ........................................................................................ 15

    A.   Plaintiffs Have Utterly Ignored the Meaning of the Term "Direct Evidence." ..... 15

    B.   Plaintiffs Have Failed To Demonstrate that Their Alleged Conspiracy Made Rational, Economic Sense for the Alleged Conspirators ..................................... 16

        1.   Plaintiffs lack a rational motivation for the alleged processor co-conspirators to participate in this conspiracy ............................................ 17

        2.   Plaintiffs lack a rational motivation for the alleged coop and common marketing agency co-conspirators to participate in this conspiracy. .......... 18

    C.   Plaintiffs Have Failed To Come Forward with Evidence that Tends To Exclude Independent Action as the Explanation for Defendants' Conduct. ......... 19

        1.   The record evidence shows a rational, non-conspiratorial explanation for the full-supply agreements. ................................................................. 20

i

        2.    The record evidence shows a rational, non-conspiratorial explanation for the other conduct about which Plaintiffs complain. ..............................21

IV.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' UNILATERAL CONDUCT CLAIMS. ........................................................................ 21

    A.    The Sixth Circuit Does Not Recognize a Theory of Shared Monopoly. ...............21

    B.    Plaintiffs Lack Evidence of DFA Monopoly Power. ...............................................22

    C.    Plaintiffs Have Failed To Show that Dean Possesses Monopsony Power.............24

V.    PLAINTIFFS' CLAIM OF DAMAGES DUE TO "FLOODING" IS BARRED BY THE FILED-RATE DOCTRINE. .......................................................................... 25

CONCLUSION..................................................................................................................... 25

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Bridgeport Music, Inc. v. Crited Music, Inc.*, No. 3:01-0916, 2006 WL 1129378
(M.D. Tenn. Apr. 25, 2006) ......................................................................................6

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)...........................10

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...........................................7, 11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ............................................11

*Campfield v. State Farm Mutual Automobile Insurance Co.*, 532 F.3d 1111
(10th Cir. 2008)...........................................................................................................9

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008 (6th Cir. 2005).................2, 4

*Carlin v. Dairy America, Inc.*, 690 F. Supp. 2d 1128 (E.D. Cal. 2010) .......................................25

*In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999)......................................................16

*Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000) ...................15

*Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F. Supp. 608 (M.D. Ga. 1981)................................12

*Ky. Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908 (6th Cir. 2009) .....................................4, 5, 10

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007)....................................10

*Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*,
334 U.S. 219 (1948)....................................................................................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)........................16, 19, 20

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726
(6th Cir. 2008)..............................................................................................................5

*Monsanto Co. v. Trantham*, 156 F. Supp. 2d 855 (W.D. Tenn. 2001) .........................................23

*Re/Max Int'l v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999) ................................................5, 7

*Smith Wholesale Co. v. Philip Morris USA, Inc.*, 219 F. App'x 398 (6th Cir. 2007)...................22

*Spectrum Sports Inc. v. McQuillan*, 506 U.S. 447 (1993) .............................................................22

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917 (6th Cir. 2005)........................................22

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)................................................7, 8, 11

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ....................................................................8, 9

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ..............................................................15

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ................................................................8

*United States v. Rice Growers Ass'n of California*, Civ. No. S-84-1066 EJG,
    1986 WL 12562 (E.D. Cal. Jan. 31, 1986) ..........................................................................9

*Va. Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549 (W.D. Va. 2000) ...........23

## OTHER AUTHORITIES

7 U.S.C. § 291 (2006)..................................................................................................................23

Fed. R. Civ. P. 56........................................................................................................................1

Fed. R. Civ. P. 56(e) ..................................................................................................................16

Fed. R. Evid. 702 .......................................................................................................................14

Despite engaging in a "paper dump" that violates the Court's January 2009 scheduling order and Rule 56, Plaintiffs have failed to come forward with admissible evidence sufficient to create a genuine issue of material fact on their antitrust claims. *See* Mem. Op. at 2-3 & n.3 (Dkt. # 863); Pls.' Statement of Additional Material Facts (Dkt. # 920) (containing 325 paragraphs of supposedly material "facts," not including sub-parts, along with 573 exhibits). While it is not possible or necessary to respond to every assertion in Plaintiffs' filings in a 25-page reply brief, Defendants set forth here their response to the main issues presented by Plaintiffs' Response.

## I. PLAINTIFFS MUST, BUT CANNOT, PROVE THAT ORDERS 5 AND 7 ARE A RELEVANT GEOGRAPHIC MARKET.

Plaintiffs advance three arguments to try to avoid summary judgment on their antitrust claims for failure to prove that Orders 5 and 7 are a relevant geographic market. The first two present pure legal issues for the Court—do Plaintiffs' conspiracy claims require proof of a relevant geographic market, and what is the proper legal standard for defining that market? Plaintiffs' third argument, where they present facts that supposedly support their claimed market, assumes that the Court agrees with them regarding the applicable legal standard. If the Court does not, then Plaintiffs effectively concede that Defendants are entitled to summary judgment.

### A. All of Plaintiffs' Antitrust Claims Require Proof of a Geographic Market.

Plaintiffs' first effort to avoid summary judgment on their antitrust claims raises the following question of law—do all of Plaintiffs' antitrust claims require proof of a relevant geographic market? Plaintiffs concede that three of their five claims do (Counts II-IV of the Complaint), but argue that their conspiracy claims (Counts I and V) do not.

#### 1. Plaintiffs' Section 1 conspiracy claim must be evaluated under the Rule of Reason, which requires proof of a geographic market.

The default standard for evaluating claims under Section 1 of the Sherman Act is the Rule of Reason, which requires proof of harm to competition in a relevant geographic market.

*See Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012-14 (6th Cir. 2005). Indeed, in the Sixth Circuit, *"[t]here is an automatic presumption in favor of the rule of reason standard."* *Id.* at 1012 (emphasis added). "Therefore, the *per se* rule should be applied *only in clear cut cases* of trade restraints that are so unreasonably anticompetitive that they present *straightforward questions* for reviewing courts." *Id.* (emphasis added) (internal quotation omitted). Plaintiffs' Section 1 conspiracy claim (Count V) does not come close to meeting this standard for overcoming the presumptive application of the Rule of Reason.[1]

Plaintiffs' explanation for why they believe their alleged conspiracy should be evaluated under the *per se* standard amounts to just two sentences. *See* Pls.' Resp. at 8. Plaintiffs claim that the alleged conspiracy, which they concede has "vertical elements," involves "horizontal competitors DFA, NDH, and Dean—all of which process fluid milk and all of which should compete for the purchase of such milk." *Id.* Plaintiffs then simply assert that the "vertical elements" of the conspiracy do not alter its "horizontal nature," and that the Court should treat the conspiracy alleged here like a garden-variety horizontal price-fixing case and apply the *per se* standard. *Id.* Plaintiffs' arguments fail for a variety of reasons.

*First*, Plaintiffs have alleged a massive conspiracy, involving multiple firms and individuals at various levels of the milk supply chain, including the heads of dairy cooperatives (e.g., James Baird, who heads the Lone Star cooperative), common marketing agencies (e.g., SMA and DMS), dairy processors (e.g., Dean, NDH, and Kroger), and vertically-integrated cooperatives that own interests in processing plants (e.g., DFA and Prairie Farms). *See* Compl. ¶¶ 3, 43 (Dkt. # 111). These entities are not all horizontal competitors. DMS and SMA, for

---

[1] Determining whether conduct challenged under Section 1 of the Sherman Act should be subject to *per se* treatment or analyzed under the Rule of Reason is a question of law for the Court. *Id.* at 1012-14 (deciding as a matter of law whether the *per se* standard applied).

example, are common milk marketing agencies. *See* Statement of Undisputed Material Facts in Supp. of Defs.' Jt. Mot. for Summ. J. ("SMF") ¶¶ 2(d)-(e) (Dkt. # 841). Neither processes raw milk. Dean and NDH, in contrast, purchase and process (but do not produce, market or sell) raw milk. SMF ¶¶ 2(a)-(b). And, for its part, DFA is a vertically-integrated cooperative that markets its members' milk and, like many other cooperatives, also owns interests in some plants. SMF ¶¶ 2(c), 118, 121. Plaintiffs claim that all of these entities—which plainly are not all "horizontal" competitors—are conspiring with one another to harm the plaintiff class by suppressing pay prices. Plaintiffs cannot plausibly argue that the conspiracy they have alleged is simply a horizontal conspiracy among *milk processors* to reduce the price plants pay for milk (which is *different* from the farmers' pay price, *see* Jt. Mem. of All Defs. Regarding Counts I-V ("Defs.' Br.") at 7-9 (Dkt. # 840)). Indeed, when they claim that one of the key alleged conspirators dominates the market for the *purchase* of raw milk (Dean, a buyer), and another of the alleged key conspirators dominates the market for the *sale* of raw milk (DFA, a seller), Plaintiffs cannot credibly claim that such a conspiracy is "horizontal" in nature.

 *Second*, the conspiracy Plaintiffs describe (in their lengthy contention interrogatory response, and in their expert reports (Defs.' Exs. 5, 184)) is *not* a conspiracy among milk bottlers to fix the prices those bottlers pay for milk. As Defendants explained in their opening brief— and Plaintiffs do not disagree in their response—***Plaintiffs did not analyze, have not proven, and do not claim damages associated with the prices that plants paid for raw milk***. Rather, as Plaintiffs repeatedly state, their case is about the alleged suppression of *farmers' pay prices*. *See* Rausser Dep. at 105 (Defs.' Ex. 53) (testifying that he analyzed the prices farmers received, not plant prices). But Plaintiffs do not simply claim that a group of horizontal competitors "fixed" pay prices for farmers. The conspiracy alleged here is far more complex—among the key acts supposedly in furtherance of it are supply agreements between cooperatives and processors,

3

agreements between cooperatives relating to allegedly "flooding" the Southeast with excess milk, Dean's decision to outsource its raw milk procurement functions to a common marketing agency (DMS), and DFA's decisions to invest in milk processing plants. *See* Pls.' Am. & Supp. Resp. to All Defs.' Joint First Set of Interrogs. (Defs.' Ex. 184). ***One aspect*** of that complicated conspiracy is that the conspirators' (cooperatives and processors alike) actions allegedly had the effect of fixing and suppressing pay prices for farmers.[2] Indeed, the Complaint lists this alleged fixing and suppressing of pay prices as just ***one*** of ***nine*** acts supposedly in furtherance of Plaintiffs' Section 1 conspiracy. Compl. ¶ 164(b) (Dkt. # 111). But tellingly, that same conduct is also described as anticompetitive *unilateral conduct* by entities operating at different levels of the market—e.g., monopolization by DFA, and monopsonization by Dean. *Id.* ¶¶ 146(b), 153(b).

There is no conceivable basis for claiming that this multi-actor, multi-level, multi-faceted alleged conspiracy presents a "clear cut case" involving "straightforward questions" under the Sherman Act. *Care Heating*, 427 F.3d at 1012. Yet that is what is required in order to overcome the "automatic presumption in favor of the rule of reason standard." *Id.* Because Plaintiffs cannot overcome that presumption, they must show harm to competition in a properly defined geographic market if they are to prevail on their Section 1 claim. *Id.* at 1012-14.

### 2. Plaintiffs' Section 2 conspiracy claim also requires proof of a relevant geographic market.

Under Sixth Circuit law, Plaintiffs' claim of conspiracy under Section 2 of the Sherman Act also requires proof of a relevant geographic market. In *Kentucky Speedway, LLC v.*

---

[2] Plaintiffs also suggest that they have asserted a *per se* horizontal market allocation claim, but they never describe such a claim. To the extent Plaintiffs are referring to the decision of processors to contract with cooperatives for the supply of milk, or to outsource procurement to marketing agencies (instead of the processors procuring milk by themselves), such arrangements clearly are *vertical* in nature (a contract between a supplier and purchaser). Moreover, Plaintiffs' lead expert conceded that such agreements are not necessarily anticompetitive, thus underscoring that *per se* treatment would be inappropriate. *See* Rausser Dep. at 95-99 (Defs.' Ex. 53).

4

*NASCAR, Inc.*, the court held that the plaintiff "lack[ed] the ability to define the relevant markets necessary to succeed on its claims," and on that basis affirmed an award of summary judgment to the defendant on monopoly, attempted monopoly, ***and conspiracy to monopolize*** claims. 588 F.3d 908, 916-17, 919 (6th Cir. 2009). Similarly, in *Re/Max Int'l, Inc. v. Realty One, Inc.*, the Sixth Circuit affirmed the dismissal of a conspiracy to monopolize counterclaim for failure to support the proposed geographic market. 173 F.3d 995, 1024 (6th Cir. 1999); *see also Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 737 (6th Cir. 2008) (dismissing § 2 conspiracy claim because proposed geographic market was too narrow).

Plaintiffs' argument that they must make only a "minimal showing" of a geographic market for purposes of their Section 2 conspiracy claim is based on the law of *other* circuits. *See* Pls.' Resp. at 9.[3] But whatever the law in other circuits may be, it is not the law that governs here. Plaintiffs' Section 2 conspiracy claim requires proof of a relevant geographic market.[4]

**B.      Plaintiffs' Approach to Market Definition Is Based on an Incorrect Legal Test for Defining a Relevant Geographic Market.**

Plaintiffs' second argument regarding the geographic market also presents a pure legal question for the Court to decide—what is the proper legal standard for defining the relevant geographic market in this case? Should the market be defined with reference to the area of effective competition for all buyers and sellers in the marketplace, as the Supreme Court and

---

[3] Plaintiffs do cite to this Court's prior opinion, in which the Court cited the law of *other* circuits in holding that "it is doubtful that the contours of the geographic market must be as precisely defined, if at all, in a conspiracy to monopolize claim." Mem. Op. at 36 (Dkt. # 863). As explained in Defendants' Motion for Reconsideration (Dkt. # 952), the Court's statement appears to be inconsistent with the Sixth Circuit precedent cited above.

[4] In a footnote, Plaintiffs claim, without elaboration, that their claims can proceed, even if the Court were to grant summary judgment in Defendants' favor on the geographic market, because "there is direct evidence that the anticompetitive arrangement actually had detrimental effects on competition." Pls.' Resp. at 9 n.4. Plaintiffs provide no basis for any such finding.

5

Sixth Circuit have instructed, or should it be defined solely with reference to the plaintiff class of dairy farmers, who represent only *some* of the sellers in the marketplace, as Plaintiffs argue? To avoid summary judgment, Plaintiffs must convince this Court that the latter standard—which directly contradicts the legal standard for market definition set by the Supreme Court and Sixth Circuit—is the proper way to define the geographic market in this case.

Plaintiffs do not dispute one of the most important commercial realities facing buyers and sellers of raw milk in Orders 5 and 7—namely, that ███ *of the raw milk pooled on Orders 5 and 7 comes from farmers located outside of those Orders.* Pls.' Resp. to SMF ¶ 7. And in recent years as much as ███ of the raw milk produced in Orders 5 and 7 is shipped elsewhere, primarily to Florida (Order 6). SMF ¶ 31. It is also beyond dispute that the regulatory boundaries that define the Federal Orders do not restrict where farmers sell their milk, or where processing plants purchase milk, SMF ¶ 37—indeed, many of the regulations of the federal system are designed to *encourage* the necessary movement of milk across order boundaries. *See* Expert Report of Kenneth G. Elzinga, Ph.D. ("Elzinga Rpt.") at 25-26 & n.15 (Defs.' Ex. 1).[5]

---

[5] Plaintiffs do *not* dispute that roughly half of the milk pooled on Orders 5 and 7 comes from farmers in other Orders. *See* Pls.' Resp. to SMF ¶ 7. But they nevertheless try to create the *appearance* of a dispute where none exists. Plaintiffs' response to Defendants' Statement of Undisputed Material Facts includes lengthy arguments challenging the *legal significance* of facts related to the issue of market definition. *See, e.g.*, Pls.' Resp. to SMF ¶¶ 30-32. Such argument serves no purpose other than to obscure the undisputed nature of the factual evidence before the Court. *See Bridgeport Music, Inc. v. Crited Music, Inc.*, No. 3:01-0916, 2006 WL 1129378, at *3 (M.D. Tenn. Apr. 25, 2006) ("[T]he parties should follow the Local Rules and either answer disputed, undisputed, or undisputed for the purpose of the motion. . . . *Lengthy legal arguments are not necessary or wanted in the statement of uncontested facts.*").

In their response to certain paragraphs (e.g., ¶ 30), Plaintiffs assert that, in prior years, the volume of milk pooled on Orders 5 and 7, but produced in other Orders, is overstated as a result of Defendants' alleged "flooding" of the Southeast with excess outside milk. ███████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████

6

These undisputed market dynamics mean that, if this Court follows the test repeatedly articulated by the Supreme Court and the Sixth Circuit for defining relevant geographic markets, then the Plaintiffs cannot as a matter of law sustain their claim that Orders 5 and 7 constitute the relevant market here. In the words of the Supreme Court, the relevant geographic market in an antitrust case is "the area of effective competition." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). "The geographic market selected *must*, therefore, both *correspond to the commercial realities of the industry* and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-67 (1962) (emphasis added, quotations and footnote omitted). Proposed markets that *ignore* a substantial portion of commerce must be rejected. *Re/Max Int'l v. Realty One, Inc.*, 173 F.3d 995, 1017 (6th Cir. 1999) ("when the evidence indicates that a large proportion of consumers within the proposed area in fact turn to alternative sources of supply outside the proposed area, the market boundaries posited by the plaintiff must be rejected.").

Plaintiffs' answer to the decades of legal precedent regarding geographic market definition is to argue that none of it applies to their claims. Plaintiffs contend that, because their claims involve an alleged monopsony (an exercise of buyer-side market power), this Court should ignore the teachings of the cases cited above and in Defendants' opening memorandum, and instead focus on only one question—where could the dairy farmer Plaintiffs who happen to reside within Plaintiffs' proposed market (Orders 5 and 7), and who indisputably represent just *some* of the sellers in the marketplace, sell their milk if the prices they are paid were suppressed? *See* Pls.' Resp. at 10. Plaintiffs claim that, as a matter of law, the answer to that question dictates the boundaries of the geographic market here, and that *it would be legally erroneous even to consider* (a) the other sellers in the marketplace (that is, the farmers outside of Orders 5 and 7

---

███████████████████████████████████████████ *See* Reply Report of Gordon Rausser at 107 (Defs.' Ex. 6) ("I find no excessive imports starting in 2008.").

7

who supply approximately half of the raw milk pooled on Orders 5 and 7); or (b) where the alleged monopsonist buyers here purchase raw milk (which, again, indisputably extends well beyond the regulatory boundaries of Orders 5 and 7). *Id.* at 10-12. Nothing in the antitrust laws, or even in the cases cited by Plaintiffs, supports such an approach. Indeed, the legal principles Plaintiffs themselves recite confirm that it would be legal error to define a market solely with reference to *some* of the sellers in the marketplace.

According to Plaintiffs, "the relevant geographic market in a *monopoly* case [i]s 'the area of effective competition . . . in which the seller operates, and to which the purchaser can practicably turn for supplies." Pls.' Resp. at 10 (emphasis added) (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963) (quoting *Tampa Elec.*, 365 U.S. at 327)). Plaintiffs' position here is that "[i]n a case involving an alleged *monopsony*, the position of the participants is *switched*." Pls.' Resp. at 10 (emphasis added). If one simply "switches" the participants in the tests advocated by Plaintiffs, then their proposed standard for defining the geographic market in a *monopsony* case should be: *both* "the area in which the [buyer] operates [i.e., makes purchases], *and* to which the [sellers] can practicably turn for [sales]." But Plaintiffs, of course, do not advocate this approach. █████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ Pls.' Resp. at 11. None of the cases cited by Plaintiffs supports their novel approach to market definition.

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001), certainly does not. There, oil companies were alleged to be parties to a monopsony cartel through which they allegedly suppressed the salaries of nonunion managerial, professional, and technical ("MPT") employees. The issue was how to define the relevant *product* market (not the geographic market, as in this

8

case).  The Court appropriately focused the product market question on the following issue:  to what other employers could the employees turn if they were trying to avoid an exercise of monopsony power?  *Id.* at 202 ("At issue is the interchangeability, from the perspective of an MPT employee, of a job opportunity in the oil industry with, for example, one in the pharmaceutical industry.").  Nowhere in its decision—which did not even discuss the issue of geographic markets—did the court in *Todd* suggest that, in defining the relevant geographic market in a monopsony case, one should consider only where *some* of the sellers could turn to avoid an attempted exercise of monopsony power.

Nor did the court reach such a result in *United States v. Rice Growers Ass'n of California*, Civ. No. S-84-1066 EJG, 1986 WL 12562 (E.D. Cal. Jan. 31, 1986), another case cited by Plaintiffs.  There, the government sought to prevent a merger of rice mills in part on the ground that, post-merger, the company would have monopsony power in the purchase of paddy rice.  *Id.* at *4.  The court found that California constituted the relevant geographic market, but its holding was based, in part, on a finding that *all of the alleged monopsonists' purchases were within that proposed market. Id.* at *7 ███████████████████████████
██████████████████████.[6]

Defendants' expert, Professor Kenneth G. Elzinga, has explained the flaw in Plaintiffs' approach to market definition with reference to the following example:

---

[6] *Campfield v. State Farm Mutual Automobile Insurance Co.*, also cited by the Plaintiffs, simply relies on the Second Circuit's articulation in *Todd* of how to approach market definition in a monopsony case.  532 F.3d 1111, 1118 (10th Cir. 2008).  The final case Plaintiffs cite, *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219 (1948), did not concern the definition of geographic markets at all.  The issue was whether the alleged conspiracy involved "interstate trade and commerce or [was] one . . . affecting only purely local trade and commerce," such that it was outside of the Sherman Act.  *Id.* at 221-22.  The Court in no way established the standard for defining geographic markets in a monopsony case.

> [Plaintiffs'] approach is similar to assuming that a handful of
> consumers who live near a local drugstore, but do not have cars,
> constitute a relevant market because they cannot shop at other drug
> stores. The fact that some consumers lack alternatives does not
> mean they are facing a monopoly in the sale of drug store
> merchandise. The price of merchandise in the drug store is
> determined by demand and supply forces broader than the
> individual consumers on the demand side and the particular
> neighborhood store on the supply side. The set of immobile
> consumers, in this example, is protected by the fact that many
> consumers are mobile and have access to other store locations.
> . . . This means that the actual geographic market is much broader
> than the neighborhood around a single store, even though there are
> consumers in this example who are unable to shop throughout the
> market.

Elzinga Rpt. at 56-57 (Ex. 1).[7] As Prof. Elzinga also explained, the same is true of dairy farmers.

Thus, many smaller farmers in a given Federal Order who have high transportation costs might

have limited options if the plants to which they normally sell were to suddenly decrease their

price. But as long as there are larger farmers (wherever they are located) with more options who

also serve that plant, and who would take their milk elsewhere in reaction to that price decrease,

the less mobile farmers are protected by the process by which the *market* (which includes both

the more and the less mobile farmers) determines demand, supply and price. *Id.* at 57.

There is no justification for Plaintiffs' claim that the geographic market here should be

defined solely with reference to those dairy farmers who reside in Orders 5 and 7 and comprise

the plaintiff class. By focusing only on themselves, Plaintiffs ignore the Supreme Court's long-

---

[7] Prof. Elzinga is a renowned expert in antitrust economics for whom one of the analytical tools for defining geographic markets is named (the Elzinga-Hogarty test). He also has served as an expert for the prevailing party in multiple cases decided by the U.S. Supreme Court and by the Sixth Circuit. *See, e.g., Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *Ky. Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908 (6th Cir. 2009). Plaintiffs nevertheless filed a motion to exclude certain of his opinions on market definition, raising the same legal issue addressed here. *See* Defs.' Resp. to Pls.' Mot. to Exclude Opinions and Testimony of Kenneth Elzinga and Joseph Kalt (Dkt. # 960). Plaintiffs' motion is unfounded, but it shows that both sides believe the legal dispute about market definition is ripe for resolution as a matter of law.

standing admonition that the antitrust laws are concerned with the *protection of competition, and not of particular competitors*. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977). The dairy farmers in Orders 5 and 7 are not the only farmers competing to sell raw milk to the plants in these two Orders. The first step in evaluating any claim that these farmers have been subjected to unlawful monopsony power is to determine the geographic scope of the market *within which these farmers compete*. And that requires consideration of the *entire* "area of effective competition." *Tampa Elec.*, 365 U.S. at 327.

It is undisputed that the plants in Orders 5 and 7 acquire raw milk not only from dairy farmers in Orders 5 and 7, but also in significant part from farmers located outside of those Orders. *See supra*, p. 6.[8] Those inflows reflect the fact that pricing levels are (and need to be) sufficiently high in Orders 5 and 7 to attract hundreds of millions of pounds of milk produced elsewhere each year. There is no dispute that these flows of milk are a critical determinant of the prices dairy farmers in Orders 5 and 7 receive for their milk. That is, perhaps most obviously, the basic premise of Plaintiffs' claim that "flooding" Orders 5 and 7 with excess milk from the Southwest has adversely affected their pay prices. Consideration of this "commercial realit[y]" is *required* in defining the relevant geographic market, *Brown Shoe*, 370 U.S. at 336-37, and means that the geographic market here cannot be artificially limited to Orders 5 and 7.

### C. Plaintiffs Lack Sufficient Evidence to Raise a Material Dispute of Fact as to the Relevant Geographic Market.

Plaintiffs also claim to find support for their proposed market definition from the record in this case, but the facts to which Plaintiffs point do not remotely establish that Orders 5 and 7 are a standalone geographic market for antitrust purposes. Most significantly, Plaintiffs at no

---

8 ████████████████████████████████████████████████████
████████████████████████████████████████████████

point argue that these facts would be sufficient to raise a triable issue of fact as to the relevant market *even if their view of the law of market definition is incorrect.*

*First,* Plaintiffs point to testimony regarding whether Orders 5 and 7 should be combined for regulatory purposes. *See* Pls.' Resp. at 13-14. But testimony about federal milk marketing regulations neither alters nor bears upon the proper legal test for defining a relevant geographic market. *See Kinnett Dairies, Inc. v. Dairymen, Inc.,* 512 F. Supp. 608, 640 (M.D. Ga. 1981) ("Regulations serve purposes and have their appropriate effect, but they do not alter economic realities.").[9] Defendants are not arguing that the federal order regulations do not "affect the commercial realities of the marketplace," Pls.' Resp. at 14, just that, as the undisputed record shows, the regulations do not dictate or define where raw milk is bought and sold. They thus do not and cannot set the boundaries of antitrust markets.

*Second,* Plaintiffs cannot escape the fact that the Defendants' commercial conduct *confirms* that Orders 5 and 7 are not a market. Although Plaintiffs now claim it is immaterial (Pls.' Resp. to SMF ¶ 39), it is undisputed that DFA's Southeast Area Council is *not* coextensive with the boundaries of Orders 5 and 7—it reaches well into Texas, ***includes the entirety of another Federal Order***, Order 6 (Florida), and ***omits*** part of Order 5. *See* Defs.' Ex. 97. The same is true of SMA. *See* SMF ¶ 41. The Defendants' conduct thus aligns with the commercial reality that the raw milk market extends well beyond the boundaries of Orders 5 and 7.

*Finally,* Plaintiffs claim support for their proposed market from their expert, Dr. Rausser. But Dr. Rausser applied the same legally flawed approach to market definition that Plaintiffs have advocated here, focusing only on a portion of the sellers. Pls.' Resp. at 15-18. His

---

[9] Plaintiffs' attempt to distinguish *Kinnett* on the ground that "it was a monopolization case," Pls.' Resp. at 14 n.11, but what the court observed was that the *"economic realities"* and *"actual movements of milk"* suggested that the plaintiff's proposed market was too small. 512 F. Supp. at 639-40 (emphasis added). That is precisely the problem with Plaintiffs' proposed market here.

testimony is for this and other reasons inadmissible, as explained in Defendants' Motion to Exclude (Dkt. # 879). But, as this Court just recently held, even if it is not formally excluded, an opinion that fails to address the applicable legal standard for defining a relevant geographic market cannot create a genuine issue of material fact. *See* Mem. Op. at 29-30 (Dkt. # 863).

## II. PLAINTIFFS HAVE NOT SHOWN INJURY *CAUSED BY* DEFENDANTS' ALLEGEDLY ANTICOMPETITIVE CONDUCT.

### A. Dr. Rausser's Statistical Analysis Does Not Show Injury Caused By Defendants' Allegedly Anticompetitive Behavior.

Plaintiffs acknowledge that establishing antitrust injury, an essential element of their claims, requires them to prove that the conduct they are complaining about *caused* them to receive pay prices that were lower than they would have received under competitive conditions. *See* Pls.' Resp. at 19, 22. Dr. Rausser's statistical analysis, which is all Plaintiffs offer on this key issue, is not sufficient to raise a triable issue of fact. Even if one assumed for argument sake that Dr. Rausser's analysis passed the admissibility test (and it does not), Plaintiffs would still fail to demonstrate antitrust injury.

By its own terms, Dr. Rausser's statistical model shows that most of what he calls price suppression occurred *before* the acts that are the focus of Plaintiffs' case. ███████████

███████████████████████████████████████████████████

███████████████████████████ But the problem for Plaintiffs is that the key mechanism that Dr. Rausser and Plaintiffs identify as the basis for the price suppression—ownership by Defendants of, and full-supply agreements with, a high percentage of the processing plants in the Southeast—did not occur until December 2001 at the earliest. *See* Defs.' Br. at 22. The fact that Dr. Rausser's model shows that most of the alleged price suppression had occurred *before* the conduct that has been the focus of Plaintiffs' case (Dean-Suiza merger, expansion of full-supply agreements to former Dean and current NDH plants,

13

outsourcing to DMS, etc.) makes it clear that, whatever Dr. Rausser's model is measuring, it is not pay price suppression caused by the conduct about which the Plaintiffs are complaining.

Plaintiffs also fall short in making the threshold showing that Dr. Rausser's statistics provide a reliable basis to say that pay prices in Orders 5 and 7 were lower than they should have been under competitive conditions. First, Plaintiffs cannot cure the fact that Dr. Rausser did not present any statistical analysis showing that *pay prices* (as opposed to some variant or partial measure of pay prices) in Orders 5 and 7 were lower than a competitive level.

Second, Plaintiffs defend Dr. Rausser's benchmark analysis on a theoretical level, citing cases for the unremarkable proposition that the use of yardsticks in estimating damages can be appropriate. Pls.' Resp. at 23, 27. But Dr. Rausser failed to *calibrate* his yardstick—he provided no foundation for his claim that any difference between over order premiums in Orders 5 and 7 (as he measured them) and those in his so-called benchmark regions is a reliable measure of anticompetitive pay price suppression. Without establishing what the relationship between premiums in Orders 5 and 7 versus his benchmark orders would be *absent anticompetitive conduct in Orders 5 and 7* (e.g., in a time unaffected by the alleged conduct), his statistical comparison is meaningless. This is not simply a matter of weight or credibility; it goes to the core of whether there is sufficient reliability for Dr. Rausser's analysis to satisfy Fed. R. Evid. 702. *See* Defs.' Mot. to Exclude the Testimony of Dr. Rausser (Dkt. # 878-879).

### B. Plaintiffs' Assertions About Monopsony Theory and the Prices Plants Paid for Milk Do Not Raise a Triable Issue of Fact about Antitrust Injury.

Plaintiffs' other arguments about antitrust injury are equally unavailing. For example, Plaintiffs argue that agricultural markets have been described as susceptible to monopsonistic conduct, Pls.' Resp. at 19, but that argument provides no *facts* to create a triable issue as to whether these dairy farmers have suffered antitrust injury.

14

Nor does their bald assertion that there is "ample evidence of price suppression." *Id.* at 20-21. The evidence Plaintiffs cite is mostly about the prices allegedly paid by processors, and *not* the *prices received by dairy farmers.* Recognizing as much, Plaintiffs assert that the change in plant prices "necessarily resulted in reduced prices paid to farmers"—a critical proposition for which they offer *nothing* from the record here, but rather a citation *to a case* involving children's toy retailing and manufacturing markets. *Id.* at 21 (citing *Toys "R" Us, Inc. v. FTC,* 221 F.3d 928, 935-36 (7th Cir. 2000)). The lack of record citation is not accidental. There is *no evidence* that plants paid lower prices, and as a result, Plaintiffs have not shown, and could not show on this record, the extent to which the alleged *pay* price suppression was the result of reduced *plant* prices. The requisite proof of antitrust injury is simply not here.[10]

## III.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS OF CONSPIRACY.

### A.   Plaintiffs Have Utterly Ignored the Meaning of the Term "Direct Evidence."

Plaintiffs begin their defense of their conspiracy claims with more than 12 pages of text in which they outline their version of a variety of events dating back to 1998. Pls.' Resp. at 32-45. Not until almost the end of that section (p. 43) do Plaintiffs first use the term "direct evidence," followed by a one-paragraph argument a few pages later that, *if there is direct evidence of a conspiracy,* then the requirements of the Supreme Court's opinion in *Matsushita* about permissible inferences of a conspiracy do not apply. *Id.* at 46. Absent from Plaintiffs'

---

[10] Plaintiffs also fail to explain away their inability to show antitrust injury from the full-supply agreements that are the centerpiece of their case. *See* Pls.' Resp. at 28-29. Plaintiffs cannot overcome the controlling law in this circuit for one claiming antitrust injury by an exclusive contract, *Indeck Energy Servs., Inc. v. Consumers Energy Co.,* 250 F.3d 972, 977 (6th Cir. 2000), except to claim that independent farmers are *not* competitors of the cooperatives, Pls.' Resp. at 31—an argument that squarely contradicts their repeated assertions that a key element of the conspiracy here was to eliminate the competitive threat of independent dairy farmers by allegedly forcing them to market their milk through DMS. *See, e.g., id.* at 37, 44.

argument is any acknowledgement of the courts' definition of the term "direct evidence," and any explanation as to how *any* of the points in their 12-page factual exegesis meet that definition.

Direct evidence of a conspiracy is evidence that requires no inferences—most typically an admission of participation in admittedly anticompetitive conduct. *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) ("Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."). Plaintiffs' long factual recitation involves evidence which either (a) Plaintiffs acknowledge is the subject of competing inferences, or (b) requires multiple inferential steps to get from the "facts" to the inferences Plaintiffs would draw (even if one ignores, as Plaintiffs do, the contrary facts that undo their chain of inferences). *See, e.g.*, Pls.' Resp. at 41 & n.32. This is not "direct evidence" as the courts define that term.

**B.    Plaintiffs Have Failed To Demonstrate that Their Alleged Conspiracy Made Rational, Economic Sense for the Alleged Conspirators.**

Plaintiffs' second fatal failure on the conspiracy issue is their inability to demonstrate that the would-be conspirators had rational economic motives to engage in the pay-price suppressing conspiracy that Plaintiffs have alleged. As Defendants noted in their opening brief,

> [T]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule 56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: *if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.*

Defs.' Br. at 32-33 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986) (emphasis added)). Despite Plaintiffs' protestations to the contrary, that is the standard against which Plaintiffs' conspiracy allegations in this case must be tested.

### 1. Plaintiffs lack a rational motivation for the alleged processor co-conspirators to participate in this conspiracy.

In trying to explain the processors' alleged motivation to participate in this conspiracy, Plaintiffs point to processors' natural inclination to pay less for raw milk. In so doing, Plaintiffs ignore that the conspiracy they claim caused them harm was a conspiracy to suppress dairy farmer *pay* prices, not a conspiracy to reduce the prices paid by *plants*. Plaintiffs' expert, Dr. Rausser, made clear that he did not, and believed he need not, ███████████████████████

███████████████████████████████████████████████████████

████████████████ *See* Rausser Dep. at 105-06, 469-70 (Defs.' Ex. 53).[11] Plaintiffs' claim to have shown a rational motivation for processor participation in this alleged conspiracy by pointing to processors' desire to pay less for raw milk (Pls.' Resp. at 47) is fatally undercut by Plaintiffs' complete failure of proof on that issue.

Plaintiffs feign amazement at what they claim is Defendants' argument that the processors would not want to pay less for milk because it would be against their self-interest. Pls.' Resp. at 48-49. That strawman is not what Defendants argued. Rather, Defendants pointed out, quite correctly, that part of the irrationality here is that, *per the Plaintiffs' theory*, processors would be conspiring to accelerate the decline in local supply of milk in Orders 5 and 7 (the natural result of reduced pay prices), thus forcing those same processors to *replace* that milk by increasing their purchases of milk from outside—milk which the Plaintiffs insist was *more*

---

[11] Indeed, Plaintiffs argue that there is no data available in the record of this case from which the prices plants paid could be reliably estimated and analyzed, claiming that data collected and published by the U.S. Department of Agriculture is insufficient for that purpose. *See* Pls.' Resp. at 49-50. That is patently incorrect. As Defendants explain in their response to Plaintiffs' *Daubert* challenge to the use of this USDA data, (1) this data is frequently used and cited by academic researchers and government experts, (2) Plaintiffs' own expert (Dr. Rausser) made extensive and repeated use of the same data, and (3) Defendants' experts took extensive steps to validate the reliability of the USDA data for the purposes for which they utilized it. *See* Defs.' Resp. to Pls.' Mot. to Exclude Testimony of Profs. Elzinga and Kalt at 16-24 (Dkt. # 960).

*expensive.* Plaintiffs offer no meaningful response to that argument, but rather largely just repeat the incantation that processors want to pay less, not more. It is for that very reason that it would not be economically rational for processors to conspire to reduce pay prices for local farmers, if as Plaintiffs allege, doing so would force greater reliance on more distant (and, according to Plaintiffs, expensive) outside milk.

Finally, Plaintiffs do not respond to the argument that they have offered no explanation for the supposed motivation of alleged conspirators such as Kroger and Prairie Farms to participate in a conspiracy that (1) did not reduce what they paid for milk, and (2) allegedly enabled Dean and DFA to achieve dominant positions in the marketplace. *See* Defs.' Br. at 29, 45. In short, as to the pay-price conspiracy alleged here, Plaintiffs have failed to provide the requisite rational motivation for participation by the processor Defendants.

### 2. Plaintiffs lack a rational motivation for the alleged coop and common marketing agency co-conspirators to participate in this conspiracy.

Plaintiffs fare no better in trying to articulate a rational motivation for coops and common marketing agencies to engage in a conspiracy to reduce the pay prices earned by their dairy farmer members. Pls.' Resp. at 50-53. First, Plaintiffs cavalierly assert that coops would rationally want to eliminate competition among themselves for farmer milk, and that there is nothing unusual about eliminating competition as a motive to conspire. *Id.* at 50. That discussion of course omits the obvious: that alleged conspiracies to eliminate competition are typically rational because they are designed to enable the conspirators to charge more or pay less *to someone else.* Here, the problem that Plaintiffs ignore is that they are claiming the coops conspired to eliminate competition *so that they could purposely harm their own members*, not so that they could benefit from reduced competition.

18

Even Plaintiffs' lead expert admitted that this was a difficult problem. *See* Rausser Dep. at 112-13 (Defs.' Ex. 53). His answer was to shift his focus to the alleged motivation of management—in other words, the alleged conspiracy was not rational for DFA (or the other coops) as farmer-owned entities, but management in effect "hijacked" the coops into following policies that were bad for the coops and their farmer members. But the Plaintiffs' problem is that they cannot adequately link the alleged wrongful incentives of the many individuals they attack in their brief to the alleged conspiracy to suppress dairy farmer pay prices. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

At the end of the day, Plaintiffs are left with conspiracy allegations that make no rational economic sense for either the alleged processor or coop participants.

### C. Plaintiffs Have Failed To Come Forward with Evidence that Tends To Exclude Independent Action as the Explanation for Defendants' Conduct.

In their arguments about whether conduct was consistent with Defendants' self-interest, Plaintiffs again miss the point as to what they are obliged to show. The issue, as the Supreme Court made clear in *Matsushita*, is not whether Plaintiffs can offer some evidence which could give rise to an inference that Defendants' actions were harmful to their unilateral self-interest. Given the lack of rational motivation for the conspiracy they have alleged, Plaintiffs' burden is greater—indeed, the presence of a plausible alternative explanation is sufficient, as the Supreme

Court has held, to preclude an inference of conspiracy. *Matsushita,* 475 U.S. at 596-97. Perhaps not surprisingly, in their lengthy discussion of Defendants' self-interest, Pls.' Resp. at 53-60, Plaintiffs never even attempt to show how they prevail under the applicable legal standard.

### 1. The record evidence shows a rational, non-conspiratorial explanation for the full-supply agreements.

Most obviously, Plaintiffs have not come forward with evidence that tends to exclude independent, non-collusive action as the basis for the full supply agreements. Pls.' Resp. at 53-56. Plaintiffs' weak attempt to show how the full-supply agreements were not in processors' interests (*id.* at 56) fails on its face. Defendants' outlined in their opening brief how full-supply agreements suit processors' interests by shifting costs and risks to the coop supplier, as evidenced by the widespread use of such contracts in the industry by entities having no connection to this alleged conspiracy. Defs.' Br. at 50-51. A processor has an obvious *unilateral* incentive to lower its input costs; if, as Plaintiffs claim, this was the intended effect of the full-supply agreements, they do not tend to exclude the possibility of independent action.

Plaintiffs do no better in showing how full-supply agreements in deficit regions were so against coops' interest as to be explained only by a conspiracy. They rely on statements by persons outside of the Southeast (Pls.' Resp. at 54) and never adequately respond to the significance of the fact that ███████████████████████████████████████

████████████████████████████████████

Plaintiffs conclude their discussion by drifting into a legal argument about exclusive contracts by monopolists. *See* Pls.' Resp. at 55-56. This only further underscores Plaintiffs' confusion. Such contracts have at times been held to be anticompetitive because of their effects on other participants in the market, but they are absolutely understood to be *in the monopolists'*

*self interest.* This "legal discussion," if anything, supports the conclusion that a firm with a large market share may be pursuing its own self-interest when it enters into such contracts.[12]

> ## 2. The record evidence shows a rational, non-conspiratorial explanation for the other conduct about which Plaintiffs complain.

Plaintiffs have not eliminated independent, non-collusive action as the explanation for the other actions they cite, whether it be the purchase of supplemental milk (Pls.' Resp. at 56), the creation and operation of SMA (*id.* at 57), or the providing of rebates and credits to processor customers, whether announced or not (*id.* at 58-60). The alternative explanations set forth by Defendants stand, *see* Defs.' Br. at 55-61, and Plaintiffs do not even try to show how their contrary views of these arrangements are sufficient under *Matsushita* to create a triable issue.

## IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' UNILATERAL CONDUCT CLAIMS.

Plaintiffs' response regarding their unilateral conduct claims reveals their deep misunderstanding of the applicable law, and the total absence of factual support for the notion that either DFA or Dean has, or had a dangerous probability of achieving, monopoly power.

### A. The Sixth Circuit Does Not Recognize a Theory of Shared Monopoly.

Plaintiffs assert that, except for Count III against DFA, their "unilateral conduct" claims are not unilateral conduct claims at all, but efforts to pursue their conspiracy allegations within a monopolization/attempted monopolization framework. Pls.' Resp. at 61 ("Count II is a claim for Attempt to Monopolize and Monopsonize against all Defendants acting in concert . . . . Count IV

---

[12] In their failed attempt to attack the full-supply agreements, Plaintiffs clearly misstate the conclusion of a USDA article they cite—insisting in bolded type face that the article "specifically states that these same full-supply agreements harm Plaintiffs." Pls.' Resp. at 55. In fact, the authors wrote only that such agreements "are not always a plus for cooperatives" and that in high utilization markets, coops "may have to purchase milk at unattractive prices to meet commitments under full-supply agreements." Plaintiffs also put their over-heated argument into what is presented in their brief *as part of the quote from the USDA researchers. See id.* (2d paragraph of block quote). The USDA researchers made no such statements.

21

is a claim for Unlawful Monopsony against Dean *and* in the alternative against Dean, NDH and

DFA, collectively.").[13] Far from saving Plaintiffs' claims, this argument establishes that

Defendants are entitled to summary judgment. While some *other* circuits have accepted theories

of "shared monopoly," the Sixth Circuit, among others, has not. *See Smith Wholesale Co. v.

Philip Morris USA, Inc.*, 219 F. App'x 398, 409 (6th Cir. 2007) ("[C]onsidering a combination

of market shares of more than one company is an inappropriate measure of [a defendant's]

market power. Market power under § 2 of the Sherman Act is the ability of a single seller to

raise prices and restrict output." (internal quotations and citation omitted)));[14] *Spirit Airlines, Inc.

v. Nw. Airlines, Inc.*, 431 F.3d 917, 931 (6th Cir. 2005) ("'[Section] 2 addresses the actions of

single firms that monopolize or attempt to monopolize . . . .'" (quoting *Spectrum Sports Inc. v.

McQuillan*, 506 U.S. 447, 454 (1993))). Defendants are entitled to summary judgment on Count

II and Count IV, to the extent it asserts collective monopsony power by Dean, NDH and DFA.

### B.     Plaintiffs Lack Evidence of DFA Monopoly Power.

As to Count III, Plaintiffs have not come forward with evidence that DFA has monopoly

power. Plaintiffs' response makes clear that (a) they are eschewing any effort to prove that DFA

has monopoly power based on circumstantial proof of its market share; and (b) they have *no*

expert analysis of DFA's market share or market power. The first concession makes this case

---

[13] Plaintiffs reiterate in a footnote that their attempt to monopsonize claim (Count II) is *not*
against any defendant individually, but then claim that if it *were* against Dean alone, ███████
████████████████████████████████████████████ Pls.' Resp. at 68 n.50.  Having
declared that the claim is against *all* Defendants, Plaintiffs cannot then turn around and argue
that the claim may still be against Dean *individually.*  In any case, a single footnote, devoid of
record citations, does not preserve a claim against Dean individually.

[14] Plaintiffs suggest that the Sixth Circuit's statements in *Smith* somehow do not mean what they
say and that, if Plaintiffs allege a *conspiracy*, then they can aggregate Defendants' market shares.
Aggregate market shares may be relevant to the adjudication *of those conspiracy claims*, but that
does not make them relevant to claims of monopolization or attempted monopolization under
Section 2, which must be directed to the conduct of a single firm.

22

rare; the second warrants summary judgment in DFA's favor. *See Monsanto Co. v. Trantham*, 156 F. Supp. 2d 855, 862 n.3 (W.D. Tenn. 2001) (generally "expert proof is required to prove antitrust claims"); *Va. Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 601 (W.D. Va. 2000) (same). The flimsy, circumstantial evidence that Plaintiffs describe as "direct" shows why expert analysis should be required for Section 2 claims.[15]

As supposedly direct evidence of control over price, Plaintiffs point to the fact that DFA participates in DCMA, which Plaintiffs concede is a non-defendant common marketing agency of which roughly a dozen dairy cooperatives, including non-conspirators SMI and Cobblestone, are members. Pls.' Resp. to SMF ¶¶ 71-73. DCMA announces over-order premiums, not pay prices for dairy farmers who belong to DCMA-member coops. While Plaintiffs claim that DFA's participation in DCMA shows its "control" over prices, they cite no evidence that DFA *forced* other DCMA members to price their milk in any particular way, or that DCMA has any role in pay price determination. This is not "direct evidence" of control over prices.[16]

Next, Plaintiffs claim to have evidence that DFA excluded competition, pointing to a dispute with the Florida-based cooperative, SMI, but Plaintiffs present no evidence that SMI was in fact excluded from any market. Nor could they, since the evidence shows that SMI has *expanded* its presence in Orders 5 and 7 during the alleged conspiracy period. *See* SMF ¶ 23.

Finally, Plaintiffs point to DFA's supply agreements with various processors, but ignore the fact that nothing in the contracts prevents others from attempting to compete away the

---

[15] The Sixth Circuit has reserved judgment on this issue. *See* Defs.' Br. at 68 n.31.

[16] Nor is there evidence that DFA has "the ability to control competition," Pls.' Resp. at 65, which is not a phrase used in the cases. While Plaintiffs point to the fact that DFA, which manages DMS in the Southeast, has a role in marketing and setting the prices for DMS shippers, that is hardly evidence of monopoly power—after all, the Capper-Volstead Act specifically authorizes cooperatives to market (and thus price) non-member milk. *See* 7 U.S.C. § 291 (2006).

23

business by offering superior prices or services. Defs.' Br. at 67-68. Instead, Plaintiffs try here to pass off circumstantial proof as direct evidence. Plaintiffs acknowledge that exclusive supply contracts are not necessarily evidence of monopoly power; they simply claim that ███████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████ In support of these claims, Plaintiffs cite only to Dr. Rausser's report, PSOF ¶¶ 200-01 (Dkt. # 920), but Dr. Rausser confirmed that he did *no analysis* and is offering *no opinion* on whether DFA has market power. Rausser Dep. at 100-01 (Defs.' Ex. 53). Plaintiffs cannot now rely on him or his report for the notion that DFA *does* have market power. DFA is entitled to summary judgment on Count III.

### C. Plaintiffs Have Failed To Show that Dean Possesses Monopsony Power.

As with their claim against DFA, Plaintiffs rely exclusively on allegedly direct evidence of Dean's monopsony power. First, Plaintiffs claim that Dean has the ability to set prices, but the evidence Plaintiffs cite does not remotely support that proposition. Plaintiffs cite testimony from an NDH representative who makes the unsurprising assertion that he would not agree to pay more for raw milk than his competitors, including Dean. *See* Pls.' Resp. at 62-63. Since Dean was NDH's competitor for processed milk sales, it is hardly surprising that the president of NDH would not want to pay more than his competition for raw milk. That does not remotely prove that Dean itself has *control* over prices in the marketplace.

Second, Plaintiffs argue that Dean "excludes competition from the market." *Id.* at 63. Plaintiffs cite Dean's purchase of the Red Oak plant in Georgia from the Maryland/Virginia cooperative and others, but this is the very same episode that this Court commented upon when it granted Defendants' motion for summary judgment on the retailer plaintiffs' unilateral conduct claims—holding that "[i]f anything, this is circumstantial, not direct, evidence," and is insufficient to create a genuine issue of material fact. Mem. Op. at 26 & n.14 (Dkt. # 863).

24

Apart from that, Plaintiffs simply list some plants that Dean bought or closed over the past several years (including several not even located in Orders 5 and 7). Pls.' Resp. at 63. Plaintiffs do not and cannot explain how these acquisitions or closures constitute direct evidence of the power to exclude competition. As this Court has observed, "the closing of unprofitable plants is not evidence of violation of the antitrust laws," Mem. Op. at 9, and again, if anything, plant closures represent circumstantial, not direct evidence of monopoly power, *id.* at 26 n.14. Dean is entitled to summary judgment on Count IV.

## V. PLAINTIFFS' CLAIM OF DAMAGES DUE TO "FLOODING" IS BARRED BY THE FILED-RATE DOCTRINE.

In *Carlin v. Dairy America, Inc.*, the court authored a lengthy and thoughtful opinion holding that the federal minimum blend price for raw milk is subject to the filed-rate doctrine. 690 F. Supp. 2d 1128 (E.D. Cal. 2010). In so holding, the *Carlin* court distinguished this Court's prior opinion, where, based on arguments Plaintiffs made at the time, this Court found that "the rates being challenged [here] were *not* the minimum blend rate determined by the Secretary, but were over-order premiums *above* the minimum rates that were allegedly manipulated by the defendants." *Id.* at 1134 (emphasis added). Now, it is clear that Plaintiffs' Stage 1 damages *do* specifically challenge the federal minimum blend price. *See* Pls.' Resp. at 74 (Plaintiffs' Stage 1 damages "*rely on re-calculating the federal blend price*." (emphasis added)). In the words of the *Carlin* court, that "is precisely what the filed rate doctrine forbids." 690 F. Supp. 2d at 1136.

### CONCLUSION

For the foregoing reasons, as well as those previously stated, Defendants are entitled to summary judgment on Counts I through V of the Complaint.

Dated: September 17, 2010          Respectfully submitted,

/s/ Steven R. Kuney
Steven R. Kuney

Kevin Hardy
Carl R. Metz
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000
skuney@wc.com
khardy@wc.com

W. Todd Miller
BAKER & MILLER PLLC
2401 Pennsylvania Avenue, N.W.
Suite 300
Washington, DC 20037
Tel: (202) 663-7820
tmiller@bakerandmiller.com

G.P. Gaby
MILLIGAN & COLEMAN
230 West Depot Street
P. O. Box 1060
Greeneville, TN 37744-1060
Tel: (423) 639-6811
sweems@milligancoleman.com

*Counsel for Defendants Dairy Farmers of America,
Inc., Dairy Marketing Services, and Mid-Am
Capital*

26

*On behalf of All Defendants, with permission:*

Paul T. Denis
Paul H. Friedman
Dechert LLP
1775 I Street, N.W.
Washington, DC 20006
Tel: (202) 261-3300
paul.denis@dechert.com
paul.friedman@dechert.com
paul.frangie@dechert.com

Carolyn H. Feeney
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Tel: (215) 994-4000
carolyn.feeney@dechert.com
david.stanoch@dechert.com

William C. Bovender
Mark S. Dessauer
Hunter, Smith & Davis, LLP
1212 North Eastman Road
Kingsport, TN 37664
Tel: (423) 378-8840
bovender@hsdlaw.com
dessauer@hsdlaw.com

*Attorneys for Defendant*
*Dean Foods Company*

Jerry L. Beane
Kay Lynn Brumbaugh
ANDREWS KURTH LLP
1717 Main Street
Suite 3700
Dallas, TX 75201
Tel: 214-659-4400
jerrybeane@andrewskurth.com
kaylynnbrumbaugh@andrewskurth.com

*Counsel for Defendant National Dairy*
*Holdings, LP*

Steven E. Kramer
Thomas M. Hale
KRAMER, RAYSON, LEAKE, RODGERS
& MORGAN, LLP
800 S. Gay Street, Suite 2500
P. O. Box 629
Knoxville, TN 37901-0629
Tel: 865-525-5134
skramer@kramer-rayson.com
tomhale@kramer-rayson.com

*Counsel for Defendant National Dairy Holdings, LP*

Richard W. Pectol
PECTOL & MILES
202 East Unaka Avenue
Johnson City, TN 37601
Tel: 423-928-6106
rwpectol@earthlink.net

Daniel D. Crabtree
David E. Everson
STINSON MORRISON HECKER LLP
1201 Walnut, Suite 2900
Kansas City, MO 64106
Tel: 913-344-6750 (Crabtree)
Tel: 816-842-8600 (Everson)
dcrabtree@stinson.com
deverson@stinson.com

*Counsel for Defendant Gary Hanman*

Edward T. Brading
Bradley E. Griffith
HERNDON, COLEMAN, BRADING &
McKEE
104 E. Main Street
Johnson City, TN 37604
Tel: 423-434-4700
ebrading@lawyerfirm.com
bgriffith@lawyerfirm.com

*Counsel for Defendant Gerald Bos*

Charles W. German
Brandon J.B. Boulware
ROUSE HENDRICKS GERMAN MAY
P.C.
1010 Walnut, Suite 400
Kansas City, MO 64106
Tel: 816-471-7700
Charleyg@rhgm.com
brandonb@rhgm.com

*Counsel for Defendant Gerald Bos*


W. Gordon Dobie
Kari M. Rollins
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-9703
Tel: 312-558-5600
wdobie@winston.com
karollins@winston.com

Craig V. Gabbert, Jr.
J. David McDowell
HARWELL HOWARD FYNE GABBERT
& MANNER, P.C.
315 Deaderick Street, Suite 1800
Nashville, TN 37238-1800
Tel: 615-256-0500
cvg@h3gm.com
jdm@h3gm.com

*Counsel for Defendant*
*Southern Marketing Agency, Inc.*

Andrew T. Wampler
Robert L. Arrington
WILSON WORLEY MOORE GAMBLE &
STOUT, PC
2021 Meadowview Lane, 2nd Floor
Eastman Credit Union Building
P. O. Box 88
Kingsport, TN 37662
Tel: 423-723-0400
awampler@wwmgs.com
rarrington@wwmgs.com

Kelly B. Tidwell
PATTON, TIDWELL & SCHROEDER,
LLP
4605 Texas Boulevard
Texarkana, TX 75503
Tel: 903-792-7080
kbt@texarkanalaw.com

*Counsel for Defendant James Baird*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing JOINT REPLY OF ALL DEFENDANTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON COUNTS I THROUGH V was filed electronically in redacted form on September 17, 2010. Copies of the redacted version of this document will be served on all counsel of record via the Court's CMF/ECF system. I further certify that unredacted copies of the foregoing document have been served on all counsel of record via electronic mail this same day.

/s/ Carl R. Metz
Carl R. Metz