# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## GREENEVILLE DIVISION

| | | |
|---|---|---|
| IN RE: SOUTHEASTERN MILK | ) | |
| ANTITRUST LITIGATION | ) | |
| | ) | **Master File No. 2:08-MD-1000** |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | **Judge J. Ronnie Greer** |
| *Sweetwater Valley Farm, Inc., et al. v.* | ) | |
| *Dean Foods Co., et al., No.  2:07-CV 208.* | ) | |
| | ) | |

## MEMORANDUM OPINION AND  ORDER

This matter is currently before the Court on numerous motions *in limine* filed by defendants

parties in this case. [Docs. 1315, 1313, 1298, 1325, 1332, 1336, 1309].  Plaintiffs have responded.

Oral argument was conducted on June 21-22, 2011.  These matters are now ripe for disposition.

**1.     Defendants' Motion *In Limine* to Exclude Plaintiffs From Arguing or Offering Evidence on the Prices Plants Paid for Raw Milk, [Doc. 1315]; Response, [Doc. 1433].**

In this motion, defendants seek an order precluding the plaintiffs from "commenting on or

presenting evidence concerning whether the prices plants paid for raw milk during the alleged

conspiracy were suppressed below a competitive level."  More specifically, defendants seek by this

motion to exclude any opinion Professor Gordon Rausser, plaintiffs' damages expert, may intend

to offer at trial on the prices plants paid.  Defendants argue that Professor Rausser did not study that

question and has not offered an opinion on whether the prices plants paid [1] during the alleged

---

[1]     Defendants explain the difference between prices received by farmers and the prices paid by processing plants in a footnote to their motion, which reads as follows:

conspiracy period were suppressed below competitive levels in his original expert report, his rebuttal report or in his deposition testimony.

Plaintiffs respond to defendants' motion and argue that the motion should be denied for three reasons: (1) Rausser did in fact thoroughly analyze prices paid by plants; (2) any deficiencies in Rausser's testimony should be construed against defendants who "withheld" evidence regrading the prices plants paid; and (3) the motion is an improper and untimely attempt to bring a *Daubert* challenge. The Court will briefly address each of the arguments raised by the plaintiffs in response.

First of all, plaintiffs argue that the defendants' motion *in limine* is a thinly disguised effort by defendants to circumvent the Court's previously established deadlines for *Daubert* challenges to expert testimony. Defendants disagree, arguing that they do not challenge in this motion the methodology employed by Professor Rausser or the reliability of his conclusions based on the underlying data; they simply argue here that he should not be permitted to offer an opinion at trial which he has not previously disclosed in his reports or deposition testimony. Defendants have the better of this argument. This Court agrees that the subject motion does not address an issue which would ordinarily be raised in a *Daubert* motion but raises a question of the admissibility of evidence

---

The **prices received** by farmers – often called the "mailbox price" or "pay price" – are final net prices that incorporate the federal "blend" price and various deducted costs and expenses (e.g., a cooperative may deduct an administrative or hauling fee from a member's "final" net pay price). The **prices plants paid** are gross prices prior to any deductions, and incorporate the minimum federal "classified" pricing required to be paid by processing plants based on the products produced, and which is an entirely different set of prices from either "blend" price or "mailbox" price.

Doc. 1315

2

more appropriately suited for a motion *in limine*. [2] The Court declines plaintiffs' invitation to deny defendants' motion on that basis. Next, plaintiffs argue that Professor Rausser "thoroughly analyzed prices paid by plants." Defendants, on the other hand, argue that Professor Rausser did not study or analyze the issue and offered no opinion on whether the prices plants paid during the alleged conspiracy period were suppressed below a competitive level. Both parties cannot be correct and one is obviously misrepresenting the situation to the Court. The Court will not resolve this issue at this time except to note that Professor Rausser clearly testified in his deposition that, with respect "to the price bottling plants pay for milk, he [had] not examined that question."

Finally, in seemingly contradictory fashion, and after claiming that Rausser did a thorough analysis, plaintiffs claimed at oral argument that Rausser did not complete the analysis because the data produced by the defendants did not allow such analysis and that he simply analyzed it "to the extent he could." Plaintiffs then seem to argue that because the data would not allow sufficient analysis, Rausser should nevertheless be allowed to give an opinion. Such a position is unusual, to say the least, and ignores the rules related to expert testimony and, maybe more importantly, turns the burden of proof on its head by requiring defendants to disprove an opinion not based on facts or data.

The Court's ruling on this motion is not seriously debatable and is quite straightforward:

---

[2] A motion *in limine* is nothing more than a request for guidance by the Court regarding an evidentiary question. The trial court may, if it chooses to exercise its discretion, provide such guidance by ruling on the motion in limine; however, the court's ruling on a motion in limine is subject to change for whatever reason when the evidence is actually offered and objected to at trial. *See, generally, New Jersey v. Portash*, 440 U.S. 450, 462 (1979) (Powell, J. concurring). *See also United States v. Oakes*, 565 F.2d 170, 171-72 (1st Cir. 1977). The benefit arising from motion *in limine* practice is obvious. The procedure makes more efficient use of the court's time, minimizes delays during trial and allows the parties to consider the court's advisory ruling in preparing their strategy for trial.

Neither Professor Rausser, nor any other expert, may offer an opinion at trial which has not been disclosed in his or her expert disclosure, any rebuttal report or in deposition. [3] To the extent plaintiffs intend to offer any opinions by Professor Rausser or any other expert at trial with respect to whether the prices plants paid during the alleged conspiracy period were suppressed below a competitive level, they must inform the Court of the opinions to be offered prior to the witness assuming the witness stand and the Court will hold a hearing out of the presence of the jury to determine whether or not those opinions have been fully disclosed. Plaintiffs may not, as they have done with respect to this motion, simply refer to multiple pages of the witness's expert report but must be prepared to show the Court where in the report the opinion sought to be introduced is specifically disclosed. If plaintiffs are unable to do so, the testimony will not be admitted.

2.      **Defendants' Motion *In Limine* to Exclude Plaintiffs' Argument or Evidence Pertaining to Damages for Sales to Non-defendants and Non-alleged Co-conspirators, [Doc. 1313]; Response [Doc. 1460].**

In this motion, defendants seeks to prohibit plaintiffs from introducing evidence of damages arising from the sale of raw milk to persons or entities other than defendants and alleged co-conspirators, damages they characterize as "non-recoverable." Defendants claim such evidence inflates plaintiffs' claimed damages because the farmers who sold milk to a person or entity other than a defendant or co-conspirator are not part of the class certified, making such evidence irrelevant under Federal Rule of Evidence 402 and confusing, misleading and unfairly unprejudicial pursuant to Federal Rule of Evidence 403. Plaintiffs implicitly acknowledge that they seek such damages and

---

[3] The Court realizes that allowing an expert witness to give an opinion not stated in his reports but testified to in a deposition is also somewhat problematic; however, in that case, the opposing party has been placed on notice of the opinion and has had an opportunity to examine the expert witness on that opinion and the basis for the opinion. Under those circumstances, the Court is constrained to allow the opinion at trial.

4

argue that the scope of the injury from defendants' alleged anti-competitive acts includes suppressed prices received by all southeast dairy farmers who marketed, sold their milk through, or sold milk to any defendant or co-conspirator.[4] Plaintiffs accuse defendants of attempting to redefine the class certified and argue that granting defendants' motion "would effect a forced opt out of a significant number of the class members."

Plaintiffs proposed, and the Court certified, a class of

> All dairy farmers, whether individuals or entities, who produced Grade A milk within Orders 5 or 7 and sold Grade A milk directly or through an agent to Defendants or Co-Conspirators in Orders 5 and/or 7 during any time period from January 1, 2001 to the present.[5]

Under the class definition, dairy farmers are thus included within the boundaries of the class if they (1) produced Grade A milk within Orders 5 or 7, and (2) sold Grade A milk directly or through an agent to defendants or co-conspirators during the relevant time period. Defendants therefore argue that "raw milk sales to buyers other than defendants and co-conspirators are not eligible for class treatment" and allowing evidence that the price for such sales was illegally suppressed by defendants would prejudicially encourage the jury to award non-recoverable damages.

At first glance, the significance of this motion is not readily apparent. The importance of the motion became clear, however, during oral argument and appeared to focus on raw milk marketed through DFA, SMA or DMS but not necessarily sold[6] to a defendant or a co-conspirator. Indeed,

---

[4] Plaintiffs also argue that this motion is in reality an untimely *Daubert* motion. That argument is rejected for the same reason set forth with respect to the prior motion.

[5] The Court also excluded certain persons from the class; those exclusions are not relevant to the instant motion, however.

[6] The parties disagreed at oral argument over whether or not sales records produced would allow such an analysis since milk produced by farmers and marketed through a marketing agency is "pooled" before being sold to processors.

5

the parties disagree on whether Professor Rausser's damages model, and thus his conclusions as to class damages, includes any analysis or attempt to limit damages to only those related to milk both produced within Orders 5 and 7 and sold to a defendant or co-conspirator during the relevant time period.

Some factual background illustrates the issue. A dairy farmer can market milk either by joining a cooperative or by marketing milk independently. In the southeast, there are several cooperatives which market raw milk, five of which are the member cooperatives of SMA.[7] These cooperatives market milk to several processors, including defendants in this case. Various milk processing plants also acquire raw milk directly from independent dairy farmers who produce milk in Orders 5 or 7 but who are not members of any cooperative. Dean has acquired significant quantities of raw milk directly from independent dairy farmers.

The resolution of this motion is, like the previous one, far simpler than the parties have made it. To the extent plaintiffs propose to introduce evidence of damages suffered by dairy farmers who are not members of the certified class, such evidence is irrelevant. If somehow relevant, such evidence constitutes an invitation to the jury to award damages on an improper basis and is unfairly prejudicial to defendants.

Although not required for the resolution of this motion, the Court will address the question about which there appears to be a major disagreement between plaintiffs and defendants–the boundaries of the class certified. Plaintiffs accuse defendants of a "cynical attempt to remove from the class dairy farmers who sell through SMA and DFA/DMS-the very people that have been

---

[7] DFA, Maryland and Virginia Milk Producers Cooperative Ass'n, Inc., Arkansas Dairy Cooperative Ass'n, Dairymen's Marketing Cooperative, Inc. and Lone Star Milk Producers Ass'n.

harmed by defendants" and claim that "surreptitious requests lurk in defendants' carefully-worded motion." Defendants, on the other hand, claim it is plaintiffs who attempt to expand the class definition. The Court agrees with defendants.

Plaintiffs' inflammatory language is not helpful. The Court has defined the class certified in unambiguous language, language proposed by the plaintiffs themselves. As noted above, the class includes all dairy farmers, with certain exclusions, who both produced Grade A milk within Orders 5 or 7 **and** sold Grade A milk directly or through an agent to defendants or co-conspirators. Plaintiffs' attempt to redefine or modify the class is clear by their description of the class in their response to the instant motion-"all southeast dairy farmers' milk marketed by or sold through or to defendants or their co-conspirators." Such a description of the class completely ignores the limitation of the class definition that the class includes Grade A milk produced within the relevant time period in Orders 5 or 7 only if sold directly or through an agent to defendants or co-conspirators. [8]

Thus, based on the unambiguous language of the class definition approved by the Court, several things are clear about who is (or is not) included in the class certified. First, dairy farmers who produced Grade A milk outside Orders 5 or 7 are not part of the class, regardless of the processor they sold to; second, dairy farmers who produced Grade A milk within Orders 5 or 7 but sold to someone other than a defendant or co-conspirator are not part of the class. As a result, plaintiffs may recover damages only for damages sustained by producers who also sold to

---

[8] That plaintiffs understand the tenuous nature of their position is also illustrated by their apparent alternative request that the Court modify the formal certification "into conformity with the class definition that plaintiffs and the Court believe to have been certified." What the Court "believes" has been set out in its class certification order and the Court declines any invitation to consider a modification of the class definition at this late date without a proper motion filed by plaintiffs.

7

defendants or co-conspirators. Therefore, evidence of damages by dairy farmers who are not members of the class is irrelevant, regardless of whether or not the milk produced by them was marketed by a defendant. The motion *in limine*, [Doc. 1313], is GRANTED.

**3.      Defendants' Motion in Limine to Exclude All Evidence of or Reference to the Proposed Merger of Orders 5 and 7, [Doc. 1298]; Response, [Doc. 1435]**

In 2004, the United States Department of Agriculture (USDA), Agricultural Marketing Service, was considering a proposal to merge Appalachian Federal Order 1005 and Southeast Federal Order 1007 (Orders 5 and 7) into one geographic order. DFA and SMA supported the proposal and a representative of DFA testified at a hearing to state the position of DFA and SMA. Dean opposed the merger and the merger was ultimately not approved by the USDA. Plaintiffs now offer DFA and SMA's testimony and submissions to the USDA as "admissions that Defendants viewed Orders 5 and 7 as a single, common economic market." Defendants seek an order precluding plaintiffs from presenting any evidence, testimony, argument or reference to the proposed merger.

Defendants argue that the evidence is not relevant to any issue in the case since federal orders exist only for administrative purposes and that, even if relevant, the evidence would "unfairly confuse and mislead the jurors into believing (1) that Orders 5 and 7 may constitute one relevant geographic market for purposes of antitrust regulation and this litigation, and (2) that these Defendants admit, or even endorse, the allegation that Orders 5 and 7 constitute a relevant geographic market **under the antitrust laws**," especially since defendant Dean affirmatively approved the merger. Plaintiffs respond that the "admissions" of DFA and SMA are "compelling evidence that Orders 5 and 7 is a relevant market," and thus probative on the issue of the relevant antitrust market. More specifically, plaintiffs argue that the testimony and statements contain a host

8

of admissions about the economic realities to be considered in determining the relevant market for antitrust purposes. Plaintiffs further argue that the fact that not all defendants subscribe to the challenged evidence is itself irrelevant because, under Rule 801(d)(2)(E), admissions against interest of one co-conspirator are deemed admissions attributed to all conspirators.

Relevant out of court admissions of a party are admissible when offered by an opponent. *Shell v. Parrish*, 448 F.2d 528, 534-35 (6th Cir. 1971) (quoting 4 Wigmore § 1048 (" . . . in effect and broadly, anything said by the party opponent may be used against him as an admission, provided it exhibits the quality of inconsistency with the facts now asserted by him in pleadings or testimony.")). Such statements are not hearsay. Fed. R. of Evid. 801(d)(2). Statements made by an agent authorized to make the statement or by an employee during and within the scope of his employment are likewise admissible. *Id.* Furthermore, a statement of one co-conspirator is admissible against the others as an admission of a party opponent in both civil and criminal cases, if made during the course of and in furtherance of the conspiracy. Fed. R. of Evid. 801(d)(2)(E); *Snyder v. Assoc. Gen. Contractors*, 677 F.2d 1111 (6th Cir. 1982).

For statements to be admissible under Rule 801(d)(2)(E), the Court must find that (1) a conspiracy existed, (2) defendant was a member of the conspiracy, and (3) the co-conspirator made the proffered statement during the course and in furtherance of the conspiracy. *United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999). The district court may "admit the [ ] statements subject to a later demonstration of their admissibility." *Id.* (quoting *United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979)). "A statement is 'in furtherance of' a conspiracy if it is intended to promote the 'objectives of the conspiracy.'" *United States v. Henderson*, 307 Fed. App'x 970, 977 (6th Cir. 2009) (quoting *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994)). A statement may be in

furtherance of a conspiracy "even if not exclusively, or even primarily, made to further the conspiracy." *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000). Whether a statement was in furtherance of a conspiracy turns on the context in which it was made and the intent of the declarant in making it. *United States v. Conrad*, 507 F.3d 424, 431 (6th Cir. 2007).

No party here disputes the legal principles which apply to this motion. They also do not disagree that the issue of the relevant geographic market for antitrust purposes is very much at issue in this case. They do, however, disagree about whether the evidence at issue is relevant on the matter at issue in this case. Simply put, plaintiffs argue that DFA and SMA's testimony and written submissions to the USDA in connection with the proposed merger of Orders 5 and 7 "admit a host of characteristics regarding the economic realities to be considered in determining the relevant geographic market, ranging from market structure to raw milk supply and sales patterns to nature geographic boundaries." Defendants, on the other hand, argue that, since the federal orders exist for purely administrative purposes, evidence related to the position of DFA and SMA in support of the proposed merger is irrelevant to the question of the relevant geographic market for purposes of this antitrust litigation. To this extent, the Court agrees with both.

The Court finds entirely persuasive the arguments of defendants that the geographic areas of the federal orders are largely for government regulatory purposes and do not necessarily reflect relevant geographic markets for Sherman Act purposes. *See Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F.Supp. 608, 639-40 (M.D. Ga. 1981), *aff'd* 715 F.2d 520 (11th Cir. 1983). [9] Thus, facts related to the proposed merger are irrelevant. In other words, that the USDA considered a proposal to

_____

[9] Professor Rausser, plaintiffs' expert witness on the geographic market, has conceded as well that the federal orders were not created for the purpose of defining a relevant geographic market, although he concludes, based on his study of the economic realities, that the boundary of the antitrust market is the same as the boundary for Orders 5 and 7.

merge Orders 5 and 7, that DFA and SMA supported the proposal, that Dean opposed the merger, and that USDA ultimately did not approve the merger, are all irrelevant on the issue of the relevant geographic market for antitrust purposes. DFA and SMA's support of the proposal to merge the orders administratively is not an admission of the relevant market for purposes of this antitrust case. There is no inconsistency in the two positions.

That does not mean, however, that all statements of DFA and SMA during the administrative proceedings are irrelevant and admissible. To the extent that the statements relate to "characteristics regarding the economic realities to be considered in determining the relevant market," they are relevant and admissible. For instance, the statements of DFA and SMA on such topics as market structure, supply and demand, raw milk sales patterns, revenue and cost distribution, and natural geographic boundaries, all economic realities that likely must be considered in determining the relevant geographic market for antitrust purposes, are matters at issue in this case. [*See* p. 3 of Pl. Br., Doc. 1435].

The motion *in limine* will therefore be GRANTED IN PART and DENIED IN PART. Neither evidence related to the fact of the proposed merger nor any party's position on the proposed merger is relevant and the motion is GRANTED as to this evidence. The motion is DENIED as to statements attributable to DFA and SMA as to evidence related to the economic realities to be considered in determination of the relevant geographic market. This of course raises a practical problem. Plaintiffs have not attempted to specifically extract such statements from the massive documents they propose to introduce related to the proposed merger. Within seven (7) days of the entry of this order, plaintiffs shall specifically identify to defendants the statements which deal with the relevant question- i.e. the economic realities to be considered in determining the relevant

antitrust market. Notwithstanding any other deadline previously established by the Court, defendants may, within five (5) days after that, move *in limine* to exclude any of the designated evidence on any other ground on which they object.

Finally, defendants argue that these statements of SMA and DFA, even if relevant, are unfairly prejudicial under Rule 403 and would confuse and mislead the jurors. The Court's ruling on the motion removes most of the claimed prejudice, especially in view of Dean's affirmative opposition to the proposed merger. In addition, the Court cannot further assess the possibility of unfair prejudice until the plaintiffs more specifically identify the statements they consider relevant. In view of the Court's ruling, defendants' claim of unfair prejudice set forth in this motion lacks merit.

**4.      Defendants' Motion *In Limine* to Exclude Evidence and Argument Suggesting That Any Defendant Has Violated or Circumvented Any DOJ Consent Decree Relating to Raw Milk Supply Contracts, [Doc. 1325]; Response, [Doc. 1422].**

In 1973, the United States filed a complaint against Mid-America Dairymen, Inc., DFA's predecessor, [10] alleging violation of Sections 1 and 2 of the Sherman Act. In 1977, "without trial or adjudication of any issue of fact or law . . ., and without this Final Judgment constituting evidence or admission by either party as to any issue of fact or law," Mid-America Dairymen consented to entry of a consent judgment in compromise and settlement of the government's claims. *See United States v. Mid-America Dairymen, Inc.*, 1997 WL 1425 (W.D. Mo). Among other things, the judgment prohibited Mid-America Dairymen from "entering into or enforcing any Milk Sales

---

[10]   DFA was formed in 1998.

Agreement[11] containing a term in excess of one (1) year" and required Mid-America Dairymen to divest itself of certain of its processing plants.

From the outset of this litigation, plaintiffs have argued that DFA's full supply agreement with Dean, which consists of a series of 20 successive one-year agreements, violates or circumvents the consent decree because DFA and Dean insured the long-term nature of the agreements by DFA agreeing to forgive a $40 million promissory note owed by Dean and Dean agreeing to $47 million in liquidated damages if Dean failed to renew each of the 20 one-year agreements. (Amended Consolidated Comp., ¶¶ 74, 80). Defendants seek an order barring plaintiffs from presenting evidence or argument relating to the 1977 consent decree or evidence or arguments suggesting that DFA, either alone or in conjunction with Dean, "circumvented" or violated the consent decree.

Defendants argue that the very existence of the consent decree is irrelevant, much less evidence that DFA might have violated the decree. They argue that plaintiffs have no standing to enforce the 34 year old decree, that evidence by plaintiff of a violation would require a trial within a trial, and that such evidence violates Rules 401, 402, and 404(b). Plaintiffs' response is confusing. In their written response to the motion, they argue that the question of whether DFA has violated the consent decree is one of fact for the jury- i.e. "the ultimate issue to be decided by the jury," and that such a finding would establish an overt act of the conspiracy and also defendants' intent (they are not clear on how this establishes intent or the nature of the intent sought to be established). At oral argument, plaintiff's counsel argued that plaintiffs intend to prove that "DFA had an obligation" under the consent decree and that DFA circumvented it. He also argued that the consent decree

---

[11] "Milk Sales Agreement" is defined in the judgment as "a contract between defendant and a person operating a fluid milk processing and packaging plant wherein the buyer agrees to purchase from defendant a specified or ascertainable quantity of milk."

itself is a "public admission" by DFA.

As an initial matter, evidence by plaintiffs of the full supply agreements between Dean and DFA and the structuring of the agreements, including the terms of the promissory note, is relevant and admissible at trial. Defendants have not argued otherwise. The question raised by this motion, however, is whether plaintiffs can also argue that the evidence shows that defendants have violated or conspired to violate the consent decree. Despite the plaintiffs' brave efforts to articulate an admissible purpose for evidence related to their claim of a violation of the consent decree, they have failed to do so. They have not made any effort to show that the consent decree is a "public admission" by DFA. Indeed, they could not in view of the express language of the decree itself and Federal Rule of Evidence 408.[12]

And, while plaintiffs may argue that the acts which they claim "circumvented" the consent decree were overt acts in furtherance of the conspiracy, they make no effort to show that a violation of the consent decree itself is an overt act and they do not develop their argument that violation of the consent decree establishes defendants' intent.[13] Plaintiffs' real motivation in arguing a violation of the consent decree is made clear by plaintiffs' written response to the motion and their oral argument on the motion. They argue that "[p]laintiffs should not be precluded from showing and arguing that all of these facts viewed together . . . **show that defendants effectively violated the 1997 consent decree** . . .," [Doc. 1422, p. 5] (emphasis added). In other words, as counsel

---

[12]  Plaintiffs' counsel did orally offer to show how Rule 408 did not apply to this situation. The Court's recollection is that the matter was never addressed further.

[13]  As best the Court can tell, plaintiffs argue that proof of a violation of the consent decree by DFA would establish that, when defendants took the complained of actions, they knew the acts were anti-competitive because of the consent decree. Yet the consent decree contained no finding or admission that these acts were anti-competitive or illegal under the Sherman Act.

effectively acknowledged at oral argument, plaintiffs want to argue that defendants had an obligation

to the government created by the consent decree which they did not fulfill, leaving the jury to

potentially conclude that because DFA violated the law by violating the consent decree, they must

have violated the Sherman Act as alleged in plaintiffs' complaint here. That is precisely the kind

of argument and inference Rule 404(b) prohibits. The motion *in limine*, [Doc. 1325], is GRANTED.

5.      Defendants' Motion *In Limine* to Exclude Evidence and Arguments Suggesting that the
        Suiza/Dean Merger was Illegal or Anti-competitive, [Doc. 1332], Response, [Doc. 1443].

In 2001, Dean and Suiza, the two largest fluid Grade A milk bottlers in the United States

merged into a new company which continued as Dean. Defendants argue that any challenge to the

legality of the merger is time barred by the four-year statute of limitations under § 7 of the Clayton

Act and plaintiffs "should not be permitted to argue, suggest, or intimate that the Suiza/Dean merger

violated the antitrust laws or was anti-competitive," *e.g.* that it was an overt act in furtherance of the

conspiracy alleged by plaintiffs. Defendants argue that such evidence risks confusing or misleading

the jury.

Plaintiffs respond that they do not challenge the legality of the merger. On the one hand,

they appear to acknowledge the merger as a "lawful business activity" but argue on the other that

it became unlawful when it became part of an illegal conspiracy. More specifically, plaintiffs argue

that the merger "was one of the steps taken in furtherance of Defendants' conspiracy." Both

plaintiffs and defendants attempt to confuse the issue.

As all parties acknowledge, the Suiza/Dean merger was, in and of itself, legal and plaintiffs

may not "argue, suggest, or intimate" that it was not or that it has now become unlawful. To this

extent the motion *in limine* is GRANTED. Plaintiffs may, however, offer evidence of and argue to

the jury that the merger, while legal itself, constitutes an act in furtherance of the alleged illegal conspiracy. Plaintiffs correctly argue that even lawful acts may be employed to carry out an illegal conspiracy. *See Maryland and Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 472 (1960) ("But even lawful contracts and business activities may help to make up a pattern of conduct unlawful under the Sherman Act"). As the Sixth Circuit has stated, "[i]t is not essential that the various agreements, combinations, and transactions shown by the evidence-considered singly-be unlawful." *American Tobacco Co. v. United States*, 147 F.2d 93, 106-07 (6th Cir. 1944). Just as full supply agreements and outsourcing agreements may be legal in and of themselves, they may nevertheless constitute acts in furtherance of an illegal conspiracy. That principle applies with equal force to evidence of the Suiza/Dean merger. To this extent, the motion is DENIED.

**6.      Defendants' Motion *In Limine* to Preclude Plaintiffs From Introducing Evidence Related to Supposed "Sweetheart Deals," [Doc. 1336]; Response, [Doc. 1444].**

This motion deals with the compensation, bonuses and investment returns to Robert Allen, Allen Meyer, Cletes Beshears, Tracy Noll, Brian Haugh and William Honeycutt as the result of certain joint ventures and co-ownership interests with DFA. Defendants describe these payments as money paid to professional managers who had knowledge to run the investments properly and which were used as incentives to them to increase the value of DFA assets and to maximize profits. Plaintiffs view these payments as "sweetheart deals" used to maintain the loyalty of these individuals, to motivate them to participate in and make decisions in aid of the alleged antitrust conspiracy and to keep them subservient to DFA. Plaintiffs describe the payments as follows:

- Meyer invested in four joint ventures with DFA or its predecessor and made a $70 million profit with no out-of-pocket investment. Meyer was also paid $7.5 million for

16

stock    shares even though the shares were worthless.

- Beshears made $80 million in only three years time from investments in bottling plants worth slightly more than $5 million.

- Noll made profit of $26 million on an investment in bottling plants with DFA of slightly more than $1.3 million over the course of just three years.

- Haugh's investment of $100,000 in NDH resulted in a $10.1 million return in just two years.

- Allen was paid $22 million on a two year investment in Tuscan/Lehigh bottling plants with little out-of-pocket investment.

- Honeycutt contributed $247,500 for a 49.5 ownership interest in Milk Transport. DFA purchased Honeycutt's share for $18.1 million.

Defendants claim there is no evidence that these transactions were entered into to secure any individual's participation in, or as rewards for their participating in, an illegal antitrust conspiracy and the fact that they made substantial gains related to these transactions is irrelevant and inadmissible.  Defendants further argue that even if evidence of the money made by these joint venture and deal partners is relevant, the relevance is outweighed by the substantial risk of unfair prejudice to the defendants and confusion of the jury.  Plaintiffs very simply argue that these individuals were rewarded handsomely with sweetheart deals as the result of, and to motivate, their participation in the alleged illegal conspiracy.  Plaintiffs rely on several Sixth Circuit cases in support of their position.  On this issue, the Court agrees with plaintiffs.

In *American Tobacco*, the Sixth Circuit affirmed admission of evidence of bonuses to officials of corporations alleged to have conspired in violation of the Sherman Act as "bearing on the possible motive of such officials to act in combination."  *American Tobacco*, 147 F.2d at 118.

17

The Sixth Circuit also said that the evidence "constitutes evidence from which the jury could draw inferences that they had been given by [defendants] to dealers to affect particular price situations, and to carry out a price conspiracy." *Id.* at 114-15. Likewise, in *United States v. Dairy Farmers of America, Inc.*, 426 F.3d 850 (6th Cir. 2005), the Sixth Circuit affirmed admission of evidence of similar payments as economic incentives by DFA to insure that joint venture partners "will act in ways consistent with DFA's interest. *Id.* at 854. *See also United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001). In sum, evidence of very significant payments by DFA to these individuals constitutes evidence from which the jury can conclude that the payments provided a strong motive to these persons to do as DFA demanded and that each had a plausible reason to participate in the alleged illegal conspiracy. Furthermore, defendants have not shown that the probative value of this evidence is "substantially outweighed by the danger of unfair prejudice," Fed. R. of Evid. 403, requiring that, regardless of its probative value, the evidence be excluded, nor do they establish what less prejudicial way there might be for plaintiffs to establish the relevant point.

At oral argument, counsel for NDH suggested that *American Tobacco* and *United States v. Dairy Farmers of America, Inc.* are distinguishable because in those cases the government used evidence of payments to various individuals to prove the existence of an agreement, while here the parties admit the existence of the agreement. As the defendants have repeatedly acknowledged in their pleadings and at oral argument on various motion before this Court, the essential facts of the case, including certain agreements, will not be in dispute at the trial. What will be disputed, however, very vigorously in the case is the effect and result of the agreements entered into. The fact that DFA has made very significant payments to various individuals who have made little or no financial investment in these joint ventures and business relationships creates an inference that these

18

individuals entered into these agreements not just with the expectation of making a profit but with the expectation of making a very substantial amount of money in a very short period of time with their participation in concerted action with the defendants in the illegal antitrust conspiracy. To the extent there is a factual distinction between the facts here and the facts in the Sixth Circuit's *American Tobacco* and *DFA* cases, that distinction is one which does not create a difference. The motion *in limine*, [Doc. 1336], is DENIED.

**7.      Defendants' Motion *In Limine* to Exclude All Evidence of or Reference to Comments Allegedly Made by James Baird to James Berlin Allegedly threatening the future of DMCI and Don Allen, [Doc. 1309]; Response, [Doc. 1456].**

In this motion, plaintiffs object to plaintiffs' exhibit 808–the minutes of a July 16, 2002 meeting of the Board of Directors of Dairymen's Marketing Cooperative, Inc. ("DMCI"). At specific issue is a minute entry relating to a report by Don Allen, who was present at the meeting, of his conversation ("talk") with James Berlin. According to Allen, Berlin told him he had attended a "Lonestar meeting" and had asked James Baird "why is DMCI out paying us every month?" Baird reportedly replied: "We will squeeze out Don Allen and DMCI."

Defendants characterize the exhibit as "an unauthenticated document reflecting at least four levels of hearsay," and seeks its exclusion, pursuant to Rules 403, 801(c), and 901, because it "constitutes hearsay, has not been authenticated, it speculative, wholly lacks foundation, and is prejudicial, misleading, and confusing." Plaintiffs claim that SMA was formed with the goal of controlling 100% of the milk in the southeast and to eliminate competition. They further claim that Baird was instrumental in the foundation of SMA through threats and coercion. They characterize the exhibit at issue as evidence of Baird's "threat" to DMCI, an admission of a party opponent, a

statement of a co-conspirator in furtherance of the conspiracy, and thus not hearsay. They argue alternatively that exhibit 808 reflects the "perception" of DMCI "leading to its vote to join SMA." In other words, they argue that they do not offer the minutes for the truth of their contents but rather to show that Don Allen's statement was made and the effect it had on DMCI with respect to its decision in April, 2003, to join SMA.

As an initial matter, plaintiffs must authenticate the document even if it is admissible for some purpose. Federal Rule of Evidence 901(a) provides the general rule for authentication. The rule requires "as a condition precedent to admissibility" evidence which establishes that the document "is what its proponent claims." In other words, the plaintiffs must provide testimony or proof that the minutes are in fact what they claim they are. They asserted at oral argument that they will do so. Based on that representation, the Court will not address the authentication issue further, except to this limited extent. Plaintiffs argue both in their response to the motion and their argument at oral argument that since defendants have listed other minutes of DMCI board meetings on their exhibit list, the minutes must be "reliable and admissible," apparently taken the position that no further authentication will be necessary. They offer no authority for their novel proposition and none exists. Plaintiffs' argument is legally incorrect and frivolous.

Assuming the plaintiffs can properly authenticate their exhibit 808, the Court still must decide defendants' hearsay objection. Defendants correctly note that the proposed exhibit potentially has multiple layers of hearsay: (1) the minutes themselves; (2) Don Allen's statement about his conversation with James Berlin; (3) Berlin's statements to Allen about his conversation with Baird; and (4) Baird's statement. Defendants also correctly state the law in the Sixth Circuit. To be admissible, each level of hearsay must be admissible under a hearsay exception. *United States*

*v. Payne*, 437 F.3d 540, 547 (6th Cir. 2006). Assuming for the purpose of this motion that the exhibit is a business record admissible under Rule 803(6), plaintiffs must still clear the other three hurdles. In an attempt to do so, they argue that Baird's "threat" is an admission of a party opponent and a statement of a co-conspirator in furtherance of the conspiracy, admissible as non-hearsay under Rule 801(d)(2)(A) and (E). This clears the fourth hurdle.

Plaintiffs make a somewhat disingenuous argument concerning the second and third hurdles–the statements of Allen and Berlin. They claim that "each statement of Berlin and Allen, who were DMCI members and employees, respectively, are [likewise] admissions of a co-conspirator, as DMCI is a cooperative member of defendant SMA," and their statements are not hearsay. This argument fails for several reasons. First of all, plaintiffs do not allege in their amended consolidated complaint nor have they argued at any point during this litigation that DMCI is a co-conspirator, nor have they ever alleged that Allen and Berlin individually are co-conspirators. Furthermore, they make no attempt to show how statements made by Berlin and Allen before DMCI joined the conspiracy could be made <u>during</u> the conspiracy or how such statements could be made in furtherance of the conspiracy.

Plaintiffs' alternative argument also fails. Seemingly as an afterthought, plaintiffs argue that exhibit 808 is not offered to prove the truth of the matter asserted but to show the effect of Baird's comments on DMCI board members. Plaintiffs' response and oral argument, however, make it clear that their true purpose is to show that DMCI joined SMA, at least in part, because of threats by Baird. In addition, the minutes themselves say nothing about any effect of the reported statements on any board member and will not support an inference that the statement, reported in July, 2002 was linked to a vote in April, 2003, by DMCI to join SMA. For all of these reasons, the

21

motion *in limine*, [Doc. 1309], is GRANTED.

**8.      Defendants' Motion *In Limine* to Preclude Plaintiffs From Mentioning or Suggesting that the Potential Savings in Milk Marketing Costs Hypothetically Calculated by Compton & Associates Would Accrue Wholly and Exclusively to SMA, [Doc. 1301]; Response, [Doc. 1431].**

Between 2003 and 2006, SMA and the Greater Southwest Agency, Inc., a marketing agency-in-common similar to SMA operating in the southwestern United States, jointly hired Compton & Associates ("Compton") to evaluate SMA's and GSA's milk marketing operations. Compton would periodically give reports or presentations to SMA or GSA regarding preliminary conclusions and recommendations for improvement. In a 2005 presentation, Compton proposed changes which could result in a potential savings of $56 million to SMA and GSA.

According to defendants, plaintiffs have, throughout this litigation, argued that the Compton study demonstrates that SMA has operated inefficiently and could have realized the savings identified by Compton had it been more efficient in its operations. In this motion, defendants argue that allowing plaintiffs to present such argument is unfairly prejudicial, confusing and misleading to the jury and should be excluded pursuant to Federal Rule of Evidence 403. Simply put, defendants argue that allowing plaintiffs to cite the Compton study and to argue that SMA could have realized $56 million in savings had it been more efficient in its operations ignores the fact that the Compton conclusion was that GSA and SMA jointly could realize a potential savings of $56 million, an argument designed by plaintiffs to confuse and mislead the jury. Plaintiffs quite predictably argue that any potential for confusion does not outweigh the probative value of the Compton analysis, the relevance of which is not challenged by defendants. They suggest that defendants will have the opportunity to present witnesses and/or cross examine plaintiffs' witnesses

to present their version of the findings of Compton.

It is true that defendants do not challenge the relevance of the Compton study in this motion. They simply argue that it is unfairly prejudicial, confusing and misleading and thus subject to exclusion under Rule 403. On this point, the Court agrees with the plaintiffs. Defendants can easily establish through cross-examination or the calling of other witnesses, that the savings contemplated by the Compton study are joint savings to be shared by GSA and SMA. There appears to be little room for confusion of the part of the jury.

One part of this motion is, however, troubling to the Court. Plaintiffs have a right to present all relevant evidence which they possess to support their claims. They do not have a right, however, to attempt to support their claims through inaccurate or misleading information or evidence. Plaintiffs appear to suggest in their response that they intend to do exactly what defendants have accused them of doing, *e.g.*, seek to attribute the entire $56 million in savings to more efficient operation on the part of SMA, something they apparently understand is not accurate. They also appear to acknowledge that they cannot attribute a specific portion of the potential savings to SMA and they argue that the burden should be on the defendants to show how the savings are to be allocated between GSA and SMA.

Plaintiffs have raised this argument repeatedly throughout this litigation by arguing that the evidence is under the control of the defendants and they should not be limited in their ability to present their case and argue inferences simply because they cannot present the necessary data. They make the argument once again that defendants should be penalized because they have "decided not to turn their information over to plaintiffs in discovery."

If there has been a discovery violation here by defendants, plaintiffs should raise that matter

in an appropriate motion so the Court can deal with it. They cannot, however, knowingly present inaccurate and misleading testimony at trial and simply shift the burden to defendants to explain it. The Compton study is a good example. The study apparently posits that $56 million in potential savings could be realized jointly by GSA and SMA. The study apparently does not allocate those savings between GSA and SMA. Plaintiffs may not simply present the study to the jury and argue that it says something it does not say. They clearly can present it and argue that it suggests that SMA, if operated more efficiently, could realize substantial savings in the millions of dollars. They cannot, however, argue that the entire $56 million in savings will be realized by SMA simply because it cannot allocate the savings between GSA and SMA.

The motion *in limine*, which seeks exclusion of the Compton studies pursuant to Rule 403, is DENIED.

So ordered.

ENTER:

<u>s/J. RONNIE GREER</u>
UNITED STATES DISTRICT JUDGE

Case 2:07-cv-00208  Document 1172  Filed 07/14/11  Page 24 of 24  PageID #: 24934