**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION**


| | |
|---|---|
| IN RE: SOUTHEASTERN MILK )<br>ANTITRUST LITIGATION )<br> )<br> )<br>THIS DOCUMENT RELATES TO: )<br>*Sweetwater Valley Farm, Inc., et al. v.* )<br>*Dean Foods Co., et al., No. 2:07-CV 208.* )<br> ) | **Master File No. 2:08-MD-1000**<br><br>**Judge J. Ronnie Greer** |


## <u>MEMORANDUM OPINION AND ORDER</u>

## I.   <u>Introduction</u>

This multidistrict class action case involves allegations by plaintiffs, independent dairy

farmers, independent cooperative members and DFA member dairy farmers, both on behalf of

themselves and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure[1]

against Dean Foods Company ("Dean"), National Dairy Holdings, L.P. ("NDH"), Dairy Farmers

of America, Inc. ("DFA"), Dairy Marketing Services, LLC ("DMS"), Southern Marketing Agency,

Inc. ("SMA"), Mid-Am Capital, LLC ("Mid-Am"), James Baird ("Baird"), Gary Hanman

("Hanman") and Gerald Bos ("Bos") (collectively referred to as "defendants") seeking treble

damages and injunctive relief for violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§

1 and 2, and a state law breach of contract claim against DFA.

Several motions for summary judgment have been filed: (1) Defendants' joint motion for

---

[1]   This Court has previously granted a motion for class certification as to the Sherman Act claims but has denied class certification as to the breach of contract claim against DFA. The Circuit Court of Appeals for the Sixth Circuit recently denied defendants' request for permission to file an interlocutory appeal of the Court's class certification order and motions to decertify the class are currently pending.

summary judgment on Counts One through Five of the complaint, [Doc. 839]; (2) supplemental motions for summary judgment by SMA, [Doc. 829], Baird [Doc. 826], Bos, [Doc. 833], and Hanman, [Doc. 836]. DFA has also moved for summary judgment as to Count Six, the state law breach of contract claim, [Doc. 842].[2] The plaintiffs have responded to all motions for summary judgment, the defendants have replied and supplemental briefs have been filed by the parties as to certain questions raised at oral argument by the Court. Oral argument was heard on January 20, 2011, and April 21, 2011. An order was entered on May 12, 2011, [Doc. 1543], announcing the Court's decision as to several of those motions. This memorandum opinion is entered for the purpose of setting forth more fully the Court's analysis and conclusions with respect to the motions.

## II. <u>Factual and Procedural Background</u>

As set forth above, plaintiffs' allege violations of §§ 1 and 2 of the Sherman Act and breach of contract by DFA. More specifically, plaintiffs allege a conspiracy to monopolize and monopsonize against all defendants under § 2 (Count One), attempt to monopolize and monopsonize under § 2 (Count Two), a monopolization claim against DFA, DMS and SMA under § 2 (Count Three), monoposonization against Dean under § 2 (Count Four), and conspiracy to restrain trade against all defendants under § 1 (Count Five). Plaintiffs also pursue a breach of contract claim against DFA in Count Six.

The plaintiffs are dairy farmers who produce or have produced during the relevant time period fluid Grade A milk within Federal Milk Market Orders ("FMMO" or "Order") 5 and 7 which was sold, directly or through an agent, to Defendants or Co-cospirators in Orders 5 and 7.

---

[2] This order will not address the motion for summary judgment filed by DFA as to the breach of contract claim. The parties have agreed to stay that count pending the trial or other disposition of the other claims.

Defendants Dean and NDH purchase, process and ship fluid Grade A milk. Dean owns a number of bottling plants in the southeast and is the largest fluid Grade A milk bottler in the southeast. NDH owns several Grade A milk bottling plants in the southeast and is the second largest Grade A milk bottler in the southeast. DFA owns fifty percent of NDH. DFA is a dairy farmer cooperative which markets, processes and ships Grade A milk. DFA owns and operates hauling companies, processing plants and distribution centers and is the third largest fluid Grade A milk bottler in the southeast. DFA is also the largest dairy cooperative in the country. DFA is owned by its dairy farmer members and governed by a board of directors comprised of dairy farmer members. DFA markets milk produced by its dairy farmer members and distributes the net proceeds or profits from its operations to its dairy farmer members. DFA also markets milk on behalf of some non-members.

DMS is a common marketing agency that markets milk on behalf of dairy farmers. DMS also performs milk marketing services for certain milk processors pursuant to outsourcing contracts. SMA is a common marketing agency that assists in marketing raw Grade A milk on behalf of its six member dairy cooperatives. SMA handles coordination of hauling and transportation of its member cooperatives' raw Grade A milk from the farm to the processing plant and in recent years the coordination of the purchase and hauling of supplemental milk on behalf of its member co-ops. Mid-Am is a subsidiary of DFA and was formed by DFA and others to provide capital to, and make equity investments in, dairy processing and fluid Grade A milk bottling operations.

Baird is the manager of SMA, an officer, director, and general manager of Lone Star Milk Producers, a dairy cooperative based in Texas, and the principal owner, officer and manager of Lone Star Milk Transport, Inc., BullsEye Transport, LLC, and BullsEye Logistics, LLC, Texas-based companies that transport Grade A milk for DFA and SMA. Baird is also the principal owner and

3

manager of GSC, LLC, an entity designed to manage and/or coordinate the operations of defendants SMA, DMS and other entities. Hanman was DFA's chief executive officer from its formation in 1998 until he retired on December 31, 2005. Hanman also served on the management committee of Dairy Management, LLC, the sole general partner of defendant NDH. Bos was DFA's chief financial officer from its formation until his retirement on December 31, 2005. Bos also served on the management committee of Dairy Management, LLC. The plaintiffs allege that Baird, Hanman and Bos have participated in, authorized, directed and/or knowingly approved or ratified the illegal conduct alleged in their complaint.

Plaintiffs allege that certain other milk marketers, milk purchasers, milk processors and other entities and individuals have participated as co-conspirators with the defendants in the violations alleged in their complaint and have performed acts and made statements in furtherance thereof. The third party co-conspirators include DairyCom, Inc., the Kroger Co., Prairie Farms Dairy, Inc., Robert W. Allen, Jay Bryant, Herman Brubaker, Gregg L. Engles, Michael J. McCloskey, Allen A. Meyer and Pete Shinkle.

This Court would ordinarily set out relevant facts related to the issues raised by the summary judgment motions. That is virtually impossible in this case, however, given the voluminous nature of the pleadings and exhibits filed by the parties, especially their statements of undisputed material facts. Both the statements of facts in support of the motions and plaintiffs' responses thereto, as well as plaintiffs' separate statement of facts, identify many "facts" which are irrelevant or, in reality, appear to be mainly arguments and/or conclusory statements advanced in support of their allegations. In reality, the material events related to the issues raised by these motions are largely undisputed, with the parties disputing only the inferences potentially to be drawn from those events

4

by the finder of fact.  Facts which are relevant to the Court's determination of these issues will be discussed within the body of the memorandum opinion.

## III.    Summary Judgment Standard

Generally, summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c)(2);[3] *Canderm Pharmacal, Ltd. v. Elder Pharm., Inc*., 862 F.2d 597, 601 (6th Cir. 1988).  Only factual disputes that might affect the outcome of a lawsuit under governing law are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To be "genuine," a dispute must involve evidence upon which a jury could find for the nonmoving party. *Id*.  The burden is upon the moving party to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Thereafter, the nonmoving party must present significant probative evidence in support of the complaint to defeat the motion. *Anderson*, 477 U.S. at 249-50.  The nonmoving party is required to show more than a metaphysical doubt as to the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  In deciding the motion, "[t]he court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute." *Stephens v. Koch Foods, LLC*, 667 F.Supp.2d 768, 2009 WL 3297289, *8 (E.D. Tenn. 2009) (citing *Anderson*).

The parties in this case have devoted considerable of their briefing and oral argument to the question of whether or not antitrust plaintiffs must meet a different standard from that required of

---

[3]    This language is quoted from the text of Rule 56(c)(2) effective until December 1, 2010.  The language in the text effective, December 1, 2010, is *slightly* different; however, the standard for granting summary judgment remains the same.

5

other civil plaintiffs. The burden on the plaintiff in an antitrust case is the same as it is on any other civil plaintiff. *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 468-69 (1992). As in other civil cases, courts addressing summary judgment motions in antitrust cases "must . . . consider all facts in the light most favorable to the non-movant and must give the non-movant the benefit of every reasonable inference." *Spirit Airlines, Inc. v. Northwest Airlines, Inc*., 431 F.3d 917, 930 (6th Cir. 2005) (internal quotations and citations omitted).

Some special rules do apply, however, with respect to the manner in which the court views certain ambiguous circumstantial evidence in a § 1 case. In conspiracy cases, "[t]he element of agreement, . . . is nearly always established by circumstantial evidence, as conspirators seldom make records of their illegal agreements." *United States v. Short*, 671 F.2d 178, 182 (6th Cir. 1982). Both the Supreme Court and the Sixth Circuit have, however, made it clear that in a case based on circumstantial evidence, an antitrust plaintiff may not reach a jury where the evidence on which he relies to prove an agreement is, at best, ambiguous. *Matsushita*, 475 U.S. 588) ("conduct as consistent with permissible competition as illegal conspiracy does not, standing alone, support an inference of agreement"); *Wallace v. Bank of Bartlett*, 55 F.3d 1166 (6th Cir. 1995). An antitrust plaintiff bears the burden of presenting evidence that "tends to exclude the possibility that the [defendants] were acting independently." *Monsanto Co. v. Spray–Rite Serv. Corp*., 465 U.S. 752, 764 (1984). An antitrust plaintiff will be unable to demonstrate a conspiracy if, "using ambiguous evidence, the inference of a conspiracy is less than or equal to an inference of independent action." *See Riverview Investments, Inc. v. Ottawa Cmty. Imp. Corp*., 899 F.2d 474, 483 (6th Cir. 1990) (citing *Matsushita*, 475 U.S. at 588). The Supreme Court reiterated that standard as recently as 2007 in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007):

> [P]roof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, *see Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed.2d 775 (1984); and at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently, *see Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574,106 S. Ct. 1388, 89 L. Ed2d 538 (1986).

550 U.S. at 554. This is consistent with the standard set forth by the Sixth Circuit in numerous cases. *See Nat'l Hockey League Players Ass'n. v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 475 (6th Cir. 2005) (Sherman Act conspiracy claim fails if evidence is "equally consistent with independent conduct"); *Sancap Abrasives Corp. v. Swiss Industrial Abrasives*, 19 F. App'x. 181, 187 (6th Cir. 2001); *Super Sulky, Inc. v. United States Trotting Ass'n*, 174 F.3d 733, 740 (6th Cir. 1999); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009-10 (6th Cir. 1999); *Bailey's Inc. v. Windsor America, Inc.*, 948 F.2d 1018, 1028 (6th Cir. 1991); *Nurse Midwifery Assoc. v. Hibbett*, 918 F.2d 605, 616-17 (6th Cir. 1990); *City Communications, Inc. v. City of Detroit*, 888 F.2d 1081, 1085 (6th Cir. 1989).

## IV.  Analysis and Discussion

### A.  The Section 1 Claim-Unlawful Conspiracy Among Defendants To Foreclose Competition and Fix Prices (Count Five)

Count Five of plaintiffs' consolidated amended complaint ("complaint") alleges a decade long, multi-faceted, far-reaching conspiracy among defendants and third-party co-conspirators "to eliminate competition for the purchase of fluid Grade A milk from dairy farmers in the southeast." Plaintiffs allege that defendants have committed certain overt acts in furtherance of the conspiracy alleged, including the following acts: (a) The use of long term full supply agreements to control southeast area farmers' access to fluid Grade A milk bottling plants; (b) depressing, fixing and

7

stabilizing prices for fluid Grade A milk paid to dairy farmers; (c) requiring southeast dairy farmers to market their fluid Grade A milk to DFA controlled entities to gain access to bottling plants; (d) threatening to cut off and cutting off southeast dairy farmers' access to bottling plants; (e) boycotting dairy farmers, cooperatives and Grade A milk bottlers; (f) "flooding" the southeast Grade A market to depress prices paid to farmers; (g) utilizing DFA-controlled entities to monitor prices for Grade A milk paid to independent dairy farmers and independent cooperative members; (h) "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with defendants' conspiracy in an effort to eliminate or control those entities as competitive outlets for milk; and (i) purchasing fluid Grade A milk bottling plants, closing down those plants and/or refusing to operate the plants with the purpose and intent of stifling competition from independent dairy farmers, cooperatives and fluid Grade A milk bottlers in the southeast.

Section 1 of the Sherman Act provides in pertinent part:

> [e]very contract, combination . . . or conspiracy in restraint of trade
> or commerce among the several states . . . is declared to be illegal.

15 U.S.C. § 1. While § 1 appears to prohibit every restraint of trade, the Supreme Court has interpreted the statute as condemning only those combinations which constitute unreasonable restraints of trade. *Standard Oil Company of New Jersey v. United States*, 221 U.S. 1 (1911). In order to establish their claim under § 1 of the Sherman Act, the plaintiffs must prove that the defendants "(1) participated in an agreement that (2) unreasonably unrestrained trade in the relevant market.") *Nat'l Hockey League Players' Assoc.*, 325 F.3d at 718.

Whether an agreement unreasonably restrains trade is determined under one of two approaches: the *per se* rule and the rule of reason. *Worldwide Basketball and Sport Tours, Inc. v. National Collegiate Athletic Association*, 388 F.3d 955, 959 (6th Cir. 2004). In *per se* cases,

8

evidence of actual effect on competition is not required because these actions are conclusively presumed to be unreasonable. *Copperweld Corp. v Independence Tube Corp.*, 467 U.S. 752, 768 (1984); *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 5-6 (1958). A restraint on trade is *per se* illegal when "the practice facially appears to be one that would almost always tend to restrict competition and decrease output." *National Collegiate Athletic Association v. Bd. of Regents of Univ. Of Oklahoma*, 468 U.S. 85, 100 (1984) (citations omitted).

Examples of practices which are *per se* illegal are horizontal price fixing, market allocation, group boycotts or tying arrangements, activities which are considered inherently anti-competitive. *Copperweld Corp.*, 467 U.S. at 768; *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 19-20 (1979); *Northern Pacific Railway Company*, 356 U.S. at 5-6. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 1522-23 (1988). There is often no bright line separating *per se* from rule of reason analysis. *NCAA*, 468 U.S. at 104, n.26.

A *per se* rule is inappropriate where the effects of a particular restraint are unclear, even where aspects of the restraint may appear to be facially anti-competitive. *Meijer, Inc. v Barr Pharmaceuticals, Inc.*, 572 F. Supp.2d 38, 47 (D.D.C. 2008). *Per se* analysis should not be extended "to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious . . . ." *Balmoral Cinema, Inc. v Allied Artists Pictures Corp.*, 885 F.2d 313, 316 (6th Cir. 1989) (quoting *FTC v Indiana Federation of Dentists*, 476 U.S. 477, 459 (1986)).

Furthermore, "there is a presumption in favor of a rule-of-reason standard," *Business Elec.*,

485 U.S. at 726. Under the rule of reason analysis, the plaintiff bears the burden of establishing that the conduct complained of "produces significant anticompetitive effects within the relevant product and geographic markets." *NHL Players' Assoc.*, 325 F.3d at 718; *Worldwide Basketball and Sport Tours*, 388 F.3d at 959 (quoting *Nat'l Hockey League Players*, 325 F.3d at 718)).

Although defendants raise numerous arguments in favor of summary judgment, each of which will be addressed hereinafter, the defendants argue that the case can be disposed of in their favor on a more simple basis. Defendants argue that all of plaintiffs' claims require definition of a relevant market, and, since plaintiffs cannot establish the relevant geographic market, all of plaintiffs' claims fail. Plaintiffs respond that not all of their claims and, more particularly, their conspiracy claims do not require that they establish the relevant geographic market. Put more simply, with respect to Count Five, the defendants claim that the allegations of violation of § 1 are subject to rule of reason analysis requiring plaintiffs to establish the relevant geographic market while plaintiffs argue that their § 1 claim is for a horizontal, *per se* illegal agreement in restraint of trade. The parties also differ on the question of whether or not to apply the rule of reason analysis or *per se* analysis to the conspiracy alleged is a question of law for the Court to decide or a question of fact for the jury.

### 1. Question of Law or Fact?

The question of whether the appropriate rule of law to be applied to the conspiracy alleged by the plaintiffs in their complaint is to be determined by the Court or is a question of fact for the jury has not been precisely answered in the Sixth Circuit. This Court concludes, however, that the weight of authority supports defendants' argument that determination of the appropriate rule of law to be applied is a question of law to be decided by the Court and that approach also appears to be

10

consistent with the Sixth Circuit's application of the legal rules involved.

As defendants note in their brief, a leading antitrust treatise recognizes that the selection of

the mode of analysis is a question of law for the court:

> While applying any one of antitrust's modes of analysis might involve many fact questions, the selection of a mode is entirely a question of law. To be sure, the Supreme Court stated in *Maricopa* that "the rule of reason requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." But that statement was not meant to indicate that the fact finder should determine whether the *per se* rule or the rule of reason applied to a particular set of facts. Rather, it meant that once the court decided that the rule of reason should apply, disputed factual questions about reasonableness should be left to the jury. In a footnote the court made clear that determining the rule of decision was a question of law.

*XI Herbert Hovencamp, Antitrust Law* ¶ 1909b at 279 (2d Ed. 2005) (citing *Perceptron, Inc. v. Sensor Adaptive Mach*., Inc., 221 F.3d 913 (6th Cir. 2000)). This statement is also consistent with

other decisions of the Sixth Circuit. For instance, in *Expert Masonry, Inc. v. Boone County, Kentucky*, 440 F.3d 336 (2006), the Sixth Circuit said: "In the first instance, *courts* must distinguish

between some types of unlawful anticompetitive restraints that [are] . . . *per se* illegal under the

antitrust laws, and the far-larger type of restraints that should be analyzed under the rule of reason

approach . . . ."). *Id.* at 342 (emphasis added). Likewise, in *United States v. Cooperative Theaters Of Ohio, Inc.*, 845 F.2d 1367 (6th Cir. 1988), although a criminal case, the district court held as a

matter of law that the alleged conduct constituted a *per se* violation of the Sherman Act, a ruling

affirmed by the Sixth Circuit. *See also Care Heating & Cooling, Inc. v. American Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005) ("if a court determines that a practice is illegal *per se*, further

examination of the practice's impact on the market or the procompetitive justifications for the

11

practice is unnecessary for finding a violation of antitrust law," suggesting that the decision as to whether a practice is illegal *per se* is one committed to the court).

The approach is likewise consistent with that taken by the United States Supreme Court and other circuit courts of appeals. The Supreme Court has repeatedly noted that the *per se* rule should be applied to conduct only after **courts** have had "considerable experience with certain business relationships." *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608 (1972). Since it seems quite clear that the *per se* rule should be applied to conduct only after it has been examined carefully by the courts, not juries, it also seems rather clear that the question of whether allegedly unlawful conduct is subject to *per se* analysis or rule of reason analysis is a legal question for the court, not a question for the jury. *See also Northern Pacific Railway Company*, 356 U.S. at 5 (suggesting that the court must first determine whether the conduct alleged to be unlawful is the type of conduct that has a "pernicious effect on competition and lacks any redeeming virtue . . .," to be considered illegal *per se*); *Copy-Data Systems, Inc. v. Toshiba America, Inc.*, 663 F.2d 405 (2d Cir. 1981) (where the district judge had held, after hearing argument from both sides, that Toshiba had imposed a horizontal, illegal *per se* territorial restriction on Copy-Data, a holding reversed by the Second Circuit on appeal as a matter of law). [4]

### 2. Horizontal or Vertical? *Per Se* or Rule of Reason?

It is beyond question that plaintiffs present their claim as a horizontal, *per se* illegal conspiracy to restrain trade and fix prices on the part of the defendants, [see complaint, Doc. 87, ¶ 162], arguing only alternatively that the agreements at issue violate § 1 of the Sherman Act under rule of reason analysis. In addition, plaintiffs repeatedly referred to their claim as a horizontal, *per*

---

[4] Both plaintiffs and defendants incorrectly cite this case as a Sixth Circuit decision.

*se* claim in their pleadings and repeatedly referred to the agreements at issue during oral argument as horizontal agreements. The labels attached to the conduct by the plaintiffs are not determinative, however, i.e. that plaintiffs repeatedly state that the conspiracy they allege is a horizontal, *per se* illegal conspiracy to fix prices and allocate markets does not make it so. In fact, the Supreme Court has recognized just this. *California Dental Ass'n. v. Federal Trade Commission*, 526 U.S. 756 (1999).

The Sixth Circuit has succinctly defined the two major types of antitrust conspiracies, as follows:

> Courts have identified two major types of antitrust conspiracies to restrain trade: horizontal and vertical. *Crane & Shovel Sales Corp. v Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988). Horizontal conspiracies involve agreements among competitors at the same level of market structure to stifle trade, such as agreements among manufacturers or among distributors to fix prices for a given product, and therefore may constitute *per se* violations of antitrust law. *Id.*; *see also Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir. 1978). Vertical conspiracies, on the other hand, involve agreements among actors at different levels of market structure to restrain trade, "such as agreements between a manufacturer and its distributors to exclude another distributor from a given product and geographic market." *Crane & Shovel Sales Corp.*, 854 F.2d at 805.

*Care Heating & Cooling*, 427 F.3d at 1013. Vertical restraints are analyzed under the rule of reason. *Id.* (citing *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 57-58 (1977)). To the extent there was any lingering doubt about whether vertical restraints are subject to *per se* or rule of reason analysis, that suggestion was quashed by the United States Supreme Court in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 551 U.S. 877 (2007) (vertical restraints to be judged according to the rule of reason). *See also Total Benefit Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430 (6th Cir. 2008).

13

As an initial matter then, the Court must determine whether or not the agreement alleged by the plaintiffs is horizontal in nature, which may constitute a *per se* violation of antitrust law, or vertical in nature, which must be analyzed under the rule of reason. In making this determination, as set forth above , the labels used by the plaintiffs are largely irrelevant and the decision will be made against a backdrop of several well established principles. First of all, "[t]here is an automatic presumption in favor of the rule of reason standard." *Care Heating & Cooling*, 427 F.3d at 1012 (citing *Business Electronics Corp.*, 485 U.S. at 726; *Continental T.V., Inc.*, 433 U.S. at 49). Secondly, the category of agreements to be analyzed under a *per se* analysis has been shrinking over the last few years. *See Leegin*. Finally, the *per se* rule should be applied only in "clear cut cases" of trade restraints that are so unreasonably anticompetitive that they present straightforward questions for reviewing courts. *NHL Players Assoc.*, 325 F.3d at 718 (citing *Sylvana*, 433 U.S. at 49-50). *See also Balmoral Cinema*, 885 F.2d at 316 ("*per se* analysis should not be extended 'to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious . . . .'").

As noted above, plaintiffs allege a horizontal conspiracy to restrain trade among the named defendants and certain non-defendant co-conspirators identified in the complaint. These include some processors of raw milk (Dean, NDH, DFA, Kroger, Prairie Farms), membership cooperatives (DFA, Prairie Farms), common marketing agencies (SMA, DMS) and individuals, (Hanman, Bos, Baird, etc.). This diverse group of actors are not just horizontal competitors but a collection of actors in the milk industry whose roles run the gambit of activities from gathering and marketing of raw milk from the farm to processing and marketing of processed milk at the retail level. This does not appear on its face to be a horizontal conspiracy, despite plaintiffs' argument that defendants

were horizontal competitors in both milk bottling and procurement of milk prior to the alleged illegal agreements to allocate markets. They also point to record evidence that certain witnesses admitted under oath that Suiza/Dean, NDH and DFA viewed each other as competitors in both markets. Apparently recognizing the flaw in their position, defendants appear to argue in their pleadings that the conspiracy involved Dean, NDH and DFA/DMS/SMA as horizontal competitors and that the various other defendants and non-defendant co-conspirators, some of whom the defendants apparently acknowledge as vertical entities, simply joined in the horizontal agreement. In making this argument, plaintiffs appear to rely primarily on two Seventh Circuit cases.

In *Denny's Marina, Inc. v. Renfro Productions, Inc.*, 8 F.3d 1217 (7th Cir. 1993), a marine dealer brought antitrust claims against its competitors, and the competitors' trade association and a boat show producer, challenging its exclusion from boat shows. The alleged illegal agreement was entered into by the marine dealers' competitors and the competitors' trade association, who, it was alleged, conspired to force Denny's out of boat shows because it was a price cutter. The operator of the premises where the boat shows were conducted, it was alleged, joined the conspiracy, by allowing Denny's competitors and their trade association to accomplish their illegal goals. The Seventh Circuit held that the fact that the conspiracy was joined by the operator of the premises where the boat shows were held did not transform the illegal agreement between Denny's competitors and their trade association into a vertical agreement.

In *Toys "R" Us, Inc. v. Federal Trade Commission*, 221 F.3d 92 (7th Cir. 2000), the court examined agreements between retailers and toy manufacturers in which each manufacturer promised to restrict distribution of its products to low priced warehouse club stores on condition that other manufacturers would do the same. Toys "R" Us, a toy retailer, invited manufacturers to stop selling

15

toys to wholesale toy clubs which competed with Toys "R" Us and the manufacturers complied. The Seventh Circuit acknowledged that the agreements between Toys "R" Us and the manufacturers were vertical agreements but determined that the FTC's finding of the horizontal agreement among the manufacturers was warranted under the circumstances, based on evidence in the form of statements by the manufacturer's executives that each manufacturer had agreed to the Toys "R" Us proposal on condition that its competitors do the same.

It seems to the Court that the *Denny's Marine* and *Toys "R" Us* cases are distinguishable from the factual situation at issue here. In the present case, although plaintiffs make an allegation of an explicit agreement to fix prices, they in reality claim concerted action on a host of non-price restrictions by vertically situated actors in furtherance of that conspiracy. *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430 (6th Cir. 2008). In addition, these two Seventh Circuit cases have not been widely cited for the proposition advanced by the plaintiffs and, indeed, the *Denny's Marina* case does not appear to have been cited at all for the proposition advanced by plaintiffs.

The Court thus concludes that the alleged agreements challenged by the plaintiffs are vertical in nature, not horizontal, and therefore not subject to *per se* analysis. Even if the Court were to determine that the agreements are horizontal in nature, however, the Court would conclude that these agreements do not involve the kind of "naked restraint" subject to *per se* analysis, as argued by the defendants.

As set forth above, *per se* analysis is reserved for a very limited category of activities. The practice must be one which facially appears to be one that would always or almost always tend to restrict competition and decrease output. As noted above, not all horizontal price fixing is the kind

16

of naked restraint of trade subject to a *per se* analysis. *See Care Heating & Cooling*, 427 F.3d at 1013 (horizontal conspiracies "***may*** constitute *per se* violations of antitrust law." (emphasis added)). In order to overcome the automatic presumption in favor of the rule of reason standard applied in the Sixth Circuit, the case must be a clear cut case of trade restraint that is so unreasonably anti-competitive as to present straightforward questions for reviewing courts. *Id.* at 1012.

As set forth above, the plaintiffs in this case allege a decade long, wide-ranging conspiracy to fix prices and allocate markets, activities which are traditionally *per se* illegal. In support of their claim, they point to a number of largely undisputed acts by the defendants which they argue are in furtherance of the alleged conspiracy. These overt acts, including the use of exclusive supply agreements, most favored nation pricing, alleged DFA control of NDH, agreements to require farmers to join SMA, simultaneous decisions by Dean and NDH to terminate non-DFA suppliers, DFA's non-disclosed control of DMS, "flooding", pooling, outsourcing agreements, and the like, are activities or conduct which are not manifestly anti-competitive, do not always or almost always tend to restrict competition or decrease output, do not always have an adverse impact on the market and are not, in and of themselves, illegal.

The essence of plaintiffs' argument here is that defendants have used a series of legal, potentially competitive practices to accomplish an unlawful effect on prices and markets. Such a claim of necessity requires the Court to examine both the history of the restraint and the restraint's effect on competition, or traditional rule of reason analysis. In other words, plaintiffs will be required to prove not only that defendants combined, contracted or conspired but also that the agreements produced adverse anti-competitive effects within the relevant product and geographic markets, that the conduct was illegal, and that the contract formed was a proximate cause of

17

plaintiffs' injury. *Int'l Logistics Group Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989) (citing *Crane & Shovel Sales Corp.*, 854 F.2d at 805).

### 3.      The Relevant Market

Having decided that the plaintiffs' conspiracy claims are subject to a rule of reason analysis, the Court must determine whether or not the plaintiffs have established a relevant geographic market within which defendants have conspired with the resulting adverse anti-competitive effects. Plaintiffs argued in their complaint, and continue to argue, that the relevant geographic market is Federal Milk Market Orders 5 and 7.

Before reaching the merits of an antitrust claim, it is necessary to identify the relevant market. *Potters Medical Center v. City Hosp. Ass'n*, 800 F.2d 568, 574 (6th Cir.1986); *Smith v. Northern Michigan Hospitals, Inc.,* 703 F.2d 942, 954 (6th Cir.1983). The plaintiffs bear the burden of defining "the relevant market within which the alleged anticompetitive effects" of the defendants' actions occur. *See Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 916 (6th Cir. 2009); *Worldwide Basketball & Sport Tours, Inc.,* 388 F.3d at 962 ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim.") (quoting *NHL Players' Assoc.,* 325 F.3d at 719-20.

A relevant market consists of both a product component and a geographic component. *Kentucky Speedway,* 588 F.3d at 916 (citing *NHL Players' Assoc.,* 325 F.3d at 719). Dr. Gordon Rausser was hired by the plaintiffs to define the relevant market in this case. The parties agree that the relevant product market is raw Grade A milk and that there is no reasonable interchangeability with a substitute product. *Spirit Airlines, Inc. v. Northwest Airlines, Inc.* 431 F.3d 917, 933 (6th Cir. 2005). Therefore, the Court will turn to the issue of the relevant geographic market as defined by

18

Dr. Rausser. In his report, Dr. Rausser concludes that the "relevant geographic market for Southeast dairy farmers is the area compromising Orders 5 and 7 because those Orders are treated as a common market, milk marketed in both orders is collectively pooled to arrive at an average blend price for both Orders, and Southeast farmers have severely limited options to move milk out of those Orders." Rausser Rpt. p. 8. [5]

The relevant geographic market is "the area of effective competition." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). That means "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Id.*; *see also White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 503 (6th Cir. 1983). Market definition is a highly fact-based inquiry. *Foundation For Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001). The Sherman Act applies with equal force to buyer side conspiracies, commonly referred to as monopsony. The Supreme Court has recognized that a conspiracy against buyers to stifle competition is as unlawful as one among sellers. *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948).

Where, as here, the plaintiffs allege a buyer-side conspiracy, the market is defined differently, requiring the Court "to reverse all of the factors involved in light of the buyer-side nature of the alleged activity." *Todd v. Exxon Corp.*, 275 F.3d 191, 201-02 (2d Cir. 2001) (citing *IIA Phillip E. Areeda, et al., Antitrust Law: an Analysis of Antitrust Principles and Their Application*,

_____

[5] Dr. Rausser acknowledges that based upon his analysis of the available data, "the geographic boundaries of the relevant market include Orders 5, 6 and 7." Rassuer Rpt p. 66. Order 6, that is, Florida, also has severely limited options to move milk out of its order. In addition, 6 of the 12 Order 6 pool distributing plants which are the closest plants to Orders 5 and 7 are controlled by Dean and NDH. Rassuer Rpt. p. 62. Therefore, Order 6 is very similarly situated to Orders 5 and 7 but was not included in the relevant geographic market.

¶ 574 at 302 n.12 (referring to a buyer-side analysis as the "mirror image" of the traditional seller-side market analysis)). In the context of a buyer-side conspiracy, "the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes." *Id.* (quoting *Roger D. Blair & Jeffrey L. Harrison, Antitrust Policy and Monopsony*, 76 Cornell L.Rev. 297, 324 (1991)).

Defendants correctly argue that courts consistently reject overly narrow geographic markets that ignore the "commercial realities" facing buyers and sellers or that unduly limit the "relevant area of effective competition." *Nilavar v. Mercy Health Sys.*, 244 F. Appx. 690, 698 (6th Cir. 2007). They argue that the undisputed record here shows that at least 40% of the milk pooled in Orders 5 and 7 was produced elsewhere and that, in effect, Professor Rausser ignored the commercial realities by excluding these producers of raw milk from his analysis because they are within "the relevant area of effective competition" and impact significantly the supply of, demand for and price of raw milk in Orders 5 and 7. Defendants further argue that a relevant market may not be defined by reference to federal order boundaries, which were established for administrative purposes, and that defendants have not themselves treated Orders 5 and 7 as a relevant market.

Plaintiffs respond with alternative arguments. First, they argue that the relevant market must be analyzed by reference to the available buyers in the relevant geographic market, not by reference to the available sellers of raw milk, and, secondly, even if it is required that determination of the relevant geographic market includes consideration that 40% of the raw milk is produced outside the relevant market as one of the commercial realities required to be considered, Professor Rausser has

20

done so.[6]  Plaintiffs further argue that the federal milk marketing orders are relevant and a factor to be considered in determining the relevant geographic market and they further argue that defendants have, in fact, treated Orders 5 and 7 as a relevant geographic market.

In short, plaintiffs argue that there are genuine issues of material fact to be decided by the jury which preclude a finding concerning the relevant market as a matter of law.  Defendants, on the other hand, argue that there is no genuine issue of material fact, that Professor Rausser has not considered all of the economic realities in formulating his opinion, and that the Court should grant judgment as a matter of law.  Although significant questions have been raised about Professor Rausser's approach, especially the possible, and maybe total,  lack of consideration by him of the raw milk flowing into Orders 5 and 7 from elsewhere, genuine questions of material fact do exist requiring the question of the relevant market to be submitted to the jury.  As this Court has noted in other orders, plaintiffs may not be able to carry their burden of proof and convince the jury that the relevant market is Orders 5 and 7; however, that is not the question before the Court.  Plaintiffs have established a jury question on the issue of the relevant geographic market.

**B.      Monopolization, Monopsonization and Attempted Monopolization and Monopsonization – Counts Two, Three and Four**

Count Three of plaintiffs' complaint alleges that DFA and DFA controlled entities possess monopoly power in the market for marketing and sales of fluid Grade A milk to fluid Grade A milk bottling plants in the southeast.  Plaintiffs allege that DFA has maintained and enhanced its market dominance by unreasonably restraining trade, artificially and anti-competitively reducing the price

---

[6]  Plaintiffs do not explain why Professor Rausser would have considered the amount of milk coming into Orders 5 and 7 as one of the "commercial realities" if determination of the relevant market did not require him to do so.

21

of fluid Grade A milk purchased from plaintiffs and members of the class, eliminating competition from rival cooperatives and independent dairy farmers, and foreclosing and excluding competitors from access to fluid Grade A milk bottling plants by engaging in predatory and unlawful conduct. More specifically, plaintiffs allege that DFA has gained monopoly power through the very same acts alleged to have been engaged in by defendants in furtherance of their alleged § 1conspiracy, [Complaint, ¶ 146].

Plaintiffs define the relevant geographic market as the southeast United States, comprised of Federal Milk Market Orders 5 and 7. They define the relevant product market as the market for sales or marketing of fluid Grade A milk to fluid Grade A bottling plants and the market for purchase of fluid Grade A milk by fluid Grade A milk bottling plants. They allege in their complaint that defendants control 77% of the fluid Grade A milk bottling capacity in the southeast, over 80% of the Grade A milk marketed in the southeast and 90% of the fluid Grade A milk produced in the southeast.

In Count Four, plaintiffs make almost identical allegations against Dean and non-defendant co-conspirator bottlers for unlawful monopsonization.[7] Count Two of the plaintiffs' complaint alleges that the same defendants named in Counts Three and Four of the complaint have attempted to monopolize and monopsonize.

Section 2 of the Sherman Act, 15 U.S.C. § 2, makes it illegal to "monopolize, (monopsonize), or attempt to monopolize (monopsonize) or combine or conspire to monopolize (monopsonize) any part or the trade or commerce among the several states . . ." The offenses of

---

[7] Monopsonization is monopoly power exercised by a buyer, rather than a seller, *Telcor Communications, Inc. v. Southwestern Bell Telephone Co.*, 305 F.3d 1124 (10th Cir. 2002), and is sometimes referred to as a "mirror image" of monopolization. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 321 (2007).

22

monopolization/monopsonization, attempt to monopolize/monopsonize and conspiracy to monopolize/monopsonize are distinct causes of action and require different proofs.

To establish a monopoly or monopsony under § 2 of the Sherman Act, plaintiffs must establish two elements: "1) possession of monopoly (or monopsony) power in the relevant market; and 2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). A claim for attempted monopolization (or monopsonization) requires: "(1) a specific intent to monopolize (or monopsonize); 2) anti-competitive conduct; and 3) a dangerous probability of success." *Tarrant Service Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 615 (6th Cir. 1993). Market strength that approaches monopoly (or monopsony) power, meaning the ability to control prices and exclude competition, is a necessary element for showing a dangerous probability of achieving monopoly (or monopsony) power in an attempt case. *Tarrant Serv. Agency*, 12 F.3d at 615; *see also Smith Wholesale Co., Inc. v. Philip Morris USA, Inc.*, 219 Fed. App'x. 398, 409 (6th Cir. 2007).

In order to succeed on either a monopolization or attempt to monopolize claim, plaintiffs must establish the relevant market in which they compete [or do business] with the alleged monopolizer. *See, e.g., Grinnell*, 384 U.S. at 571-73; *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965); *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395-99, 396 n.23 (1956); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611-12 (1953). The relevant market consists of two components: product and service market and geographic market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). The relevant product market is

23

not at issue in this motion.

A geographic market is "an area of effective competition." *Re/Max Int'l.*, 173 F.3d at 1016. The area is not defined by "metes and bounds," but "is the locale in which consumers of a product or service can turn for alternative sources of supply." *Id.*; *see also White and White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 501 (6th Cir. 1983) ("[T]he area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.") (quoting *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

Thus, "[t]he first step in any action brought under § 2 of the Sherman Act is for the plaintiff to define the relevant product and geographic markets in which it competes with the alleged monopolizer, and with respect to the monopolization claim, to show that the defendant, in fact possesses monopoly power." *Conwood Co. v. United States Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268-69 (2d Cir. 1979)). The Supreme Court has defined monopoly power as "the power to control prices or exclude competition." *E.I. duPont de Nemours & Co.*, 351 U.S. at 391. A plaintiff may establish that a defendant holds monopoly power by presenting either 1) direct evidence of actual control over prices or actual exclusion of competitors, or 2) circumstantial evidence showing a high market share within a defined market. *Re/Max Int'l, Inc.*, 173 F.3d at 1016.

Neither the Supreme Court nor the Sixth Circuit has adopted a uniform standard as to a percentage of market power that triggers monopoly (or monopsony) power for purposes of § 2. *See e.g.*, *Smith Wholesale Co., Inc.*, 219 Fed. App'x at 409. The standard for monopoly power appears to be very high, and market share is typically a determining factor. *See Grinnell*, 384 U.S.

24

at 570. While market share might, in many instances, lead to an inference of monopoly (or monopsony) power, it is not, in and of itself, the only factor to consider. *Amer. Council of Certified Podiatric Physicians and Surgeons v. Amer. Bd. of Podiatric Surgery, Inc*., 185 F.3d 606, 623 (6th Cir. 1999) ("[M]arket share is only a starting point for determining whether monopoly power exists, and the inference of monopoly power does not automatically follow from the possession of a commanding market share.").

In the Sixth Circuit, it appears that market share is a "starting point" in assessing market power and that the threshold is, indeed, very high. *See Byars v. Bluff City News Co, Inc.*, 609 F.2d 843, 850 (6th Cir. 1979) (finding that 75-80 percent or greater is a "starting point" in assessing monopoly power). *See also Smith Wholesale Co.*, 219 Fed. App'x at 409 (56% market share insufficient); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1443 (6th Cir. 1990) (19-29% market shares insufficient and "there is substantial merit in a presumption that market shares below 50 or 60% do not constitute market power" (quoting *Areeda & Hovenkamp, Antitrust Law*, Section 578.3 (1988 Supp.)); even a high market share, however, does not appear to be sufficient alone to determine a firm's capacity to achieve monopoly or monopsony. *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir. 1982) (citations omitted).

The real test is whether defendants possess sufficient market power to achieve their aims. *Id.* at 826. "Market power is the power to force a purchaser (or seller) to do something that he would not do in a competitive market," and it entails the "ability of one seller (or purchaser) to restrict output or raise prices." *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 817 (6th Cir. 1997) (quoting *Eastman Kodak Co.*, 504 U.S. at 464). In order for a Sherman Act claim to

Case 2:07-cv-00208   Document 1174   Filed 07/14/11   Page 25 of 56   PageID #: 24960

lie against a defendant, there must be a finding of market power. *Hand v. Central Transp., Inc.*, 779 F.2d 8, 11 (6th Cir. 1985).

Defendants claim that plaintiffs cannot establish that DFA possessed, or had a dangerous probability of acquiring, monopoly power in the relevant market; that Dean possessed, or had a dangerous probability of acquiring, monopsony power in the relevant market; and that plaintiffs' claim of shared monopoly fails as a matter of law. Plaintiffs predictably respond by arguing that both Dean and DFA have the necessary market power and they also make the somewhat strained argument that these counts "are not limited solely to Dean and DFA," claiming that Court Two is a claim for attempt to monopolize and monopsonize "against all defendants acting in concert with other of the defendants," (a somewhat nonsensical statement) and that Count Four is a claim for unlawful monopsony against Dean, NDH and DFA collectively.

### 1. Does DFA Possess, or Have a Dangerous Probability of Acquiring, Monopoly Power in the Relevant Market?

As plaintiffs correctly argue, a plaintiff can demonstrate the possession of, or dangerous probability of acquiring, monopoly power in one of two ways. "The first is by presenting direct evidence showing the exercise of actual control over prices or the actual exclusion of competitors." *Re/Max Int'l v. Realty One, Inc.*, 173 F.3d at 1016. "The second is by presenting circumstantial evidence of monopoly power by showing a high market share within a defined market." *Id.* Defendants argue that plaintiffs have neither direct nor circumstantial evidence that DFA possesses unilateral monopoly power.

This Court agrees with defendants and the monopolization claim, Court Three, against DFA

will be dismissed. As an initial matter, plaintiffs' attempt to salvage their unilateral conduct claims by aggregating the market shares of various defendants is misplaced. "Market power under § 2 of the Sherman Act is 'the ability of a single seller to raise prices and restrict output.'" *Smith Wholesale Co.*, 219 Fed. App'x at 409 (quoting *Virgin Atl. Airways, Ltd. v. British Airways*, 257 F.3d 256, 265 (2d Cir. 2001)). Likewise, the Sixth Circuit has rejected the argument that market power may be measured by considering a combination of the market shares of more than one company. *See Smith Wholesale Co.*, 219 Fed. App'x at 409 ("[c]onsidering a combination of market shares of more than one company is an inappropriate measure of [ ] market power.") (citing *Arthur S. Langenderfer*, 917 F.2d at 1433). Thus it seems quite clear, at least in the Sixth Circuit, that it is the ability of a single actor, exercising unilateral market power which is the relevant inquiry in a monopolization case.

The plaintiffs appear to rely largely on the first method of demonstrating the possession of, or dangerous probability of acquiring, monopoly power. To prove monopoly power by presenting circumstantial evidence, it is the defendants' market share which is the relevant inquiry, *Re/Max Int'l.*, 173 F.3d at 1016, although "[m]arket share, standing along, is insufficient to establish market power as a matter of law and is only the starting point for determining whether monopoly power exists." *Smith Wholesale Co. v. Philip Morris USA, Inc*., 2005 WL 1981452, at *8 (E.D. Tenn. August 17, 2005). Plaintiffs' expert witness, Dr. Rausser, conducted no analysis of DFA's market share or market power and indeed testified at his deposition that he held no opinion on these issues.

Plaintiffs also argue, however, that they have direct evidence of DFA monopoly power. Plaintiffs point to evidence that DFA sets the price that both other cooperatives and independent dairy farmers receive for their milk and DFA's use of fully supply contracts as direct evidence of DFA's

27

monopoly power. As plaintiffs acknowledge, DFA's actions are not, in and of themselves, a violation of § 2. While the evidence is clear that DFA is a hard-nosed actor in the market, the evidence establishes only that DFA has market power, not that it has unlawful monopoly power. Thus, there is no material question of fact regarding DFA's monopoly power.

### 2. Does Dean Possess, or Have a Dangerous Probability of Acquiring, Monoposy Power in the Relevant Market?

Defendants make essentially the same arguments with respect to Dean's possession of monopsony power in the market to buy raw milk that it makes with respect to the alleged monopolization by DFA of the market for raw milk. Once again, plaintiffs shared or combined market arguments fail with respect to the monopsonization claim for the same reason they fail with the respect to the monopolization claim. This Court also agrees with defendants that plaintiffs have not created an issue of material fact with respect to whether or not Dean possessed, or had a dangerous probability of acquiring, monopsony power in the relevant market.

Plaintiffs have, in fact, attempted to show through circumstantial evidence Dean's monopsony power by calculating its share of bottling capacity in Orders 5 and 7 at various points and times. While the various experts have reached different conclusions, it appears that the experts have calculated that Dean's share of bottling capacity is around 40%. Even assuming that an examination of bottling capacity is relevant on the question of Dean's share of the market alleged, i.e. purchases of raw Grade A milk by processing plants, it appears that these market share estimates are insufficient to establish monopsony power. Plaintiffs' class expert, Dr. John C. Beyer, estimated Dean's share of bottling capacity in Orders 5 and 7 as approximately 26% in 2002 and 41% in 2007. Dr. Rausser estimated Dean's share of bottling capacity to be approximately 41.5% and Dr. Scott estimated

28

Dean's share at 43.4%, respectively, as of 2007. As set forth above, these percentages of market share, even assuming that they measure the correct market, do not meet the threshold of what it takes to establish monopoly or monopsony power. *See Byars*, 609 F.2d at 850 (finding that 75-80% or greater is a "starting point" in assessing monopoly power); *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 935 (6th Cir. 2005) (noting Judge Learned Hand's explanation of when market share becomes large enough to constitute a monopoly: "over ninety . . . percent [ ] is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough . . ."); *Smith Wholesale Co.*, 219 Fed. App'x at 409 (56% market share insufficient). Furthermore, the undisputed evidence is that existing competitors have expanded and new rivals have appeared during the relevant time period in Orders 5 and 7.

Once again, plaintiffs also appear to rely on an argument that there is direct evidence that Dean possessed monopsony power in the market to buy raw milk or had a dangerous probability of acquiring such power. First, plaintiffs point to testimony from representatives of Dean's main supplier, DFA, and its main competitor, NDH, to support its argument that Dean has the ability to control prices paid to sellers in the market. DFA's director of customer relations, Frank Johns, testified that Dean would be a "deal breaker" in terms of implementing any price increase. Similarly, they point to testimony of NDH President Meyer who testified that NDH wouldn't accept an over-order premium unless assured that Dean and other processors were accepting the same over-order premium. Specifically, he testified that "If Dean wouldn't accept a premium, I wouldn't accept the premium." This testimony, however, tends only to establish that Dean is a major player, perhaps a leader, in the market, and that Dean has a degree of market power. It does not establish, however, that Dean has the ability to set prices at an anti-competitive level, despite Professor Rausser's opinion

29

to the contrary.

Plaintiffs also point to proof which they say establishes that Dean excludes competition from the market, mainly evidence related to the Red Oak plant in Georgia and the acquisition and shut down of eight bottling plants in the southeast. These acquisitions and shut downs, however, do not necessarily constitute evidence of excluding competition and plaintiffs point to no evidence that Dean actually shuttered plants in order to prevent price competition. For these reasons, the Court finds that there is no genuine issue of material fact as to whether or not Dean possessed, or had a dangerous probability of acquiring, monopsony power in the relevant market and summary judgment will be granted as to Court Four.

### 3. Jointly Acquired Market Power

As noted above, Court Two of plaintiffs' complaint asserts a claim under § 2 of the Sherman Act for attempt to monopolize and monopsonize. Specifically, paragraph 134 of the complaint alleges: "DFA, both by itself and in combination with DFA-controlled market agencies DMS and SMA, has attempted to and continues to attempt to possess market power in the marketing and sales of fluid Grade A milk to fluid Grade A milk bottling plants in the southeast market and maintains a dominant position in the market for the purchase of fluid Grade A milk by fluid Grade A milk bottling plants in the southeast," clearing alleging a scheme to monopolize. The complaint further alleges, in paragraph 137, that "Defendants have attempted to and continue to attempt to obtain market power in the purchase of fluid Grade A milk by fluid Grade A milk bottling plants in southeast market and they have acted with the specific intent to obtain a monopsony and use their market dominance in the bottling of fluid Grade A milk . . .," alleging a scheme on the part of defendants to monopsonize. Plaintiffs now recharacterize their Count Two claim as "a claim for

30

attempt to monopolize and monopsonize against all defendants acting in concert with other of the defendants." [8]

As set forth above, a claim for attempted monopolization requires specific intent to monopolize, anti-competitive conduct and dangerous probability of success. *Tarrant Serv. Agency*, 12 F.3d at 615. Apparently recognizing that they are unable to show sufficient market share on the part of any defendant to establish monopoly or monopsony power, plaintiffs appear to attempt in this count to aggregate market share in an effort to do what they cannot otherwise do. Such an approach, however, flies in the face of clear Sixth Circuit precedent. Although plaintiffs attempt rather feebly to distinguish the case, the Sixth Circuit has, by clear implication, rejected the "shared monopoly" theory of the plaintiffs. In the *Smith Wholesale* case, one which originated in this Court, the Sixth Circuit specifically held, when considering an attempted monopolization claim under § 2 of the Sherman Act, that "a combination of market shares of more than one company is an inappropriate measure of [ ] market power and that market power under § 2 relates to the ability of a ***single seller*** to raise prices and restrict output". This Court agrees with defendants' assertion that plaintiffs in reality suggest that somehow the Sixth Circuit did not mean what the Sixth Circuit said. Respectfully, that is an argument that must be presented to the Sixth Circuit, not to this Court. This Court will assume that the Sixth Circuit meant exactly what it said until the Sixth Circuit says otherwise. For this reason alone, Count Two of the complaint fails as a matter of law.

Furthermore, it appears to this Court that the plaintiffs misstate and misuse the holding of cases from other circuits in an attempt to salvage their attempt to monopolize and monopsonize

---

[8] The Court has previously noted the illogical nature of this statement and fails to grasp how ***all defendants*** would act in concert with ***other of the defendants***.

claims. A review of each of the cases cited by the defendants reveals that the language quoted by the defendants in those cases about the collective or joint use of monopoly power applies in the context of the language of § 2 of the Sherman Act which makes it illegal to "combine or conspire with any other person or persons to monopolize any part of the trade or commerce." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993). Thus, the language from these cases is completely inapposite and has no application to a claim of attempt to monopolize; rather, what plaintiffs in reality allege is a conspiracy to monopolize or monopsonize, the very same claim they have raised in Count One of their complaint. The elements of a conspiracy to monopolize are the existence of a conspiracy, i.e. that defendants engaged in a conspiracy, and specific intent to monopolize. *Richter Concrete*, 691 F.2d at 827. Both a conspiracy to monopolize and attempt to monopolize require that defendant have monopoly power or a dangerous probability of acquiring it. *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Centers, Inc.*, 200 F.3d 307 (5th Cir. 2000). Thus, it appears to this Court that the only real difference between a claim of attempt to monopolize under § 2 and a claim of conspiracy to monopolize under § 2 is joint or collective action by the defendants.

The plain language of § 2 further bolsters the Court's decision. As noted above, § 2 authorizes three distinct claims: (1) monopolization (or monopsonization); (2) attempt to monopolize (or monopsonize); and (3) conspiracy to monopolize (or monopsonize). The fact that a separate offense under § 2 exists for concerted action, *i.e.* conspiring, strongly suggests that claims for monopoly/ monopsony, and attempt are unilateral action claims and that any claim for joint action must be brought as a conspiracy claim rather than an attempt claim. *See H.L. Hayden Co. of N. Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989); *Carpet Group International v. Oriental Rug Importers Ass'n*, 256 F.Supp.2d (D. New Jersey, 2003).

32

To the extent plaintiffs allege unilateral conduct on the part of Dean and DFA, their attempt claim in Count Two fails for the same reasons their claims of monopolization and monopsonization in Counts Three and Four against Dean and DFA fail. To the extent they allege joint or collective action on the part of the defendants to monopolize, that claim duplicates the claim made by the plaintiffs in Count One of the complaint and Count Two should be dismissed for that reason alone. Furthermore, it appears that plaintiffs have abandoned completely their claims of unilateral conduct with respect to Count Two and Count Four and pursue only a unilateral monopolization claim against DFA in Count Three, which fails for the reasons set forth above. Counts Two, Three and Four of the complaint will therefore be dismissed.

### C.     Triable Issue of Fact as to the Alleged Conspiracies (Counts One and Five)

This Court has previously discussed the legal principles which apply to the adjudication of motions for summary judgment in antitrust cases at length in dealing with the retailer plaintiffs' motions for summary judgment and above and sees no purpose in discussing the standard again. *See* Sec. III above.

The parties have committed a substantial part of their briefs to their argument as to whether or not there is genuine issue of material fact with respect to the alleged conspiracies to suppress dairy farmer pay prices and monopolize/monopsonize. They have filed voluminous statements of fact and the exhibits to their motions consist of hundreds, if not thousands, of pages of documents. Over the almost one year since the joint motion of the defendants was filed, this Court has made every effort to review this vast volume of pleadings and documents. Based upon that review, the Court has concluded that genuine issues of material fact do indeed exist with respect to the conspiracy allegations which require a jury to perform its traditional fact-finding role. Although it might be

33

preferable for this Court to examine in detail in this memorandum opinion each of the arguments made by all of the parties in this case, such an approach would require an enormous amount of time and would increase the size of this already too long memorandum by dozens of pages. As a result, the Court simply finds that there are genuine issues of material fact with respect to the conspiracy claims of plaintiffs which require that those claims be submitted to the jury. The motion for summary judgment on this ground is DENIED.

**D.      Antitrust Injury and Antitrust Standing**

"Standing, in a conventional Article III sense, requires just proof of actual injury, causation and redressability." *NicSand, Inc. v. 3M Company*, 507 F.3d 442, 449 (6th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). A determination of antitrust standing, however, requires more. "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983). Furthermore,

> Antitrust standing to sue is at the center of all antitrust law and policy. It is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws. The requirement of antitrust standing insures that antitrust litigants use the laws to prevent anti-competitive action and make certain that they will not be able to recover under the antitrust laws when the action challenged would tend to promote competition in the economic sense. Antitrust laws reflect considered policies regulating economic matters. The antitrust standing requirement makes certain that the laws are used only to deal with the economic problems whose solutions these policies were intended to affect.

*HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991).

In other words, standing requires more than injury proximately caused by a violation of the

34

antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Plaintiffs must also prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Antitrust injury must be attributable to an anti-competitive aspect of the practice under scrutiny. *Atlantic Ridgefield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

Defendants once again raise substantial issues; however, they appear to this Court to involve disputed factual issues which must be resolved by a jury. There is evidence from which a jury could conclude that defendants, the buyers within the relevant geographic market, have restricted opportunities to sellers, i.e. plaintiffs, such that they have no other option but to sell at the price set by defendants. As a result, the jury could conclude that plaintiffs are the direct victims of anti-competitive conduct on the part of defendants. In other words, the jury may find that plaintiffs have suffered an antitrust injury because of defendants' monopsonistic behavior; *see Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948), and that they have antitrust standing to pursue these claims. Summary judgment is DENIED on this ground.

E.      **Filed–Rate Doctrine**

One aspect of plaintiffs' case deals with their allegation that defendants "flooded" the southeast with excess milk reducing the federal minimum blend prices for milk. Plaintiffs complaint explains how minimum blend prices are set and the effect, as they see it, of flooding on the federal minimum blend prices:

> 50.      USDA regulations mandate that fluid Grade A milk bottlers pay at least the weighted uniform average or minimum "blend" price for fluid Grade A milk that is "pooled" on an order. Dairy farmers "pool" Grade A milk on an order by delivering specified minimum quantities of fluid Grade A milk to USDA-regulated fluid Grade A milk bottling plants associated with that order.

35

Dairy farmers' delivery of the minimum quantity of fluid Grade A milk to fluid Grade A milk bottling plants is referred to as "touching base." USDA regulations require that dairy farmers touch base each month they are pooled on an order.

51.     The minimum blend price for an order is based upon the end uses of all Grade A milk pooled on that order. Thus, for example, if 60 percent of all Grade A milk pooled on an order was used as Class I milk (fluid Grade A milk), and the remaining 40 percent was used as Class III milk (cheese milk), the minimum blend price for all Grade A milk pooled on the order would consist of the Class I price for 60 percent and the Class III price for 40 percent. To use hypothetical prices for this example, if the Class I price is $2.00 per pound and the Class III price is $1.50 per pound, the minimum blend price would be $1.80 per pound. (Using the hypothetical utilization of 60 percent for Class 1 yields $2.00 x .6 = $1.20. 40 percent utilization for Class III yields $1.50 x .4 = $.60. When these two prices are added together, $1.20 + $.60 = $1.80.)

52.     Due to seasonal and other variations in Grade A milk production and demand and uneven distribution of dairy farmers throughout the United States, Class I utilization, the highest valued use of Grade A milk in the USDA pricing scheme, varies between orders. On some orders, such as Orders 5 and 7 where demand for bottled fluid Grade A milk often exceeds Grade A milk production, Class I utilization has traditionally exceeded 70 percent. In other areas, such as the Southwest where demand for bottled fluid Grade A milk does not exceed Grade A milk production, the percentage of Class I utilization may often be as low as 40 percent. Consequently, orders with high Class I utilization generally have higher FMMO minimum blend prices than orders with lower Class I utilization.

53.     Shifting substantial quantities of Grade A milk from one order to another is referred to as "diluting" or "flooding" a pool because the "outside" Grade A milk increases the total volume of Grade A milk pooled to the point that it decreases the Order's Class I utilization, and hence reduces the minimum blend prices. Because DFA has the capacity to flood pools and to move money arbitrarily among its members, it can use that power, as well as other means, to stifle competition in the Southeast market.

54.     USDA minimum prices for Class I Grade A milk represent the minimum or floor prices that fluid Grade A milk bottlers must pay for Grade A milk marketed pursuant to USDA regulation.

36

Cooperatives and independent dairy farmers are free to negotiate for prices in excess of FMMO minimum prices to reflect more accurately market conditions. The amounts by which prices for Grade A milk exceed FMMO minimum blend prices are known generically as "overorder premiums." Fluid Grade A milk bottling plants in the Southeast traditionally paid overorder premiums for Grade A milk prior to the successful implementation of Defendants' conspiracy, monopolization and monopsonization.

55.     The actual price a dairy farmer receives for Grade A milk is referred to as the "mailbox price." The mailbox price received by independent dairy farmers is comprised of the FMMO minimum blend price plus any over-order premium and bonuses for volume or quality, minus marketing costs. The mailbox price received by dairy cooperative members is calculated in the same way except additional charges may be deducted by the cooperative. Prior to Defendants' antitrust violations, dairy farmers in the Southeast received mailbox prices for Grade A milk that included over-order premiums that reflected more accurately competitive market conditions.

Professor Rausser, plaintiffs' damages expert, calculates the damages he claims were caused by defendants' flooding of the southeast- his Stage 1 damages. To arrive at those damages, he estimates the amount of milk that he believes should have been shipped into Orders 5 and 7 from other areas and then "re-compute[s] the uniform prices in Order 7 [but not Order 5] applying the federal formulas." Based on that recalculation, he claimed that plaintiffs were underpaid by $80 million as a result of an artificial reduction of the federal minimum blend prices for milk.

Defendants argue that these Stage 1 damages are barred by the filed-rate doctrine, which as a general rule bars challenges under state law and federal antitrust laws to rates set by federal agencies. This Court has previously discussed the origin and purpose of the filed-rate doctrine as well as the regulatory scheme involved in the setting of milk prices. *See* Doc. 79, pp. 9-11. In response to the defendants' prior motion to dismiss, plaintiffs responded to this same argument by asserting that the filed-rate doctrine does not apply here because minimum blend prices are not filed

37

with or approved by a regulatory agency so as to invoke the doctrine. They further responded that it was the fixing of over order premiums which is at the heart of their complaint, not the minimum blend prices established by the Secretary of Agriculture. This Court previously agreed with plaintiffs on both points, noting that defendants had cited no authority for the proposition that federal minimum blend prices are subject to the filed-rate doctrine. The Court specifically determined, based on plaintiffs' allegations, that it is the "mailbox price" which they allege is fixed at an artificially low amount and that these prices are neither regulated nor approved by the Department of Agriculture. The Court therefore found the filed-rate doctrine to be inapplicable to this case.

Plaintiffs argue that much has changed since the Court decided the motion to dismiss. They claim that discovery has made it clear that plaintiffs' "flooding" allegations present a direct challenge to the federal minimum blend price and that the federal minimum blend price is in fact a price set by the USDA through its federal market administrator. They further argue that the law has changed as well, citing a district court decision which specifically addressed the question of whether federal minimum blend prices are subject to the filed-rate doctrine. In *Carlin v. Dairy America, Inc.*, 690 F.Supp.2d 1128, 1133-41 (E.D. Cal. 2010), the district court determined that the monetary damages sought by plaintiffs in that case, a class of dairy farmers against a dairy corporative and a common marketing agency, could only be calculated by reference to rates set by the Secretary, something the filed-rate doctrine forbids. *Id.* at 1135-36. Defendants now renew their argument that plaintiffs' Stage 1 damages are barred by the filed-rate doctrine because they "can only be ascertained by reference to rates set by the Secretary pursuant to the FMMOs." *Id*. at 1136.[9]

---

[9] The *Carlin* court noted this Court's prior decision not to apply the filed-rate doctrine, specifically noting that this Court's decision was based on the fact that "the rates being challenged were not the minimum blend rate determined by the Secretary, but were over-order premiums above the minimum rates that were

Defendants make essentially the same arguments with respect to the filed-rate doctrine that they made previously with respect to the motion to dismiss. At the outset, however, it is important to note the different standards which apply for a motion to dismiss as opposed to a motion for summary judgment. The Court addressed a legal issue with respect to the motion to dismiss. The record is now complete and the Court must address both the factual and legal issues raised by the motion and apply the appropriate summary judgment standard to the analysis.

Defendants do appear to have changed position somewhat since the time of the motion to dismiss. At that time, they clearly argued that the filed-rate doctrine has no application because it was not the federal minimum blend price which they challenged but rather the over-order premiums paid to farmers which were at the heart of their claims. They now simply take the position that the federal minimum blend price is not subject to the filed-rate doctrine. They make several arguments in this respect. First they argue that the USDA does not file or otherwise meaningfully review the federal minimum blend prices, they argue, somewhat tongue in cheek, that they have not changed their position and they argue that the *Carlin* decision is inapposite.

For the reasons which follow, this Court now concludes that the filed-rate doctrine does in fact bar plaintiffs' claim for the so-called Stage 1 damages calculated by Professor Rausser. What is abundantly clear at this point, after the factual record has been completed, is that, at least as far as these Stage 1 damages are concerned, plaintiffs do directly challenge the federal minimum blend prices, and they can hardly argue otherwise. In order to arrive at the amount of Stage 1 damages, Professor Rausser **recalculates** the federal minimum blend price based on what he now believes it should have been. The Court cannot imagine a more direct attack on the federal minimum blend

_____

allegedly manipulated by the defendants' anti-competitive behavior." 690 F.Supp.2d at 1134.

prices.

As noted above, this Court's prior decision was premised upon two bases: (1) That plaintiffs' claim related to over-order premiums, not to the federal minimum blend prices, and (2) that minimum blend prices are not filed rates set by a government regulatory agency. The Court concludes that the first basis for the Court's decision is now shown to be factually inaccurate and the second contrary to the weight of authority, especially given the factual state of the record. This Court finds the rational in the *Carlin* case and *Servais v. Kraft Foods, Inc*., 631 N.W.2d 629 (Wis. App. 2001), *aff'd.* 643 N.W.2d 92 (Wis. 2001), to be persuasive and, to the extent Professor Rausser's damages rely on recalculating the federal minimum blend price, that claim for damages is barred by the filed rate doctrine and summary judgment will be GRANTED as to that claim.[10]

This Court discussed briefly the *Servais* case in its prior opinion with respect to the motion to dismiss. In *Carlin*, dairy farmers brought a putative class action against Dairy America, Inc., an entity established by a group of nine dairy cooperatives for the purpose of marketing dairy products manufactured by the cooperatives, and California Dairies, Inc., a dairy cooperative with a major stake in the Dairy America marketing cooperative. The plaintiffs alleged misreporting of pricing data by the defendants which led to significantly lower than would have been the case minimum prices for raw milk. The defendants moved to dismiss on grounds of the filed-rate doctrine. The district court, after reviewing the history of the filed-rate doctrine and noting the lack of any federal cases applying the doctrine in the context of federal milk marketing orders, concluded that the filed-rate doctrine

---

[10]    Plaintiffs do, as they must, acknowledge that "some of Prof. Rausser's damages rely on re-calculating the federal blend price. If true, those damages would be disallowed, not plaintiffs' entire claims." Plaintiffs would have considerably more credibility with the Court if they would simply acknowledge that Professor Rausser does in fact re-calculate the federal blend price. He states unequivocally in his report that he does so.

applies generally to minimum rates for raw milk, distinguishing this Court's prior decision in this antitrust litigation on the basis that this Court had found that the rates being challenged were not the minimum blend rate determined by the Secretary but were over-order premiums above the minimum rates. The *Carlin* court stated as follows:

> Plaintiffs' claims for monetary damage are, so far as the court can discern, solely the product of minimum prices for raw milk set by FMMO's that were artificially depressed by Defendants' misreporting of prices for NFDM. The crux of Plaintiffs' claims is that the minimum raw milk prices set forth in the FMMO's would have been higher had Defendants not misreported forward contract prices for NFDM. The monetary damages Plaintiffs claim are to be determined, as the court understands it, by calculating the difference between raw milk minimum prices as set forth in the FMMOs and what those prices would have been had Defendants not submitted on unauthorized forward contract sales prices. In other words, Plaintiffs' damages can only be ascertained by reference to rates set by the Secretary pursuant to the FMMO's during the time period in question. This is precisely what the filed-rate doctrine forbids.

*Id.* at 1136. After rejecting plaintiffs' argument that the filed-rate doctrine does not apply to federal minimum milk prices, the district court also rejected many of the same technical objections to applicability of the doctrine raised by plaintiffs in this case. At least one other district court has also rejected similar arguments. *See In Re Hawaiian & Guamanian Cabotage Antitrust Litigation*, 754 F.Supp.2d 1239, 1245 (W.D. Wash. Nov. 30, 2010). (collecting cases).

Given that Professor Rausser's Stage 1 damages opinion includes his recalculation of the federal minimum blend price, plaintiffs' claim related to those damages falls squarely withing the purpose of the filed-rate doctrine and would require this Court to substitute its judgment in this judicial proceeding for that of the governing regulatory agency. This Court agrees with the *Carlin* court that that is precisely the type of determination forbidden by the filed-rate doctrine. To allow plaintiffs' claim for Stage 1 damages would require the Court to determine what the reasonable

41

government minimum milk price would have been if defendants had not conspired as alleged in their complaint. Despite their prior claims, plaintiffs are in fact challenging the minimum prices set by the Secretary of Agriculture. In addition, now that the record has been fully developed, plaintiffs' arguments that the USDA does not file or otherwise meaningfully review the federal minimum blend price fails as well. The record in the case establishes that these rates are in fact filed with a government agency which has the authority to set and review those rates, regardless of the actual degree of agency review. *In re Hawaiian & Guamanian Cabotage Antitrust Litigation*, 754 F.Supp.2d at 1245 (citing *Carlin*, 690 F.Supp.2d at 1136-37); *In re N.J. Title Ins. Litig.* 2009 WL 3233529 at *2 (D. New Jersey) ("application of the filed-rate doctrine does not depend upon meaningful agency review of filed rates") (citing *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,, 476 U.S. [409] at 417 n.19, 106 S. Ct. 1922)).

In sum, the filed-rate doctrine bars plaintiffs' claim for Stage 1 damages and the motion for summary judgment is GRANTED in this respect.

F.      **The Bos Motion**, **[Doc. 833]**

Gerald L. Bos ("Bos") is one of the individual defendants named by the plaintiffs in the two conspiracy counts contained in the amended complaint. Bos joins the joint motion of all other defendants for summary judgment; however, he has filed a separate motion for summary judgment raising issues not raised in the joint motion. Bos argues that, regardless of whether or not plaintiffs can establish a triable issue on the existence of a conspiracy generally, they cannot establish a triable issue on the question of whether or not Bos "actively and knowingly" participated in a conspiracy to eliminate competition for the purchase and sale of raw milk and to suppress farmer pay prices. Plaintiffs predictably respond that the evidence is not only sufficient to create a triable issue but is

somewhat overwhelming as to Bos's participation in the conspiracy. The Court agrees with Bos and his supplemental motion for summary judgment will be granted.

### 1.    Factual Background

Plaintiffs' statement of the background facts in this case is set out in their brief in five sentences; beyond that, they simply refer the Court to their response to DFA's statement of facts, and plaintiffs' additional statement of facts, as well as their briefing with respect to the joint motion. Defendant does no better, setting out a two sentence statement of facts and referring the Court to other facts relevant to the motion which are discussed in the body of the motion. Neither party's approach to identification of genuine issues of material fact is helpful to the Court. As a result of the way the parties have approached the statement of facts in their briefs, the Court will not attempt to set out a statement of facts but will simply say that the Court has viewed the facts, as it is required to do, in the light most favorable to the plaintiffs.

Bos is the former chief financial officer of DFA, having retired from DFA in 2005 after 26 years with DFA and its predecessor Mid-America Dairymen, Inc. Bos served as a part time consultant to DFA after his retirement for approximately three years.

### 2.    Legal Standard

The parties agree that the appropriate standard to be applied to the question of individual liability under the antitrust laws has been stated by the Sixth Circuit in *Brown v. Donco Enterprises, Inc.*, 783 F.2d 644 (6th Cir. 1986). In *Brown*, the Sixth Circuit found it to be "undisputed that a corporation's officers and agents may be held individually liable for corporate actions that violate the antitrust laws if they authorize or participate in the unlawful acts." *Brown*, 783 F.2d at 646 (citing *United States v. Memphis Retail Package Stores Association*, 334 F.Supp. 686, 689 (W.D. Tenn.

43

1971)). The specific holding of the Sixth Circuit in *Brown* is easily extracted from the Sixth Circuit's opinion and is a rather straightforward standard which must be applied. The Sixth Circuit held:

> Individual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends. To support a determination of liability under this standard, the evidence must demonstrate that a defendant exerted his influence so as to shape corporate intentions.

*Brown*, 783 F.2d at 646.

Both plaintiffs and the defendant take this relatively straightforward statement of the standard to be applied and attempt to modify it to meet their own purposes. In doing so, both parties misstate the Sixth Circuit's holding in *Brown* and this Court's prior holding as well. Bos states the standard as follows: "Individual liability may be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anti-competitive ends <u>and</u> that an individual defendant exerted his influence so as to shape corporate intentions", citing *Brown* and this Court's prior memorandum opinion, Doc. 61 (internal quotation marks omitted). Plaintiffs, on the other hand, state the standard as:

> Under *Brown*, Bos is individually liable under the antitrust laws if he:
>
> •   Authorize[s] or participate[s] in the unlawful acts,
> • Exerts his influence so as to shape corporate intentions,
> • Becomes an active participant in formulating policy decisions with his client to restrain competition, <u>or</u>
> • Direct[s] the corporation to engage in the complained of acts for anti-competitive purpose.

Dairy Farmers Response, [Doc. 923, p. 3].

In other words, defendant alleges that individual liability made be imposed only where two showings are made. First, he claims that individual liability attaches only where a corporate agent actively and knowingly engages in the scheme designed to achieve anticompetitive ends, and

44

secondly, where the individual defendant asserted his influence so as to shape corporate intentions. On the other hand, plaintiffs appear to argue that individual liability may attach in any one of four alternative situations. Both parties are wrong. The standard set out by the Sixth Circuit for individual liability of a corporate agent is that the agent "actively and knowingly engaged in a scheme designed to achieve anti-competitive ends." *Brown*, 783 F.2d at 646. The Sixth Circuit also makes it clear that, at a minimum, to support "a determination of liability ***under this standard***, the evidence must demonstrate that a defendant exerted his influence so as to shape corporate intentions." *Id*. (emphasis added). In other words, in the Sixth Circuit, to meet the standard for individual liability, *i.e.* active and knowing participation, the evidence must show that the defendant exerted influence over corporate decisions to the point that his influence shaped corporate intentions.

Plaintiffs, however, are by far the worst offenders here. They appear to completely misstate and misuse the standard established by the Sixth Circuit. Nothing in the *Brown* decision suggests a four part alternative standard for individual liability and plaintiffs' argument that it must show only active and knowing participation without also showing that the defendant exerted his influence so as to shape corporate intentions, is simply wrong. Plaintiffs also gloss over their attempt to evade the requirement by arguing that simple participation in the unlawful acts is sufficient when in fact the evidence must show that an individual's participation was active and knowing. The Court will now turn to the question of whether or not the evidence creates a genuine issue of material fact as to whether or not Bos actively and knowingly engaged in an anticompetitive scheme.

### 3.     Analysis

Bos argues in his motion that there is no evidence against Bos which would establish a triable issue of fact with respect to whether Bos, as an individual, "actively and knowingly engaged in a

scheme designed to achieve anticompetitive ends."  More specifically, Bos not only argues that there is no evidence that he ever knowingly joined any illegal agreement, he also argues that there is no evidence to establish that he actively and knowingly participated in the various constituent parts of the alleged scheme, including plaintiffs' alleged plan by DFA and Dean to expand DFA's control of milk produced by requiring dairy farmers in the southeast to become members of DMS before they could obtain access to Dean plants, no evidence that Bos actively and knowingly participated in any scheme to fix prices, and no evidence that he actively and knowingly shared pay price information or participated in the alleged flooding scheme.  Bos further argues that there is no evidence that he actively and knowingly participated in any scheme to organize and maintain SMA for an anticompetitive purpose or any scheme to use DCMA to set agreed upon premiums and monitor compliance with the conspiracy.  He also argues that he had no active and knowing participation in the enforcement of full supply agreements.  Bos correctly argues that plaintiffs may not meet their burden of establishing a triable issue of fact by pointing to the alleged conspiratorial intent and conduct of others.

In their response to Bos's motion, plaintiffs point to a host of "facts" [11] which they argue tend to establish that Bos knowingly and actively participated in the alleged conspiracy.  As best the Court can tell from the plaintiffs' filings, they allege the following in support of their claim that there is a triable issue of fact as to Bos:

- Bos testified that he was involved in all aspects of the planning and financing of operations of DFA and its joint ventures;

---

[11]  The Court loosely refers to plaintiffs' "facts."  In reality, what plaintiffs often refer to as "facts" are simply inferences they seek to draw from other facts or conclusory statements, or they simply misstate the facts established.

46

- Gregg Engles, Dean's CEO, testified that Bos and Hanman were always together and Bos was a "driving force" behind the financial aspects of DFA/Suiza/Dean dealings;

- Bos, Hanman and co-conspirators Engles, Schenkel, Beshears, Meyer and Noll have been close friends for decades;

- Bos, Hanman and the co-conspirators listed above have entered into business deals together, as executives, co-investors and competitors;

- Bos was typically with Hanman when business matters were discussed;

- Bos was paid well for his services, including his work for a processing venture jointly owned by DFA with Pete Schenkel, then president of Suiza and bonuses paid based upon joint venture profits and volume of milk marketed by DFA;

- Bos was familiar with a prior antitrust lawsuit filed by Lonestar against DFA in 2000 [12];
- Bos is familiar with DFA business in general;

- Bos participated in DFA's plan to convert farmers to DMS;

- Bos signed the guarantee and indemnity portion of the outsourcing agreement between DMS and Dean;

---

[12] This "fact" offered by plaintiffs is a stark example of how plaintiffs misinterpret the facts which are established by the record. The fact relied upon by the plaintiffs in its statement of facts is: "In 2000, Lonestar sued DFA alleging that it, under Hanman's management and while Bos was CFO, unlawfully monopolized southeastern states, including Arkansas, Louisiana, Mississippi, and Missouri, and interfered with Lonestar's access to processing plants." From this "fact", plaintiffs argue that it is established that Bos was directly involved in every financial aspect of the conspiracy and his familiarity with this prior lawsuit "demonstrates that he knew that he was engaging in potential unlawful acts," a conclusion not even remotely justified by the "fact" offered by the plaintiffs. If such a conclusion were applicable, this would mean that any financial officer of any corporation which engaged in unlawful activity would be held responsible simply because of his or her knowledge of the financial aspects of the business. In addition, a conclusion that Bos knew of the unlawful nature of his acts cannot be established based on the fact that he knew that his employer had previously been sued.

- Bos personally negotiated the amount of "efficiency rebates" between Dean and DFA/DMS;

- Bos never saw any studies calculating any actual "efficiencies" but he nevertheless authorized the payment of "efficiency rebates";

- Bos participated in the DFA-Dean full requirements agreements [13];

- Bos helped to facilitate DFA's transfer of milk bottling plants to Suiza;

- Bos handled the financial and accounting aspects of the sale of DFA's interest in Suiza Dairy Group;

- Bos participated in the financial aspects of the acts related to the $28.5 million transaction related to "carve out" plants;

- Bos participated in the setting up of NDH, referred to by plaintiffs as a "FAUX competitor"

- Bos agreed with the multi-million dollar buyout of Noll's and Beshears's NDH ownership stake;

- Bos was motivated by the receipt of several million dollars in wages and bonuses by DFA, amounts that were significantly more than he had previously earned.

A review of these "facts" reveals very quickly why plaintiffs attempt to restate the Sixth Circuit's *Brown* standard. They repeatedly argue that Bos participated in financial aspects of the various dealings and agreements which they allege are part of the anticompetitive scheme. What they do not establish, however, is that Bos actively and knowingly participated in an anticompetitive scheme by at a minimum, demonstrating that he "exerted his influence so as to shape corporate

---

[13] Once again, the Court notes that plaintiffs' attempt to state the standard as one that requires "participation," not one that requires that the individual defendant "actively and knowingly" participate.

intentions." Plaintiffs view the standard as requiring that they simply show participation, not that they are not required to show influence on corporate intentions. Even if the acts complained of by the plaintiffs can be proven to be acts in furtherance of an anticompetitive scheme, plaintiffs have simply shown that Bos, "participated," sometimes intimately, in the financial planning and arrangements related to those acts. They have not shown, however, that he did anything more than would have been expected from a chief financial officer of any corporation, much less that his actions somehow influenced the corporate decisions that were made. Plaintiffs have engaged in "guilt by association", and they argue inferences to be drawn from the evidence which are unfair and strained to the point of not being justified or reasonable. They have, at best, offered evidence from which equally balanced inferences of anticompetitive and pro-competitive activity are established. Under the *Matsushita* standard, plaintiffs therefore fail in their burden and Bos's motion for summary judgment will be GRANTED.

G.     The Baird Motion, [Doc. 826]

James Baird ("Baird"), one of the individual defendants named by the plaintiffs, has also filed a separate motion for summary judgment raising issues not raised by the joint motion. In general, Baird alleges that he is entitled to summary judgment because the plaintiffs' circumstantial evidence regarding the formation and operation of SMA and the plaintiffs' claims of "sweetheart deals" merely show rational business decisions and that Baird had no rational economic motive to conspire. Plaintiffs predictably disagree and, on this motion, the Court agrees with the plaintiffs. Baird's supplemental motion for summary judgment will be DENIED.

Baird is a dairy farmer who was active in the formation of Lone Star Milk Producers ("LSMP") in 1997. LSMP is one of the fastest growing dairy cooperatives in the United States.

49

Baird also has ownership interest in hauling companies and has contracted with other cooperatives to manage the marketing of their milk. LSMP became a member of SMA in April, 2002. Plaintiffs argue that Baird was instrumental in the formation of SMA and has managed SMA through VFC Management, LLC ("VFC"), a for profit company owned by Baird and his daughter-in-law. Baird served on the operations committee of SMA as a representative for LSMP. Baird was named interim manager of SMA in April, 2006, and became a paid manager on January 1, 2007. One of Baird's hauling companies, Lone Star Milk Transport hauls milk for SMA.

In 2000, LSMP sued DFA alleging that it unlawfully monopolized milk in the Southeast. The suit was settled in 2001 with DFA paying LSMP $2.1 million. At about the same time as the LSMP/DFA settlement, the Suiza/Dean merger was ongoing. Suiza and DFA agreed that DFA would supply milk to the new entity. Plaintiffs allege that defendant formed SMA, controlled by DFA, to carry out the agreement and force independent cooperatives to market milk through SMA to have access to bottling plants. They essentially argue that Baird's loyalty to DFA had been acquired through the settlement of the prior lawsuit and that Baird used threats and coercion to induce various cooperatives to join SMA. Plaintiffs further claim that Baird has been paid millions of dollars in fees for his participation in the conspiracy and has made additional millions of dollars through his hauling companies and management fees.

Plaintiffs allege that Baird participated in the formation of SMA, threatened and coerced other cooperatives to join SMA and personally engaged in price fixing. The fact that he participated in the formation of SMA and persuaded others to join is not disputed. What does appear to be disputed is that Baird and DFA jointly maintained SMA through coercion and threats or that Baird colluded with DFA, Dean and DMS to fix prices and not to compete. Plaintiffs argue that Baird was motivated to

50

conspire by greed and that his actions increased his revenues and profits from managing cooperatives, protected his milk hauling revenues and profits and allowed him to diversify his business and earn millions of dollars through the use of VFC, his for profit management company.

Baird argues that his involvement in the formation and operation of SMA does not create an inference of involvement in an illegal antitrust conspiracy but rather that he was motivated to do what he did "so that all cooperatives could share in the access to bottlers without an erosion of the over order prices." He further argues that he was exercising wise business judgement and acted in the best interest of those he represented. Baird also claims that the personal financial reward to him resulted from rational business decisions and do not give rise to an inference of conspiratorial intent to harm dairy farmers. Lastly, Baird alleges that plaintiffs lack standing to pursue the alleged antitrust allegations against him.

The Court will not discuss in detail the competing views of the evidence between plaintiffs and Baird. They are clearly set out in the record. Nor will the Court discuss in detail the competing inferences which the parties consider reasonable for the jury to draw from the proof. Suffice it to say that the Court finds the record contains evidence which, if believed by the jury, would be sufficient evidence from which the jury could find that an illegal conspiracy existed, that Baird joined it, and that he personally participated in acts in furtherance of the conspiracy. The jury could also conclude that Baird took actions contrary to his own self interest absent a conspiracy and that he was motivated to conspire by the prospect of huge monetary gains.

The Court will briefly discuss, however, Baird's standing argument. Baird argues, without citation to any on-point authority, that any harm from any of Baird's conduct is too remote for a claim to be asserted by a cooperative member dairy farmer. That is so, he argues, because the direct victim

51

is the cooperative itself. To the extent dairy farmers desire relief, he asserts they should seek it through their cooperatives.

As noted above, Baird cites no authority for his argument that cooperative dairy farmer members are required to seek relief derivatively and the Court has found none. Indeed the only authority at the Circuit Court level which addresses the issue is the case cited by plaintiffs, *Alexander v. National Farmers Org.*, 687 F.2d 1173, 1208-09 (8th Cir. 1982), in which the Eighth Circuit found that dairy cooperative members have standing to pursue damages resulting from suppressed prices received for milk because such damages belong to members of dairy cooperatives, not the cooperative itself.[14] The Court finds the rational of ***Alexander*** persuasive.

### H.     The Hanman Motion, [Doc. 836]

Gary Hanman ("Hanman"), another of the individual defendants named by the plaintiffs, has, like Bos and Baird joined the joint motion of all other defendants for summary judgment and has also filed a motion for summary judgment raising issues not raised in the joint motion. Hanman raises two arguments in his motion for summary judgment. First, he argues that there is no basis for individual liability against him and, secondly, he argues that plaintiffs' claim for attempted monopoly/monopsony against him fails because he lacked market power. Given the Court's ruling with respect to the attempted monopoly/monopsony claim, the Court need not decide the second of the issues raised by Hanman.[15]

---

[14]     Plaintiffs state in their brief that many other cases reach the same conclusion. They do not, however, cite a single one of them.

[15]     Plaintiffs have, in response to Hanman's claim with respect to lack of market power for the claim of attempted monopoly/monopsony, responded that a showing of market power is not necessary to their ***conspiracy*** claim. This further bolsters the Court's prior decision that, in reality, plaintiffs claim is one for conspiracy to monopolize/monopsonize rather than attempt to monopolize/monopsonize.

52

Hanman was president and CEO of DFA from 1998 through 2005 and supervised and was responsible for managing DFA staff and management personnel. Under plaintiffs' theory, Hanman was one of the two individuals responsible for designing, initiating and driving the conspiracy alleged in this case. He developed the business plan of DFA which led to DFA doing various acts which are alleged to be in furtherance of the conspiracy; signed the full supply agreements and the amendments thereto; authorized and participated in the creation of NDH, alleged by plaintiffs to be a sham competitor which permitted Dean to merge with Suiza; authorized and participated in the creation of SMA; and made millions of dollars participating in the conspiracy. Hanman's salary while CEO of DFA ranged from approximately $850,000 in 1999 to more than $17 million in 2005. After his term as CEO ended, Hanman was a consultant for DFA for three years with a pay salary of $500,000 per year and the potential for making well in excess of $1,000,000.

The standard for individual liability for corporate officers is, as discussed above, set forth in *Brown v. Donco Enterprises, Inc.* Under the Sixth Circuit's holding, officers and agents may be held individually liable for corporate actions that violate the antitrust laws if they "actively and knowingly engaged in a scheme designed to achieve anti-competitive ends." *Brown*, 783 F.2d at 646. "[T]he evidence must demonstrate that a defendant exerted his influence so as to shape corporate intentions." *Id.* As discussed in the section on the Bos motion above, plaintiffs once again misstate the holding of *Brown* here; however, there are genuine issues of material fact with respect to Hanman's participation even under the correct statement of the *Brown* standard. Hanman's supplemental motion for summary judgment will, therefore, be DENIED.

## I. The SMA Motion, [Doc. 829]

SMA, in its supplemental motion for summary judgment, argues that there is no genuine issue

of material fact as to whether SMA joined in a conspiracy to suppress prices, even assuming the existence of such a conspiracy involving others.[16]  According to SMA, "[p]laintiffs' price fixing claims are rooted in the allegation that defendants conspired to fix and depress over order prices charged to dairy processors in the Southeast at artificially low levels."  SMA argues that its formation led to the preservation of over order prices at levels higher than would otherwise have been the case and that it has no role in the establishment of over order premiums, a process carried out by DCMA, an 11-member cooperative organization not named as a defendant in this litigation.  SMA also argues that its procurement of supplemental milk is consistent with industry standards and does not result in "flooding" of the Southeastern market.

The following statement of relevant facts is taken from the brief of the plaintiffs.  SMA is a marketing agency of dairy cooperatives, including DFA.  The day-to-day operations of SMA are handled by the "operations committee," which consists of non-farmer managers from the SMA cooperative members.  Baird has been a member of the operations committee since SMA's inception in April, 2002, until the present.  In April, 2006, Baird was formally appointed general manager of SMA.  Since January 1, 2007, Baird has managed SMA through VFC Management, a for-profit company owned by Baird and his daughter-in-law.  VFC charges a $.09/cwt. fee on all SMA cooperative member milk, which is used to fund a 15% profit guarantee to Baird on all milk marketed through SMA– approximately $9,000,000.00 in 2008 alone.

Defendants, including Dean Foods, formed and controlled SMA and forced previously independent cooperatives to market their milk through SMA in order to access bottling plants covered

---

[16]  SMA's supplemental motion relates only to Count Five, the § 2 claim.  SMA does not separately address the § 2 claims regarding monopolization and monopsonation which are addressed in the joint motions for summary judgment.

54

by DFA full-supply agreements. Because nearly all milk produced in the southeast is funneled through SMA (including the milk of DFA-controlled DMS, which is pooled in SMA), defendants used SMA to monitor and enforce their conspiracy, to flood the market with unneeded milk to further suppress prices, and to engage in other unlawful activities designed to eliminate competition and artificially reduce and fix milk prices.

Plaintiffs respond to SMA's argument by accusing SMA of misunderstanding fundamental rules of antitrust claim construction by viewing plaintiffs' "price-fixing" and "flooding" claims "in isolation of the seven other overt acts alleged in Count V" of plaintiffs' complaint. They also correctly argue that SMA, at least for the purpose of its supplemental motion, cannot show an absence of genuine issue of material fact as to the other five overt acts since the moving party bears the burden of showing that it is entitled to judgment as a matter of law. On this point, the Court agrees with plaintiffs. Defendants are accused of participation in a conspiracy. Assuming that plaintiffs can establish the existence of a conspiracy, a coconspirator is liable for all acts performed in furtherance of the conspiracy. *United States v. Hayter Oil Co.*, 51 F.3d 1265, 1271 (6th Cir. 1995) (citing *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946)). Each conspirator is liable for the overt acts committed by any member of the conspiracy, even if the defendant did not personally commit the acts. *United States v. Murphy*, 937 F.2d 1032, 1041 (6th Cir. 1991) (citing *Poliafico v. United States*, 237 F.2d 97, 104 (6th Cir. 1956) (Engle, J., dissenting)). It is not necessary that each conspirator know all the details of the conspiracy or all the participants involved. *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985).

Furthermore, SMA's claim also falls victim to the Supreme Court's admonition that a conspiracy case is to be judged by viewing it as a whole, not "by dismembering it and viewing its

55

separate parts." *Continental Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 698-99 (1962). Viewing the evidence as a whole, and not in isolation, the cumulative effect of all the evidence creates a genuine issue of material fact, even though some of the specific acts in furtherance of the conspiracy may not be illegal in themselves. *See American Tobacco Co. v. United States*, 147 F.2d 93, 107 (6th Cir. 1945) ("Acts done to give effect to the conspiracy may be, in themselves, wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition.").

The evidence presented by plaintiffs, when viewed as a whole, creates a genuine issue of material fact. The evidence, if believed by the jury, will establish that the defendants designed SMA with the goal of controlling 100% of the milk produced to eliminate the "independent" option, farmers were required to join SMA by coercion and threats, DFA controls SMA, SMA's pricing guidelines require its member cooperatives to charge customers the DCMA set over-order premiums, DCMA is DFA controlled, SMA monitors and enforces prices among its member cooperatives, and SMA provided price compilations to competitors.

The supplemental motion of SMA for summary judgment is DENIED.

So ordered.

ENTER:

s/J. RONNIE GREER<br>
UNITED STATES DISTRICT JUDGE

56